**No. 26-12062**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

THE C STORE DEPOT, INC., et al.,

Plaintiffs-Appellees,

v.

U.S. FOOD AND DRUG ADMINISTRATION, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Middle District of Florida

# BRIEF FOR APPELLANTS


BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7213*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2495*

*Of Counsel:*

ROBERT FOX FOSTER
Acting General Counsel
U.S. Department of Health and
Human Services

SEAN R. KEVENEY
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

BARBARA ALKALAY
JAMES ALLRED
Senior Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD 20993-0002

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, undersigned counsel certifies that the following persons have an interest in the outcome of this appeal:

Alkalay, Barbara

Allred, James Stephen

Callinan, Ryan Dillon

Diamantas, Kyle, Acting Commissioner of Food and Drugs

Foster, Robert Fox

Fraser, James C.

Hallmark, Brandon

Harwell, Lacy R.

Heyer, Eric N.

Kehoe, Gregory W.

Kennedy, Robert F. Jr., Secretary of the U.S. Department of Health and Human Services

Keveney, Sean

Matulis, James Michael

Matulis, Stacy

Scriven, Mary S., U.S. District Judge

Shams, Sophia

Shumate, Brett A.

Smith, Joseph A.

Tenny, Daniel

The C Store Depot, Inc.

United States Food and Drug Administration

United States Department of Health and Human Services

Vicente, Wendy

Wise, Mamie V.

Zest Brands LLC

## STATEMENT REGARDING ORAL ARGUMENT

The district court erroneously concluded that plaintiffs were likely to succeed on their challenge to the validity of a Food and Drug Administration regulation. The Fifth Circuit recently rejected a similar challenge to the one at issue in this case. The government believes that oral argument would be beneficial to the Court in this case.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ... 1

STATEMENT OF JURISDICTION ... 2

STATEMENT OF THE ISSUE ... 3

STATEMENT OF THE CASE ... 4

A. Statutory Background ... 4

B. Regulatory Background ... 7

C. Prior Proceedings ... 13

D. Standard of Review ... 18

SUMMARY OF ARGUMENT ... 18

ARGUMENT ... 21

I. Plaintiffs Are Not Likely To Succeed In Their Challenge To The Refuse-to-File Letter ... 22

A. FDA's Certification of the PMTA rule satifies the Regulatory Flexibility Act ... 22

B. The district court wrongly concluded otherwise. ... 28

II. The Equities Do Not Favor Injunctive Relief ... 40

CONCLUSION ... 46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aeronautical Repair Station Ass'n v. FAA*,
494 F.3d 161 (D.C. Cir. 2007) .................... 23-24

*Alenco Commc'ns, Inc. v. FCC*,
201 F.3d 608 (5th Cir. 2000) .................... 7, 23

*Am. Hosp. Ass'n v. Azar*,
983 F.3d 528 (D.C. Cir. 2020) .................... 25

*Associated Fisheries of Me., Inc. v. Daley*,
127 F.3d 104 (1st Cir. 1997) .................... 7, 39

*Carpenter, Chartered v. Secretary of Veteran Affs.*,
343 F.3d 1347 (Fed. Cir. 2003) .................... 24

*Cement Kiln Recycling Coal. v. EPA*,
255 F.3d 855 (D.C. Cir. 2001) .................... 31

*Cigar Ass'n of America v. FDA*,
150 F.4th 68 (D.C. Cir. 2021) .................... 32

*Colorado ex rel. Colo. State Banking Bd. v. Resolution Tr. Corp.*,
926 F.2d 931 (10th Cir. 1991) .................... 24

*Council for Urological Ints. v. Burwell*,
790 F.3d 212 (D.C. Cir. 2015) .................... 24, 25

*Department of Com. v. New York*,
588 U.S. 752 (2019) .................... 37

*Environmental Def. Ctr., Inc. v. U.S. EPA*,
344 F.3d 832 (9th Cir. 2003) .................... 24

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................... 22, 25, 39

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) .................... 4

*Florida Manufactured Hous. Ass'n v. Cisneros*,
53 F.3d 1565 (11th Cir. 1995) .......... 39

*Florida Preborn Rescue, Inc. v. City of Clearwater*,
161 F.4th 732 (11th Cir. 2025) .......... 18

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024) .......... 21

*Kealani Distrib., LLC v. FDA*,
168 F.4th 741 (5th Cir. 2026) .......... 1, 7, 19, 22, 23, 24, 25, 28, 32, 40

*Mid-Tex Elec. Coop., Inc. v. FERC*,
773 F.2d 327 (D.C. Cir. 1985) .......... 29, 31

*National Mining Ass'n v. Secretary of Lab.*,
153 F.3d 1264 (11th Cir. 1998) .......... 24

*National Tel. Coop. Ass'n v. FCC*,
563 F.3d 536 (D.C. Cir. 2009) .......... 7, 23, 24, 25

*Nicopure Labs, LLC v. FDA*,
944 F.3d 267 (D.C. Cir. 2019) .......... 35

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 21

*Northport Health Servs. of Ark., LLC v. U.S. Dep't of Health & Hum. Servs.*,
14 F.4th 856 (8th Cir. 2021) .......... 24, 27

*Rural Cellular Ass'n v. FCC*,
588 F.3d 1095 (D.C. Cir. 2009) .......... 39

*Salt Lake Trib. Publ'g Co. v. AT & T Corp.*,
320 F.3d 1081 (10th Cir. 2003) .......... 43

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty*,
605 U.S. 168 (2025) .......... 25, 39

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) .......... 43

*Southwestern Pa. Growth All. v. Browner*,
121 F.3d 106 (3d Cir. 1997) .................................................... 24, 28, 29

*Stone v. Commissioner*,
86 F.4th 1320 (11th Cir. 2023) .................................................... 44

*Swain v. Junior*,
958 F.3d 1081 (11th Cir. 2020) .................................................... 21

*United States v. Texas*,
599 U.S. 670 (2023) .................................................... 44

*U.S. Cellular Corp. v. FCC*,
254 F.3d 78 (D.C. Cir. 2001) .................................................... 24

*ValueVision Int'l, Inc. v. FCC*,
149 F.3d 1204 (D.C. Cir. 1998) .................................................... 26

**Statutes:**

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. P, tit. I, subtitle B, 136 Stat. 49
§ 111(a), 136 Stat. at 789 .................................................... 12, 13, 41, 44
§ 111(d)(2)(B), 136 Stat. at 790 .................................................... 13
§ 111(e), 136 Stat. at 790 .................................................... 13, 15

Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009) (21 U.S.C. § 387 *et seq.*) .................................................... 1, 4
§ 2(1)-(6), 123 Stat. 1777 .................................................... 4
§ 2(15), 123 Stat. 1777 .................................................... 4
§ 2(38)-(42), 123 Stat. 1780 .................................................... 4
§ 2(47)-(49), 123 Stat. 1781 .................................................... 4
21 U.S.C § 321(rr)(1) .................................................... 4
21 U.S.C. § 321(rr)(1) (2009) .................................................... 8
21 U.S.C. § 381(a) .................................................... 41
21 U.S.C. § 387a(a)-(b) .................................................... 4
21 U.S.C. § 387a(b) .................................................... 5, 7
21 U.S.C. § 387j(a)(1) .................................................... 5
21 U.S.C. § 387j(a)(2) .................................................... 5, 20, 41
21 U.S.C. § 387j(b) .................................................... 14
21 U.S.C. § 387j(b)(1) .................................................... 5

21 U.S.C. § 387j(b)(1)(A) .......... 10, 20, 33
21 U.S.C. § 387j(c) .......... 45
21 U.S.C. § 387j(c)(2) .......... 33
21 U.S.C. § 387j(c)(2)(A) .......... 5, 10, 38
21 U.S.C. § 387j(c)(4) .......... 6, 10, 33, 44

Regulatory Flexibility Act
5 U.S.C. § 603(a) .......... 6
5 U.S.C. § 603(b)(3) .......... 29
5 U.S.C. § 603(b)(4) .......... 29
5 U.S.C. § 604(a) .......... 6, 23
5 U.S.C. § 604(a)(4) .......... 29
5 U.S.C. § 605(b) .......... 6, 7, 19, 23, 26
5 U.S.C. § 611(a)(1)-(2) .......... 37
5 U.S.C. § 611(b)-(c) .......... 37

5 U.S.C. § 706(2)(A) .......... 22

28 U.S.C. § 1292(a)(1) .......... 2

28 U.S.C. § 1331 .......... 2

**Regulations:**

21 C.F.R. § 1114.7 .......... 14

21 C.F.R. § 1114.7(k) .......... 10

21 C.F.R. § 1114.9 .......... 10

21 C.F.R. § 1114.15(c)(1)(v) .......... 11

21 C.F.R. § 1114.15(e) .......... 11

21 C.F.R. § 1114.17 .......... 10

21 C.F.R. § 1114.27(b)(1)(i) .......... 10, 45

**Rules:**

Fed. R. App. P. 4(a)(1)(B)(iv) .......... 2

Fed. R. Civ. P. 65(c) .......... 18

**Other Authorities:**

FDA, Dep't of Health & Hum. Servs.:

*Enforcement Priorities for Certain New Tobacco Products Marketed Without Premarket Authorization: Guidance for Industry* (May 2026), https://perma.cc/UK3K-Z6W7 .......... 42

No. FDA-2014-N-0189, *Deeming Tobacco Products to be Subject to the Food, Drug, and Cosmetic Act* (May 2016), https://perma.cc/GX7M-ZMDQ .......... 8, 31-32, 34-35

No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Final Rule* (Oct. 5, 2021), https://perma.cc/64PU-LX39 .......... 11-12, 26, 27-28, 34, 36, 37

No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Proposed Rule* (Sep. 25, 2019), https://perma.cc/XB6B-SNK5 .......... 9

81 Fed. Reg. 28974 (May 10, 2016) .......... 7, 8, 35

84 Fed. Reg. 50566 (Sep. 25, 2019) .......... 8, 9, 33

86 Fed. Reg. 55300 (Oct. 5, 2021) .......... 1, 4, 9, 10, 11, 25-26, 27, 34, 36, 45

88 Fed. Reg. 16551 (Mar. 20, 2023) .......... 13

## INTRODUCTION

Plaintiffs seek to market synthetic nicotine pouches, which Congress has expressly made unlawful absent premarket authorization by the Food and Drug Administration (FDA). Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009) (codified as amended at 21 U.S.C. § 387 *et seq.*) (Tobacco Control Act). The substantive standard for premarket authorization is set out by statute. In this litigation, plaintiffs challenge FDA's implementing regulation, the Premarket Tobacco Product Application and Recordkeeping Rule, 86 Fed. Reg. 55300 (Oct. 5, 2021) (PMTA rule), which describes with more particularity the types of information that applicants should submit to satisfy the statutory standard. And plaintiffs do not challenge the regulation on the merits, but instead on the ground that FDA inadequately complied with the Regulatory Flexibility Act, which imposes requirements on agencies to consider the effects of rules on small businesses.

