**No. 26-12062**

**IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

THE C STORE DEPOT, INC., et al.,

Plaintiffs-Appellees,

v.

U.S. FOOD AND DRUG ADMINISTRATION, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the Middle District of Florida

**APPELLANTS' REDACTED APPENDIX VOLUME I OF I**

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7213*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2495*

*Of Counsel:*

ROBERT FOX FOSTER
Acting General Counsel
U.S. Department of Health and Human Services

SEAN R. KEVENEY
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

BARBARA ALKALAY
JAMES ALLRED
Senior Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD 20993-0002

# Index

District Court Docket Report ........ Tab A

Temporary Restraining Order (Dkt. 31) ........ Tab 31

Complaint [REDACTED] (Dkt. 55) ........ Tab 55

Refuse to File Letter [REDACTED] (Dkt. 57-3, Exhibit A) ........ Tab 57-3

Motion for Preliminary Injunction [REDACTED] (Dkt. 59) ........ Tab 59

Preliminary Injunction Order [REDACTED] (Dkt. 61) ........ Tab 61

Notice of Appeal (Dkt. 62) ........ Tab 62

# TAB A

# 8:26cv483, The C Store Depot, Inc. Et Al V. United States Food And Drug Administration Et Al

US District Court Docket

United States District Court, Florida Middle

(Tampa)

**This case was retrieved on 08/20/2026**

## Header

**Case Number:** 8:26cv483
**Date Filed:** 02/20/2026
**Assigned To:** Judge Mary S. Scriven
**Referred To:** Magistrate Judge Christopher P. Tuite
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** 11th Circuit, 26-12062-H
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:0702
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 3 | 02/20/2026 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by The C Store Depot, Inc. (MCB) (Entered: 02/20/2026) | |
| 4 | 02/20/2026 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Zest Brands LLC. (MCB) (Entered: 02/20/2026) | |
| 5 | 02/20/2026 | NOTICE of a related action per Local Rule 1.07(c) by The C Store Depot, Inc., Zest Brands LLC. Related case(s): No. (MCB) (Entered: 02/20/2026) | |
| 6 | 02/20/2026 | SUMMONS issued as to United States Food and Drug Administration, United States Health and Human Services, U.S. Attorney and U.S. Attorney General. (Originals given to counsel at intake window) (MCB) (Entered: 02/20/2026) | |
| 8 | 02/23/2026 | MOTION for Eric N. Heyer to appear pro hac vice by The C Store Depot, Inc., Zest Brands LLC. (eportal) (MCB) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 02/23/2026) | |
| 9 | 02/23/2026 | MOTION for James C. Fraser to appear pro hac vice by The C Store Depot, Inc., Zest Brands LLC. (eportal) (MCB) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 02/23/2026) | |
| 10 | 02/23/2026 | MOTION for Joseph A. Smith to appear pro hac vice by The C Store Depot, Inc., Zest Brands LLC. (eportal) (MCB) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 02/23/2026) | |
| 11 | 02/23/2026 | MOTION for Ryan D. Callinan to appear pro hac vice by The C Store Depot, Inc., Zest Brands LLC. (eportal) (MCB) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 02/23/2026) | |
| | 02/23/2026 | ***PRO HAC VICE FEES PAID (Receipt Number TPA73807 for $150) by attorney Eric N. Heyer, appearing on behalf of The C Store Depot, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Inc., Zest Brands LLC. Related document: 8 MOTION for Eric N. Heyer to appear pro hac vice. (EGP) (Entered: 02/23/2026) | |
| | 02/23/2026 | ***PRO HAC VICE FEES PAID (Receipt Number TPA73807 for $150) by attorney James C. Fraser, appearing on behalf of The C Store Depot, Inc., Zest Brands LLC. Related document: 9 MOTION for James C. Fraser, to appear pro hac vice. (EGP) (Entered: 02/23/2026) | |
| | 02/23/2026 | ***PRO HAC VICE FEES PAID (Receipt Number TPA73807 for $150) by attorney Joseph A. Smith, appearing on behalf of The C Store Depot, Inc., Zest Brands LLC. Related document: 10 MOTION for Joseph A. Smith to appear pro hac vice. (EGP) (Entered: 02/23/2026) | |
| | 02/23/2026 | ***PRO HAC VICE FEES PAID (Receipt Number TPA73807 for $150) by attorney Ryan D. Callinan, appearing on behalf of The C Store Depot, Inc., Zest Brands LLC. Related document: 11 MOTION for Ryan D. Callinan to appear pro hac vice. (EGP) (Entered: 02/23/2026) | |
| 12 | 02/23/2026 | ENDORSED ORDER GRANTING Plaintiffs' Motion to Seal the Case. The Court finds the Plaintiffs have met their burden of showing that good cause exists to seal the case. The seal shall remain in effect unless and until an Order of the Court on a duly noticed motion directs otherwise. Signed by Judge Mary S. Scriven on 2/23/2026. (KMF) (Entered: 02/23/2026) | |
| 13 | 02/23/2026 | ORDER SETTING HEARING on the Motion for Temporary Restraining Order 7. The hearing is set for Friday, February 27, 2026 at 9:00 AM in the Sam M. Gibbons United States Courthouse, Tampa, Florida, Courtroom 7A before Judge Mary S. Scriven. See Order for details. Signed by Judge Mary S. Scriven on 2/23/2026. (KMF) (Entered: 02/23/2026) | |
| 18 | 02/23/2026 | CERTIFICATE of service by The C Store Depot, Inc., Zest Brands LLC re 1 Complaint, 7 MOTION for Temporary Restraining Order, 2 MOTION to Seal Case, 5 Notice of a Related Action, 4 Disclosure Statement - LR 3.03 and FRCP 7.1, 3 Disclosure Statement - LR 3.03 and FRCP 7.1. (MCB) (Entered: 02/24/2026) | |
| 19 | 02/23/2026 | NOTICE of Proposed Form of TRO by The C Store Depot, Inc., Zest Brands LLC re 7 MOTION for Temporary Restraining Order. (Attachments: # 1 Text of Proposed Order)(MCB) (Entered: 02/24/2026) | |
| 14 | 02/24/2026 | ENDORSED ORDER granting Plaintiff's 8 Motion for Special Admission as to attorney Eric N. Heyer. If counsel has not already done so, within fourteen (14) days hereof, he shall complete the e-filer registration (more information available at https://www.flmd.uscourts.gov/for-lawyers). Signed by Magistrate Judge Christopher P. Tuite on 2/24/2026. (TC) (Entered: 02/24/2026) | |
| 15 | 02/24/2026 | ENDORSED ORDER granting Plaintiff's 9 Motion for Special Admission as to attorney James C. Fraser. If counsel has not already done so, within fourteen (14) days hereof, he shall complete the e-filer registration (more information available at https://www.flmd.uscourts.gov/for-lawyers). Signed by Magistrate Judge Christopher P. Tuite on 2/24/2026. (TC) (Entered: 02/24/2026) | |
| 16 | 02/24/2026 | ENDORSED ORDER granting Plaintiff's 10 Motion for Special Admission as to attorney Joseph A. Smith. If counsel has not already done so, within fourteen (14) days hereof, he shall complete the e-filer registration (more information available at https://www.flmd.uscourts.gov/for-lawyers). Signed by Magistrate Judge Christopher P. Tuite on 2/24/2026. (TC) (Entered: 02/24/2026) | |
| 17 | 02/24/2026 | ENDORSED ORDER granting Plaintiff's 11 Motion for Special Admission as to attorney Ryan D. Callinan. If counsel has not already done so, within fourteen (14) days hereof, he shall complete the e-filer registration (more information available at https://www.flmd.uscourts.gov/for-lawyers). Signed by Magistrate Judge Christopher P. Tuite on 2/24/2026. (TC) (Entered: 02/24/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 20 | 02/25/2026 | NOTICE of Appearance by Mamie Wise on behalf of United States Food and Drug Administration, United States Health and Human Services (LD) (Entered: 02/26/2026) | |
| 22 | 02/25/2026 | RESPONSE re 13 Order Setting Hearing on Motion, filed by United States Food and Drug Administration, United States Health and Human Services. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(LD) (Entered: 02/26/2026) | |
| 23 | 02/25/2026 | NOTICE of Appearance by Stacy Matulis on behalf of The C Store Depot, Inc., Zest Brands LLC (LD) (Entered: 02/26/2026) | |
| 24 | 02/25/2026 | Plaintiffs' Witness List for Hearing on Motion for Temporary Restraining Order by The C Store Depot, Inc., Zest Brands LLC. (LD) (Entered: 02/26/2026) | |
| 25 | 02/26/2026 | Plaintiffs' Reformatted* Exhibit List for Hearing on Motion for Temporary Restraining Order by The C Store Depot, Inc., Zest Brands LLC. (LD) (Entered: 02/26/2026) | |
| 26 | 02/27/2026 | NOTICE of Appearance by James Allred on behalf of United States Food and Drug Administration, United States Health and Human Services (CTR) (Entered: 02/27/2026) | |
| 27 | 02/27/2026 | NOTICE of Updated Exhibit List for Hearing on Motion for Temporary Restraining Order by The C Store Depot, Inc., Zest Brands LLC (CTR) (Entered: 02/27/2026) | |
| 28 | 02/27/2026 | NOTICE TO COUNSEL James Allred of Local Rule 2.01(b)(1)(G), which requires members of the Middle District bar to register with the Middle District CM/ECF system by submitting an e-file registration through PACER. (Signed by Deputy Clerk). (CTR) (Entered: 02/27/2026) | |
| 29 | 02/27/2026 | Minute Entry. In Person Proceedings held before Judge Mary S. Scriven: MOTION HEARING held on 2/27/2026 re 7 MOTION for Temporary Restraining Order filed by Zest Brands LLC, The C Store Depot, Inc. Court Reporter: David Collier (CRB) (Entered: 02/27/2026) | |
| 30 | 02/27/2026 | ORAL ORDER GRANTING Motion for Temporary Restraining Order 7 for the reasons stated on the record. The case shall remain sealed pending further Order of the Court on a motion of any Party. Signed by Judge Mary S. Scriven on 2/27/2026. (KMF) (Entered: 02/27/2026) | |
| 38 | 02/27/2026 | Exhibit List and Admitted Exhibits from TRO hearing held on 2/27/2026 by The C Store Depot, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 14, # 14 Exhibit 15A, # 15 Exhibit 15B, # 16 Exhibit 16, # 17 Exhibit 18, # 18 Exhibit 19, # 19 Exhibit 23, # 20 Exhibit 24)(CRB) (Entered: 03/16/2026) | |
| 31 | 03/02/2026 | ORDER memorializing the Court's February 27, 2026 ore tenus Order granting the Plaintiffs' Motion for Temporary Restraining Order. See Order for details. Signed by Judge Mary S. Scriven on 3/2/2026. (KMF) (**Main Document 31 replaced on 8/18/2026 to unseal; per order 54.**) (LNR) (Entered: 03/02/2026) | |
| 32 | 03/03/2026 | STATUS report and Stipulated [Proposed] Scheduling Order by United States Health and Human Services, United States Food and Drug Administration, The C Store Depot, Inc., Zest Brands LLC. (LD) (Entered: 03/04/2026) | |
| 33 | 03/04/2026 | ORDER. Upon the agreement of the Parties and the Court's ore tenus order given on the record at the hearing held on February 27, 2026, the Temporary Restraining Order, (Dkt. 31), shall remain in full force and effect until 11:59 p.m. on March 27, 2026. See Order for Preliminary Injunction briefing schedule. Signed by Senior Judge Charlene Edwards Honeywell on 3/4/2026 for Judge Mary S. Scriven. (KMF) (Entered: 03/04/2026) | |
| 34 | 03/05/2026 | SUMMONS returned executed by The C Store Depot, Inc., Zest Brands | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | LLC. United States of America served on 2/24/2026, answer due 4/27/2026. (Attachments: # 1 Exhibit, # 2 Mailing Envelope)(LD) (Entered: 03/06/2026) | |
| 36 | 03/06/2026 | NOTICE of Filing Certification of Records and Index to the Administrative Record by United States Food and Drug Administration, United States Health and Human Services (LD) (Entered: 03/10/2026) | |
| 40 | 03/18/2026 | MOTION for Entry of a Protective Order by The C Store Depot, Inc., United States Food and Drug Administration, Zest Brands LLC. (LNR) Motions referred to Magistrate Judge Christopher P. Tuite. (Notified Management.) (Entered: 03/18/2026) | |
| 41 | 03/19/2026 | SEALED TIME-SENSITIVE MOTION for Leave to File Reply Brief in Support of their Motion for Preliminary Injunction by All Plaintiffs. (Management notified) (LD) (Entered: 03/19/2026) | |
| 42 | 03/20/2026 | ENDORSED ORDER GRANTING Plaintiffs' Time-Sensitive Motion 41 for Leave to File Reply in Support of Plaintiffs' Motion for Preliminary Injunction 37. Plaintiffs shall have up to and including March 23, 2026 to file a Reply, which shall not exceed ten (10) pages in length, not including the signature block or Certificate of Service. Signed by Judge Mary S. Scriven on 3/20/2026. (KMF) (Entered: 03/20/2026) | |
| 44 | 03/23/2026 | NOTICE of hearing: Telephonic Hearing set for 3/23/2026 at 02:00 PM before Judge Mary S. Scriven. Parties sent dial-in details via e-mail. (CRB) (Entered: 03/23/2026) | |
| 45 | 03/23/2026 | Minute Entry. Telephonic Proceedings held before Judge Mary S. Scriven: STATUS CONFERENCE held on 3/23/2026. Court Reporter: David Collier (CRB) (Entered: 03/23/2026) | |
| 46 | 03/23/2026 | ORDER GRANTING the Parties' Joint Motion for Protective Order 40. Signed by Judge Mary S. Scriven on 3/23/2026. (Attachments: # 1 Exhibit Acknowledgement and Consent) (KMF) (Entered: 03/23/2026) | |
| 47 | 03/23/2026 | Reply MEMORANDUM in support re 37 Motion for Preliminary Injunction, filed by The C Store Depot, Inc., Zest Brands LLC. (Attachments: # 1 Supplemental Joint Appendix)(MCB) (Entered: 03/24/2026) | |
| 48 | 04/03/2026 | NOTICE by The C Store Depot, Inc., Zest Brands LLC re 37 MOTION for Preliminary Injunction (Attachments: # 1 Exhibit A)(LD) (Entered: 04/06/2026) | |
| 50 | 04/24/2026 | JOINT CASE MANAGEMENT REPORT. (Attachments: # 1 Text of Proposed Order)(LD) (Entered: 04/27/2026) | |
| 51 | 04/29/2026 | ENDORSED ORDER GRANTING the Parties' Joint construed Motion to Extend Time for Defendants to File their Answer 50. Defendants shall file an answer to the Complaint on or before May 15, 2026. The Court, further, GRANTS the Parties' construed Motion to STAY this case beginning after Defendants file an answer until June 15, 2026. This stay will be in effect for all purposes other than filings related to unsealing the record or any notice of appeal. The Parties are DIRECTED to file a joint notice regarding unsealing the record, as detailed in the Case Management Report 50, by May 8, 2026. Signed by Judge Mary S. Scriven on 4/29/2026. (KMF) (Entered: 04/29/2026) | |
| | 05/04/2026 | Case Stay Lifted. (GL) (Entered: 05/04/2026) | |
| 52 | 05/08/2026 | SEALED JOINT STATUS REPORT. (LD). (Entered: 05/11/2026) | |
| 53 | 05/15/2026 | ANSWER and affirmative defenses to 1 Complaint, by United States Food and Drug Administration, United States Health and Human Services, United States of America.(LD) (Entered: 05/19/2026) | |
| 54 | 05/29/2026 | ENDORSED ORDER. The Court is in receipt of the Sealed Joint Status Report 52 and the accompanying hard copies and electronic versions of the redacted documents. Accordingly, the Clerk is DIRECTED to UNSEAL THE CASE. The Clerk is further DIRECTED to PRESERVE THE SEALS on docket entries 1, 2, 7, 21, 35, 37, 37-1, 38-13, 39, 43, and 49. The Parties are DIRECTED to separately docket REDACTED | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | copies of all documents kept sealed, except docket 43, which will remain sealed in its entirety, as agreed to in the Joint Status Report. The SEALED DOCKET ENTRIES 1, 2, 7, 21, 35, 37, 37-1, 38-13, 39, 43, and 49 will remain sealed unless and until an Order of the Court on a duly noticed motion directs otherwise. Signed by Judge Mary S. Scriven on 5/29/2026. (KMF) (Entered: 05/29/2026) | |
| 55 | 06/08/2026 | REDACTION of Verified Complaint [ECF 01] by The C Store Depot, Inc., Zest Brands LLC. (Heyer, Eric) (Entered: 06/08/2026) | |
| 56 | 06/08/2026 | REDACTION Motion to Temporarily Seal Civil Action by The C Store Depot, Inc., Zest Brands LLC. (Attachments: # 1 Exhibit I to Motion to Seal - Redacted, # 2 Exhibit II to Motion to Seal - Redacted, # 3 Proposed Order to Motion to Seal - Redacted)(Heyer, Eric) (Entered: 06/08/2026) | |
| 57 | 06/08/2026 | REDACTION Motion for Temporary Restraining Order by The C Store Depot, Inc., Zest Brands LLC. (Attachments: # 1 Exhibit 1 to Motion for TRO - Redacted, # 2 Exhibit 2 to Motion for TRO - Redacted, # 3 Exhibit 3 to Motion for TRO - Redacted)(Heyer, Eric) (Entered: 06/08/2026) | |
| 58 | 06/08/2026 | REDACTION Transcript of 02/27/26 Motion Hearing by The C Store Depot, Inc., Zest Brands LLC. (Heyer, Eric) (Entered: 06/08/2026) | |
| 59 | 06/08/2026 | REDACTION Motion for Preliminary Injunction by The C Store Depot, Inc., Zest Brands LLC. (Attachments: # 1 Exhibit 1 to Motion for Preliminary Injunction - Redacted)(Heyer, Eric) (Entered: 06/08/2026) | |
| 60 | 06/08/2026 | REDACTION Plaintiff's TRO Hearing Exhibit 14 by The C Store Depot, Inc., Zest Brands LLC. (Heyer, Eric) (Entered: 06/08/2026) | |
| 61 | 06/08/2026 | REDACTION Order Granting Motion for Preliminary Injunction by The C Store Depot, Inc., Zest Brands LLC. (Heyer, Eric) (Entered: 06/08/2026) | |
| 62 | 06/09/2026 | NOTICE OF INTERLOCUTORY APPEAL as to 49 Order on Motion for Preliminary Injunction, by United States Food and Drug Administration, United States Health and Human Services. Filing fee not paid. (LD) (Entered: 06/11/2026) | |
| 63 | 06/11/2026 | TRANSMITTAL of initial appeal package to the U.S. Court of Appeals - 11th Circuit re 62 Notice of Appeal - Interlocutory. Filing fee not paid. (Appealing Order 49, attached is the redacted Order 61) (JVC) (Entered: 06/11/2026) | |
| | 06/12/2026 | ***11th Circuit Case Number: 26-12062-H for 62 Notice of Appeal - Interlocutory filed by United States Food and Drug Administration, United States Health and Human Services. (MCB) (Entered: 06/12/2026) | |
| 64 | 06/16/2026 | Joint MOTION to Stay Pending Resolution of Appeal by United States Food and Drug Administration, United States Health and Human Services, United States of America. (Wise, Mamie) (Entered: 06/16/2026) | |
| 65 | 06/17/2026 | ENDORSED ORDER GRANTING the Parties' Joint Motion to Stay Proceedings Pending Resolution of Appeal 64. The stay of the case that expired on June 15, 2026 is extended nunc pro tunc. The case is STAYED until the Eleventh Circuit issues its decision on the appeal of the preliminary injunction order. Signed by Judge Mary S. Scriven on 6/17/2026. (KMF) (Entered: 06/17/2026) | |
| 66 | 06/18/2026 | RESPONSE re 57 Redacted document Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (Redacted) filed by United States Food and Drug Administration, United States Health and Human Services, United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3 Part 1, # 4 Exhibit 3 Part 2, # 5 Exhibit 3 Part 3, # 6 Exhibit 3 Part 4, # 7 Exhibit 3 Part 5, # 8 Exhibit 3 Part 6, # 9 Exhibit 3 Part 7, # 10 Exhibit 4, # 11 Exhibit 5, # 12 Exhibit 6)(Wise, Mamie) (Entered: 06/18/2026) | |
| 67 | 06/18/2026 | RESPONSE re 59 Redacted document Defendants' Opposition to | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Plaintiffs' Motion for Preliminary Injunction (Redacted) filed by United States Food and Drug Administration, United States Health and Human Services, United States of America. (Wise, Mamie) (Entered: 06/18/2026) | |
| 68 | 06/24/2026 | TRANSCRIPT information form filed by United States Food and Drug Administration, United States Health and Human Services, United States of America re 62 Notice of Appeal - Interlocutory. USCA number: 26-12062. No transcript(s) requested. (Wise, Mamie) (Entered: 06/24/2026) | |
| 69 | 07/30/2026 | NOTICE of change of address by Eric N. Heyer (Heyer, Eric) (Entered: 07/30/2026) | |
| 70 | 07/31/2026 | NOTICE TO COUNSEL Joseph A. Smith of Local Rule 2.01(b)(2)(B), which requires members of the Middle District bar to maintain with the clerk a current telephone number, mailing address, and email address. Update your contact information for the Middle District through PACER. (Signed by Deputy Clerk). (WLB) (Entered: 07/31/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