As the Fifth Circuit recently recognized, FDA complied with the Regulatory Flexibility Act's "purely procedural requirements" when it certified that the PMTA rule would not have a "significant economic impact on a substantial number of small entities." *Kealani Distrib., LLC v. FDA*, 168 F.4th 741, 746, 748-49. (5th Cir. 2026) (quotation marks omitted). FDA substantiated that conclusion by explaining that the costs for small businesses arise from the Tobacco Control Act,

which imposes the substantive requirements for FDA premarket authorization, not from the rule, which merely clarifies how the statute will be implemented and, if anything, may reduce costs by making statutory requirements clearer. FDA's conclusion was thus reasonable and reasonably explained.

The district court's contrary decision stems from its misunderstanding that FDA's rule imposes various costs and burdens on plaintiffs. In reality, the Tobacco Control Act imposes the requirements for premarket authorization and the standard for product authorization, and the PMTA rule merely reiterates those requirements and clarifies the process for applying them. And the court inexplicably blamed FDA for not considering plaintiffs' products in particular in connection with the rulemaking, even though at the time of the rulemaking, plaintiffs' products were not subject to the Tobacco Control Act or the rule at all.

This Court should accordingly vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. On April 10, 2026, the district court entered a preliminary injunction barring FDA from enforcing the refuse-to-file letter against plaintiffs. Dkt. 61. The government filed a timely notice of appeal on June 9, 2026. Dkt. 62; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

The Tobacco Control Act generally requires FDA premarket authorization for new tobacco products. Pursuant to the Act, FDA has promulged regulations concerning premarket authorization, including the 2021 PMTA rule, which seeks to streamline the premarket authorization process by, among other things, describing the information that must be included in a PMTA so FDA can determine whether a product meets the Tobacco Control Act's requirements. Plaintiffs manufacture and sell oral synthetic nicotine pouches, which became subject to the Tobacco Control Act's premarket authorization requirements and relevant regulations as a result of Congress's 2022 amendment. The questions presented are:

**1.** Whether FDA violated the Regulatory Flexibility Act by failing to preemptively consider the economic impact of its PMTA rule on plaintiffs' oral synthetic nicotine products, which were not subject to the rule at the time it was issued and only became subject to the rule as a result of Congress's later statutory amendment.

**2.** Whether FDA satisfied the Regulatory Flexibility Act by certifying that the PMTA rule will not have a significant impact on a substantial number of small entities and explaining its reasons for concluding that the rule "will generate net

benefits or negligible net costs for most affected small entities." 86 Fed. Reg. at 55405.

## STATEMENT OF THE CASE

### A. Statutory Background

**1.** The Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (2009) (codified as amended at 21 U.S.C. § 387 *et seq.*), establishes a comprehensive scheme for the regulation of tobacco products, which Congress has broadly defined to include "any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption." 21 U.S.C § 321(rr)(1). Recognizing the health risks inherent in these products, the tobacco industry's history of unsubstantiated and misleading claims, and the special hazards presented to children, *see* Tobacco Control Act § 2(1)-(6), (15), (38)-(42), (47)-(49), 123 Stat. at 1777-78, 1780-81, Congress legislated a series of requirements governing the manufacture, labeling, and marketing of tobacco products, and gave FDA "broad discretion" with respect to their regulation, *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 571 (2025).

The Tobacco Control Act was immediately applicable to certain categories of tobacco products, including conventional cigarettes and smokeless tobacco. 21 U.S.C. § 387a(a), (b). Congress also authorized FDA to bring within the scope of

the Act "any other tobacco products that the Secretary by regulation deems to be subject to this subchapter." *Id.* § 387a(b).

As relevant here, the Tobacco Control Act requires premarket FDA review before "new tobacco product[s]" may be introduced into interstate commerce. 21 U.S.C. § 387j(a)(2). A "new tobacco product" is defined as a tobacco product that was "not commercially marketed in the United States as of February 15, 2007[,]" or was modified after that date. *Id.* § 387j(a)(1). Applications to market a new tobacco product must include, among other information, "full reports of all information … concerning investigations which have been made to show the [product's] health risks"; a statement of the product's ingredients, components, and principles of operation; specified manufacturing information; and samples of the product and its proposed labeling. *Id.* § 387j(b)(1). By statute, FDA must deny an application if the product does not conform to manufacturing requirements or product standards, its labeling is false or misleading, or the applicant has failed to show that marketing of the product "would be appropriate for the protection of the public health." *Id.* § 387j(c)(2)(A).

In determining whether the marketing of a product would be appropriate for the protection of the public health, FDA must consider "the risks and benefits to the population as a whole, including users and nonusers of the tobacco product," and must take into account "(A) the increased or decreased likelihood that existing

users of tobacco products will stop using such products; and (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products." 21 U.S.C. § 387j(c)(4).

**2.** The Regulatory Flexibility Act generally requires agencies to consider the impact of their notice and comment rulemaking on small businesses. An agency ordinarily must "prepare and make available for public comment" along with any notice of proposed rulemaking "an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). When promulgating a final rule that was the subject of a proposed rule, agencies must likewise publish a final regulatory flexibility analysis that contains, among other things, "a statement of the need for, and objectives of, the rule"; "a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis" and the agency's response to those issues; and a description of the rule's effect on small entities and the steps the agency has taken to minimize the rule's significant economic impact on such entities. *Id.* § 604(a).

The Regulatory Flexibility Act further provides that those requirements "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). In that event, the agency

must publish the certification "along with a statement providing the factual basis for such certification" in the Federal Register at the time it publishes the proposed or final rule. *Id.* Accordingly, no initial or final regulatory flexibility analysis is required for rules that the agency certifies will not have a significant economic impact on a substantial number of small entities.

Courts have characterized the Regulatory Flexibility Act's requirements as procedural rather than substantive. *See, e.g.*, *National Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009); *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000); *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997). Thus, courts have reviewed agency compliance "only to determine whether an agency has made a reasonable, good-faith effort to carry out the mandate of the [Act]." *Kealani Distrib., LLC v. FDA*, 168 F.4th 741, 746 (5th Cir. 2026) (quotation marks omitted).

### B. Regulatory Background

**1.** As noted above, the Tobacco Control Act automatically applied only to a defined set of tobacco products. In May 2016, FDA exercised its authority under 21 U.S.C. § 387a(b) to deem all products meeting the definition of "tobacco product," excluding accessories of such products, to be subject to the Tobacco Control Act. Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act, 81 Fed. Reg. 28974, 28975 (May 10, 2016) (deeming rule). At

that time, "tobacco product" was defined as "any product made or derived from tobacco that is intended for human consumption, including any component, part, or accessory of a tobacco product (except for raw materials other than tobacco used in manufacturing a component, part, or accessory of a tobacco product)." 21 U.S.C. § 321(rr)(1) (2009). Among the products made subject to the Tobacco Control Act by the deeming rule were certain dissolvables, gels, waterpipe tobacco, electronic nicotine delivery systems (like e-cigarettes, vape pens, and e-hookahs), and pipe tobacco. 81 Fed. Reg. at 28976. FDA prepared and published a regulatory impact analysis for the deeming rule, in which the agency predicted that, by making the Tobacco Control Act's requirements applicable to all products meeting the statutory definition of "tobacco product," the deeming rule would "have a significant economic impact on a substantial number of small entities," and would prompt "significant product exit and reduced entry." FDA, Dep't of Health & Hum. Servs., No. FDA-2014-N-0189, *Deeming Tobacco Products to be Subject to the Food, Drug, and Cosmetic Act* 4, 20, (May 2016), https://perma.cc/GX7M-ZMDQ.

**2.** FDA issued a notice of proposed rulemaking in September 2019 to clarify and streamline the content and review process for PMTAs. 84 Fed. Reg. 50566, 50567-68 (Sep. 25, 2019). FDA explained that it had received "thousands of premarket applications that range widely in the level of detail they contain,"

with some containing "very little of the information that is necessary for FDA to complete its statutorily required review, while other applications are more detailed and provide the necessary sufficient supporting information." *Id.* at 50567. FDA thus "develop[ed] the proposed rule, which describes the information" that "an applicant must include in a PMTA for FDA to be able to complete a substantive review of an application" under the statutory standard. *Id.* FDA prepared a preliminary regulatory impact analysis and initial regulatory flexibility analysis, and proposed certifying that the proposed rule, if adopted, "would not have a significant economic impact on a substantial number of small entities." FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Proposed Rule* 6 (Sep. 25, 2019), https://perma.cc/XB6B-SNK5.

After considering public comments, FDA made that certification in the final rule, which the agency issued in October 2021 "to improve the efficiency of the submission and review of PMTAs." 86 Fed. Reg. at 55301(Oct. 5, 2021). The rule has three broad purposes. First, FDA sought to clarify the required contents to "provide applicants with a better understanding of the information a PMTA must contain." *Id.* To that end, the rule "describes and sets forth content and format requirements for PMTAs and includes FDA's interpretations of various provisions." *Id.* Consistent with the Tobacco Control Act, the rule directs

applicants to "submit detailed information regarding the physical aspects of its new tobacco product and full reports of information regarding investigations that may show the health risks of the new tobacco product and whether it presents the same or different risks compared to other tobacco products," so that FDA can assess whether marketing the product is appropriate for the protection of the public health. *Id.*; *see also* 21 C.F.R. § 1114.7(k); 21 U.S.C. § 387j(b)(1)(A), (c)(2)(A), (c)(4). Second, the rule provides various procedures with respect to FDA's review of PMTAs to assist in streamlining the process. For example, the rule provides procedures for amending and resubmitting PMTAs, 86 Fed. Reg at 55301, and allows applicants to "submit a single premarket submission for multiple products (*i.e.*, a bundled PMTA)," among other measures, *id.* at 55317. *See* 21 C.F.R. §§ 1114.9 (amendments) and 1114.17 (resubmissions). And as relevant here, the rule provides that "FDA will make a threshold determination of whether the application contains sufficient information to permit a substantive review" and, where FDA determines that a PMTA "does not contain sufficient information … to permit a substantive review of the application" in accordance with the Tobacco Control Act, "may refuse to file a PMTA." 21 C.F.R. § 1114.27(b)(1)(i); *see also* 86 Fed. Reg at 55315 (similar). Third, the rule includes various postmarket requirements, such as the retention and maintenance of certain records as well as

postmarket reporting requirements. 86 Fed. Reg at 55301; 21 C.F.R. § 1114.15(c)(1)(v), (e).