# TAB 31

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**THE C STORE DEPOT, INC., et al.,**

Plaintiffs,

vs. **Case No.: 8:26-cv-483-MSS-CPT**

**U.S. FOOD AND DRUG ADMINISTRATION, et al.,**

Defendants.
_______________________________________/

**SEALED ORDER**

On Friday February 27, 2026, the Court entered an *ore tenus* Order **GRANTING** the Plaintiffs' Motion for Temporary Restraining Order. (Dkts. 7, 30) This short-form Order memorializes the Court's ruling.

It is hereby **ORDERED** that the Refuse to File letter issued to Plaintiff Zest Brands LLC and dated January 30, 2026, is **STAYED** to maintain the status quo for a period not to exceed **FOURTEEN DAYS** from the date of this Order. The Court's Order and findings are limited to Plaintiffs only and extend only as far as they relate to the PMTA Rule's application to Plaintiffs' specific novel tobacco product. This Order does not refer to ENDs or e-liquid products or any other product subject to the challenged PMTA Rule. This Order is set to **EXPIRE on March 13, 2026** absent a signed notice of all Parties consenting to the extension of this Order.

Based on the factual findings and for the reasons articulated on the record at the hearing in this matter, which are incorporated herein by reference, the Court made the following preliminary findings:

1. Based on the briefing and evidence presented at the February 27, 2026 hearing, Plaintiffs have demonstrated they have a substantial likelihood of success on the merits.
2. Absent a temporary restraining order, Plaintiffs will suffer immediate and irreparable harm.
3. The potential harm Plaintiffs face absent the relief provided in this Order outweighs any harm a temporary restraining order would inflict on the Defendants.
4. The public interest does not support the perpetuation of unlawful agency action but does support ensuring that government agencies abide by the statutes that govern their operations. Furthermore, permitting Plaintiffs to continue under the status quo for fourteen days does not pose significant harm to the public interest.

The Court finds that because Defendants are unlikely to suffer any harm as a result of this Order, Plaintiffs shall not be required to post a bond. **This matter shall remain sealed until the Court orders the seal lifted.**

**DONE** and **ORDERED** in Tampa, Florida this 2nd day of March 2026, *nunc pro tunc* to February 27, 2026.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record

# TAB 55

PUBLIC / REDACTED VERSION

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| THE C STORE DEPOT, INC.<br>5172 Le Tourneau Circle<br>Tampa, FL 33610<br><br>and<br><br>ZEST BRANDS LLC<br>5172 Le Tourneau Circle<br>Tampa, FL 33610<br><br>Plaintiff,<br><br>v.<br><br>U.S. FOOD AND DRUG ADMINISTRATION; MARTIN A. MAKARY, M.D., Commissioner of Food and Drugs, 10903 New Hampshire Avenue, Silver Spring, MD 20903,<br><br>and<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., J.D., Secretary of Health and Human Services, 200 Independence Avenue, SW, Washington DC 20201,<br><br>Defendants. | ) | Case No. **8:26-cv-483-MSS-CPT**<br><br>**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF REQUESTED** |

**VERIFIED COMPLAINT**

Plaintiffs The C Store Depot, Inc. ("CSD") and Zest Brands LLC ("Zest"), for their Complaint against the United States Food and Drug Administration ("FDA"), Martin A. Makary, M.D. (in his official capacity as the Commissioner of Food and

Drugs), the United States Department of Health and Human Services ("HHS"), and Robert F. Kennedy, Jr., J.D. (in his official capacity as Secretary of Health and Human Services), allege and aver as follows:

## NATURE OF THE ACTION

1. Plaintiffs are woman-owned small businesses that manufacture and distribute oral pouch products containing nicotine and food grade-quality ingredients. These products neither contain tobacco nor involve combustion or inhalation of any chemicals. Through this action, Plaintiffs seek a declaratory judgment that FDA violated the Regulatory Flexibility Act, 5 U.S.C. §§ 601, *et seq*., when, in 2021, the agency adopted a rule establishing the requirements for premarket applications for such products without engaging in the required regulatory flexibility analysis. Instead, FDA arbitrarily and capriciously certified that the rule would not have a significant impact on a substantial number of small entities.

2. FDA's failure to engage in the required regulatory flexibility analysis was arbitrary, capricious, and an abuse of discretion because, *inter alia*, when FDA adopted the rule specifying particular application requirements (the "Final PMTA Rule"), the agency claimed that all associated compliance costs resulted not from the Final PMTA Rule, but from another rule FDA had enacted five years before. But in its regulatory flexibility analysis for the earlier rule, FDA claimed it did not know how many manufacturers of novel nicotine products like Plaintiff Zest would be

affected, claimed that FDA could not estimate the costs of preparing applications for such products, and stated that "[w]ith respect to future rules, . . . we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." FDA's failure to engage in the statutorily required regulatory flexibility analysis for its Final PMTA Rule now presents dramatic real-world consequences for Plaintiffs in the form of the immediate and complete destruction of their businesses, as explained herein.

3. Plaintiffs also seek a declaratory judgment that FDA violated the Administrative Procedure Act by (i) arbitrarily and capriciously adopting uniform clinical and non-clinical study and data requirements in the 2021 rule governing premarket applications for all statutorily defined "tobacco products"—ranging from unfiltered combustible cigarette to nicotine pouches like Plaintiffs' that present essentially the same health risks as nicotine gum that FDA has approved as safe and effective as a smoking cessation aid—without considering the relevance, applicability, or appropriateness of the requirements to the degree of harm presented by the products in contravention of Congress's intent; and (ii) issuing a Refuse to File ("RTF") letter to Plaintiff Zest that rejected Zest's premarket applications for its nicotine pouches based on application requirements that FDA unlawfully, arbitrarily, and capriciously adopted through the 2021 rule.

4. In addition to the declarations described above, Plaintiffs seek a judgment temporarily, preliminarily, and permanently enjoining FDA from applying the rule's requirements to premarket applications for nicotine pouches, temporarily and preliminarily staying FDA's RTF letter issued to Zest, and setting aside and vacating the RTF letter.

## THE PARTIES

5. Plaintiff Zest Brands LLC ("Zest") is a Florida limited liability company headquartered at 5172 Le Tourneau Circle, Tampa, Florida 33610. Zest manufactures and sells oral nicotine pouches under its ZEO Universe brand as a reduced harm alternative for users of cigarettes and smokeless tobacco products. Zest employs fewer than 1,500 employees, qualifying it as a "small business" under the Regulatory Flexibility Act. *See* 5 U.S.C. § 601(3); 13 C.F.R. § 121.201.

6. Plaintiff C Store Depot, Inc. ("CSD") is a Florida corporation headquartered at 5172 Le Tourneau Circle, Tampa, Florida 33610. CSD distributes Plaintiff Zest's ZEO Universe oral nicotine pouches to tobacco and nicotine product wholesalers and retailers nationwide. Zest also employs fewer than 1,500 employees, qualifying it as a "small business" under the Regulatory Flexibility Act.

7. Defendant United States Food and Drug Administration is an executive branch agency of the federal government and is headquartered at 10903 New Hampshire Avenue, Silver Spring, Maryland 20903.

8. Defendant Martin A. Makary, M.D. (sued here only in his official capacity), is the Commissioner of Food and Drugs and an officer of the United States. His office is at 10903 New Hampshire Avenue, Silver Spring, MD 20903.

9. Defendant United States Department of Health and Human Services ("HHS") is an executive branch agency of the federal government and is headquartered at 200 Independence Avenue, S.W., Washington, DC 20201.

10. Defendant Robert F. Kennedy, Jr., J.D., (sued here only in his official capacity) is the Secretary of Health and Human Services and an officer of the United States. His office is at 200 Independence Avenue, S.W., Washington, DC 20201.

11. FDA is an operating division of HHS. The Commissioner of Food and Drugs reports to the Secretary of Health and Human Services.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1361. This Court has the authority to grant the declaratory relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201 and 2202. The Court also has the authority to hold unlawful and set aside FDA's actions pursuant to 5 U.S.C. §§ 611(a), 702, and 706.

13. This Court has personal jurisdiction over Defendants FDA, HHS, Commissioner Makary, and Secretary Kennedy in their official capacities, as each is an agency or official of the United States Government.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C) as the district wherein Plaintiffs reside.

## FACTS

### A. The Parties Agree that Oral Nicotine Pouches Like Plaintiffs' Present Far Fewer Health Risks than Traditional Tobacco Products.

15. The Centers for Disease Control, which is an operating agency of Defendant HHS, has explained that oral "[n]icotine pouches are small microfiber pouches that contain a powder made of nicotine, flavorings, and other ingredients. People typically put pouches between their lip and gum, where the nicotine is absorbed."[1]

16. Unlike traditional tobacco products, and similar to other oral nicotine pouch products, Plaintiffs' ZEO Universe oral nicotine pouches do not contain any tobacco leaf or other tobacco plant material. Instead, in addition to pharma (USP) grade nicotine, they contain other inactive and non-addictive ingredients that are generally recognized by FDA as safe when used as food additives.

17. Also, unlike traditional tobacco products, use of Plaintiffs' ZEO Universe oral nicotine pouches does not involve any combustion or inhalation of any chemicals. Instead, when the user places the pouch in his or her mouth, the nicotine

[1] *See* https://www.cdc.gov/tobacco/nicotine-pouches/index.html (Jan. 2025).

contained in the pouch is absorbed over time into the user's bloodstream through the buccal membranes.

18. As a result, oral nicotine pouches as a category, including Plaintiffs' ZEO Universe nicotine pouches, are far less harmful than traditional tobacco products, including those involving combustion and direct and secondhand inhalation of smoke, such as combustible cigarettes, and smokeless tobacco products, which FDA has stated may contain 4,000 chemicals, including as many as 30 chemicals linked to oral and other cancers.[2]

19. For years, FDA has recognized that different tobacco and nicotine-containing products present different health risks, with combusted tobacco products, such as cigarettes, most harmful to health and non-combusted products posing lower health risks.

20. For example, in a 2017 speech, the FDA Commissioner observed that "it's cigarettes that are the primary cause of tobacco-related disease and death" but that "the nicotine in cigarettes is not directly responsible for the cancer, lung disease, and heart disease that kill hundreds of thousands of Americans each year. . . . [Rather,] it's the other chemical compounds in tobacco, and in the smoke created by

---

[2] FDA, Smokeless Tobacco Products, Including Dip, Snuff, Snus, and Chewing Tobacco (June 7, 2023), https://www.fda.gov/tobacco-products/products-ingredients-components/smokeless-tobacco-products-including-dip-snuff-snus-and-chewing-tobacco.

setting tobacco on fire, that directly and primarily cause the illness and death, not the nicotine."[3]

21. While nicotine is addictive, nicotine itself does ***not*** cause cancer. FDA's website emphasizes that it is the "toxic mix of chemicals [in tobacco smoke]—***not nicotine***—[that] causes serious health effects among those who use tobacco products, including fatal lung diseases, like chronic obstructive pulmonary disease (COPD) and cancer."[4]

22. FDA thus recognizes that oral nicotine poches are generally a lower-risk alternative for cigarette smokers.[5] Indeed, as recently as September 2025, FDA acknowledged that "nicotine pouches can help some adults switch away from more harmful tobacco products, and adults who significantly reduce their cigarette use or fully switch from smoking cigarettes to using a lower-risk alternative tobacco

---

[3] FDA Commissioner Scott Gottlieb, *Protecting American Families: Comprehensive Approach to Nicotine and Tobacco* (June 28, 2017), available at: https://tinyurl.com/4zjcmvjb (last visited June 6, 2024).

[4] FDA, Nicotine Is Why Tobacco Products Are Addictive (July 7, 2025), https://www.fda.gov/tobacco-products/health-effects-tobacco-use/nicotine-why-tobacco-products-are-addictive#2 (emphasis added).

[5] FDA, The Relative Risks of Tobacco Products (Dec. 19 2025), https://www.fda.gov/tobacco-products/health-effects-tobacco-use/relative-risks-tobacco-products.

product could generally reduce their health risks and exposure to toxic and cancer-causing chemicals."[6]

### B. In its Analysis of a Rule "Deeming" Novel Tobacco Products to be Subject to the Tobacco Control Act's Premarket Authorization Requirements, FDA Emphasized that It Could Not Quantify the Costs Associated with Future Rulemakings Specifying the Contents of Premarket Tobacco Applications.

23. In 2009, Congress granted FDA regulatory authority over tobacco products for the first time by amending the Federal Food, Drug, and Cosmetic Act ("FDCA") through the Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776 (2009) ("TCA" or "Act").

24. When granting FDA jurisdiction over tobacco products, Congress made clear that its underlying purpose and intent was to reduce the morbidity (disease) and mortality (death) that results from smoking and the use of other traditional tobacco products.

25. For example, in its findings, Congress concluded that combustible cigarettes "cause cancer, heart disease, and other serious adverse health effects"; are "the foremost preventable cause of premature death in America"; cause "over 400,000 deaths in the United States each year,"; and that "approximately 8,600,000

---

[6] FDA, FDA Launches Program to More Efficiently Review Nicotine Pouch Applications (Sept. 18, 2025), https://www.fda.gov/tobacco-products/ctp-newsroom/fda-launches-program-more-efficiently-review-nicotine-pouch-applications.

Americans have chronic illness relating to smoking." TCA, §§ 2(2), (13), 123 Stat. 1776, 1777.

26. Congress also found that a 50 percent "reduction in youth smoking" would save "over 3,000,000" minors "from premature death due to tobacco-related disease" and "would also result in approximately $75,000,000,000 in savings attributable to reduced health care costs." TCA, § 2(14), 123 Stat. 1776, 1777.

27. Congress also stated that one of its purposes in enacting the TCA was to "provide new and flexible enforcement authority" to FDA "to ensure that there is effective oversight of the tobacco industry's efforts to develop, introduce, and promote less harmful tobacco products." TCA § 3(4), 123 Stat. 1776, 172.

28. The TCA's requirements originally extended only to "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco."[7] 21 U.S.C. § 387a(b). However, Congress allowed FDA to extend by regulation the TCA's requirements to "any other tobacco products that the Secretary by regulation deems" to fall under the Act. *Id*.

29. In 2016, FDA first extended the TCA's requirements to novel nicotine products when it "deemed" products containing nicotine derived from tobacco to be

[7] The TCA defines "smokeless tobacco" as "any tobacco product that consists of cut, ground, powdered, or leaf tobacco and that is intended to be placed in the oral or nasal cavity." 21 U.S.C. § 387(18).