FDA provided a factual basis for its certification that the final rule was not expected to have a significant economic impact on a substantial number of small businesses. 86 Fed. Reg. at 55405. The agency explained that it "already included the costs to submit and review PMTAs for deemed tobacco products in the final [regulatory impact analysis]" for the deeming rule, which made the Tobacco Control Act's premarket review provisions applicable to all tobacco products (except accessories), as defined by the Act, and which was expected to impose significant costs on regulated entities. *Id.* By contrast, the agency predicted that the PMTA rule, which primarily fleshes out the requirements already in place, "will generate" only "incremental costs related to the preparation of PMTAs for [electronic nicotine delivery systems]." *Id.* Because the PMTA rule is generally expected to promote efficiency in preparing and reviewing applications, FDA predicted "that the final rule will generate net benefits or negligible net costs for most affected small entities." *Id.*

FDA prepared a final regulatory impact analysis to accompany the final PMTA rule that addressed the rule's impact on small entities and responded to comments questioning FDA's assessment of the rule's costs. FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product*

*Applications and Recordkeeping Requirements: Final Rule* (Oct. 5, 2021), https://perma.cc/64PU-LX39. In that analysis, FDA reiterated its determination that "[t]he Deeming Rule will cause many existing firms to exit the market, creating significant market consolidation." *Id.* at 42. And it explained that the substantial impacts of premarket authorization requirements on small entities "are attributable to the Deeming Rule," not the PMTA rule, and so they need not be assessed in the regulatory impact analysis for the latter. *Id.* at 41-42; *see also id.* at 12-13. FDA ultimately anticipated that "most small entities" subject to the PMTA rule "will either benefit from the final rule or will incur small annualized costs of approximately $2,000." *Id.* at 44. FDA accordingly "certif[ied] that the final rule will not have a significant economic impact on a substantial number of small entities." *Id.*

**3.** In 2022, Congress expanded the Tobacco Control Act's definition of "tobacco product" to include products "containing nicotine from any source." Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. P, tit. I, subtitle B, § 111(a), 136 Stat. 49, 789. Congress specified that, as result of the amendment, tobacco products containing nicotine from any source are now subject to the provisions of the Tobacco Control Act as well as "all requirements of regulations for tobacco products," and Congress directed FDA to "publish a notice in the Federal Register to update the Code of Federal Regulations to reflect such

deemed amendment to existing regulations and guidance." *Id.* § 111(e), 136 Stat. at 790. While the amendment took effect on April 14, 2022, Congress authorized a 90-day transition period following the effective date during which manufacturers could continue to market non-tobacco nicotine products without prior authorization. *Id.* at § 111(d)(2)(B), 136 Stat. at 790. FDA accordingly issued a notice "updating the definition of 'tobacco product' in regulations issued, in whole or in part, under the [Tobacco Control Act], to reflect the amendments made by the Appropriations Act." Definition of the Term "Tobacco Product" in Regulations Issued Under the Federal Food, Drug, and Cosmetic Act, 88 Fed. Reg. 16551, 16551 (Mar. 20, 2023).

### C. Prior Proceedings

**1.** Plaintiffs are small businesses that manufacture and distribute oral synthetic nicotine pouches. Dkt. 55, at 2, 4, 22. These products do not contain tobacco plant material but instead contain synthetic nicotine, *id.* at 22, and thus qualify as tobacco products under the 2022 statutory amendment, *see* Pub. L. No. 117-103, § 111(a), 136 Stat. at 789. Pursuant to the Tobacco Control Act, plaintiffs submitted a bundled PMTA in 2022 seeking authorization to market their tobacco products. Dkt. 55, at 22. In 2026, FDA issued a letter refusing to file plaintiffs' PMTAs on the basis that the "applications lack the … required information necessary for substantive scientific review" as provided by the

Tobacco Control Act and explained in the PMTA rule. Dkt. 57-3, at 8 (first citing 21 U.S.C. § 387j(b); and then citing 21 C.F.R. § 1114.7). Specifically, the letter explains that [redacted][1]

Plaintiffs filed suit challenging FDA's refusal to file their PMTAs on the basis that the PMTA rule, which authorizes FDA to refuse to file deficient applications, was promulgated in violation of the Regulatory Flexibility Act and the Administrative Procedure Act (APA). *See generally* Dkt. 55. Plaintiffs sought a temporary restraining order, which the district court granted. Dkts. 31, 57. Plaintiffs then sought a preliminary injunction, and the parties agreed to an extension of the temporary restraining order through April 10, 2026. Dkts. 33, 59.

[1] This case was previously filed under seal, but the district court has since allowed the parties to separately docket redacted copies of certain documents. Dkt. 54. The docket numbers for some of the sealed documents do not appear on the documents or docket sheet. We have accordingly cited to them here by their name and date. These documents can be viewed in the separately filed sealed appendix.

**2.** The district court subsequently granted plaintiffs' motion for a preliminary injunction and stayed the refuse-to-file letter pending final judgment in the case. Although the court acknowledged that plaintiffs' products only became subject to the Tobacco Control Act's and PMTA rule's requirements due to Congress's expansion of "the definition of tobacco products," Dkt. 61, at 5, the court determined that FDA erred in failing to consider the effect of the PMTA rule—which predates the 2022 amendment—on plaintiffs' products, *see id.* at 13-14. According to the court, Congress's 2022 amendment did not exempt FDA from having to consider the impact of the premarket authorization requirements on synthetic new tobacco products such as plaintiffs'. *Id.* at 10. And the court further concluded that Congress did not "ratif[y] the PMTA Rule by subjecting synthetic nicotine products to 'all requirements of regulations for tobacco products.'" *Id.* (quoting Pub. L. No. 117-103, § 111(e), 136 Stat. at 790).

Having concluded FDA was required to consider the impact of premarket authorization requirements with respect to plaintiffs' products, the district court held that plaintiffs "are likely to prevail on their argument that the [PMTA rule] was arbitrary [and] capricious." Dkt. 61, at 13. The court acknowledged that FDA has certified under Section 605 of the Regulatory Flexibility Act that the PMTA rule would not have a significant economic impact on small entities and provided a factual statement to support its certification. *Id.* And the court further recognized

"that substantive disagreements with the FDA's factual basis for its certifications are outside of the scope of judicial review" under the Regulatory Flexibility Act. *Id.* at 17 (quotation marks omitted). But the court concluded that FDA's certification was "facially false" and thus "does not have the force of a certification." *Id.* at 18. Specifically, the court found that FDA erroneously attributed any costs resulting from the requirement to prepare and submit PMTAs for newly deemed tobacco products to the deeming rule, which "only performed a cost-analysis on [electronic nicotine delivery systems] and e-liquid products" and "expressly declined to perform a cost-analysis on any novel tobacco products, such as Plaintiffs' products." *Id.* at 13. Because FDA "never prepared a regulatory flexibility analysis for novel tobacco products," the court held that FDA was required to perform such an analysis when promulgating the PMTA rule. *Id.* at 18.

The district court also noted that the deeming rule "did not specify the investigations or specific studies a PMTA would require for approval." Dkt. 61, at 14. The court relied on a letter by the Small Business Administration (SBA) objecting to FDA's statement that the costs of premarket authorization were due to the deeming rule rather than the PMTA rule, as well as expert testimony provided by plaintiffs stating that "a PMTA would cost between $3,000,000 and $13,000,000," and that plaintiffs' expert "is not aware of the FDA ever accepting a PMTA that did not include a clinical study." *Id.* at 15-16 (quotation marks

omitted). Given what it considered to be the high costs and burdens of submitting PMTAs, the court concluded that FDA's factual statement supporting its certification that the rule would not have a significant economic impact on a substantial number of small entities was based on "false premises." *Id.* at 15.

The district court assessed the remaining equitable factors and found that they also favor a preliminary injunction. The court determined that plaintiffs would suffer various economic harms absent a stay of the refuse-to-file letter, which the district court characterized as "expressly prohibit[ing] Plaintiffs from continuing to sell their products." Dkt. 61, at 20. And the court further concluded that a continued stay is necessary for plaintiffs to be able to "import the necessary components of their products." *Id.* The court also found that plaintiffs "would suffer reputational harm" absent an injunction. *Id.* at 21. None of these harms, the district court concluded, would be remediable were plaintiffs to ultimately prevail on the merits. *Id.* at 19-21. And the district court determined that "the balance of hardship and public interest factors weigh in favor" of a preliminary injunction because the government "must comply with the law and applicable rules." *Id.* at 22. The court rejected any wrongdoing by plaintiffs' continued marketing of their products, stating that "if Plaintiffs' conduct is illegal, it is only illegal as a result of a challenged agency action which this Court has found likely to be arbitrary and capricious." *Id.* at 23. And the court cited FDA's lack of enforcement against

"similar novel nicotine products available on the market" to mean that "FDA will suffer no harm from an order merely preserving the status quo." *Id.* at 23-24.

The district court accordingly entered a preliminary injunction staying the refuse-to-file letter issued to plaintiffs pending final judgment of the case and waiving the security required by Federal Rule of Civil Procedure 65(c). Dkt. 61, at 25.

### D. Standard of Review

Although this Court "generally review[s] preliminary injunctions only for an abuse of discretion," it reviews "de novo the legal conclusions on which they are based." *Florida Preborn Rescue, Inc. v. City of Clearwater*, 161 F.4th 732, 738 n.1 (11th Cir. 2025) (italics and quotation marks omitted). Under this standard, reversal is warranted where "the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Id.* (quotation marks omitted).

## SUMMARY OF ARGUMENT

The district court erroneously issued a preliminary injunction staying FDA's refuse-to-file letter issued to plaintiffs on the basis that the PMTA rule, which authorizes such letters, was promulgated in violation of the Regulatory Flexibility Act.

**I.** Plaintiffs are not likely to succeed on their claim that the PMTA rule was promulgated in violation of the Regulatory Flexibility Act and the APA.

**A.** The Regulatory Flexibility Act imposes certain procedural requirements during agency rulemaking to ensure agencies consider the economic impacts of their rules on small entities. FDA complied with the Act's requirements when it certified that the PMTA rule, which clarifies the Tobacco Control Act's requirements for premarket authorization for certain tobacco products and imposes various administrative rules for streamlining FDA's review of applications, would not have a "significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). The Fifth Circuit has accordingly held that FDA's certification of the PMTA rule complies with the Regulatory Flexibility Act's requirements. *Kealani Distrib., LLC v. FDA*, 168 F.4th 741, 746 (5th Cir. 2026).