"tobacco products" under the Act. *See* 81 Fed. Reg. 28974 (May 10, 2016) (the "Deeming Rule") (adopting, *inter alia*, 21 C.F.R. § 1100.1).

30. Then, in March 2022, Congress enacted legislation expanding the TCA's definition of "tobacco product" to include products "containing nicotine from any source," even if that source was not the tobacco plant, effective April 14, 2022. *See* Pub. L. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

31. Under section 910 of the TCA, anyone wishing to market a "new tobacco product" in interstate commerce must file a premarket tobacco product application ("PMTA") with FDA and receive a marketing granted order from the agency. *See* 21 U.S.C. § 387j.

32. A "new tobacco product" is one "that was not commercially marketed in the United States as of February 15, 2007." 21 U.S.C. § 387j(a)(1)(A).

33. Section 910 of the Act requires FDA to issue a marketing granted order if the PMTA demonstrates, among other things, that permitting marketing of the new tobacco product "would be appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2)(A).

34. While the TCA sets out certain categories of information that a PMTA must contain, 21 U.S.C. § 387j(b), it does not elaborate as to the requirements or specific information necessary to satisfy the PMTA requirements.

35. Instead, the Act provides that whether an applicant has shown that a marketing granted order for a tobacco product would be "appropriate for the protection of the public health," 21 U.S.C. § 387j(c)(2)(A), "shall, when appropriate, be determined on the basis of well-controlled investigations, which may include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product." 21 U.S.C. § 387j(c)(5)(A).

36. However, the TCA also provides that, if FDA "determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A)) which is sufficient to evaluate the tobacco product," the FDA may grant a marketing order based on such other evidence. 21 U.S.C. § 387j(c)(5)(B).

37. At the time FDA issued the Deeming Rule in 2016, the agency had not yet begun to develop the regulations governing PMTAs, including regulations specifying the types of "investigations," or studies, required of applicants, including clinical studies involving human subjects.

38. Nevertheless, as required by the Regulatory Flexibility Act, 5 U.S.C. § 604, FDA issued a Final Regulatory Impact and Regulatory Flexibility Act analysis ("Deeming Rule RIA") in conjunction with the Deeming Rule.[8]

[8] Available at https://www.regulations.gov/document/FDA-2019-N-2854-0125.

39. In its Deeming Rule RIA, FDA repeatedly stressed that "research burdens of PMTAs are quite different from premarket applications for new drugs. For example, FDA does not expect that PMTAs will include randomized clinical trials like those conducted to support drug approvals." Deeming Rule RIA at 86, 150.

40. In response to public comments that argued that "based on the types of studies that FDA would require . . . the cost of a PMTA could be millions of dollars per product," FDA stated, "We disagree." Deeming Rule RIA at 37. In its discussion of potential "Human Studies," FDA suggested that it anticipated that applicants would be able to rely on publicly available information or studies that FDA itself was conducting at the time—not that multi-million dollar studies of the applicants' individual products would be required. *Id.* at 149-50.

41. The Deeming Rule RIA did not include any specific estimates for the costs of preparing PMTAs for novel nicotine products other than electronic nicotine delivery system ("ENDS") products and e-liquids for use in them.

42. Rather, even though FDA noted that the Deeming Rule would extend the TCA's requirements, including the premarket authorization requirement to "tobacco products that do not fit into traditional product categories, such as ENDS and nicotine gels," FDA stated that it was unable to quantify the "costs for novel tobacco products other than ENDS due to lack of data." Deeming Rule RIA at 75.

FDA further stated that it could not even estimate the number of manufacturers and importers of such novel products that would be affected by the Deeming Rule. *Id*. at 69.

43. In response to comments criticizing FDA for failing to accurately quantify the costs of the Deeming Rule, including the costs of preparing PMTAs, FDA stated: "With respect to future rules, . . . we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." Deeming Rule RIA at 53-54.

### C. When FDA Later Published a Rule Specifying the Contents of Premarket Tobacco Applications, the Agency Claimed It had Already Accounted for the Costs of Compliance in the Deeming Rule Even Though the New Rule Piled on Substantial Additional Investigation Costs.

44. More than three years later, on September 25, 2019, FDA published its proposed rule regarding the agency's requirements for the contents of PMTAs for all tobacco products, including "deemed" tobacco products. Premarket Tobacco Product Applications and Record Keeping Requirements, Proposed Rule, 84 Fed. Reg. 50566 ("Proposed PMTA Rule").

45. The Proposed PMTA Rule, the text of which alone took up fully 24 pages of the *Federal Register*, set forth the required content and format of PMTAs. *See* 21 C.F.R. § 1114.7.

46. In conjunction with the Proposed PMTA Rule, FDA published a preliminary impact analysis and initial regulatory flexibility analysis ("PMTA Rule Preliminary RIA").[9]

47. In its PMTA Rule Preliminary RIA, FDA proposed to certify pursuant to 5 U.S.C. § 605(b) that the PMTA Rule "would not have a significant economic impact on a substantial number of small entities." PMTA Rule Preliminary RIA at 6.

48. FDA reasoned that it had "already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule" in 2016, PMTA Rule Preliminary RIA at 7, and that the earlier analysis "accounted for the costs to comply with the format and content requirements of a PMTA as described in the TCA," *id*. at 22.

49. Some 598 comments were filed with FDA by stakeholders in response to the Proposed PMTA Rule.

50. In response to the PMTA Rule Preliminary RIA, the Small Business Administration's ("SBA") Office of Advocacy filed comments. In those comments, SBA objected to FDA's proposed certification that the PMTA Rule would not have a significant impact on a substantial number of small entities, writing that the certification "improperly assumes that the compliance costs of the proposed rule's

[9] Available at https://www.fda.gov/media/130833/download?attachment.

requirements for deemed products are due to the agency's 2016 rule," rather than to the PMTA Final Rule, which explained FDA's interpretation and implementation of the statutory requirements.

51. Despite SBA's Office of Advocacy's objection, FDA published the final PMTA Rule on October 5, 2021, months before Zest's products were brought under the FDA's jurisdiction. 86 Fed. Reg. 55300 ("Final PMTA Rule").

52. FDA published its final Regulatory Impact Analysis and Regulatory Flexibility Act Analysis ("Final PMTA Rule RIA") on the same date.[10]

53. In its Final PMTA Rule RIA, FDA certified that the Final PMTA Rule would generate net benefits or negligible net costs for most affected small entities. FDA thus certified that the Final PMTA Rule would not have a significant economic impact on a substantial number of small entities. Final PMTA Rule RIA at 7, 41

54. In response to comments asserting that FDA had failed to account for many of the costs to prepare and submit PMTAs for deemed tobacco products, FDA stated: "We attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Final Rule and not this rule. We therefore consider most aspects of these comments out-of-scope." Final PMTA Rule RIA at 12.

[10] Available at https://www.fda.gov/media/152622/download.

55. Likewise, in response to comments, like those submitted by the SBA, that suggested that FDA improperly proposed to certify that the PMTA rule would not have a significant impact on a substantial number of small entities, FDA stated: "We disagree with this comment. We believe that this comment conflates the impacts of the Deeming Rule with the impacts of this final rule." Final PMTA Rule RIA at 13.

56. Because FDA certified that the PMTA rule would not have a significant impact on a substantial number of small entities, the agency rejected the suggestion that it needed to prepare a full regulatory flexibility analysis. Final PMTA Rule RIA at 42. As a result, FDA did not consider potential alternatives or modifications to the Proposed PMTA Rule to lessen the burden of its requirements on small entities while still satisfying the TCA's statutory requirements as would otherwise be required by 5 U.S.C. § 604(a)(6).

57. FDA reached its conclusions that the Final PMTA Rule would generate net benefits or negligible net costs for most affected small businesses even though, through its interpretation of the types of "investigations" that *all* applicants for premarket authorization would need to provide, FDA piled on substantial additional costs to generate and submit a complete PMTA.

58. Thus, by way of example, in 21 C.F.R. § 1114.7(k), FDA required applicants for *all* types of tobacco products, regardless of whether such products

contained any harmful or potentially harmful constituents besides nicotine, to submit, *inter alia*:

a. study reports regarding the health effects of the constituents, including harmful and potentially harmful constituents, "at the quantitative levels delivered to both users and nonusers under the range of conditions under which the product might be used," 21 C.F.R. § 114.7(k)(1)(i)(A);

b. study reports regarding the "genotoxicity, carcinogenicity, reproductive toxicity, immunotoxicity, acute toxicity, and repeat dose (chronic) toxicity" of the product both standing alone and relative to other tobacco products, including "studies which discuss the toxicological effects of any leachables and extractables that can appear from the container closure system and the ingredient mixture," 21 C.F.R. § 1114.7(k)(1)(i)(B);

c. study reports regarding the "pharmacological profile" of the product, "including pharmacokinetics, pharmacodynamics, metabolism, and elimination profile" of "*any* of the ingredients, additives, and [harmful and potentially harmful constituents]" both standing alone and relative to other tobacco products," 21 C.F.R. § 1114.7(k)(1)(i)(C) (emphasis added);

d. study reports addressing "[h]ow users actually use the product, including use topography, product use frequency, [and] use trends over time," 21 C.F.R. § 1114.7(k)(1)(ii)(B);

e. study reports on the likelihood that users of other tobacco products will (i) start using the product; (ii) use the product in conjunction with other tobacco products; (iii) switch or switch back to using other, more harmful tobacco product after starting use of the product; and (iv) use the product when they might have otherwise quit using all tobacco products, 21 C.F.R. § 1114.7(k)(1)(ii)(C)-(F);

f. study reports on the likelihood that non-users of tobacco products will initiate use of the product, as well as switch to other, more harmful, tobacco products, 21 C.F.R. § 1114.7(k)(1)(ii)(A)-(B);

g. study reports on the likelihood that former users of tobacco products will re-initiate use with the subject product, 21 C.F.R. § 1114.7(k)(1)(iii)(C); and

h. the impact of the product and its labeling and advertising on consumer perception, use intentions, and ability to use the product in accordance with instructions, 21 C.F.R. § 1114.7(k)(1)(iv)(A)-(C).

59. Contrary to FDA's suggestions in the "Human Studies" section of its Deeming Rule RIA that applicants would be able to rely heavily on publicly available information or studies that FDA itself was conducting, for novel products like oral nicotine pouches, each of the above-referenced categories requires either

significant non-clinical testing and/or clinical studies involving human subjects with at least some number of the applicant's own, unique products.

60. Further, despite FDA's repeatedly stating in its Deeming Rule RIA that the agency did not expect that randomized clinical trials would be required for most tobacco products, in reality, to authorize a tobacco product through the PMTA pathway, FDA has typically required a longitudinal switching or cessation study, such as a randomized controlled trial, in which the applicant's specific product is used. Depending on study design and duration, these studies alone typically cost between $1,000,000 and over $6,000,000 or more. FDA does not provide pass/fail criteria for such clinical studies; thus, even if an applicant devotes substantial time and resources to such a study, it does not know whether it will meet FDA's standards.

61. Depending on the product's complexity and the extent of clinical (i.e., human subject) evidence included, a bundled PMTA for an oral nicotine pouch product that satisfies all of FDA's "investigation" demands set forth in the Final PMTA Rule will typically cost between $3 million and over $15 million.

62. This actual cost range is a far cry from the estimate FDA provided in its Deeming Rule RIA for e-liquid products for use in electronic nicotine delivery systems, or e-cigarettes (which themselves are significantly more complex than oral nicotine pouch products because they involve heating, aerosolization, and inhalation). In its Deeming Rule RIA, FDA estimated the cost of preparing a

complete bundled PMTA for these product to be between $181,686 and $2,014,120, with an average cost per SKU of $131,643. Deeming Rule RIA at 87.

63. The vast disparity between the costs FDA estimated in its Deeming Rule RIA for e-liquids for use in e-cigarettes and the actual costs to prepare a complete PMTA for a far less complex product, oral nicotine pouch products, is the result of the significantly more onerous "investigation" demands that FDA imposed through the Final PMTA Rule.

64. Indeed, FDA's demands set forth in both the Proposed and Final PMTA Rule caused many manufacturers of novel nicotine products that had originally intended to or did, in fact, submit PMTAs that failed to satisfy FDA's "investigation" requirements to close their doors and withdraw from the market completely.

**D. Plaintiff Zest Timely Submits PMTAs for its Oral Nicotine Pouch Products in 2022.**

65. As noted above, effective April 14, 2022, Congress broadened the TCA's definition of "tobacco product" to include products "containing nicotine from any source." Pub. L. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

66. The same legislation required that, for products containing non-tobacco nicotine that were already commercially marketed to remain on the market, applications for such products had to be submitted to FDA by May 14, 2022. *See* Pub. L. 117-103, § 111(d).

67. Because Zest's oral nicotine pouch products were not commercially marketed as of February 15, 2007, they are considered a "new tobacco product" under section 910 of the TCA.

68. Zest was established in 2019, before its nicotine-containing products were brought under the TCA by legislation on April 14, 2022. Zest also launched its nicotine pouch products before that date.

69. On May 14, 2022, Zest, through its scientific consultants, submitted bundled PMTAs for [redacted] of its ZEO Universe pouch products containing synthetic nicotine.[11] Zest submitted various amendments to the PMTAs between May 14, 2022, and March 26, 2025.

70. As noted above, the ZEO Universe pouch products contain high-quality, food-grade ingredients sourced from industry standard suppliers and pharmaceutical (USP) grade nicotine. In this respect, the ZEO Universe pouches are not materially different from nicotine pouch products sold by major tobacco companies that obtained FDA marketing granted orders in 2025, including Philip Morris International's ZYN and Altria Group's on! Plus.

71. Because Zest submitted its PMTAs by May 14, 2022 (one month after the TCA was amended to cover non-tobacco nicotine pouch products), Zest's pouch

[11] A "bundled" PMTA is "a single premarket submission for multiple products." 86 Fed. Reg. 55300, 55317.

products were not immediately subject to an FDA enforcement action. *See* Pub. L. 117-103, § 111(d).

72. On December 1, 2022, Zest received an acceptance letter from FDA noting the agency's acceptance of Zest's bundled PMTAs.

**E. FDAs Process for Reviewing PMTAs**

73. In its Final PMTA Rule, FDA provided for three stages of review of premarket applications:

a. Acceptance review. When an applicant submits a PMTA to FDA, the agency conducts an initial review "to determine whether the PMTA may be accepted for further review." 21 C.F.R. § 1114.27(a). FDA must "accept" a PMTA for further review if the application complies with the content and format requirements found in 21 C.F.R. §§ 1105.10 and 1114.7. *See* 21 C.F.R. § 1114.27(a). If FDA does not "accept" a PMTA, it will issue a "Refuse to Accept" Letter and "close" the application. 21 C.F.R. §§ 1114.27(a), 1114.29(a), (b).

b. Filing review. If FDA "accepts" a PMTA, it then makes "a threshold determination of whether the application contains sufficient information to permit a substantive review" (also called "application review"). 21 C.F.R. § 1114.27(b). If the PMTA contains sufficient

information for "substantive review," FDA "files" the application. 21 C.F.R. § 1114.27(b)(2).

c. Substantive review. If FDA "files" the PMTA, it will then conduct a "substantive review" of the application and "act on the application" within 180 days of the date of filing. 21 C.F.R. § 1114.27(c)(1)-(2).

## F. FDA's Exercise of Enforcement Discretion for New Tobacco Products with Timely-Filed PMTAs Undergoing any Stage of Review

74. The distribution of an FDA-regulated product without the required FDA marketing authorization may result in an FDA "enforcement action."

75. FDA enforcement actions with respect to tobacco products include, among other things:

a. administrative civil money penalty proceedings that may result in penalties of up to $21,903 for each violation, not to exceed $1,460,195 for all violations adjudicated in a single proceeding, *see* 21 U.S.C. § 333(f)(9)(A); 21 C.F.R. § 17.2; 45 C.F.R. § 102.3;

b. injunction proceedings that may result in a permanent injunction prohibiting the defendant from marketing its products, *see* 21 U.S.C. § 332(a);

c. the seizure and destruction of the subject products, *see* 21 U.S.C. § 334(a); and/or

d. a criminal prosecution that could result in one year in prison and/or a fine of $1,000, *see* 21 U.S.C. § 333(a)(1).

76. However, FDA often exercises "enforcement discretion"—*i.e.*, refrains from bringing an enforcement action—for products that do not have FDA marketing authorization.

77. Because many non-tobacco nicotine pouch products were legally on the market before they became subject to the TCA in 2022, FDA's general practice has been to exercise enforcement discretion for non-tobacco nicotine pouch products with timely-filed PMTAs so long as those PMTAs are undergoing any stage of FDA review (be it acceptance review, filing review, or substantive review).

78. Thus, for instance, FDA never took enforcement action regarding Philip Morris' ZYN product or Altria Group's on! PLUS product even though Philip Morris and Altria Group marketed the products before FDA authorized the products.

79. Multiple other brands of oral nicotine pouch products containing both tobacco-derived nicotine and non-tobacco nicotine that are the subject of pending PMTAs, including products sold by large tobacco companies, such as British American Tobacco's VELO and Altria Group's on!, have been commercially marketed by their manufacturers for years without enforcement activity by FDA.

80. Indeed, on information and belief, FDA has never initiated an enforcement action charging a respondent/defendant with selling an unauthorized nicotine pouch product where that product was the subject of a timely-filed PMTA still undergoing any stage of FDA review.

### G. FDA Refuses to File Plaintiff's PMTAs for Substantive Review.

81. On January 30, 2026, FDA issued a Refuse to File ("RTF") letter for Zest's PMTAs. Before Zest received the RTF letter, Zest had not received any communication from the FDA on its PMTAs since the acceptance letter in December 2022.

82. Each of the bases for FDA's refusal to file the applications cited in the agency's RTF letter relied on provisions found in FDA's Final PMTA Rule, 21 C.F.R. Part 1114.