**B.** The district court's contrary decision rests on several misunderstandings regarding the PMTA rule and the source of premarket authorization requirements. Although the district court faulted FDA for not considering in its PMTA rule the impact of extending premarket authorizations to products such as plaintiffs', it was Congress, not FDA, that subjected plaintiffs' products to these requirements. The requirement to seek FDA premarket authorization is imposed by the Tobacco Control Act, to which plaintiffs' products became subject in 2022 as a result of Congress's amendment to the statute. FDA thus had no occasion—and was under

no obligation—to consider plaintiffs' products in its PMTA rule, which was promulgated *before* 2022 and thus before plaintiffs' products were even subject to the Tobacco Control Act's premarket authorization requirements.

The district court further erred in attributing to the PMTA rule the costs and burdens of submitting health-risk investigations and studies as part of seeking premarket authorization. Again, the Tobacco Control Act imposes the requirements for premarket authorization, including the requirement that applicants submit health risk information regarding their products. *See* 21 U.S.C. § 387j(a)(2), (b)(1)(A). The PMTA rule does not change any of these requirements; instead, the rule merely clarifies what health-risk information is necessary for FDA to properly assess an application in accordance with the statutory standards. Providing that clarification does not increase costs but rather, as FDA explained, is likely to be neutral or even a net cost savings. In addition to improperly expanding the record, the district court's reliance on expert testimony was erroneous because it focused on the absolute costs of compliance with the rule rather than whether the PMTA rule meaningfully increased those costs. And even if FDA's prediction of likely costs had turned out to be incorrect in some respect, the district court identified nothing remotely resembling the sort of abdication of responsibility that would entitle plaintiffs to relief based on the Regulatory Flexibility Act.

**II.** The district court further erred in its assessment of the equities, which do not favor injunctive relief. Because the general requirements for plaintiffs' products come from the Tobacco Control Act rather than the PMTA rule, the district court's injunction staying the refuse-to-file letter does not actually relieve plaintiffs of any of their alleged economic harms. Moreover, plaintiffs' asserted reputational harms are unsubstantiated and self-inflicted. In contrast, the preliminary injunction harms the government and public interest by preventing the orderly disposition of plaintiffs' application.

## ARGUMENT

As this Court has recognized, a "preliminary injunction is appropriate only when the moving party can show that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (quotation marks omitted). The "first two factors are 'the most critical,'" and the third and fourth factors merge in cases in which "the government is the party opposing the preliminary injunction." *Swain v. Junior*, 958 F.3d 1081, 1088, 1091 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434-45 (2009)).

## I. Plaintiffs Are Not Likely To Succeed In Their Challenge To The Refuse-To-File Letter

The district court wrongly concluded that plaintiffs were likely to succeed in their argument that the PMTA rule was promulgated in violation of the Regulatory Flexibility Act. FDA satisfied the Act's requirements when it certified that the PMTA rule, which clarifies how FDA intends to apply the statutory standard but does not make any substantive changes, would not have a substantial economic impact on a significant number of small entities. The Fifth Circuit has rejected a similar Regulatory Flexibility Act challenge to the PMTA rule. *Kealani Distrib., LLC v. FDA*, 168 F.4th 741, 746 (5th Cir. 2026).

### A. FDA's Certification of the PMTA rule satisfies the Regulatory Flexibility Act.

**1.** Under the APA, courts may review whether an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Part of this consideration is whether the agency has "reasonably considered the relevant issues." *Id.* Judicial review under this standard is "deferential," and "a court may not substitute its own policy judgment for that of the agency." *Id.*

The Regulatory Flexibility Act "makes the interests of small businesses a 'relevant factor' for certain rules." *Kealani*, 168 F.4th at 747 (quotation marks omitted). The Act generally requires that an agency consider the impact of a proposed or final rule on small entities subject to the rule. An agency may do so in one of two ways: either by publishing a "regulatory flexibility analysis" that, among other things, estimates and analyzes the effects of the rule on small entities to which the rule will apply, 5 U.S.C. § 604(a), or by "certif[ying] that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities," *id.* § 605(b). In the latter event, the agency must publish the certification "along with a statement providing the factual basis for such certification" in the Federal Register at the time it publishes the proposed or final rule. *Id.* Accordingly, no initial or final regulatory flexibility analysis is required for rules that the agency certifies will not have a significant economic impact on a substantial number of small entities and supports that certification with a factual statement.

Numerous courts have characterized the Regulatory Flexibility Act as "a procedural rather than substantive agency mandate." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000); *see National Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). That is because, while the statute sets out "precise, specific steps an agency must take," *Aeronautical Repair Station Ass'n v.*

*FAA*, 494 F.3d 161, 178 (D.C. Cir. 2007), it "imposes no substantive constraint on agency decisionmaking," *National Tel. Coop. Ass'n*, 563 F.3d at 540. Accordingly, courts "review agency compliance with the Regulatory Flexibility Act only to determine whether an agency has made a reasonable, good-faith effort to carry out the mandate of the [Act]." *Kealani*, 168 F.4th at 746 (quotation marks omitted); *see U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001). Under that standard, courts will uphold agency action when the agency provides a reasonable factual statement supporting its certification that the rule will not have a significant economic impact on a substantial number of small entities. *See, e.g.*, *Southwestern Pa. Growth All. v. Browner*, 121 F.3d 106, 123 (3d Cir. 1997); *Environmental Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 878-79 (9th Cir. 2003); *Colorado ex rel. Colo. State Banking Bd. v. Resolution Tr. Corp.*, 926 F.2d 931, 948 (10th Cir. 1991); *National Mining Ass'n v. Secretary of Lab.*, 153 F.3d 1264, 1269 n.7 (11th Cir. 1998); *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015); *Carpenter, Chartered v. Secretary of Veteran Affs.*, 343 F.3d 1347, 1357 (Fed. Cir. 2003); *cf. Northport Health Servs. of Ark., LLC v. U.S. Dep't of Health & Hum. Servs.*, 14 F.4th 856, 876-79 (8th Cir. 2021) (upholding a rule even in the absence of a factual statement where the rule's lack of a significant economic impact was sufficiently clear on its face). Courts are particularly deferential to an agency's judgments in this context, as it involves predictive

economic assessments that fall squarely within an agency's expertise. *See Council for Urological Ints.*, 790 F.3d at 227; *Nat'l Tel.*, 563 F.3d at 541; *Seven Cnty. Infrastructure Coal. v. Eagle Cnty*, 605 U.S. 168, 182 (2025) ("Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." (quotation marks omitted)); *Prometheus*, 592 U.S. at 427; *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 536 (D.C. Cir. 2020) ("[W]hen an agency's decision is primarily predictive, our role is limited; we require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive.").

Together, the APA and Regulatory Flexibility Act "require that a rule's impact on small businesses be reasonable and reasonably explained," and an agency's certification or regulatory flexibility analysis are "for APA purposes, part of an agency's explanation for its rule." *Kealani*, 168 F.4th at 747 (quotation marks omitted).

**2.** FDA's certification of the PMTA rule and factual statement easily meet that standard. Pursuant to the Regulatory Flexibility Act, FDA assessed the likely impact of the PMTA rule on small businesses and predicted that "the final rule will generate net benefits or negligible net costs for most affected small entities." 86

Fed. Reg. at 55405; *see* FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Final Rule*, *supra*, at 44. FDA further explained that the "final rule will make the review of PMTAs more efficient" and "create cost savings for FDA and for PMTA applicants." 86 Fed. Reg. at 55405. The agency acknowledged that "the final rule will generate incremental costs related to the preparation of PMTAs" for certain covered products, and that firms may incur costs "to read and understand the rule," "to maintain records," and to "submit postmarket reports." *Id.* But FDA explained that the greater efficiency provided by the rule makes it likely that the rule will "generate net benefits or negligible net costs." *Id.* Based on that well-supported explanation, FDA certified that "the final rule will not have a significant economic impact on a substantial number of small entities" and, if anything, "will generate net benefits or negligible net costs for most affected small entities," *id.*, obviating the need for further analysis under the Regulatory Flexibility Act, 5 U.S.C. § 605(b) (making the requirements of § 604 inapplicable if an agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities" and "publish[es] such certification in the Federal Register … along with a statement providing the factual basis for such certification"). *See ValueVision Int'l, Inc. v. FCC*, 149 F.3d 1204, 1213 (D.C. Cir. 1998) (holding that the agency's conclusion that a rule would have "a 'positive'

effect" on regulated entities satisfied the Regulatory Flexibility Act); *Northport Health*, 14 F.4th at 879 (holding that the agency's "fail[ure] to provide a factual basis in support of its § 605(b) certification" of a revised rule was "harmless error" because the revised rule "*lessens* whatever financial burden" was previously placed by the original rule).

FDA further published a regulatory impact analysis examining the incremental costs attributable to the PMTA rule. In that analysis, FDA addressed comments, including a comment submitted by the SBA's Office of Advocacy, claiming that the agency "failed to account for many of the costs that would result from the requirement to prepare and submit PMTAs for deemed tobacco products." FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Final Rule*, *supra*, at 12, 41-42. FDA explained that "any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products" were "attribut[able]" to the deeming rule and Tobacco Control Act. *Id.* at 12. FDA already considered these costs in its final regulatory impact analysis for the deeming rule. 86 Fed. Reg. at 55405. For this reason, FDA "estimate[d] the incremental impact" of the PMTA rule, "relative to the compliance costs attributable to the" deeming rule and Tobacco Control Act, FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements:*

*Final Rule*, *supra*, at 12, and concluded that "the final rule will not have a significant economic impact on a substantial number of small entities," *id.* at 44.

The Fifth Circuit recently rejected a substantively similar challenge to the one plaintiffs raise here—that FDA's certification of the PMTA rule violates the Regulatory Flexibility Act, holding that "FDA complied with the [Act] when promulgating the Final PMTA Rule." *Kealani*, 168 F.4th at 744. Specifically, the court determined that the "2016 Deeming Rule's assessment of the cost for compliance provides an adequate factual basis for the FDA's certification that the 2021 Final PMTA rule would not have a significant economic impact on a substantial number of small entities." *Id.* at 751. Because the court concluded that "FDA made a 'reasonable, good-faith effort' to comply with the [Regulatory Flexibility Act]'s purely procedural requirements," it held that FDA's certification of the PMTA rule was not arbitrary and capricious. *Id.* at 749; *see also Southwestern Pa.*, 121 F.3d at 123 (confirming that an agency's analysis under the Regulatory Flexibility Act need not account for costs that flow from other rules).