83. FDA's RTF letter warned: "You cannot introduce or deliver for introduction these products into interstate commerce. The manufacture, sale, and/or distribution of these products, as new tobacco products that lack FDA authorization, is prohibited by law and subject to enforcement action by FDA unless and until the products receives (sic) such authorizations … These actions may include, but are not limited to, civil money penalties, including an enhanced civil money penalty under [21 U.S.C. 333(f)(9)(B)(i)], seizure, criminal prosecution, and/or injunction."

84. FDA's RTF letter indicated that Zest could submit new PMTAs for these products with the allegedly missing information. However, it is Plaintiffs' understanding that FDA would consider such a new PMTA to be submitted after May 14, 2022, and that the products would therefore not be eligible for FDA's practice of enforcement discretion for products with timely-filed PMTAs

undergoing any stage of FDA review. It is also Plaintiffs' understanding that FDA would place such new PMTAs at the end of the agency's queue of pending PMTAs, further delaying the agency's review of Zest's PMTAs.

85. As a result of the RTF letter, if Plaintiffs continue to sell and distribute their respective inventories of ZEO Universe non-tobacco nicotine pouches in interstate commerce, they will be subject to FDA enforcement activity.

86. Unless FDA's RTF letter is declared to be unlawful and enjoined, Plaintiffs' [redacted]. Further, Plaintiffs will be forced to [redacted]. The [redacted], meaning that even if Plaintiffs submitted new applications and FDA did allow Plaintiffs to again market the ZEO Universe products, Plaintiffs' [redacted] now would cause Plaintiffs irreparable reputational harm with their customers.

87. If FDA's RTF letter is not declared to be unlawful and enjoined, Plaintiffs will lose the value of their respective inventories and of the costs of preordered goods and raw materials already purchased for Zest to manufacture additional quantities of ZEO Universe pouches. Plaintiffs will also lose the

substantial investment in the PMTA work to date, which was financed primarily by [redacted].

88. Approximately [redacted] of Zest's overall revenues are derived from sales of its ZEO Universe pouch products subject to the RTF letter and [redacted] of C Store Depot's overall revenues are derived from sales of the same ZEO Universe pouch products. If the Court does not issue an injunction and declare the RTF letter unlawful, both Zest and C Store Depot [redacted]. Absent injunctive relief, Zest and C Store Depot will be forced to [redacted] Approximately [redacted] without an injunction.

**<u>COUNT I</u>**
**Regulatory Flexibility Act**

89. Plaintiffs repeat each of the preceding paragraphs as if fully set forth herein.

90. The Regulatory Flexibility Act requires federal agencies to follow certain procedures to consider and minimize the impact of a proposed rule that would affect a substantial number of small entities, including analysis of potential alternatives to the regulation that would satisfy the statutory requirements without imposing unnecessary burdens on small businesses. 5 U.S.C. §§ 603(a)-(c), 604(a).

91. An agency can avoid this requirement "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). When an agency makes such a certification, the agency is required to also publish a statement providing the factual basis for the certification. *Id*.

92. An agency's improper certification is subject to judicial review under the Administrative Procedure Act's "arbitrary and capricious" standard. 5 U.S.C. § 611(a); *Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1433-37 (M.D. Fla. 1998).

93. A court may find a certification to be improper where, even though there is a "statement," the statement does not provide a factual basis, or explanation, for why the rule at issue will not have a significant economic impact on a substantial number of small entities. *North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647, 652 (E.D. Va. 1997).

94. Plaintiffs Zest and CSD are small entities for purposes of the Final PMTA Rule.

95. In FDA's Deeming Rule RIA, the agency explicitly acknowledged that it lacked data on the number of manufacturers and importers of novel nicotine products other than ENDS and stated that it could not quantify the costs of the

Deeming Rule (which include the costs of PMTA preparation) for such products due to a lack of data. Deeming Rule RIA at 69, 75.

96. Further, FDA had not yet even begun the process of developing the regulations governing PMTAs that would define the "investigations" required of applicants. FDA thus noted that it could not "predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." Deeming Rule RIA at 53-54.

97. Nevertheless, in the Deeming Rule RIA, FDA minimized the need for expensive clinical studies and repeatedly suggested that randomized controlled trials would likely be unnecessary for most newly deemed products.

98. However, five years later, when FDA finalized the PMTA Rule, the agency imposed requirements for multiple costly clinical studies, including randomized controlled trials or their equivalents (i.e., longitudinal studies that followed user switching behavior over time), for *all* new tobacco products, regardless of their overall risk profile in terms of morbidity and mortality.

99. And, despite the fact that FDA had previously acknowledged that it could quantify neither the number of manufacturers of novel nicotine products other than ENDS nor the costs the Deeming Rule (and thus the PMTA process) would impose on such manufacturers, FDA certified that the Final PMTA Rule would have no significant impact on a substantial number of small entities. FDA claimed that

this was the case because all costs associated with preparing and submitting a PMTA were attributable exclusively to the Deeming Rule, and thus accounted for in the Deeming Rule RIA.

100. Like the certification in *North Carolina Fisheries Ass'n v. Daley*, FDA's certification includes a statement—that the Final PMTA Rule would generate net benefits or negligible net costs for most affected small entities—but not a factual basis for that statement. By claiming that all costs associated with the PMTAs resulted from the Deeming Rule and not the Final PMTA Rule itself, FDA elided an explanation of the actual effects of the Final PMTA Rule's particular requirements.

101. In summary, although FDA admitted in its Deeming Rule RIA that the agency could not estimate the costs of rules that had not yet been promulgated, including those governing PMTA requirements, when it later issued the Final PMTA Rule, FDA relied on and cited the regulatory impact analysis performed years earlier, before any proposed PMTA rule was even developed.

102. And, as the multiple contradictions between FDA's statements in its Deeming Rule RIA and Final PMTA Rule RIA underscore, the added costs of the specific investigation requirements set forth in the Final PMTA Rule are significant and have driven many small businesses out of the market.

103. FDA admitted in the Deeming Rule RIA that it could not provide a reliable estimate of the number of small manufacturers that would exit the market,

but when it issued the Final PMTA Rule, FDA ignored this impact, considering only the regulatory costs to firms that filed a PMTA.

104. The Regulatory Flexibility Act thus required FDA to prepare and publish a full regulatory flexibility analysis in conjunction with the agency's adoption of the Final PMTA Rule that evaluated and explained, *inter alia*, the steps FDA took to minimize the economic impact on small entities, including an evaluation of other significant alternatives to the Final PMTA Rule. 5 U.S.C. § 604(a).

105. By failing to prepare and publish such a full regulatory flexibility analysis, FDA violated the Regulatory Flexibility Act.

106. FDA's certification that the Final PMTA Rule would generate net benefits or negligible net costs for most affected small entities was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

107. The Final PMTA Rule has had a significant impact on a substantial number of small entities, preventing many from applying or from applying for the full scope of tobacco products for which they would otherwise apply and limiting their ability to submit applications that comply with the regulations and requirements imposed by the Final PMTA Rule. FDA could have regulated premarket tobacco applications submitted by small entities in another manner, and its certification

unreasonably ignored the economic impact of the choices it made in developing the Final PMTA Rule.

108. Zest's RTF letter is premised on alleged failures to comply with requirements of the Final PMTA Rule, including a pharmacokinetics clinical study requirements that only the Final PMTA Rule establishes as a required "investigation."

109. Zest's RTF letter constitutes final agency action for purposes of judicial review under the Regulatory Flexibility Act.

110. Plaintiffs thus seek a declaration that FDA adopted the Final PMTA Rule in violation of the Regulatory Flexibility Act, an order vacating the Final PMTA Rule until FDA complies with its obligations under the Regulatory Flexibility Act, and an order setting aside and vacating FDA's Refuse to File letter issued to Zest for its alleged failure to comply with the Final PMTA Rule.

111. Because Plaintiffs will also suffer immediate, irreparable harm absent injunctive relief, Plaintiffs also request temporary and preliminary injunctions staying the RTF letter.

**COUNT II**
**Administrative Procedure Act**

112. Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

113. Under the Administrative Procedure Act, a "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." 5 U.S.C. § 704.

114. The APA requires a court to "hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2).

115. A court's APA "review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (cleaned up).

116. FDA's RTF letter is subject to judicial review under the APA because it is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see, e.g.*, *Braeburn v. FDA*, 389 F. Supp. 3d 1 (D.D.C. 2019) (setting aside "FDA Letter Decision" under the APA).

a. FDA's RTF letter is "final agency action" because it is a final determination by the agency that Zest's PMTAs are not eligible for substantive review. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (stating a "final agency action" is one that "marks the consummation of the agency's decision-making process" and that is not "tentative or interlocutory in nature") (cleaned up); *see also, e.g.*, 21 C.F.R. § 1114.29(b).

b. FDA's RTF letter is "final agency action" also because it disqualifies the products at issue from FDA's enforcement discretion for ENDS products with timely-filed PMTAs undergoing any stage of FDA review. *See Bennett*, 520 U.S. at 178 (stating that a "final agency action" is "one by which rights or obligations have been determined or from which legal consequences will flow") (cleaned up).

117. The RTF letter injures Zest in that it denies Zest the substantive review of its PMTAs to which Zest is entitled.

118. The RTF letter also injures Plaintiffs in that it disqualifies the products at issue from FDA's enforcement discretion for non-tobacco nicotine pouch products with timely-filed PMTAs undergoing any stage of FDA review.

119. The relief Plaintiffs requests in this Complaint would redress Plaintiffs' injuries in two ways:

a. It would result in Zest eventually obtaining substantive review of its PMTAs; and

b. It would render the products sold by Plaintiffs eligible for FDA's enforcement discretion for non-tobacco nicotine pouch products with timely-filed PMTAs undergoing any stage of FDA review.

120. The RTF letter is premised on alleged failures to comply with requirements of the Final PMTA Rule.

121. The RTF letter is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law because FDA's certification that the Final PMTA Rule would have no significant impact on a substantial number of small entities was arbitrary and capricious for the reasons explained above.

122. FDA's Final PMTA Rule—and the RTF letter that relies thereon—is also arbitrary and capricious because it imposes extensive, costly, and uniform "investigation" requirements on *all* new tobacco products regardless of the morbidity and mortality profile of those products in contravention of Congress's intent when it established the "appropriate for the protection of the public health" standard for authorizing marketing of new tobacco products.

123. FDA's Final PMTA Rule—and the RTF letter that relies thereon—is also arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law because FDA's Final PMTA Rule fails to specify any objective criteria for FDA to apply to determine whether marketing a new tobacco product is "appropriate for the protection of the public health."

124. "Appropriate for the protection of the public health" is not defined in the TCA. However, all undefined statutory terms "do—in fact must—have a single, best meaning" that is "fixed at the time of enactment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

125. The best meaning of the term "appropriate for the protection of the public health" is that the new tobacco product will contribute to a net decrease in serious tobacco-related disease and death in the U.S. population as a whole.

126. Although oral nicotine pouch products, like Zest's ZEO Universe pouches, contain no harmful or potentially harmful constituents other than nicotine, no carcinogens, and food grade ingredients, and Defendants' own studies suggesting they are not popular among youth,[12] the Final PMTA Rule subjects them to many of the same "investigation" requirements as a wide range of combustible, carcinogenic, and/or inhaled tobacco products, including cigarettes, smokeless tobacco, and ENDS. Among these requirements is the requirement for a clinical study on the nicotine pharmacokinetics of the products.

127. FDA had authority to interpret, explain, and implement the generic PMTA requirements set forth in the TCA in a variety of ways, but chose to interpret the statutory "investigation" requirements in a uniform manner that imposes unduly burdensome clinical study requirements on manufacturers of novel, non-combusted,

[12] The CDC's 2024 National Youth Tobacco Survey found that only 1.8% of middle and high school youth had used nicotine pouches in the last 30 days, and that 70% of that 1.8% used the products less than 20 out of the last 30 days, suggesting a lack of dependency for most users. FDA, Results from the Annual National Youth Tobacco Survey (Jan. 22, 2025), https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey-nyts.

and non-inhaled products like oral nicotine pouches that are at the far low end of the tobacco product continuum of risk.

128. Given Congress's stated intent in the TCA to reduce the morbidity and mortality associated smoking and use of traditional tobacco products and the "best meaning" of "appropriate for the protection of the public health," FDA's interpretation of the TCA's "investigations" language in the Final Deeming Rule as imposing uniform study requirements regardless of a new tobacco product's risk profile is arbitrary, capricious, and an abuse of discretion.

129. Plaintiffs thus seek a declaration that the FDA adopted the Final PMTA Rule in violation of the Administrative Procedure Act, an order setting aside and vacating the Final PMTA Rule, and an order setting aside and vacating FDA's Refuse to File letter issued to Zest for its alleged failure to comply with the Final PMTA Rule.

130. Because Plaintiffs will also suffer immediate, irreparable harm absent injunctive relief, Plaintiffs also request temporary and preliminary injunctions staying the RTF letter.

## REQUEST FOR RELIEF

131. Plaintiffs respectfully request that this Court enter judgment in their favor that includes the following relief:

a. A declaration pursuant to 28 U.S.C. § 2201 that FDA's Regulatory Flexibility Act certification in the Final PMTA Rule RIA violated the Regulatory Flexibility Act;

b. A declaration pursuant to 28 U.S.C. § 2201 that the Final PMTA Rule violated the Administrative Procedure Act;

c. A setting aside, vacatur, and remand to FDA of the Final PMTA Rule and of the RIA associated therewith as arbitrary, capricious, an abuse of discretion and/or contrary to law;

d. A temporary, preliminary, and permanent injunction pursuant to 5 U.S.C. § 611(4)(B) against enforcement of the Final PMTA Rule;

e. A declaration pursuant to 28 U.S.C. § 2201 that the RTF letter issued by FDA to Zest is arbitrary, capricious, an abuse of discretion, and contrary to law;

f. A setting aside, vacatur, and remand to FDA of the RTF letter issued by FDA to Zest;

g. A temporary and preliminary injunction staying the RTF letter;

h. An order awarding Plaintiffs their costs, expenses, and fees (including attorney fees) pursuant to 28 U.S.C. § 2412; and

i. An order granting such other and further relief as is necessary and appropriate.

Respectfully submitted,

Dated: February 20, 2026

/s/ James Matulis
James Matulis
FBN 0077429
MATULIS IP LAW
9806 Gretna Green Drive
Tampa, Florida 33626
(813) 451-7347
Jim@MatulisLaw.com

/s/ Eric N. Heyer
Eric N. Heyer* (Lead Counsel)
James C. Fraser*
Joseph A. Smith*
Ryan C. Callinan*
THOMPSON HINE LLP
1919 M Street, N.W. Suite 700
Washington, D.C. 20036
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Joseph.Smith@ThompsonHine.com
Ryan.Callinan@ThompsonHine.com

*motion for admission pro hac vice forthcoming

*Counsel for Plaintiffs*

# VERIFICATION

Inga Nasi, being first duly cautioned and sworn, deposes and states, based on her personal knowledge and records generated, kept, and maintained in the ordinary course of business of Plaintiffs The C Store Depot, Inc. and Zest Brands LLC, that the allegations contained in the Verified Complaint are true and correct.

DocuSigned by:
Inga Nasi
478D02A7D08F450...
Inga Nasi

# TAB 57-3

# Exhibit 3

# Exhibit A

U.S. FOOD & DRUG ADMINISTRATION

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

January 30, 2026

**REFUSE TO FILE**

Zest Brands LLC
Attention: Inga Nasi, CEO
6303 Blue Lagoon Drive, Suite 400
Miami, FL 33126

**FDA Submission Tracking Numbers (STNs):** [redacted] see Appendix A

Dear Inga Nasi:

We completed a preliminary review of your PMTAs[1] and determined that these applications do **not** meet the filing requirements for a new tobacco product seeking a marketing order under section 910(b) of the FD&C Act.[2] As a result, we are refusing to file the applications for the new tobacco products identified in Appendix A, effective the date of this letter. Refer to Appendix B for a list of amendments and additional submissions received.

Your applications lack the following required information necessary for substantive scientific review per section 910(b) of the FD&C Act and 21 C.F.R. § 1114.7:

[redacted]

[redacted]

[redacted]

[1] Premarket Tobacco Product Applications (PMTAs)
[2] Federal Food, Drug, and Cosmetic Act (FD&C Act)

[redacted]

Refer to Appendix C for additional information to consider submitting in future submissions. The information provided in this letter may not represent a complete list of comments and potential deficiencies.

**You cannot introduce or deliver for introduction these new tobacco products into interstate commerce. The manufacture, sale, and/or distribution of these products, as new tobacco products that lack FDA authorization, is prohibited by law and subject to enforcement action by FDA unless and until the products receive such authorization. See generally FD&C Act section 301. These actions may include, but are not limited to, civil money penalties, including an enhanced civil money penalty under FD&C Act section 303(f)(9)(B)(i), seizure, criminal prosecution, and/or injunction. In addition, tobacco products offered for import into the United States that appear to be adulterated and/or misbranded may be detained or refused admission. It is your responsibility to ensure new tobacco products you manufacture, sell, and/or distribute comply with all applicable statutory and regulatory requirements under the FD&C Act and FDA's implementing regulations.**

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[3,4] using eSubmitter.[5] Alternatively, submissions may be mailed to:

Food and Drug Administration
Center for Tobacco Products
Document Control Center (DCC)
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

---

[3] For more information about CTP Portal, see http://www.fda.gov/TobaccoProducts/GuidanceComplianceRegulatoryInformation/Manufacturing/ucm515047.htm
[4] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[5] For more information about eSubmitter, see https://www.fda.gov/industry/fda-esubmitter

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[6]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

If you have any questions, please contact Shapol Warmzyary, Regulatory Health Project Manager, at (240) 402-5995 or Shapol.Warmzyary@fda.hhs.gov.