**B. The district court wrongly concluded otherwise.**

The district court's contrary decision rests on several misunderstandings. The PMTA rule does not actually impose any of the costs or burdens with which the district court and plaintiffs are concerned. Instead, the costs and burdens associated with premarket authorization are attributable to the Tobacco Control

Act, and were properly considered by FDA in the deeming rule with respect to the entities made subject to the Act at that time. FDA was under no obligation to consider the effects of premarket authorization requirements with respect to products such as plaintiffs', as these requirements were subsequently imposed by congressional legislation rather than by agency rulemaking.

**1.** The district court erred in its determination that because the deeming rule's analysis "expressly declined to perform a cost-analysis on any novel tobacco products, such as Plaintiffs' products," FDA was required under the Regulatory Flexibility Act to consider the effect of premarket authorization on these products in its PMTA rule. Dkt. 61, at 13, 18. The Regulatory Flexibility Act requires agencies to consider the impact of a rule on the "small entities *to which the rule will apply*." 5 U.S.C. § 604(a)(4) (emphasis added); *see also id.* § 603(b)(3) (requiring the initial analysis to include an "estimate of the number of small entities to which the proposed rule will apply"); *id.* § 603(b)(4) (requiring an "estimate of the classes of small entities which will be subject to the requirement"). It does not require agencies to consider as part of rulemaking small entities to which the rule does not, and could not, at that time apply. *See Mid-Tex Elec. Coop., Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985); *Southwestern Pa.*, 121 F.3d at 123-34 (holding that the Regulatory Flexibility Act does not require an

agency to consider the effects on small entities that will result from later rulemaking).

Here, plaintiffs' products were not subject to the Tobacco Control Act when FDA promulgated the deeming rule in 2016 or the PMTA rule in 2021, and thus FDA was not required to consider plaintiffs in the process of rulemaking. When the deeming and PMTA rules went into effect, the Tobacco Control Act's definition of "tobacco products" did not include non-tobacco nicotine products such as plaintiffs' oral synthetic nicotine pouches. *See supra* pp. 7-8, 12-13. Plaintiffs' products only became subject to the Tobacco Control Act's premarket authorization requirements in 2022, when Congress amended the statutory definition of "tobacco products" to include non-tobacco nicotine products. Because plaintiffs' products were not subject to the Tobacco Control Act's premarket authorization requirements when FDA promulgated the deeming and PMTA rules, plaintiffs were not among the "small entities" that FDA must consider in order to satisfy the Regulatory Flexibility Act. Put another way, it is entirely reasonable for FDA not to consider as part of its rulemaking products to which its rule would not apply.

The district court's suggestion that Congress's later decision to expand the scope of a regulation retroactively renders the agency's promulgation of that regulation unreasonable is nonsensical and would burden federal agencies with the

impossible task of considering the potential effects of a rule on the possible entities to which the rule does not but one day *might* apply due to potential future Congressional action. *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam) ("[T]o require an agency to assess the impact on all of the nation's small businesses possibly affected by a rule would be to convert every rulemaking process into a massive exercise in economic modeling."). "Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy." *Mid-Tex Elec.*, 773 F.2d at 343. That is especially true in a case like this, where it was Congress—not FDA—that subjected plaintiffs to premarket authorization requirements. *See* Dkt. 61, at 5 ("In response to the Consolidated Appropriations Act in 2022, which rendered Plaintiffs' products subject to the PMTA, Plaintiffs incurred significant expenses to file PMTAs in 2022."); *see supra* pp. 12-13.

In any event, FDA did consider the potential impacts of the deeming rule on novel tobacco products. FDA considered the impact of the deeming rule on electronic nicotine delivery systems, which were novel tobacco products at the time, and it recognized that there were some products for which it was "unable to quantify the costs for novel tobacco products other than [electronic nicotine delivery systems] due to lack of data." FDA, Dep't of Health & Hum. Servs., No.

FDA-2014-N-0189, *Deeming Tobacco Products to be Subject to the Food, Drug, and Cosmetic Act*, *supra*, at 75. To the extent the district court considered FDA's failure to consider plaintiffs' products in particular, the Regulatory Flexibility Act does not demand that an agency separately analyze each product type or sector of the small business community that may be affected by a rule. *Cigar Ass'n of America v. FDA*, 150 F.4th 68, 76 (D.C. Cir. 2021) (rejecting an APA challenge to the deeming rule in part because plaintiffs cited "no authority for the proposition that FDA needed to consider the benefits of premarket review specifically for each industry or product affected" by the rule).

**2.** The district court similarly erred in concluding that FDA improperly failed to consider "the investigations or specific studies a PMTA would require for approval." Dkt. 61, at 14. The relevant question is whether FDA erred in its determination that the PMTA rule would meaningfully increase costs for small businesses. For the reasons discussed, *see supra* pp. 25-28; *infra* pp. 34-40, it did not. Even before the PMTA rule was promulgated, applicants had an obligation to substantiate their applications with sufficient evidence. Indeed, as the Fifth Circuit recognized, "the requirement that an applicant include all known information concerning health risk investigations for its product in a PMTA is mandated" by the Tobacco Control Act, *Kealani*, 168 F.4th at 749, which requires manufacturers seeking premarket authorization to submit applications that contain, among other

things, "full reports of all information … concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products," 21 U.S.C. § 387j(b)(1)(A).

FDA promulgated the PMTA rule to address confusion among applicants regarding what types of information FDA would consider adequate when assessing an application pursuant to the Tobacco Control Act's standards. *See* 84 Fed. Reg. at 50567 (explaining that FDA "develop[ed] the proposed rule, which describes the information" that "an applicant must include in a PMTA for FDA to be able to complete a substantive review of an application," based on its review of "thousands of premarket applications that range[d] widely in the level of detail they contain[ed]"). Under the Act, FDA must deny an application if the applicant fails to show that marketing its product "would be appropriate for the protection of the public health," taking into account risks to tobacco users and nonusers and the likelihood that users will quit or nonusers will start using tobacco products. 21 U.S.C. § 387j(c)(2), (4). The PMTA rule describes the types of information that should be submitted to satisfy that statutory standard, all the while providing applicants "flexibility in determining how to use existing information to support a PMTA for their product and what types of additional investigations" may be necessary "to provide FDA with information that demonstrates that permitting the

marketing of its new tobacco product would be [appropriate for the protection of public health]." 86 Fed. Reg. at 55358; *see also id*. ("We decline to require that an applicant conduct a list of new studies as part of every application under this rule because there may be other ways in which an applicant can provide scientific information to inform FDA's review (*e.g.*, bridging, published literature)."). FDA accordingly explained that the PMTA rule should have a neutral or potentially even net negative effect on costs. *Id.* at 55405; *see also* FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Final Rule*, *supra*, at 43-44.

If, contrary to fact, the PMTA rule had mandated that applicants provide evidence of a type or in a volume materially greater than had previously been required, there might be some question as to whether the rule imposed a substantial new cost. But neither plaintiffs nor the district court has demonstrated that FDA erred in its determination that the rule would not substantially increase the costs or burdens beyond what was already imposed by the statute. For tobacco products that became subject to the Tobacco Control Act's premarket authorization requirements as a result of the deeming rule, FDA accounted for the significant costs of extending the Act's premarket authorization to those products when it promulgated that rule. *See* FDA, Dep't of Health & Hum. Servs., No. FDA-2014-N-0189, *Deeming Tobacco Products to be Subject to the Food, Drug, and*

*Cosmetic Act*, *supra*, at 85, 89, 133 (estimating that the costs of investigations and studies required by the Tobacco Control Act was "expected to be substantial," ranging from $814,000 to $1.1 million); 81 Fed. Reg. at 29074 (finding that the deeming rule "will have a significant economic impact on a substantial number of small entities"); *id.* at 28980 tbl. 1 (summarizing expected costs attributable to the deeming rule over a 20-year period). But for products, like plaintiffs', that became subject to the Tobacco Control Act's premarket authorization requirement as result of a later statutory amendment and not agency rulemaking, any significant costs are attributable only to Congress. Thus, "[i]t was *Congress*, not the FDA, that imposed [the premarket authorization requirements]" of which plaintiffs complain. *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 281 (D.C. Cir. 2019) (emphasis added).

The district court wrongly assumed that, because FDA in the deeming rule analysis "address[ed] studies that could be required in a PMTA" but noted that the agency could not "predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established," that meant that FDA later erred in relying on the deeming rule's analysis of these costs in its PMTA rule. Dkt. 61, at 14-15 (quotation marks omitted); *see id.* (citing the SBA's "object[ion] to the assertion that the PMTA Rule costs were due to the Deeming Rule"). But that statement merely recognizes the uncontroversial point that a later rule *may*

impose additional substantive requirements for studies and investigations in connection with PMTAs, in which case FDA may be required to consider the costs of such requirements. It does not suggest, as the district court improperly presumed, that a future rule will necessarily impose such costs. Here, the PMTA rule plainly does not impose any new study requirements, and thus FDA did not err in relying on the deeming rule's estimated costs of studies, which the agency expressly noted "continue to reflect the best available estimates." FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Final Rule*, *supra*, at 43-44.

Given that the PMTA rule does not impose any new significant costs or requirements, FDA's promulgation of the rule was entirely consistent with the Regulatory Flexibility Act. As we have explained, *see supra* pp. 33-34, the PMTA rule does not meaningfully change or add to the Tobacco Control Act's premarket authorization requirements; it merely reiterates the Tobacco Control Act's requirement that an applicant "submit detailed information regarding the physical aspects of its new tobacco product and full reports of information regarding investigations that may show the health risks of the new tobacco product and whether it presents the same or different risks compared to other tobacco products" so that FDA can assess whether marketing the product is appropriate for the protection of the public health. 86 Fed. Reg. at 55301. Because the PMTA rule

does not impose any new meaningful substantive requirements for premarket authorization apart from those already required by the Tobacco Control Act and considered by the deeming rule with respect to covered small entities, FDA properly concluded that the costs of studies presented in the deeming rule's estimate costs "continue to reflect the best available estimates." FDA, Dep't of Health & Hum. Servs., No. FDA-2019-N-2854, *Premarket Tobacco Product Applications and Recordkeeping Requirements: Final Rule*, *supra*, at 13, 43. And with respect to the costs attributable to the PMTA rule (which stem largely from administrative requirements for submitting applications and certain recordkeeping requirements), FDA reasonably concluded that the Rule imposed no significant new costs. *See id.* at 33-44.

The district court also improperly relied on expert testimony to assess the merits of plaintiffs' assertion that the PMTA rule imposes substantial new costs on applicants. In this APA case, review should have been limited to the administrative record, *Department of Com. v. New York*, 588 U.S. 752, 780 (2019); *see also* 5 U.S.C. § 611(a)(1), (2) (providing for judicial review "in accordance with" the APA); *id.* § 611(b), (c) (recognizing that review of an agency's compliance with the Regulatory Flexibility Act is limited to the record).