Sincerely,

Digitally signed by Benjamin Apelberg -S
Date: 2026.01.30 16:36:56 -05'00'

Benjamin Apelberg, Ph.D.
Deputy Director
Office of Science
Center for Tobacco Products

**Enclosures**:
Appendix A – New Tobacco Products Subject of This Letter
Appendix B – Amendments and Additional Submissions Received for This Applicant
Appendix C – Additional Comments That May Be Considered for Future Nicotine Pouch Product Submissions

[6] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

# TAB 59

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| THE C STORE DEPOT, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 8:26-cv-00483-MSS-CPT |
| v. | ) | |
| | ) | |
| U.S. FOOD AND DRUG | ) | |
| ADMINISTRATION, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR PRELIMINARY INJUNCTION AND**
**INCORPORATED MEMORANDUM**

Plaintiffs The C Store Depot, Inc. ("CSD") and Zest Brands LLC ("Zest"), pursuant to Federal Rule of Civil Procedure 65(a), respectfully move the Court for a preliminary injunction continuing this Court's stay of the Refuse to File ("RTF") letter issued by Defendant U.S. Food and Drug Administration ("FDA"). The RTF letter is premised on a federal rule enacted in contravention of the Regulatory Flexibility Act ("RFA") and constitutes final agency action. Because the RTF letter, if not stayed, will imminently require Plaintiffs to [redacted] Plaintiffs seek preliminary injunctive relief continuing the stay of the RTF letter.

## INTRODUCTION

The Court has already heard extensive evidence and issued a temporary restraining order staying FDA's January 30, 2026 Refuse to File letter issued to Zest that is premised on requirements set forth in FDA's Final PMTA Rule promulgated in 2021. Through this motion, Plaintiffs simply request the Court to consider largely the same evidence and arguments and enter a preliminary injunction on the same basis.

As the Court found in granting Plaintiffs' motion for temporary restraining order, FDA failed to engage in reasoned decision-making when it certified under 5 U.S.C. § 605(b) that the Final PMTA Rule promulgated in 2021 would not have a significant economic impact on a substantial number of small entities. February 27,

2026 Hearing Transcript ("TRO Hrg. Tr.") at 134-35. FDA claimed that the costs of preparing a PMTA were already accounted for in FDA's regulatory flexibility analysis that accompanied its 2016 Deeming Rule when, in fact, that earlier analysis specifically disclaimed any attempt to quantify the costs of preparing a PMTA for novel nicotine products other than electronic nicotine delivery systems ("ENDS"). *Id*. Plaintiffs are thus likely to succeed on the merits of their claims under the Regulatory Flexibility Act and Administrative Procedure Act.

Following its consideration of the evidence, the Court also concluded that if the RTF letter is not stayed, Plaintiffs will be threatened with irreparable harm, including the loss of their business reputation "at every level," the loss of [redacted], and the [redacted], all of which would not be compensable in monetary damages due to sovereign immunity. TRO Hrg. Tr. at 135-36.

The Court also found that this threatened harm outweighs any harm that staying the RTF letter poses to Defendants. *Id*. at 138. Further, the Court found that the public interest weighs in favor of injunctive relief, as the public interest does not support "the perpetuation of unlawful agency actions" but does support "ensuring that Governmental agencies abide by statutes that govern their operations" and "comply with the letter of the law and applicable undisputed

rules." *Id*. at 136-37.

As this motion explains, each of the foregoing conclusions continues to be applicable at the preliminary injunction stage. The Court should grant Plaintiffs' motion for a preliminary injunction and continue its stay of the RTF letter.

## FACTUAL AND LEGAL BACKGROUND

### A. Oral Nicotine Pouch Products Like Plaintiffs' Present Far Fewer Health Risks than Traditional Tobacco Products

Plaintiff Zest manufactures and Plaintiff CSD distributes oral nicotine pouch products under the brand ZEO Universe. Verified Complaint ("V.C."), ¶¶ 5-6; TRO Hrg. Tr. at 91:23-92:13. Each of Zest and CSD qualify as a "small business" for purposes of the Regulatory Flexibility Act because each employs fewer than 1,500 employees. TRO Hrg. Tr. at 92:5-7; 5 U.S.C. § 601(3); 13 C.F.R. § 121.201.

Unlike traditional tobacco products, Plaintiffs' nicotine pouches do not contain any tobacco plant material; instead, in addition to pharmaceutical-grade nicotine, they contain inactive and non-addictive ingredients that FDA generally recognizes as safe ("GRAS") when used as food additives. V.C., ¶ 16; TRO Hrg. Tr. at 45:13-47:1. Using the products does not involve combustion or inhalation; rather, users place the pouches between their lip and gum, and the nicotine is absorbed into the bloodstream through the buccal membranes. V.C., ¶ 15, 17; TRO Hrg. Tr. at 44:9-17. As a result, nicotine pouch products, including Plaintiffs' products, are far less harmful than traditional tobacco products, including

smokeless tobacco products, which FDA says may contain 4,000 chemicals, including as many as 30 linked to cancers. V.C., ¶ 18; Pltfs. Ex. 8.

**B. The TCA's Premarket Authorization Requirement**

The Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776 (2009) ("TCA" or "Act"), grants FDA jurisdiction over tobacco products, including Plaintiffs' nicotine pouches. 21 U.S.C. §§ 321(rr), 387a. FDA has recognized that products like Plaintiffs' present significantly less health risks than products containing tobacco, and particularly combusted tobacco products, such as cigarettes. V.C., ¶¶ 19, 22; Pltfs. Exs. 10, 12. This is, in part, because, as FDA has also long stated, nicotine itself does not cause cancer; rather, it is the other chemical compounds in tobacco and tobacco smoke that cause fatal lung diseases and cancer. V.C., ¶¶ 20-21; Pltfs. Exs. 9, 11.

The TCA's requirements originally extended only to cigarettes, smokeless tobacco, and limited other traditional tobacco products. 21 U.S.C. § 387a(b). However, the TCA allowed FDA to extend by regulation the Act's requirements to "any other tobacco products that the Secretary by regulation deems" to fall under the Act. *Id*. Through its 2016 "Deeming Rule," FDA deemed products containing nicotine derived from tobacco to be "tobacco products" under the Act. 81 Fed.

Reg. 28974 (adopting, *inter alia*, 21 C.F.R. § 1100.1); Pltfs. Ex. 1.[1] In 2022, Congress expanded the TCA's definition of "tobacco product' to include products "containing nicotine from any source." Pub. L. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

Section 910 of the TCA requires anyone wishing to market a "new tobacco product"[2] in interstate commerce to file a premarket tobacco product application ("PMTA") with FDA. 21 U.S.C. § 387j. To receive a marketing granted order, an applicant must demonstrate that its product is "appropriate for the protection of the public health," or "APPH." 21 U.S.C. § 387j(c)(2)(A).

While the TCA sets out certain categories of information that a PMTA must contain, 21 U.S.C. § 387j(b), it does not elaborate as to the specific requirements. Instead, the Act provides that whether a product is APPH "shall, when appropriate, be determined on the basis of well-controlled investigations, which *may* include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product." 21 U.S.C. § 387j(c)(5)(A) (emphasis added). However, the Act also provides that if FDA "determines that there exists valid scientific evidence (other than evidence derived from investigations described in

---

[1] "Pltfs. Ex." refers to the exhibits introduced by Plaintiffs at the hearing on Plaintiffs' motion for a temporary restraining order.

[2] A "new tobacco product" is one that was not commercially marketed in the United States as of February 15, 2007. 21 U.S.C. § 387j(a)(1)(A).

subparagraph (A)) which is sufficient to evaluate the tobacco product, FDA may grant marketing authorization based on such other evidence." 21 U.S.C. § 387j(c)(5)(B).

### C. FDA's 2016 Deeming Rule Regulatory Flexibility Act Analysis Downplayed the Anticipated Costs of PMTAs Generally and Stated that FDA Could Not Provide An Estimate for the Costs of Preparing PMTAs for Novel Nicotine Products Like Pouches

When FDA issued the Deeming Rule in 2016, the agency had not begun to develop the regulations governing PMTAs, including those specifying the types of "investigations," or studies, required of applicants. V.C., ¶ 37. Nevertheless, FDA issued a Final Regulatory Impact and Regulatory Flexibility Act analysis ("Deeming Rule RIA") in conjunction with the Deeming Rule. Pltfs. Ex. 2.

In its Deeming Rule RIA, FDA stressed that "research burdens of PMTAs are quite different from premarket applications for new drugs. For example, FDA does not expect that PMTAs will include randomized clinical trials like those conducted to support drug approvals." Pltfs. Ex. 2 at 86, 150; TRO Hrg. Tr. at 52:16-54:7. In response to public comments that argued that "based on the types of studies that FDA would require . . . the cost of a PMTA could be millions of dollars per product," FDA stated, "We disagree." Pltfs. Ex. 2 at 37; TRO Hrg. Tr. at 54:20-55:7. In its discussion of potential "Human Studies," FDA stated that applicants would be able to rely on publicly available information or studies that FDA itself was conducting at the time—not that multi-million-dollar studies of the

applicants' individual products would be required. Pltfs. Ex. 2 at 149-50.

Even though novel oral nicotine products, including some nicotine pouch products, were already on the market when the Deeming Rule RIA was published, *see* Supplemental Declaration of Inga Nasi, Exhibit 1 hereto, at ¶¶ 4-6, it did not include any specific estimates for the costs of preparing PMTAs for novel nicotine products other than electronic nicotine delivery systems ("ENDS"), or e-cigarettes, and e-liquids for use in them, TRO Hrg. Tr. at 51:6-11, 56:18-22. These products are significantly more complex than nicotine pouch products because they involve heating, aerosolization, and inhalation. V.C., ¶ 62; TRO Hrg. Tr. at 57:11-58:2. For e-liquids, FDA estimated the cost of a bundled PMTA to be between $181,686 and $2,014,120, with an average cost per SKU of $131,643. Pltfs. Ex. 2 at 87-88.

Although FDA recognized that the PMTA requirements would now apply to "tobacco products that do not fit into traditional product categories, such as ENDS and nicotine gels," FDA stated that it was unable to quantify the "costs for novel tobacco products other than ENDS due to lack of data." Pltfs. Ex. 2 at 75; *see also id.* at 114 ("We are unable to quantify the costs for other novel tobacco products . . . due to data limitations and the relatively small size of their markets."). FDA also stated that it could not even estimate the number of manufacturers of such novel products that would be affected by the Deeming Rule. *Id*. at 69.

Importantly, in response to public comments arguing that FDA had failed to

accurately quantify the costs of the Deeming Rule, including the costs of preparing PMTAs, FDA stated: "With respect to future rules, . . . we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." Pltfs. Ex. 2 at 53-54.

### D. FDA Failed to Prepare a Full Regulatory Flexibility Act Analysis for its 2021 Final PMTA Rule Despite the Substantial New and Costly Investigation Requirements the Rule Imposed

In 2019, FDA first published its "Proposed PMTA Rule," which specified requirements for the contents and format of PMTAs for all new tobacco products. 84 Fed. Reg. 50566; Pltfs. Ex. 3 (adopting, *inter alia*, 21 C.F.R. § 1114.7).

FDA simultaneously published a preliminary regulatory impact analysis and initial regulatory flexibility analysis ("PMTA Rule Preliminary RIA"). Pltfs. Ex. 4. Therein, FDA proposed to certify pursuant to 5 U.S.C. § 605(b) that the PMTA Rule "would not have a significant economic impact on a substantial number of small entities." Pltfs. Ex. 4 at 6. FDA reasoned that it had "already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule" in 2016, *id*. at 7, and that the earlier analysis "accounted for the costs to comply with the format and content requirements of a PMTA as described in the TCA," *id*. at 22.

In comments in response to the PMTA Rule Preliminary RIA, the Small Business Administration's Office of Advocacy objected to FDA's proposed

certification because the certification "improperly assumes that the compliance costs of the proposed rule's requirements for deemed products are due to the agency's 2016 rule," rather than to the PMTA Final Rule, which explained FDA's interpretation and implementation of the statutory requirements. Pltfs. Ex. 5 at 1.

Nevertheless, in October 2021, FDA published the final PMTA Rule ("Final PMTA Rule"), 86 Fed. Reg. 55300 (Oct. 5, 2021), Pltfs. Ex. 6, and final Regulatory Impact Analysis and Regulatory Flexibility Act Analysis ("Final PMTA Rule RIA"), Pltfs. Ex. 7. In the Final PMTA Rule RIA, FDA did not undertake a full Regulatory Flexibility Act analysis that considered the costs of preparing a PMTA to satisfy the Final PMTA Rule's requirements (beyond minor administrative costs due to, for example, new formatting requirements) or consider less costly alternatives for small entities. Pltfs. Ex. 7 at 41-44. Instead, FDA certified that the Final PMTA Rule would "generate net benefits or negligible net costs for most affected small entities." Pltfs. Ex. 7 at 7, 41. FDA thus certified that the Final PMTA Rule would not have a significant economic impact on a substantial number of small entities. *Id.*

Even though, in less than the first six months of 2020 alone, almost 46 million units of nicotine pouch products were sold to U.S. consumers, FDA did not engage in any regulatory flexibility analysis specific to PMTAs for nicotine pouch products. Suppl. Nasi Decl., ¶ 9 and Ex. F thereto; TRO Hrg. Tr. at 21:14-20.

In response to comments contending that FDA had failed to account for many of the costs to prepare and submit PMTAs for deemed tobacco products, FDA stated: "We attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Final Rule and not this rule. We therefore consider most aspects of these comments out-of-scope." Pltfs. Ex. 7 at 12. Likewise, in response to comments, like those of the SBA, that suggested that FDA's Regulatory Flexibility Act certification was improper, FDA stated: "We disagree with this comment. We believe that this comment conflates the impacts of the Deeming Rule with the impacts of this final rule." *Id.* at 13. FDA rejected the suggestion that it needed to prepare a full regulatory flexibility analysis. *Id.* at 42. As a result, FDA did not fully consider potential alternatives or modifications to the Proposed PMTA Rule to lessen the burden of its requirements on small entities as would otherwise be required by 5 U.S.C. § 604(a)(6).

But the Final PMTA Rule did, in fact, impose significant and costly additional requirements, including new "investigation" requirements, on the PMTA process, regardless of product type. *See* 21 C.F.R § 1114.7(k); V.C., ¶¶ 57-59; TRO Hrg. Tr. at 64:17-67:24, 75:16-77:10; Pltfs. Ex. 15A. Thus, applicants for all types of new tobacco products must provide extensive non-clinical and/or clinical studies with human subjects and the applicant's own, unique products on, *inter alia*, delivery of harmful and potentially harmful constituents, 21 C.F.R. §

1114.7(k)(1)(i)(A), toxicity studies, 21 C.F.R. § 1114.7(k)(1)(i)(B), studies regarding the pharmacological profile of the products, including pharmacokinetics, 21 C.F.R. §§ 1114.7(k)(1)(i)(C), actual use studies, 21 C.F.R. § 1114.7(k)(1)(i)(C), switching studies following subjects over time, 21 C.F.R. § 1114.7(k)(1)(ii)(A)-(B) and (k)(1)(iii)(C), and consumer perception and use intention and human factors studies, 21 C.F.R. § 1114.7(k)(1)(iv)(A)-(C). Pltfs. Ex. 6 at 132-33; Pltfs. Ex. 15A; TRO Hrg. Tr. at 64:17-67:24, 75:16-77:10.

For the study requirements, FDA does not provide pass/fail criteria. TRO Hrg. Tr. at 67:22-24; V.C. ¶ 60; Declaration of Dr. Willie McKinney, Exhibit 2 to Plaintiffs' Motion for Temporary Restraining Order, ¶ 21. And, contrary to its earlier statements that randomized controlled trials would likely be unnecessary, FDA places weight on longitudinal clinical study evidence, typically in the form of randomized controlled trials, that follow the same individuals over time to evaluate switching from cigarettes or cessation when deciding to authorize new tobacco products. McKinney Decl., ¶¶ 18, 19; TRO Hrg. Tr. at 53:3-55:7. In fact, FDA has never authorized a product "that did not include a clinical study like a randomized controlled trial." TRO Hrg. Tr. at 55:2-7; McKinney Decl., ¶ 19. And in contrast to its earlier suggestions that applicants could rely heavily on publicly available information, FDA has frequently communicated to applicants that publicly available scientific literature "is not sufficient to evaluate their product." TRO Hrg.

Tr. at 55:8-56:17; McKinney Decl., ¶ 22.

The costs to prepare bundled PMTAs for oral nicotine products that provide all the information FDA requests in the Final PMTA Rule often far exceed FDA's baseline cost estimates found in its Deeming Rule RIA for far more complex ENDS products. TRO Hrg. Tr. at 77:2-81:5; Pltfs. Ex. 15B; McKinney Decl., ¶ 13. The cost of preparing such a PMTA for 18 oral nicotine product SKUs would range between $3 million and $13 million or more. TRO Hrg. Tr. at 80:18-81:5; Pltfs. Ex. 15B; McKinney Decl., ¶¶ 14-15. The disparity between the cost ranges for e-liquids found in the Deeming Rule and the actual cost ranges for less complex oral nicotine pouch products is the result of the more onerous "investigation" demands FDA imposed through the Final PMTA Rule. TRO Hrg. Tr. at 75:16-77:10, 77:2-14, 78:18-81:5; Pltfs. Exs. 15A and 15B; V.C., ¶ 63.

### E. Zest's Timely Filing of PMTAs for its Pouches and FDA's RTF Letter

Zest first marketed its ZEO Universe nicotine pouches, which contain synthetic nicotine, in 2022 before they became subject to FDA regulation or the TCA's premarket authorization requirement. TRO Hrg. Tr. at 70:15-18, 91:19-25; 92:8-15. Zest timely submitted its bundled PMTAs for [redacted] of its pouch products on May 14, 2022, Pltfs. Ex. 14 at 4, meaning that the products were not immediately subject to FDA enforcement for selling products without authorization and that the pouches benefitted from FDA's general practice of allowing the

continued importation and marketing of such products with timely-filed PMTAs so long as the applications are undergoing any stage of review. V.C. ¶¶ 69, 71, 74-80; TRO Hrg. Tr. at 17:14-25, 92:19 – 99:19, 109:25-110:7; Pltfs. Ex. 19.