In any event, this extra-record testimony does not support plaintiffs' characterization of the PMTA rule as imposing substantial additional costs. The

testimony, which is not part of the administrative record but was proffered for the first time in district court, related to the costs of submitting applications generally, rather than providing any analysis of the increased costs associated with the PMTA rule as opposed to the previously operative regulatory scheme. The fact that plaintiffs must submit PMTAs, which may be costly and include specific health risk information and investigations, is because Congress has found tobacco products—including synthetic nicotine products such as plaintiffs' products—to be particularly harmful, *see infra* pp. 4, 43-44, and accordingly has required applicants to provide FDA with certain health risk information and mandated that FDA deny an application if the applicant has failed to show that marketing of the product "would be appropriate for the protection of the public health," 21 U.S.C. § 387j(c)(2)(A). While the district court credited the expert's estimation of costs to submit PMTAs, plaintiffs' expert never explained how these costs are attributable to the PMTA rule rather than the Tobacco Control Act. As FDA reasonably explained, any costs attributable to the PMTA rule were minimal and may be offset by the benefit to small entities seeking premarket authorization by clarifying and streamlining FDA's process for reviewing PMTAs. *See supra* at pp. 11, 25-26.

Even if plaintiffs could demonstrate that the costs of submitting applications has increased beyond the prior status quo following the PMTA rule (which, for the reasons discussed above, they did not), that still would not render FDA's

certification of the PMTA rule erroneous. Agencies are awarded substantial leeway when assessing and predicting the costs of a rule—a notoriously difficult task. *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 111 (1st Cir. 1997) (noting "the enormous difficulty of estimating enforcement costs in advance" and so "judicial review must recognize that some arbitrariness is inherent in the exercise of discretion amid uncertainty"); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("[T]he 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments and interim regulations."); *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182 ("Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." (quotation marks omitted)). Accordingly, it is well established that an agency's reasonable numerical predictions about a rule based on the record before it at the time of rulemaking are not arbitrary and capricious. *See, e.g.*, *Prometheus*, 592 U.S. at 422-28; *Florida Manufactured Hous. Ass'n v. Cisneros*, 53 F.3d 1565, 1579-81 (11th Cir. 1995). Here, FDA made reasonable estimates in its deeming rule regarding the costs of premarket authorization requirements on new tobacco products subject to the rule at that time, and the agency properly relied on those estimates when promulgating the PMTA rule based on its reasonable assessment

that the rule does not meaningfully alter the existing premarket authorization requirements.

* * *

The district court was therefore wrong in characterizing FDA's certification of the PMTA rule as a "sham." Dkt. 61, at 18. FDA concluded, based on the record before it, that the PMTA rule would not impose a significant economic impact on a substantial number of small entities. The agency did so based on its assessment of the rule, which does not impose any meaningful substantive premarket authorization requirements but rather merely reiterates the Tobacco Control Act's existing requirements and explains the kinds of health information (as required by statute) that applicants must submit for FDA to assess applications consistent with the Tobacco Control Act's mandate. Whether plaintiffs or the district court disagree with FDA's conclusions is beside the point—all the Regulatory Flexibility Act requires is a "reasonable, good-faith effort to carry out the mandate of the [Act]." *Kealani*, 168 F.4th at 746 (quotation marks omitted). Because FDA's certification of the PMTA rule meets that standard, plaintiffs are not likely to succeed on their Regulatory Flexibility Act challenge.

## II. The Equities Do Not Favor Injunctive Relief

The district court was further wrong in concluding that the equities here warrant an injunction.

**A.** Plaintiffs generally allege (and the district court mostly accepted) economic harms from being "unable to continue selling their products," "sunk costs in manufacturing" and being "unable to import their products into the United States," being "forced to begin the PMTA process anew," and "a complete loss of market share." Dkt. 61, at 19; Dkt. 59, at 21 (quotation marks omitted). But even accepting these asserted economic harms as true, they all stem from the Tobacco Control Act's general prohibition on importing or marketing non-tobacco nicotine products, including synthetic oral pouch products, absent FDA premarket authorization. 21 U.S.C. § 387j(a)(2) (providing that premarket authorization is "required" for new tobacco products); *id.* § 381(a); Pub. L. No. 117-103, § 111(a), 136 Stat. at 789 (extending the Tobacco Control Act's premarket authorization requirements to non-tobacco nicotine products). The district court was thus wrong in characterizing the refuse-to-file letter as "itself expressly prohibit[ing] Plaintiffs from continuing to sell their products." Dkt. 61, at 20. While the letter recognizes the Tobacco Control Act's prohibition on such tobacco products absent FDA authorization, the letter does not itself place any prohibition on plaintiffs. *See* Dkt. 57-3, at 9 (explaining that the "manufacture, sale, and/or distribution of [plaintiffs' oral synthetic nicotine pouches], as new tobacco products that lack FDA authorization, is prohibited by law and subject to enforcement action by FDA

unless and until the products receive such authorization" and citing the Tobacco Control Act).

For this reason, the relief awarded—an injunction staying the refuse-to-file letter—does not actually relieve plaintiffs of their asserted economic harms. Regardless of whether the letter is enjoined, plaintiffs are still barred by the Tobacco Control Act from importing or marketing their oral synthetic nicotine pouches. While FDA has indicated it will not prioritize enforcement of the Tobacco Control Act with respect to nicotine pouch applications that are both "pending" and have been "accepted and filed," U.S. Dep't of Health & Hum. Servs., *Enforcement Priorities for Certain New Tobacco Products Marketed Without Premarket Authorization: Guidance for Industry* 3 (May 2026), https://perma.cc/UK3K-Z6W7 (footnote omitted), enjoining the refuse-to-file letter does not place plaintiffs' applications in that category, *see id.* at 3 n.7, nor does it render plaintiffs' continued violation of a statute any less unlawful. Plaintiffs' continued marketing and importation of their oral synthetic nicotine pouches remains just as unlawful today as it did when the refuse-to-file letter was in effect, and so any alleged economic harm stemming from the inability to import or market these products does not justify the preliminary injunction.

The district court further erred in its determination that plaintiffs "would suffer reputational harm" that "is not fully compensable" and thus warrants

injunctive relief. Dkt. 61, at 21. This purported reputational harm stems from [redacted] Plaintiffs are not entitled to manufacture harm [redacted] Moreover, plaintiffs' asserted harms here are purely conjectural and unsubstantiated, [redacted] *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam) ("[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." (quotation marks omitted)).

To the extent the district court mistakenly believed that its injunction would authorize plaintiffs to continue to market and import their oral nicotine pouches, that only underscores its misunderstanding of the balance of equities. Here, an injunction would clearly harm the public interest by frustrating Congress's statutory objectives. In enacting the Tobacco Control Act, Congress determined

that new tobacco products should be subject to premarket authorization and was particularly concerned with the risks such products would pose to new users. 21 U.S.C. § 387j(c)((4). Congress likewise expanded the universe of tobacco products subject to the Tobacco Control Act in 2022 by amending the definition of tobacco products to include products with nicotine from any source. *See* Pub. L. No. 117-103, § 111(a), 136 Stat. at 789. While the court pointed to FDA's "apparently … little enforcement action" against such products as indicating that plaintiffs' continued importation and marketing of their products do not present any public harm, an agency's enforcement priorities are based on a number of factors (such as allocation of resources) and do not override Congress's independent policy determinations. *See United States v. Texas*, 599 U.S. 670, 679-80 (2023) (recognizing that "the Executive Branch must prioritize its enforcement efforts" because it "invariably lacks the resources" to fully execute every law and "must constantly react and adjust" to the most pressing "needs of the American people"); *Stone v. Commissioner*, 86 F.4th 1320, 1328 (11th Cir. 2023) (noting the "complicated balancing of a number of factors" associated with an agency's enforcement priorities and discretion, including consideration of an agency's available resources (quotation marks omitted)).

**B.** The district court's injunction also harms the government and public by interfering with FDA's efforts to streamline the process for reviewing PMTAs. As

explained, *see supra* pp. 9-10, FDA promulgated the PMTA rule "to improve the efficiency of the submission and review of PMTAs," 86 Fed. Reg at 55301—a review FDA is required by statute to undertake, *see generally* 21 U.S.C. § 387j(c). The rule, which was based on FDA's review of thousands of PMTAs with varying amounts of information, clarifies the Tobacco Control Act's requirements and streamlines the application process. 86 Fed. Reg at 55301. FDA's refuse-to-file authority is an important part of this streamlining effort, as it allows FDA to make a "threshold determination of whether [an] application contains sufficient information to permit a substantive review," 21 C.F.R. § 1114.27(b)(1)(i), rather than expending agency resources to undertake a comprehensive review of an application that FDA knows from the outset does not contain information necessary to support authorization pursuant to the statutory standards. The district court's injunction staying the refuse-to-file letter issued by FDA to plaintiffs disrupts the agency's efforts to "make the review of PMTAs more efficient," 86 Fed. Reg at 55302, thus harming the government and public.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY

*s/ Sophia Shams*
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7213*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2495*
*sophia.shams@usdoj.gov*

*Of Counsel:*

ROBERT FOX FOSTER
Acting General Counsel
U.S. Department of Health and
Human Services

SEAN R. KEVENEY
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

BARBARA ALKALAY
JAMES ALLRED
Senior Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD 20993-0002

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,397 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*s/ Sophia Shams*
Sophia Shams

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sophia Shams*
Sophia Shams

# ADDENDUM

## TABLE OF CONTENTS

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. P, tit. I, subtitle B, § 111 .......... A1

Tobacco Control Act & Relevant Regulations

21 U.S.C. § 387j .......... A4

21 C.F.R. § 1114.27 .......... A12

Regulatory Flexibility Act

5 U.S.C. § 603 .......... A16

5 U.S.C. § 604 .......... A18

5 U.S.C. § 605 .......... A20

5 U.S.C. § 611 .......... A21

**SECTION 111. FDA AUTHORITY OVER PRODUCTS CONTAINING NICOTINE.**

(a) TOBACCO PRODUCT DEFINED.—Section 201(rr) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(rr)) is amended—

(1) in subparagraph (1), by inserting ‘‘, or containing nicotine from any source,’’ after ‘‘from tobacco’’; and

(2) by adding at the end the following: ‘‘(5) The term ‘tobacco product’ does not mean an article that is a food under paragraph (f), if such article contains no nicotine, or no more than trace amounts of naturally occurring nicotine.’’.

(b) APPLICABILITY TO CERTAIN PRODUCTS.—Section 901(b) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387a(b)) is amended by adding at the end the following: ‘‘This chapter shall also apply to any tobacco product containing nicotine that is not made or derived from tobacco.’’.