On Friday, January 30, 2026, at 5:00 p.m., FDA issued the RTF letter to Zest. TRO Hrg. Tr. at 108:10-17; Pltfs. Ex. 14. The [redacted] deficiencies presented in the letter as preventing a "filing" determination all relied on provisions of the Final PMTA Rule found in 21 C.F.R. §§ 1114.7. Pltfs. Ex. 14; TRO Hrg. Tr. at 81-13-16. The RTF letter also warned Zest that the agency could take enforcement action if Zest continues sales following the RTF letter. Pltfs. Ex. 14; TRO Tr. at 81:17-23; 100:9-14. Zest attempted to engage with FDA and had a meeting with the agency about the RTF letter before seeking judicial relief. TRO Hrg. Tr. at 106:22-107:22.

**F. The RTF Letter Poses an Immediate, Existential Threat to Plaintiffs**

The RTF letter poses an [redacted] to Plaintiffs' businesses, TRO Hrg. Tr. at 108:19-114:4, Declaration of Inga Nasi, Exhibit 1 to Plaintiffs' Motion for Temporary Restraining Order, ¶¶ 14-19, and to their owner's personal finances, TRO Hrg. Tr. at 111:24-113:18 ("It's akin to death"). Once it issued the RTF letter, [redacted]. TRO Hrg. Tr. at 109:8-110:7. Even if Plaintiffs were to keep selling despite FDA's threat of enforcement, Plaintiffs' [redacted]

[redacted]. TRO Hrg. Tr. at 103:25-106:14; Nasi Decl., ¶¶ 14-15; Suppl. Nasi Decl., ¶¶ 10-12. [redacted] will cost approximately [redacted], a sum that [redacted]. Nasi Decl., ¶ 16. Zest also has [redacted] tied up in purchased raw materials and inputs currently in transit from suppliers, as well as inventory that Plaintiffs will no longer be able to sell. Nasi Decl. ¶ 14; TRO Hrg. Tr. at 109:5-18, 110:8-19. Plaintiffs also owe excise taxes to the State of Florida that [redacted] if there is a [redacted] in terms of [redacted]. Nasi Decl., ¶ 19; TRO Hrg. Tr. at 110:8 – 111:9

[redacted] of Zest's revenues come from sales of the pouches and CSD similarly realizes [redacted] from sales of the pouches and is also [redacted]. Nasi Decl., ¶¶ 10, 17, 18; TRO Hrg. Tr. at 111:10-23. Without a stay, both Plaintiffs will have to [redacted] and [redacted] Nasi Decl., ¶¶ 18, 19; TRO Hrg. Tr. at 92:5-7, 108:19-109:1.

## STANDARD OF REVIEW

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the

opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (same); *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 U.S. App. LEXIS 10263, at *31 (11th Cir. Apr. 15, 2022). Here, a preliminary injunction continuing the existing stay of the RTF letter is necessary to prevent irreparable harm to Plaintiffs pending the final outcome of this case.

## ARGUMENT

### I. Plaintiffs are Likely to Succeed on the Merits of Their Claims

Congress enacted the Regulatory Flexibility Act "to improve Federal rulemaking by creating procedures to analyze the availability of more flexible regulatory approaches for small entities." Pub. L. 96-354, 94 Stat. 1164, 1164 (Sept. 19, 1980). To that end, the RFA requires an agency to conduct a "final regulatory flexibility analysis" when the agency adopts a rule via notice-and-comment rulemaking. 5 U.S.C. § 604.

A regulatory flexibility analysis includes, among other things, "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statute," including a discussion of why the agency rejected other significant alternatives to the rule. 5 U.S.C. § 604(a)(6). Congress required agency regulatory flexibility analyses because "uniform Federal regulatory and reporting requirements [had] in

numerous instances imposed unnecessary and disproportionately burdensome demands" on "small businesses," that had "adversely affected competition in the marketplace" and "discouraged innovation." 94 Stat. 1164.

Congress recognized that there are some situations in which an agency rule does not impact small businesses. Therefore, the RFA exempts agencies from conducting a regulatory flexibility analysis when the agency head provides a certification that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). But such a certification must include "a statement providing the factual basis for [the] certification." 5 U.S.C. § 605(b).

Congress expressly made an agency's section 605(b) certification subject to judicial review under the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 611(a), including the APA's provisions that allow courts to "set aside" agency actions that are "arbitrary" or "capricious" under 5 U.S.C. § 706(2)(A). *See, e.g.*, *North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647, 651-653 (E.D. Va. 1997) (setting aside rule because section 605(b) certification was arbitrary and capricious).[3]

An agency action "qualifies as 'arbitrary' or 'capricious' if the agency did

---

[3] The RFA itself also allows district courts to remand the rule to the agency and defer enforcement of the rule against small entities. 5 U.S.C. § 611(a)(4).

not engage in 'reasoned decision-making.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). In other words, "the process by which" an agency "reaches [a] result must be logical and rational." *Id.* (quoting *Allentown*, 522 U.S. at 374). As the D.C. Circuit has observed:

> the APA together with the Regulatory Flexibility Act require that a rule's impact on small businesses be reasonable and reasonably explained. A regulatory flexibility analysis is, for APA purposes, part of agency's explanation for its rule. *See Small Refiner Lead Phase-Down Task Force v. EPA*, 227 U.S. App. D.C. 201, 705 F.2d 506, 539 (D.C. Cir. 1983) ("a reviewing court should consider the regulatory flexibility analysis as part of its overall judgment whether a rule is reasonable"); *see also Thompson v. Clark*, 239 U.S. App. D.C. 179, 741 F.2d 401, 405 (D.C. Cir. 1984) ("Thus, if data in the regulatory flexibility analysis -- or data anywhere else in the rulemaking record -- demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand.") (citation omitted).

*Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540-41 (D.C. Cir. 2009) (Kavanaugh, J.).

FDA's section 605(b) certification for the Final PMTA Rule is a paradigmatic example of arbitrary and capricious agency action. According to FDA, it was not the Final PMTA Rule that would have "a significant economic impact on a substantial number of small entities." Pltfs. Ex. 7 at 42. Rather, according to FDA, the 2016 *Deeming Rule* was responsible for any significant economic impacts on a substantial number of small entities. *See id.* at 12 ("We

attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Rule and not this rule."); *see also* Pltfs. Ex. 4 at 7 ("[W]e already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule").

But FDA's regulatory impact analysis for the Deeming Rule did not include any estimates for the costs of preparing PMTAs for novel nicotine products other than ENDS products and e-liquids for use in them. Indeed, FDA twice acknowledged that it was unable to quantify the "costs for novel tobacco products other than ENDS due to lack of data." Pltfs. Ex. 2 at 75; *see also id.* at 114. And FDA further stated that it could not even estimate the number of manufacturers and importers of such novel nicotine products that would be affected by the Deeming Rule. *Id*. at 69.

Further, even if nicotine pouches were a very small segment of the tobacco products market when the Deeming Rule was finalized in 2016, they no longer were by the time the Final PMTA Rule was published in 2021. In less than six months of the previous year, almost 46 million units of tobacco pouches were sold to U.S. consumers. Yet FDA admittedly took no action to attempt to calculate or consider the costs of preparing PMTAs for small manufacturers of nicotine pouch products in its Final PMTA Rule RIA. *See* TRO Hrg. Tr. at 24:1-25:18.

The extreme disparity between FDA's statements and generalized cost estimates for preparing PMTAs for ENDS products in the Deeming Rule RIA and the reality of preparing PMTAs for nicotine pouch products under the Final PMTA Rule underscores that FDA's section 605(b) certification was arbitrary and capricious because the Final PMTA Rule's detailed testing and study requirements impose substantial additional costs.[4] In the Deeming Rule RIA, FDA emphasized that randomized controlled trials would likely be unnecessary, emphasized that applicants would be able to rely on publicly available studies found in the scientific literature, and disagreed with statements suggesting that study requirements would run PMTA costs into the millions of dollars. In reality, however, under the Final PMTA Rule, FDA has never authorized *any* product without a longitudinal switching study in the form of a randomized controlled trial or similar study and has rejected most attempts by applicants to rely on published scientific literature rather than specific studies on their own products. TRO Hrg. Tr. at 55:2-7, 55:15-56:17. Further, the actual costs of preparing a bundled PMTA for nicotine pouch products like Plaintiffs' run from $3 million to over $13 million, whereas in the Deeming Rule RIA, FDA had estimated the costs for a bundled PMTA for e-

[4] Indeed, the vast disparity between FDA's cost estimates for PMTAs for ENDS and the actual cost of preparing robust PMTAs for far less complex nicotine pouch products provides a second, independent basis for concluding that FDA's adoption of its Final PMTA Rule without examining the costs of preparing PTMAs for nicotine pouch products was arbitrary and capricious.

liquids for use in ENDS products—a substantially more complex application because, unlike nicotine pouches, e-liquid products are heated, aerosolized and inhaled—to be only between $181,686 and $2,014,120. TRO Hrg. Tr. at 78:16-81:5; Pltfs. Ex 15B.

In sum, FDA's section 605(b) certification for the Final PMTA Rule unlawfully elided a reasonable explanation of the actual costs and effects of the Final PMTA Rule's particular testing and study requirements, including as to nicotine pouch products altogether.[5] While the earlier Deeming Rule RIA pointed to the future and stated that the agency could not "predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established," Pltfs. Ex. 2 at 53-54, the later Final PMTA Rule section 605(b) certification pointed to the past and baselessly claimed that the Deeming Rule was the sole source of virtually all PMTA costs. This was not "reasoned decision-making." *Michigan v. EPA*, 576 U.S. at 750. Therefore, FDA's section 605(b) certification was arbitrary and capricious and Zest's RFA letter premised on the Final PMTA Rule's requirements must be set aside.

[5] Just as in an earlier case where a judge in this District found another federal agency to have provided a section 605(b) certification in violation of the RFA, the "RFA watchdog," the SBA, contemporaneously criticized the planned certification as arbitrary and capricious but FDA "refused to budge." *See Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1433-37 (M.D. Fla. 1998)

## II. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.

The remaining injunctive relief factors also weigh in Plaintiffs' favor. The RTF letter expressly forbids Plaintiffs from continuing t[redacted] at the evidentiary hearing and in her declarations, without injunctive relief staying the RTF letter, Plaintiffs would be rendered unable to continue selling their products, TRO Hrg. Tr. at 81:17-23, 100:4-8, 108:19, suffer sunk costs in manufacturing and be unable to import their products into the United States, *id*. at 109:8-24, 110:8-19, be forced to begin the PMTA process anew without the ability to sell while the new PMTA is pending, *id*. at 100:9-14, suffer a [redacted], *id.* at 113:19-114:4), suffer substantial reputational harm with their customers [redacted], *id*. at 104:11-106:14, 110:20-111:9, be forced to [redacted], *id*. at 108:19-25, and would [redacted] that they [redacted], forcing them to [redacted], *id*. at 111:10-23.

While "economic harm will not satisfy the irreparable-harm element in many cases, that general rule does not necessarily hold where there is no adequate remedy at law to recover damages for the harm suffered." *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres of Land*, 910 F.3d 1130, 1165 (11th Cir. 2018). "[I]n an APA action[,] sovereign immunity bars the recovery of monetary damages from

the federal government." *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021). "[T]he inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable." *Odebrecht Constr. v. Sec'y, Fla. DOT*, 715 F.3d 1268, 1289 (11th Cir. 2013).

The imposition of costs to comply with government orders that "could imperil the financial viability" of businesses are properly considered under the irreparable harm analysis. *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022). When a plaintiff has no adequate remedy at law, its "[u]nrecoverable monetary loss is an irreparable injury." *Id.* The Eleventh Circuit confronted a similar issue in *LabMD, Inc. v. FTC*, where it found that the costs of complying with an FTC Order constituted irreparable harm because of FTC's sovereign immunity. 678 F. App'x 816, 821 (11th Cir. 2016). If the Eleventh Circuit found that the hundreds of thousands of dollars in costs that the plaintiff in *LabMD* faced constituted irreparable harm, then certainly the millions of dollars in losses that Plaintiffs confront here qualify.

Finally, the Eleventh Circuit has found that injury to a company's "reputation, trust, and goodwill" is the "the sine qua non of injunctive relief." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1183 (11th Cir. 2022). "It is well-established that the loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are

difficult to compute." *Edwards Moving & Rigging, Inc. v. Jenkins*, No. 8:19-cv-1004-T-36SPF, 2019 U.S. Dist. LEXIS 128821, at *13 (M.D. Fla. June 5, 2019). Plaintiffs have no doubt that, without a stay of the RTF letter, they will lose customer goodwill and permanent damage to their reputation in the market. TRO Hrg. Tr. at 110:20-111:9. Consumers of the ZEO Universe pouches will likely either return to smoking more harmful cigarettes, seek out alternative nicotine sources, such as ENDS products, or switch to products sold by competing nicotine pouch manufacturers, most of whom also have not received a marketing granting order and yet continue to sell in the same outlets as Plaintiffs without repercussions. TRO Hrg. Tr. at 94:16-99:19; Pltfs. Ex. 19.

As this Court has already found, Plaintiffs have conclusively demonstrated that the [redacted] harm they face from the RTF letter is irreparable. TRO Hrg. Tr. at 135:24-136:22. The Eleventh Circuit has stayed marketing denial orders FDA issued to ENDS manufacturers in analogous circumstances even though those products were likewise adulterated under the TCA because they lacked an FDA marketing order. *See* Feb. 1, 2022 Order in *Bidi Vapor, LLC v. FDA*, No. 21-13340 (11th Cir.). The Court should do the same here.

### III. The Balance of Harms and Public Interest Weigh in Favor of Injunctive Relief.

The balance of harms and public interest factors "merge, when as here, the government is the opposing party." *Florida v. HHS*, 739 F. Supp. 3d 1091, 1110

(M.D. Fla. 2024) (internal quotation omitted). When a private party seeks a stay or injunctive relief against the government, the court must "weigh the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025).

Here, these factors strongly favor Plaintiffs. Absent a stay, Plaintiffs will suffer [redacted], as detailed above. Continuing to market their products following the RTF letter would expose Plaintiffs to potentially significant penalties, 21 U.S.C. §§ 331-334, V.C., ¶¶ 74, 75, 83-85, and removing their products will ultimately require Plaintiffs to [redacted]. The relief Plaintiffs seek "would simply suspend the administrative alteration of the status quo." *Wages & White Lion v. FDA*, 16 F.4th 1130, 1144 (5th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 430 n.1 (2009)). Plaintiffs' products would remain on the market just as they did during the more than three years the PMTAs were pending and consistent with FDA's practice of deferring enforcement against nicotine pouch products with pending applications. V.C., ¶¶ 76-80; TRO Hrg. Tr. at 17:14-25, 92:19 – 99:19, 109:25-110:7; Pltfs. Ex. 19. The relief Plaintiffs seek would simply return them to the same position as competing nicotine pouch manufacturers have enjoyed since they submitted their PMTAs. TRO Hrg. Tr. at 49:12-51:11; 106:15-21.

The harm to Plaintiff "flows naturally from the likelihood of irreparable injury." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1321 (11th Cir. 2010). In contrast, FDA will suffer no harm from an order merely preserving the status quo. Further, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Florida v. HHS*, 749 F. Supp. 3d at 1110 (quoting *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021)); *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 619 (5th Cir. 2021) ("Any interest [the government] may claim in enforcing an unlawful [rule] is illegitimate."). Further, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Brown v. HHS*, 4 F.4th 1220, 1265 (11th Cir. 2021). To the contrary, "there is substantial public interest in ensuring government agencies abide by federal laws even when they are pursuing their prerogatives." *Doe v. Bondi*, 785 F. Supp. 3d 1268, 1287 (N.D. Ga. 2025). Finally, the public interest supports ensuring continued access to Plaintiffs' less harmful nicotine products for users that are current and former users of cigarettes or other tobacco products. TRO Hrg. Tr. at 113:19-114:4.[6]

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and enter a preliminary injunction order staying the RTF letter.

[6] Further, as it did when entering the temporary restraining order, given the lack of potential harm to Defendants, the Court should exercise its discretion to not require Plaintiffs to post a bond. *See BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

Respectfully submitted,

Dated: March 11, 2026

/s/ James Matulis
James Matulis
FBN 0077429
MATULIS IP LAW
9806 Gretna Green Drive
Tampa, FL 33626
(813) 451-7347
Jim@MatulisLaw.com

/s/ Eric N. Heyer
Eric N. Heyer* (Lead Counsel)
James C. Fraser*
Joseph A. Smith*
Ryan C. Callinan*
THOMPSON HINE LLP
1919 M Street, N.W. Suite 700
Washington, D.C. 20036
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Joseph.Smith@ThompsonHine.com
Ryan.Callinan@ThompsonHine.com

*admitted pro hac vice

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of March, 2026, I will cause the foregoing motion, Exhibit 1 thereto, and the proposed form of order to be served via electronic mail on all counsel of record for Defendants.

/s/ Eric N. Heyer

# TAB 61

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| THE C STORE DEPOT, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 8:26-cv-00483-MSS-CPT |
| v. | ) | |
| | ) | |
| U.S. FOOD AND DRUG ADMINISTRATION, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR PRELIMINARY INJUNCTION AND**
**INCORPORATED MEMORANDUM**

Plaintiffs The C Store Depot, Inc. ("CSD") and Zest Brands LLC ("Zest"), pursuant to Federal Rule of Civil Procedure 65(a), respectfully move the Court for a preliminary injunction continuing this Court's stay of the Refuse to File ("RTF") letter issued by Defendant U.S. Food and Drug Administration ("FDA"). The RTF letter is premised on a federal rule enacted in contravention of the Regulatory Flexibility Act ("RFA") and constitutes final agency action. Because the RTF letter, if not stayed, will imminently require Plaintiffs to [redacted] Plaintiffs seek preliminary injunctive relief continuing the stay of the RTF letter.