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall take effect 30 days after the date of enactment of this Act.

(d) SUBMISSION OF APPLICATIONS FOR PREVIOUSLY MARKETED PRODUCTS.—

(1) TRANSITION PERIOD FOR ALL PRODUCTS.—With respect to a tobacco product that contains nicotine from any source other than tobacco and that was being marketed in the United States within 30 days after the date of enactment of this Act, such product shall not be considered to be in violation of section 910 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j) (relating to applications for review of certain tobacco products) during the 60-day period following the date of enactment of this Act.

(2) SUBMISSION OF APPLICATIONS.—

(A) IN GENERAL.—As a condition for continuing to market a product described in paragraph (1) after the 60-day period specified in such paragraph, during the 30- day period beginning on the effective date specified in subsection (c), the manufacturer shall submit a new tobacco product application under section 910(b) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j(b)) with respect to such product.

(B) TRANSITION PERIOD.—Except as provided in subparagraph (C), with respect to a tobacco product for which an application is submitted as described in subparagraph (A), the manufacturer of such product may continue to market such product during the 90-day period beginning on the effective date specified in subsection (c).

(C) EXCEPTION.—If the Secretary of Health and Human Services previously denied an application under section 910(c)(2) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j(c)(2)), refused to file an application under section 910(b) of such Act, or withdrew an order under section 910(d) of such Act for a previous version of a tobacco product that used nicotine made or derived from tobacco, such product is not eligible for continued marketing under subparagraph (B).

(3) END OF TRANSITION PERIOD.—Beginning on the date that is 90 days after the effective date specified in subsection (c), a tobacco product described in paragraph (1) (including such a tobacco product that is the subject of a pending application under section 910 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j)) is in violation of such section 910 if such tobacco product does not have an order in effect under subsection (c)(1)(A)(i) of such section.

(e) APPLICABILITY OF EXISTING REQUIREMENTS FOR TOBACCO PRODUCTS.—Effective 30 days after the date of enactment of this Act, with respect to any regulation promulgated or related guidance issued, in whole or part, under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.) before the date that is 30 days after such date of enactment, the term ‘‘tobacco product’’ shall have the meaning of, and shall be deemed amended to reflect the meaning of, such term as defined in section 201(rr) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(rr)), as amended by subsection (a). Products that are tobacco products under such section 201(rr), as so amended, shall be subject to all requirements of regulations for tobacco products. The Secretary of Health and Human Services shall publish a notice in the Federal Register to update the Code of Federal Regulations to reflect such deemed amendment to existing regulations and guidance.

(f) TECHNICAL ACHIEVABILITY.—Section 907(b)(1) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387g(b)(1)) is amended by inserting before the period at the end the following: ‘‘, including with regard to any differences related to the technical achievability of compliance with such standard for products in the

same class containing nicotine not made or derived from tobacco and products containing nicotine made or derived from tobacco''.

**21 U.S.C. § 387j**

(a) In general

(1) New tobacco product defined

For purposes of this section the term "new tobacco product" means—

(A) any tobacco product (including those products in test markets) that was not commercially marketed in the United States as of February 15, 2007; or

(B) any modification (including a change in design, any component, any part, or any constituent, including a smoke constituent, or in the content, delivery or form of nicotine, or any other additive or ingredient) of a tobacco product where the modified product was commercially marketed in the United States after February 15, 2007.

(2) Premarket review required

(A) New products

An order under subsection (c)(1)(A)(i) for a new tobacco product is required unless—

(i) the manufacturer has submitted a report under section 387e(j) of this title; and the Secretary has issued an order that the tobacco product—

(I) is substantially equivalent to a tobacco product commercially marketed (other than for test marketing) in the United States as of February 15, 2007; and

(II) is in compliance with the requirements of this chapter; or

(ii) the tobacco product is exempt from the requirements of section 387e(j) of this title pursuant to a regulation issued under section 387e(j)(3) of this title.

(B) Application to certain post-February 15, 2007, products

Subparagraph (A) shall not apply to a tobacco product—

(i) that was first introduced or delivered for introduction into interstate commerce for commercial distribution in the United States after February 15, 2007, and prior to the date that is 21 months after June 22, 2009; and

(ii) for which a report was submitted under section 387e(j) of this title within such 21-month period,

except that subparagraph (A) shall apply to the tobacco product if the Secretary issues an order that the tobacco product is not substantially equivalent.

(3) Substantially equivalent defined

(A) In general

In this section and section 387e(j) of this title, the term "substantially equivalent" or "substantial equivalence" means, with respect to the tobacco product being compared to the predicate tobacco product, that the Secretary by order has found that the tobacco product—

(i) has the same characteristics as the predicate tobacco product; or

(ii) has different characteristics and the information submitted contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that it is not appropriate to regulate the product under this section because the product does not raise different questions of public health.

(B) Characteristics

In subparagraph (A), the term "characteristics" means the materials, ingredients, design, composition, heating source, or other features of a tobacco product.

(C) Limitation

A tobacco product may not be found to be substantially equivalent to a predicate tobacco product that has been removed from the market at the initiative of the Secretary or that has been determined by a judicial order to be misbranded or adulterated.

(4) Health information

(A) Summary

As part of a submission under section 387e(j) of this title respecting a tobacco product, the person required to file a premarket notification under such section shall provide an adequate summary of any health information related to the tobacco product or state that such information will be made available upon request by any person.

(B) Required information

Any summary under subparagraph (A) respecting a tobacco product shall contain detailed information regarding data concerning adverse health

effects and shall be made available to the public by the Secretary within 30 days of the issuance of a determination that such tobacco product is substantially equivalent to another tobacco product.

(b) Application

(1) Contents

An application under this section shall contain—

(A) full reports of all information, published or known to, or which should reasonably be known to, the applicant, concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products;

(B) a full statement of the components, ingredients, additives, and properties, and of the principle or principles of operation, of such tobacco product;

(C) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such tobacco product;

(D) an identifying reference to any tobacco product standard under section 387g of this title which would be applicable to any aspect of such tobacco product, and either adequate information to show that such aspect of such tobacco product fully meets such tobacco product standard or adequate information to justify any deviation from such standard;

(E) such samples of such tobacco product and of components thereof as the Secretary may reasonably require;

(F) specimens of the labeling proposed to be used for such tobacco product; and

(G) such other information relevant to the subject matter of the application as the Secretary may require.

(2) Referral to Tobacco Products Scientific Advisory Committee

Upon receipt of an application meeting the requirements set forth in paragraph (1), the Secretary—

(A) may, on the Secretary's own initiative; or

(B) may, upon the request of an applicant,

refer such application to the Tobacco Products Scientific Advisory Committee for reference and for submission (within such period as the Secretary may establish) of a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation.

(c) Action on application

(1) Deadline

(A) In general

As promptly as possible, but in no event later than 180 days after the receipt of an application under subsection (b), the Secretary, after considering the report and recommendation submitted under subsection (b)(2), shall—

(i) issue an order that the new product may be introduced or delivered for introduction into interstate commerce if the Secretary finds that none of the grounds specified in paragraph (2) of this subsection applies; or

(ii) issue an order that the new product may not be introduced or delivered for introduction into interstate commerce if the Secretary finds (and sets forth the basis for such finding as part of or accompanying such denial) that 1 or more grounds for denial specified in paragraph (2) of this subsection apply.

(B) Restrictions on sale and distribution

An order under subparagraph (A)(i) may require that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title.

(2) Denial of application

The Secretary shall deny an application submitted under subsection (b) if, upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product, the Secretary finds that—

(A) there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health;

(B) the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of such tobacco product do not conform to the requirements of section 387f(e) of this title;

(C) based on a fair evaluation of all material facts, the proposed labeling is false or misleading in any particular; or

(D) such tobacco product is not shown to conform in all respects to a tobacco product standard in effect under section 387g of this title, and there is a lack of adequate information to justify the deviation from such standard.

(3) Denial information

Any denial of an application shall, insofar as the Secretary determines to be practicable, be accompanied by a statement informing the applicant of the measures required to remove such application from deniable form (which measures may include further research by the applicant in accordance with 1 or more protocols prescribed by the Secretary).

(4) Basis for finding

For purposes of this section, the finding as to whether the marketing of a tobacco product for which an application has been submitted is appropriate for the protection of the public health shall be determined with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account—

(A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

(B) the increased or decreased likelihood that those who do not use tobacco products will start using such products.

(5) Basis for action

(A) Investigations

For purposes of paragraph (2)(A), whether permitting a tobacco product to be marketed would be appropriate for the protection of the public health shall, when appropriate, be determined on the basis of well-controlled investigations, which may include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product.

(B) Other evidence

If the Secretary determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A))

which is sufficient to evaluate the tobacco product, the Secretary may authorize that the determination for purposes of paragraph (2)(A) be made on the basis of such evidence.

(d) Withdrawal and temporary suspension

(1) In general

The Secretary shall, upon obtaining, where appropriate, advice on scientific matters from the Tobacco Products Scientific Advisory Committee, and after due notice and opportunity for informal hearing for a tobacco product for which an order was issued under subsection (c)(1)(A)(i), issue an order withdrawing the order if the Secretary finds—

(A) that the continued marketing of such tobacco product no longer is appropriate for the protection of the public health;

(B) that the application contained or was accompanied by an untrue statement of a material fact;

(C) that the applicant—

(i) has failed to establish a system for maintaining records, or has repeatedly or deliberately failed to maintain records or to make reports, required by an applicable regulation under section 387i of this title;

(ii) has refused to permit access to, or copying or verification of, such records as required by section 374 of this title; or

(iii) has not complied with the requirements of section 387e of this title;

(D) on the basis of new information before the Secretary with respect to such tobacco product, evaluated together with the evidence before the Secretary when the application was reviewed, that the methods used in, or the facilities and controls used for, the manufacture, processing, packing, or installation of such tobacco product do not conform with the requirements of section 387f(e) of this title and were not brought into conformity with such requirements within a reasonable time after receipt of written notice from the Secretary of nonconformity;

(E) on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when the application was reviewed, that the labeling of such tobacco product, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected

within a reasonable time after receipt of written notice from the Secretary of such fact; or

(F) on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when such order was issued, that such tobacco product is not shown to conform in all respects to a tobacco product standard which is in effect under section 387g of this title, compliance with which was a condition to the issuance of an order relating to the application, and that there is a lack of adequate information to justify the deviation from such standard.

(2) Appeal

The holder of an application subject to an order issued under paragraph (1) withdrawing an order issued pursuant to subsection (c)(1)(A)(i) may, by petition filed on or before the 30th day after the date upon which such holder receives notice of such withdrawal, obtain review thereof in accordance with section 387l of this title.