## INTRODUCTION

The Court has already heard extensive evidence and issued a temporary restraining order staying FDA's January 30, 2026 Refuse to File letter issued to Zest that is premised on requirements set forth in FDA's Final PMTA Rule promulgated in 2021. Through this motion, Plaintiffs simply request the Court to consider largely the same evidence and arguments and enter a preliminary injunction on the same basis.

As the Court found in granting Plaintiffs' motion for temporary restraining order, FDA failed to engage in reasoned decision-making when it certified under 5 U.S.C. § 605(b) that the Final PMTA Rule promulgated in 2021 would not have a significant economic impact on a substantial number of small entities. February 27,

2026 Hearing Transcript ("TRO Hrg. Tr.") at 134-35. FDA claimed that the costs of preparing a PMTA were already accounted for in FDA's regulatory flexibility analysis that accompanied its 2016 Deeming Rule when, in fact, that earlier analysis specifically disclaimed any attempt to quantify the costs of preparing a PMTA for novel nicotine products other than electronic nicotine delivery systems ("ENDS"). *Id.* Plaintiffs are thus likely to succeed on the merits of their claims under the Regulatory Flexibility Act and Administrative Procedure Act.

Following its consideration of the evidence, the Court also concluded that if the RTF letter is not stayed, Plaintiffs will be threatened with irreparable harm, including the loss of their business reputation "at every level," the loss of [redacted], and the [redacted], all of which would not be compensable in monetary damages due to sovereign immunity. TRO Hrg. Tr. at 135-36.

The Court also found that this threatened harm outweighs any harm that staying the RTF letter poses to Defendants. *Id.* at 138. Further, the Court found that the public interest weighs in favor of injunctive relief, as the public interest does not support "the perpetuation of unlawful agency actions" but does support "ensuring that Governmental agencies abide by statutes that govern their operations" and "comply with the letter of the law and applicable undisputed

rules." *Id*. at 136-37.

As this motion explains, each of the foregoing conclusions continues to be applicable at the preliminary injunction stage. The Court should grant Plaintiffs' motion for a preliminary injunction and continue its stay of the RTF letter.

## FACTUAL AND LEGAL BACKGROUND

### A. Oral Nicotine Pouch Products Like Plaintiffs' Present Far Fewer Health Risks than Traditional Tobacco Products

Plaintiff Zest manufactures and Plaintiff CSD distributes oral nicotine pouch products under the brand ZEO Universe. Verified Complaint ("V.C."), ¶¶ 5-6; TRO Hrg. Tr. at 91:23-92:13. Each of Zest and CSD qualify as a "small business" for purposes of the Regulatory Flexibility Act because each employs fewer than 1,500 employees. TRO Hrg. Tr. at 92:5-7; 5 U.S.C. § 601(3); 13 C.F.R. § 121.201.

Unlike traditional tobacco products, Plaintiffs' nicotine pouches do not contain any tobacco plant material; instead, in addition to pharmaceutical-grade nicotine, they contain inactive and non-addictive ingredients that FDA generally recognizes as safe ("GRAS") when used as food additives. V.C., ¶ 16; TRO Hrg. Tr. at 45:13-47:1. Using the products does not involve combustion or inhalation; rather, users place the pouches between their lip and gum, and the nicotine is absorbed into the bloodstream through the buccal membranes. V.C., ¶ 15, 17; TRO Hrg. Tr. at 44:9-17. As a result, nicotine pouch products, including Plaintiffs' products, are far less harmful than traditional tobacco products, including

smokeless tobacco products, which FDA says may contain 4,000 chemicals, including as many as 30 linked to cancers. V.C., ¶ 18; Pltfs. Ex. 8.

### B. The TCA's Premarket Authorization Requirement

The Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776 (2009) ("TCA" or "Act"), grants FDA jurisdiction over tobacco products, including Plaintiffs' nicotine pouches. 21 U.S.C. §§ 321(rr), 387a. FDA has recognized that products like Plaintiffs' present significantly less health risks than products containing tobacco, and particularly combusted tobacco products, such as cigarettes. V.C., ¶¶ 19, 22; Pltfs. Exs. 10, 12. This is, in part, because, as FDA has also long stated, nicotine itself does not cause cancer; rather, it is the other chemical compounds in tobacco and tobacco smoke that cause fatal lung diseases and cancer. V.C., ¶¶ 20-21; Pltfs. Exs. 9, 11.

The TCA's requirements originally extended only to cigarettes, smokeless tobacco, and limited other traditional tobacco products. 21 U.S.C. § 387a(b). However, the TCA allowed FDA to extend by regulation the Act's requirements to "any other tobacco products that the Secretary by regulation deems" to fall under the Act. *Id*. Through its 2016 "Deeming Rule," FDA deemed products containing nicotine derived from tobacco to be "tobacco products" under the Act. 81 Fed.

Reg. 28974 (adopting, *inter alia*, 21 C.F.R. § 1100.1); Pltfs. Ex. 1.[1] In 2022, Congress expanded the TCA's definition of "tobacco product' to include products "containing nicotine from any source." Pub. L. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

Section 910 of the TCA requires anyone wishing to market a "new tobacco product"[2] in interstate commerce to file a premarket tobacco product application ("PMTA") with FDA. 21 U.S.C. § 387j. To receive a marketing granted order, an applicant must demonstrate that its product is "appropriate for the protection of the public health," or "APPH." 21 U.S.C. § 387j(c)(2)(A).

While the TCA sets out certain categories of information that a PMTA must contain, 21 U.S.C. § 387j(b), it does not elaborate as to the specific requirements. Instead, the Act provides that whether a product is APPH "shall, when appropriate, be determined on the basis of well-controlled investigations, which *may* include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product." 21 U.S.C. § 387j(c)(5)(A) (emphasis added). However, the Act also provides that if FDA "determines that there exists valid scientific evidence (other than evidence derived from investigations described in

[1] "Pltfs. Ex." refers to the exhibits introduced by Plaintiffs at the hearing on Plaintiffs' motion for a temporary restraining order.

[2] A "new tobacco product" is one that was not commercially marketed in the United States as of February 15, 2007. 21 U.S.C. § 387j(a)(1)(A).

subparagraph (A)) which is sufficient to evaluate the tobacco product, FDA may grant marketing authorization based on such other evidence." 21 U.S.C. § 387j(c)(5)(B).

**C. FDA's 2016 Deeming Rule Regulatory Flexibility Act Analysis Downplayed the Anticipated Costs of PMTAs Generally and Stated that FDA Could Not Provide An Estimate for the Costs of Preparing PMTAs for Novel Nicotine Products Like Pouches**

When FDA issued the Deeming Rule in 2016, the agency had not begun to develop the regulations governing PMTAs, including those specifying the types of "investigations," or studies, required of applicants. V.C., ¶ 37. Nevertheless, FDA issued a Final Regulatory Impact and Regulatory Flexibility Act analysis ("Deeming Rule RIA") in conjunction with the Deeming Rule. Pltfs. Ex. 2.

In its Deeming Rule RIA, FDA stressed that "research burdens of PMTAs are quite different from premarket applications for new drugs. For example, FDA does not expect that PMTAs will include randomized clinical trials like those conducted to support drug approvals." Pltfs. Ex. 2 at 86, 150; TRO Hrg. Tr. at 52:16-54:7. In response to public comments that argued that "based on the types of studies that FDA would require . . . the cost of a PMTA could be millions of dollars per product," FDA stated, "We disagree." Pltfs. Ex. 2 at 37; TRO Hrg. Tr. at 54:20-55:7. In its discussion of potential "Human Studies," FDA stated that applicants would be able to rely on publicly available information or studies that FDA itself was conducting at the time—not that multi-million-dollar studies of the

applicants' individual products would be required. Pltfs. Ex. 2 at 149-50.

Even though novel oral nicotine products, including some nicotine pouch products, were already on the market when the Deeming Rule RIA was published, *see* Supplemental Declaration of Inga Nasi, Exhibit 1 hereto, at ¶¶ 4-6, it did not include any specific estimates for the costs of preparing PMTAs for novel nicotine products other than electronic nicotine delivery systems ("ENDS"), or e-cigarettes, and e-liquids for use in them, TRO Hrg. Tr. at 51:6-11, 56:18-22. These products are significantly more complex than nicotine pouch products because they involve heating, aerosolization, and inhalation. V.C., ¶ 62; TRO Hrg. Tr. at 57:11-58:2. For e-liquids, FDA estimated the cost of a bundled PMTA to be between $181,686 and $2,014,120, with an average cost per SKU of $131,643. Pltfs. Ex. 2 at 87-88.

Although FDA recognized that the PMTA requirements would now apply to "tobacco products that do not fit into traditional product categories, such as ENDS and nicotine gels," FDA stated that it was unable to quantify the "costs for novel tobacco products other than ENDS due to lack of data." Pltfs. Ex. 2 at 75; *see also id.* at 114 ("We are unable to quantify the costs for other novel tobacco products . . . due to data limitations and the relatively small size of their markets."). FDA also stated that it could not even estimate the number of manufacturers of such novel products that would be affected by the Deeming Rule. *Id*. at 69.

Importantly, in response to public comments arguing that FDA had failed to

accurately quantify the costs of the Deeming Rule, including the costs of preparing PMTAs, FDA stated: "With respect to future rules, . . . we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." Pltfs. Ex. 2 at 53-54.

**D. FDA Failed to Prepare a Full Regulatory Flexibility Act Analysis for its 2021 Final PMTA Rule Despite the Substantial New and Costly Investigation Requirements the Rule Imposed**

In 2019, FDA first published its "Proposed PMTA Rule," which specified requirements for the contents and format of PMTAs for all new tobacco products. 84 Fed. Reg. 50566; Pltfs. Ex. 3 (adopting, *inter alia*, 21 C.F.R. § 1114.7).

FDA simultaneously published a preliminary regulatory impact analysis and initial regulatory flexibility analysis ("PMTA Rule Preliminary RIA"). Pltfs. Ex. 4. Therein, FDA proposed to certify pursuant to 5 U.S.C. § 605(b) that the PMTA Rule "would not have a significant economic impact on a substantial number of small entities." Pltfs. Ex. 4 at 6. FDA reasoned that it had "already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule" in 2016, *id*. at 7, and that the earlier analysis "accounted for the costs to comply with the format and content requirements of a PMTA as described in the TCA," *id*. at 22.

In comments in response to the PMTA Rule Preliminary RIA, the Small Business Administration's Office of Advocacy objected to FDA's proposed

certification because the certification "improperly assumes that the compliance costs of the proposed rule's requirements for deemed products are due to the agency's 2016 rule," rather than to the PMTA Final Rule, which explained FDA's interpretation and implementation of the statutory requirements. Pltfs. Ex. 5 at 1.

Nevertheless, in October 2021, FDA published the final PMTA Rule ("Final PMTA Rule"), 86 Fed. Reg. 55300 (Oct. 5, 2021), Pltfs. Ex. 6, and final Regulatory Impact Analysis and Regulatory Flexibility Act Analysis ("Final PMTA Rule RIA"), Pltfs. Ex. 7. In the Final PMTA Rule RIA, FDA did not undertake a full Regulatory Flexibility Act analysis that considered the costs of preparing a PMTA to satisfy the Final PMTA Rule's requirements (beyond minor administrative costs due to, for example, new formatting requirements) or consider less costly alternatives for small entities. Pltfs. Ex. 7 at 41-44. Instead, FDA certified that the Final PMTA Rule would "generate net benefits or negligible net costs for most affected small entities." Pltfs. Ex. 7 at 7, 41. FDA thus certified that the Final PMTA Rule would not have a significant economic impact on a substantial number of small entities. *Id.*

Even though, in less than the first six months of 2020 alone, almost 46 million units of nicotine pouch products were sold to U.S. consumers, FDA did not engage in any regulatory flexibility analysis specific to PMTAs for nicotine pouch products. Suppl. Nasi Decl., ¶ 9 and Ex. F thereto; TRO Hrg. Tr. at 21:14-20.

In response to comments contending that FDA had failed to account for many of the costs to prepare and submit PMTAs for deemed tobacco products, FDA stated: "We attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Final Rule and not this rule. We therefore consider most aspects of these comments out-of-scope." Pltfs. Ex. 7 at 12. Likewise, in response to comments, like those of the SBA, that suggested that FDA's Regulatory Flexibility Act certification was improper, FDA stated: "We disagree with this comment. We believe that this comment conflates the impacts of the Deeming Rule with the impacts of this final rule." *Id*. at 13. FDA rejected the suggestion that it needed to prepare a full regulatory flexibility analysis. *Id*. at 42. As a result, FDA did not fully consider potential alternatives or modifications to the Proposed PMTA Rule to lessen the burden of its requirements on small entities as would otherwise be required by 5 U.S.C. § 604(a)(6).

But the Final PMTA Rule did, in fact, impose significant and costly additional requirements, including new "investigation" requirements, on the PMTA process, regardless of product type. *See* 21 C.F.R § 1114.7(k); V.C., ¶¶ 57-59; TRO Hrg. Tr. at 64:17-67:24, 75:16-77:10; Pltfs. Ex. 15A. Thus, applicants for all types of new tobacco products must provide extensive non-clinical and/or clinical studies with human subjects and the applicant's own, unique products on, *inter alia*, delivery of harmful and potentially harmful constituents, 21 C.F.R. §

1114.7(k)(1)(i)(A), toxicity studies, 21 C.F.R. § 1114.7(k)(1)(i)(B), studies regarding the pharmacological profile of the products, including pharmacokinetics, 21 C.F.R. §§ 1114.7(k)(1)(i)(C), actual use studies, 21 C.F.R. § 1114.7(k)(1)(i)(C), switching studies following subjects over time, 21 C.F.R. § 1114.7(k)(1)(ii)(A)-(B) and (k)(1)(iii)(C), and consumer perception and use intention and human factors studies, 21 C.F.R. § 1114.7(k)(1)(iv)(A)-(C). Pltfs. Ex. 6 at 132-33; Pltfs. Ex. 15A; TRO Hrg. Tr. at 64:17-67:24, 75:16-77:10.

For the study requirements, FDA does not provide pass/fail criteria. TRO Hrg. Tr. at 67:22-24; V.C. ¶ 60; Declaration of Dr. Willie McKinney, Exhibit 2 to Plaintiffs' Motion for Temporary Restraining Order, ¶ 21. And, contrary to its earlier statements that randomized controlled trials would likely be unnecessary, FDA places weight on longitudinal clinical study evidence, typically in the form of randomized controlled trials, that follow the same individuals over time to evaluate switching from cigarettes or cessation when deciding to authorize new tobacco products. McKinney Decl., ¶¶ 18, 19; TRO Hrg. Tr. at 53:3-55:7. In fact, FDA has never authorized a product "that did not include a clinical study like a randomized controlled trial." TRO Hrg. Tr. at 55:2-7; McKinney Decl., ¶ 19. And in contrast to its earlier suggestions that applicants could rely heavily on publicly available information, FDA has frequently communicated to applicants that publicly available scientific literature "is not sufficient to evaluate their product." TRO Hrg.

Tr. at 55:8-56:17; McKinney Decl., ¶ 22.

The costs to prepare bundled PMTAs for oral nicotine products that provide all the information FDA requests in the Final PMTA Rule often far exceed FDA's baseline cost estimates found in its Deeming Rule RIA for far more complex ENDS products. TRO Hrg. Tr. at 77:2-81:5; Pltfs. Ex. 15B; McKinney Decl., ¶ 13. The cost of preparing such a PMTA for 18 oral nicotine product SKUs would range between $3 million and $13 million or more. TRO Hrg. Tr. at 80:18-81:5; Pltfs. Ex. 15B; McKinney Decl., ¶¶ 14-15. The disparity between the cost ranges for e-liquids found in the Deeming Rule and the actual cost ranges for less complex oral nicotine pouch products is the result of the more onerous "investigation" demands FDA imposed through the Final PMTA Rule. TRO Hrg. Tr. at 75:16-77:10, 77:2-14, 78:18-81:5; Pltfs. Exs. 15A and 15B; V.C., ¶ 63.

### E. Zest's Timely Filing of PMTAs for its Pouches and FDA's RTF Letter

Zest first marketed its ZEO Universe nicotine pouches, which contain synthetic nicotine, in 2022 before they became subject to FDA regulation or the TCA's premarket authorization requirement. TRO Hrg. Tr. at 70:15-18, 91:19-25; 92:8-15. Zest timely submitted its bundled PMTAs for [redacted] of its pouch products on May 14, 2022, Pltfs. Ex. 14 at 4, meaning that the products were not immediately subject to FDA enforcement for selling products without authorization and that the pouches benefitted from FDA's general practice of allowing the

continued importation and marketing of such products with timely-filed PMTAs so long as the applications are undergoing any stage of review. V.C. ¶¶ 69, 71, 74-80; TRO Hrg. Tr. at 17:14-25, 92:19 – 99:19, 109:25-110:7; Pltfs. Ex. 19.

On Friday, January 30, 2026, at 5:00 p.m., FDA issued the RTF letter to Zest. TRO Hrg. Tr. at 108:10-17; Pltfs. Ex. 14. The [redacted] deficiencies presented in the letter as preventing a "filing" determination all relied on provisions of the Final PMTA Rule found in 21 C.F.R. §§ 1114.7. Pltfs. Ex. 14; TRO Hrg. Tr. at 81-13-16. The RTF letter also warned Zest that the agency could take enforcement action if Zest continues sales following the RTF letter. Pltfs. Ex. 14; TRO Tr. at 81:17-23; 100:9-14. Zest attempted to engage with FDA and had a meeting with the agency about the RTF letter before seeking judicial relief. TRO Hrg. Tr. at 106:22-107:22.