(3) Temporary suspension

If, after providing an opportunity for an informal hearing, the Secretary determines there is reasonable probability that the continuation of distribution of a tobacco product under an order would cause serious, adverse health consequences or death, that is greater than ordinarily caused by tobacco products on the market, the Secretary shall by order temporarily suspend the authority of the manufacturer to market the product. If the Secretary issues such an order, the Secretary shall proceed expeditiously under paragraph (1) to withdraw such application.

(e) Service of order

An order issued by the Secretary under this section shall be served—

(1) in person by any officer or employee of the department designated by the Secretary; or

(2) by mailing the order by registered mail or certified mail addressed to the applicant at the applicant's last known address in the records of the Secretary.

(f) Records

(1) Additional information

In the case of any tobacco product for which an order issued pursuant to subsection (c)(1)(A)(i) for an application filed under subsection (b) is in effect, the applicant shall establish and maintain such records, and make such reports

to the Secretary, as the Secretary may by regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination of, whether there is or may be grounds for withdrawing or temporarily suspending such order.

(2) Access to records

Each person required under this section to maintain records, and each person in charge of custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

(g) Investigational tobacco product exemption for investigational use

The Secretary may exempt tobacco products intended for investigational use from the provisions of this subchapter under such conditions as the Secretary may by regulation prescribe.

**21 C.F.R. § 1114.27**

(a) Acceptance review.

(1) After an applicant submits a PMTA, FDA will perform an initial review of the PMTA to determine whether it may be accepted for further review. FDA may refuse to accept an application that:

(i) Does not comply with the applicable format requirements in §1114.7(b), §1114.15, or §1114.17 (as applicable);

(ii) Is not administratively complete because it does not appear to contain the information required by §1114.7 (excluding product samples), §1114.15 or §1114.17, as applicable;

(iii) Does not pertain to a tobacco product subject to chapter IX of the Federal Food, Drug, and Cosmetic Act (as required by §1105.10 of this chapter); or

(iv) FDA can otherwise refuse to accept under §1105.10.

(2) If FDA accepts an application for further review, FDA will issue an acknowledgement letter to the applicant that specifies the PMTA STN. If FDA determines that it will require product samples as part of the PMTA, it will send instructions on how and where to submit product samples, as described in §1114.7(e) of this chapter.

(3) If FDA refuses to accept an application, FDA will issue a letter to the applicant identifying the deficiencies, where practicable, that prevented FDA from accepting the application.

(b) Filing review.

(1) After accepting a PMTA, FDA will make a threshold determination of whether the application contains sufficient information to permit a substantive review. FDA may refuse to file a PMTA if any of the following applies:

(i) The PMTA does not contain sufficient information required by section 910(b)(1) of the Federal Food, Drug, and Cosmetic Act and by §1114.7, §1114.15, or §1114.17, as applicable, to permit a substantive review of the application;

(ii) The application does not contain any substantive information, including information from published literature or bridged from an investigation of another tobacco product, regarding each of the following topics.

(A) The health risks of the new tobacco product as described in either §1114.7(k)(1)(i)(A), (B), or (C));

(B) The health risks of the new tobacco product compared to the health risks generally presented by products in the same product category as well as products in at least one different category that are used by the consumers an applicant expects will use its new tobacco product (as described in a portion of §1114.7(k)(1)(i)(D)).

(C) The abuse liability of the new tobacco product (as set forth in §1114.7(k)(1)(ii)(A));

(D) How consumers would be expected to actually use the product, such as use frequency, use trends over time, and how such use affects the health risks of the product to individual users (as described in §1114.7(k)(1)(ii)(B));

(E) The potential impact that the marketing of the new tobacco product would have on the likelihood that current tobacco product users would change their tobacco product use behavior, such as starting to using the new tobacco product, using the product in conjunction with other tobacco products, or, after using the product, switching to or switch back to other tobacco products that may present increased risks to individual health (i.e., any of the information set forth in either §1114.7(k)(1)(ii)(C), (D), (E), or (F));

(F) The impact of the tobacco product and its label, labeling, or advertising, to the extent that advertising has been studied, on tobacco product use behavior of current nonusers of tobacco products (i.e., any of the information described in §1114.7(k)(1)(iii));

(G) The impact of the product and its label, labeling, or advertising, to the extent that advertising has been studied, on individuals' perception of the product and their use intentions

(i.e., any of the information described in §1114.7(k)(1)(iv)); and

(H) The ways in which human factors can affect the health risks of the new tobacco product (i.e., any of the information described in §1114.7(k)(1)(v));

(iii) The PMTA contains a false statement of material fact;

(iv) The PMTA is a supplemental PMTA that does not comply with §1114.15; or

(v) The PMTA is a resubmission that does not comply with §1114.17.

(2) If FDA refuses to file an application, FDA will issue a letter to the applicant identifying the deficiencies, where practicable, that prevented FDA from filing the application.

(3) If FDA files an application, FDA will issue a filing letter to the applicant.

(c) Application review.

(1) Except as described in this paragraph and §1114.9(b), within 180 days of receipt of an application described in section 910(b)(1) of the Federal Food, Drug, and Cosmetic Act meeting the filing requirements set out in 1114.27(b), FDA will complete its review of the PMTA and act on the application.

(2) FDA will begin substantive review of the application after it is filed under paragraph (b) of this section. FDA may communicate with the applicant as set forth under §1114.25 to seek additional or clarifying information.

(3) FDA may refer the PMTA or portions of the PMTA, upon its own initiative or applicant request, to TPSAC for reference and for the submission of a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation.

(4) FDA may conduct inspections of the applicant's manufacturing sites, and sites and entities involved with clinical and nonclinical research (including third parties and contract research organizations) to support FDA's review of the PMTA. Where an applicant prevents FDA from scheduling and

conducting inspections that are necessary for FDA to complete its review of the PMTA in a timely manner, FDA may pause the 180-day review period for the number of days necessary to complete the inspection.

(5) FDA may defer review of a PMTA for a new product that, if introduced or delivered for introduction into interstate commerce, would be adulterated or misbranded due to the manufacturer or importer's failure to comply with user fee payment and reporting requirements under part 1150.

**5 U.S.C. § 603**

(a) Whenever an agency is required by section 553 of this title, or any other law, to publish general notice of proposed rulemaking for any proposed rule, or publishes a notice of proposed rulemaking for an interpretative rule involving the internal revenue laws of the United States, the agency shall prepare and make available for public comment an initial regulatory flexibility analysis. Such analysis shall describe the impact of the proposed rule on small entities. The initial regulatory flexibility analysis or a summary shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule. The agency shall transmit a copy of the initial regulatory flexibility analysis to the Chief Counsel for Advocacy of the Small Business Administration. In the case of an interpretative rule involving the internal revenue laws of the United States, this chapter applies to interpretative rules published in the Federal Register for codification in the Code of Federal Regulations, but only to the extent that such interpretative rules impose on small entities a collection of information requirement.

(b) Each initial regulatory flexibility analysis required under this section shall contain—

(1) a description of the reasons why action by the agency is being considered;

(2) a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

(c) Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as—

(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) the use of performance rather than design standards; and

(4) an exemption from coverage of the rule, or any part thereof, for such small entities.

(d)

(1) For a covered agency, as defined in section 609(d)(2), each initial regulatory flexibility analysis shall include a description of—

(A) any projected increase in the cost of credit for small entities;

(B) any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any increase in the cost of credit for small entities; and

(C) advice and recommendations of representatives of small entities relating to issues described in subparagraphs (A) and (B) and subsection (b).

(2) A covered agency, as defined in section 609(d)(2), shall, for purposes of complying with paragraph (1)(C)—

(A) identify representatives of small entities in consultation with the Chief Counsel for Advocacy of the Small Business Administration; and

(B) collect advice and recommendations from the representatives identified under subparagraph (A) relating to issues described in subparagraphs (A) and (B) of paragraph (1) and subsection (b).

**5 U.S.C. § 604**

(a) When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain—

(1) a statement of the need for, and objectives of, the rule;

(2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(5) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(6) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected; and (6) 1 for a covered agency, as defined in section 609(d)(2), a description of the steps the agency has taken to minimize any additional cost of credit for small entities.

(b) The agency shall make copies of the final regulatory flexibility analysis available to members of the public and shall publish in the Federal Register such analysis or a summary thereof.

**5 U.S.C. § 605**

(a) Any Federal agency may perform the analyses required by sections 602, 603, and 604 of this title in conjunction with or as a part of any other agenda or analysis required by any other law if such other analysis satisfies the provisions of such sections.

(b) Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification. The agency shall provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration.

(c) In order to avoid duplicative action, an agency may consider a series of closely related rules as one rule for the purposes of sections 602, 603, 604 and 610 of this title.

**5 U.S.C. § 611**

(a)

(1) For any rule subject to this chapter, a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with chapter 7. Agency compliance with sections 607 and 609(a) shall be judicially reviewable in connection with judicial review of section 604.

(2) Each court having jurisdiction to review such rule for compliance with section 553, or under any other provision of law, shall have jurisdiction to review any claims of noncompliance with sections 601, 604, 605(b), 608(b), and 610 in accordance with chapter 7. Agency compliance with sections 607 and 609(a) shall be judicially reviewable in connection with judicial review of section 604.

(3)

(A) A small entity may seek such review during the period beginning on the date of final agency action and ending one year later, except that where a provision of law requires that an action challenging a final agency action be commenced before the expiration of one year, such lesser period shall apply to an action for judicial review under this section.

(B) In the case where an agency delays the issuance of a final regulatory flexibility analysis pursuant to section 608(b) of this chapter, an action for judicial review under this section shall be filed not later than—

(i) one year after the date the analysis is made available to the public, or

(ii) where a provision of law requires that an action challenging a final agency regulation be commenced before the expiration of the 1- year period, the number of days specified in such provision of law that is after the date the analysis is made available to the public.

(4) In granting any relief in an action under this section, the court shall order the agency to take corrective action consistent with this chapter and chapter 7, including, but not limited to—

(A) remanding the rule to the agency, and

(B) deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest.

(5) Nothing in this subsection shall be construed to limit the authority of any court to stay the effective date of any rule or provision thereof under any other provision of law or to grant any other relief in addition to the requirements of this section.

(b) In an action for the judicial review of a rule, the regulatory flexibility analysis for such rule, including an analysis prepared or corrected pursuant to paragraph (a)(4), shall constitute part of the entire record of agency action in connection with such review.

(c) Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review only in accordance with this section.

(d) Nothing in this section bars judicial review of any other impact statement or similar analysis required by any other law if judicial review of such statement or analysis is otherwise permitted by law.