**F. The RTF Letter Poses an Immediate, Existential Threat to Plaintiffs**

The RTF letter poses an [redacted] to Plaintiffs' businesses, TRO Hrg. Tr. at 108:19-114:4, Declaration of Inga Nasi, Exhibit 1 to Plaintiffs' Motion for Temporary Restraining Order, ¶¶ 14-19, and to their owner's personal finances, TRO Hrg. Tr. at 111:24-113:18 ("It's akin to death"). Once it issued the RTF letter, [redacted]. TRO Hrg. Tr. at 109:8-110:7. Even if Plaintiffs were to keep selling despite FDA's threat of enforcement, Plaintiffs' [redacted]

[redacted]. TRO Hrg. Tr. at 103:25-106:14; Nasi Decl., ¶¶ 14-15; Suppl. Nasi Decl., ¶¶ 10-12. [redacted] will cost approximately [redacted], a sum that [redacted]. Nasi Decl., ¶ 16. Zest also has [redacted] tied up in purchased raw materials and inputs currently in transit from suppliers, as well as inventory that Plaintiffs will no longer be able to sell. Nasi Decl. ¶ 14; TRO Hrg. Tr. at 109:5-18, 110:8-19. Plaintiffs also owe excise taxes to the State of Florida that [redacted] if there is a [redacted] in terms of [redacted]. Nasi Decl., ¶ 19; TRO Hrg. Tr. at 110:8 – 111:9

[redacted] of Zest's revenues come from sales of the pouches and CSD similarly realizes [redacted] from sales of the pouches and is also [redacted]. Nasi Decl., ¶¶ 10, 17, 18; TRO Hrg. Tr. at 111:10-23. Without a stay, both Plaintiffs will have to [redacted] and [redacted] Nasi Decl., ¶¶ 18, 19; TRO Hrg. Tr. at 92:5-7, 108:19-109:1.

## STANDARD OF REVIEW

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the

opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (same); *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 U.S. App. LEXIS 10263, at *31 (11th Cir. Apr. 15, 2022). Here, a preliminary injunction continuing the existing stay of the RTF letter is necessary to prevent irreparable harm to Plaintiffs pending the final outcome of this case.

## ARGUMENT

### I. Plaintiffs are Likely to Succeed on the Merits of Their Claims

Congress enacted the Regulatory Flexibility Act "to improve Federal rulemaking by creating procedures to analyze the availability of more flexible regulatory approaches for small entities." Pub. L. 96-354, 94 Stat. 1164, 1164 (Sept. 19, 1980). To that end, the RFA requires an agency to conduct a "final regulatory flexibility analysis" when the agency adopts a rule via notice-and-comment rulemaking. 5 U.S.C. § 604.

A regulatory flexibility analysis includes, among other things, "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statute," including a discussion of why the agency rejected other significant alternatives to the rule. 5 U.S.C. § 604(a)(6). Congress required agency regulatory flexibility analyses because "uniform Federal regulatory and reporting requirements [had] in

numerous instances imposed unnecessary and disproportionately burdensome demands" on "small businesses," that had "adversely affected competition in the marketplace" and "discouraged innovation." 94 Stat. 1164.

Congress recognized that there are some situations in which an agency rule does not impact small businesses. Therefore, the RFA exempts agencies from conducting a regulatory flexibility analysis when the agency head provides a certification that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). But such a certification must include "a statement providing the factual basis for [the] certification." 5 U.S.C. § 605(b).

Congress expressly made an agency's section 605(b) certification subject to judicial review under the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 611(a), including the APA's provisions that allow courts to "set aside" agency actions that are "arbitrary" or "capricious" under 5 U.S.C. § 706(2)(A). *See, e.g.*, *North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647, 651-653 (E.D. Va. 1997) (setting aside rule because section 605(b) certification was arbitrary and capricious).[3]

An agency action "qualifies as 'arbitrary' or 'capricious' if the agency did

[3] The RFA itself also allows district courts to remand the rule to the agency and defer enforcement of the rule against small entities. 5 U.S.C. § 611(a)(4).

not engage in 'reasoned decision-making.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). In other words, "the process by which" an agency "reaches [a] result must be logical and rational." *Id.* (quoting *Allentown*, 522 U.S. at 374). As the D.C. Circuit has observed:

> the APA together with the Regulatory Flexibility Act require that a rule's impact on small businesses be reasonable and reasonably explained. A regulatory flexibility analysis is, for APA purposes, part of agency's explanation for its rule. *See Small Refiner Lead Phase-Down Task Force v. EPA*, 227 U.S. App. D.C. 201, 705 F.2d 506, 539 (D.C. Cir. 1983) ("a reviewing court should consider the regulatory flexibility analysis as part of its overall judgment whether a rule is reasonable"); *see also Thompson v. Clark*, 239 U.S. App. D.C. 179, 741 F.2d 401, 405 (D.C. Cir. 1984) ("Thus, if data in the regulatory flexibility analysis -- or data anywhere else in the rulemaking record -- demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand.") (citation omitted).

*Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540-41 (D.C. Cir. 2009) (Kavanaugh, J.).

FDA's section 605(b) certification for the Final PMTA Rule is a paradigmatic example of arbitrary and capricious agency action. According to FDA, it was not the Final PMTA Rule that would have "a significant economic impact on a substantial number of small entities." Pltfs. Ex. 7 at 42. Rather, according to FDA, the 2016 *Deeming Rule* was responsible for any significant economic impacts on a substantial number of small entities. *See id.* at 12 ("We

attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Rule and not this rule.”); *see also* Pltfs. Ex. 4 at 7 (“[W]e already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule”).

But FDA’s regulatory impact analysis for the Deeming Rule did not include any estimates for the costs of preparing PMTAs for novel nicotine products other than ENDS products and e-liquids for use in them. Indeed, FDA twice acknowledged that it was unable to quantify the “costs for novel tobacco products other than ENDS due to lack of data.” Pltfs. Ex. 2 at 75; *see also id.* at 114. And FDA further stated that it could not even estimate the number of manufacturers and importers of such novel nicotine products that would be affected by the Deeming Rule. *Id*. at 69.

Further, even if nicotine pouches were a very small segment of the tobacco products market when the Deeming Rule was finalized in 2016, they no longer were by the time the Final PMTA Rule was published in 2021. In less than six months of the previous year, almost 46 million units of tobacco pouches were sold to U.S. consumers. Yet FDA admittedly took no action to attempt to calculate or consider the costs of preparing PMTAs for small manufacturers of nicotine pouch products in its Final PMTA Rule RIA. *See* TRO Hrg. Tr. at 24:1-25:18.

The extreme disparity between FDA's statements and generalized cost estimates for preparing PMTAs for ENDS products in the Deeming Rule RIA and the reality of preparing PMTAs for nicotine pouch products under the Final PMTA Rule underscores that FDA's section 605(b) certification was arbitrary and capricious because the Final PMTA Rule's detailed testing and study requirements impose substantial additional costs.[4] In the Deeming Rule RIA, FDA emphasized that randomized controlled trials would likely be unnecessary, emphasized that applicants would be able to rely on publicly available studies found in the scientific literature, and disagreed with statements suggesting that study requirements would run PMTA costs into the millions of dollars. In reality, however, under the Final PMTA Rule, FDA has never authorized *any* product without a longitudinal switching study in the form of a randomized controlled trial or similar study and has rejected most attempts by applicants to rely on published scientific literature rather than specific studies on their own products. TRO Hrg. Tr. at 55:2-7, 55:15-56:17. Further, the actual costs of preparing a bundled PMTA for nicotine pouch products like Plaintiffs' run from $3 million to over $13 million, whereas in the Deeming Rule RIA, FDA had estimated the costs for a bundled PMTA for e-

[4] Indeed, the vast disparity between FDA's cost estimates for PMTAs for ENDS and the actual cost of preparing robust PMTAs for far less complex nicotine pouch products provides a second, independent basis for concluding that FDA's adoption of its Final PMTA Rule without examining the costs of preparing PTMAs for nicotine pouch products was arbitrary and capricious.

liquids for use in ENDS products—a substantially more complex application because, unlike nicotine pouches, e-liquid products are heated, aerosolized and inhaled—to be only between $181,686 and $2,014,120. TRO Hrg. Tr. at 78:16-81:5; Pltfs. Ex 15B.

In sum, FDA's section 605(b) certification for the Final PMTA Rule unlawfully elided a reasonable explanation of the actual costs and effects of the Final PMTA Rule's particular testing and study requirements, including as to nicotine pouch products altogether.[5] While the earlier Deeming Rule RIA pointed to the future and stated that the agency could not "predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established," Pltfs. Ex. 2 at 53-54, the later Final PMTA Rule section 605(b) certification pointed to the past and baselessly claimed that the Deeming Rule was the sole source of virtually all PMTA costs. This was not "reasoned decision-making." *Michigan v. EPA*, 576 U.S. at 750. Therefore, FDA's section 605(b) certification was arbitrary and capricious and Zest's RFA letter premised on the Final PMTA Rule's requirements must be set aside.

[5] Just as in an earlier case where a judge in this District found another federal agency to have provided a section 605(b) certification in violation of the RFA, the "RFA watchdog," the SBA, contemporaneously criticized the planned certification as arbitrary and capricious but FDA "refused to budge." *See Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1433-37 (M.D. Fla. 1998)

## II. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.

The remaining injunctive relief factors also weigh in Plaintiffs' favor. The RTF letter expressly forbids Plaintiffs from continuing t[redacted] at the evidentiary hearing and in her declarations, without injunctive relief staying the RTF letter, Plaintiffs would be rendered unable to continue selling their products, TRO Hrg. Tr. at 81:17-23, 100:4-8, 108:19, suffer sunk costs in manufacturing and be unable to import their products into the United States, *id.* at 109:8-24, 110:8-19, be forced to begin the PMTA process anew without the ability to sell while the new PMTA is pending, *id.* at 100:9-14, suffer a [redacted], *id.* at 113:19-114:4), suffer substantial reputational harm with their customers [redacted], *id.* at 104:11-106:14, 110:20-111:9, be forced to [redacted], *id.* at 108:19-25, and would [redacted] that they [redacted], forcing them to [redacted], *id.* at 111:10-23.

While "economic harm will not satisfy the irreparable-harm element in many cases, that general rule does not necessarily hold where there is no adequate remedy at law to recover damages for the harm suffered." *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres of Land*, 910 F.3d 1130, 1165 (11th Cir. 2018). "[I]n an APA action[,] sovereign immunity bars the recovery of monetary damages from

the federal government." *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021). "[T]he inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable." *Odebrecht Constr. v. Sec'y, Fla. DOT*, 715 F.3d 1268, 1289 (11th Cir. 2013).

The imposition of costs to comply with government orders that "could imperil the financial viability" of businesses are properly considered under the irreparable harm analysis. *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022). When a plaintiff has no adequate remedy at law, its "[u]nrecoverable monetary loss is an irreparable injury." *Id.* The Eleventh Circuit confronted a similar issue in *LabMD, Inc. v. FTC*, where it found that the costs of complying with an FTC Order constituted irreparable harm because of FTC's sovereign immunity. 678 F. App'x 816, 821 (11th Cir. 2016). If the Eleventh Circuit found that the hundreds of thousands of dollars in costs that the plaintiff in *LabMD* faced constituted irreparable harm, then certainly the millions of dollars in losses that Plaintiffs confront here qualify.

Finally, the Eleventh Circuit has found that injury to a company's "reputation, trust, and goodwill" is the "the sine qua non of injunctive relief." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1183 (11th Cir. 2022). "It is well-established that the loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are

difficult to compute." *Edwards Moving & Rigging, Inc. v. Jenkins*, No. 8:19-cv-1004-T-36SPF, 2019 U.S. Dist. LEXIS 128821, at *13 (M.D. Fla. June 5, 2019). Plaintiffs have no doubt that, without a stay of the RTF letter, they will lose customer goodwill and permanent damage to their reputation in the market. TRO Hrg. Tr. at 110:20-111:9. Consumers of the ZEO Universe pouches will likely either return to smoking more harmful cigarettes, seek out alternative nicotine sources, such as ENDS products, or switch to products sold by competing nicotine pouch manufacturers, most of whom also have not received a marketing granting order and yet continue to sell in the same outlets as Plaintiffs without repercussions. TRO Hrg. Tr. at 94:16-99:19; Pltfs. Ex. 19.

As this Court has already found, Plaintiffs have conclusively demonstrated that the [redacted] harm they face from the RTF letter is irreparable. TRO Hrg. Tr. at 135:24-136:22. The Eleventh Circuit has stayed marketing denial orders FDA issued to ENDS manufacturers in analogous circumstances even though those products were likewise adulterated under the TCA because they lacked an FDA marketing order. *See* Feb. 1, 2022 Order in *Bidi Vapor, LLC v. FDA*, No. 21-13340 (11th Cir.). The Court should do the same here.

## III. The Balance of Harms and Public Interest Weigh in Favor of Injunctive Relief.

The balance of harms and public interest factors "merge, when as here, the government is the opposing party." *Florida v. HHS*, 739 F. Supp. 3d 1091, 1110

(M.D. Fla. 2024) (internal quotation omitted). When a private party seeks a stay or injunctive relief against the government, the court must "weigh the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025).

Here, these factors strongly favor Plaintiffs. Absent a stay, Plaintiffs will suffer [redacted], as detailed above. Continuing to market their products following the RTF letter would expose Plaintiffs to potentially significant penalties, 21 U.S.C. §§ 331-334, V.C., ¶¶ 74, 75, 83-85, and removing their products will ultimately require Plaintiffs to [redacted]. The relief Plaintiffs seek "would simply suspend the administrative alteration of the status quo." *Wages & White Lion v. FDA*, 16 F.4th 1130, 1144 (5th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 430 n.1 (2009)). Plaintiffs' products would remain on the market just as they did during the more than three years the PMTAs were pending and consistent with FDA's practice of deferring enforcement against nicotine pouch products with pending applications. V.C., ¶¶ 76-80; TRO Hrg. Tr. at 17:14-25, 92:19 – 99:19, 109:25-110:7; Pltfs. Ex. 19. The relief Plaintiffs seek would simply return them to the same position as competing nicotine pouch manufacturers have enjoyed since they submitted their PMTAs. TRO Hrg. Tr. at 49:12-51:11; 106:15-21.

The harm to Plaintiff "flows naturally from the likelihood of irreparable injury." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1321 (11th Cir. 2010). In contrast, FDA will suffer no harm from an order merely preserving the status quo. Further, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Florida v. HHS*, 749 F. Supp. 3d at 1110 (quoting *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021)); *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 619 (5th Cir. 2021) ("Any interest [the government] may claim in enforcing an unlawful [rule] is illegitimate."). Further, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Brown v. HHS*, 4 F.4th 1220, 1265 (11th Cir. 2021). To the contrary, "there is substantial public interest in ensuring government agencies abide by federal laws even when they are pursuing their prerogatives." *Doe v. Bondi*, 785 F. Supp. 3d 1268, 1287 (N.D. Ga. 2025). Finally, the public interest supports ensuring continued access to Plaintiffs' less harmful nicotine products for users that are current and former users of cigarettes or other tobacco products. TRO Hrg. Tr. at 113:19-114:4.[6]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and enter a preliminary injunction order staying the RTF letter.

---

[6] Further, as it did when entering the temporary restraining order, given the lack of potential harm to Defendants, the Court should exercise its discretion to not require Plaintiffs to post a bond. *See BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

Respectfully submitted,

Dated: March 11, 2026

/s/ James Matulis
James Matulis
FBN 0077429
MATULIS IP LAW
9806 Gretna Green Drive
Tampa, FL 33626
(813) 451-7347
Jim@MatulisLaw.com

/s/ Eric N. Heyer
Eric N. Heyer* (Lead Counsel)
James C. Fraser*
Joseph A. Smith*
Ryan C. Callinan*
THOMPSON HINE LLP
1919 M Street, N.W. Suite 700
Washington, D.C. 20036
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Joseph.Smith@ThompsonHine.com
Ryan.Callinan@ThompsonHine.com

*admitted pro hac vice

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2026, I will cause the foregoing motion, Exhibit 1 thereto, and the proposed form of order to be served via electronic mail on all counsel of record for Defendants.

/s/ Eric N. Heyer

# TAB 62

JUN 9 2026 PM3:49
FILED - USDC - FLMD - TPA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE C STORE DEPOT, INC., *et al.*,

Plaintiffs,

v.

U.S. FOOD AND DRUG ADMINISTRATION, *et. al.*,

Defendants.

Case No. 8:26-cv-00483-MSS-CPT

**DEFENDANTS' NOTICE OF APPEAL**

Please take notice that Defendants, the U.S. Food and Drug Administration, Kyle Diamantas[1], J.D., Acting Commissioner of Food and Drugs, the U.S. Department of Health and Human Services ("HHS"), and Robert F. Kennedy, Jr., J.D., Secretary of HHS (collectively, "Defendants"), hereby appeal to the United States Court of Appeals for the Eleventh Circuit from this Court's

[1] Where public officers are sued in their official capacities, their successors are automatically substituted as named parties under Fed. R. Civ. P. 25(d). Kyle Diamantas, Acting Commissioner of Food and Drugs, has therefore been substituted for his predecessor.

April 10, 2026, Order on Motion for Preliminary Injunction entered at ECF No. 49. A redacted version of the Order at ECF No. 49 was filed at ECF No. 61.

Dated: June 9, 2026

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

Mamie Wise

LACY R. HARWELL, JR.
Assistant United States Attorney
Florida Bar No. 714623
MAMIE V. WISE
Florida Bar No. 65570
Assistant United States Attorney
JAMES S. ALLRED
District of Columbia Bar No. 1024976
Special Assistant United States Attorney
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6200
E-mail: Randy.Harwell@usdoj.gov
Mamie.Wise@usdoj.gov

*Counsel for Defendants*

OF COUNSEL:

ROBERT FOX FOSTER
Acting General Counsel
Chief Counsel for Food, Research, and Drugs
U.S. Department of Health and Human Services

SEAN R. KEVENEY
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

BARBARA ALKALAY
Senior Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD 20993-0002

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2026, I electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sophia Shams*
Sophia Shams