No. 26-12062

# In the United States Court of Appeals for the Eleventh Circuit

THE C STORE DEPOT, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

U.S. FOOD & DRUG ADMINISTRATION, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Middle District of Florida
(Hon. Mary S. Scriven)

**PUBLIC AND REDACTED BRIEF OF PLAINTIFFS-APPELLEES THE C STORE DEPOT, INC. AND ZEST BRANDS LLC**

Eric N. Heyer
James C. Fraser
THOMPSON HINE LLP
1999 K Street, NW, Suite 600
Washington, DC 20006
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@thompsonhine.com
James.Fraser@thompsonhine.com

*Counsel for Plaintiffs-Appellees The C Store Depot, Inc. and Zest Brands LLC*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and 11th Circuit Rule 28-1(b), Plaintiffs-Appellees The C Store Depot, Inc. and Zest Brands LLC respectfully submit that oral argument would be appropriate in this case. The district court properly concluded that Plaintiffs were likely to succeed on the merits of their claims that FDA acted arbitrarily and capriciously when it certified that its regulation setting forth the "investigation" requirements for premarket applications for all "new" tobacco products would not have a significant economic impact on a substantial number of small entities. The district court also properly concluded that Plaintiffs-Appellants were threatened with irreparable harm and that the merged balance of harms and public interest factors weighed in favor of injunctive relief.

# <u>TABLE OF CONTENTS</u>


INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION ........................................................3

STATEMENT OF ISSUES ....................................................................4

STATEMENT OF THE CASE ...............................................................4

A. The Tobacco Control Act's Premarket Authorization Requirement for New Tobacco Products ..........................................................4

B. FDA's 2016 Deeming Rule Regulatory Flexibility Analysis .........................6

C. FDA's Section 605(b) Certification in Support of the Agency's 2021 PMTA Rule ...........................................................8

D. The PMTA Rule's Additional and Costly "Investigation" Requirements ....11

E. Plaintiffs' Oral Nicotine Pouch Products ...........................................13

F. Zest's Timely Submitted PMTAs for its Pouches and FDA's Refuse to File Letter ..........................................................14

G. The Refuse to File Letter Posed an Immediate, REDACTED Risk to Plaintiffs ..........................................................................15

H. Proceedings Before the District Court. ..................................................17

SUMMARY OF ARGUMENT ...............................................................18

STANDARD OF REVIEW ....................................................................21

ARGUMENT .........................................................................................23

I. The District Court Properly Found that Plaintiffs Are Likely to Succeed on the Merits. .........................................................23

II. The District Court Properly Found that the PMTA Rule Materially Expanded the Burdens and Costs of Preparing a PMTA Beyond Those Imposed by the Deeming Rule......................25

III. The District Court Properly Credited Plaintiffs' Expert's Uncontroverted Testimony Regarding Application Costs. ................32

IV. The District Court Did Not Fail to Grant FDA Appropriate Deference ......................................................................37

V. The District Court Properly Considered Defendants' Failure to Estimate the Costs of the PMTA's Rule's Requirements for Novel Nicotine Products Other than ENDS and E-liquids. ...........................40

VI. *Kealani* is Distinguishable. ..................................................................43

VII. The District Court Properly Found that Plaintiffs Were Likely to Suffer Irreparable Harm and that the Equities Favor Injunctive Relief. ...................................................45

CONCLUSION ..........................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Access Now, Inc. v. Southwest Airlines Co.*,
385 F.3d 1324 (11th Cir. 2004) ....................41

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021)....................50

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998)....................24

*Associated Fisheries of Me., Inc. v. Daley*,
127 F.3d 104 (1st Cir. 1997)....................37

*Cigar Association of America v. FDA*,
5 F.4th 68 (D.C. Cir. 2021)....................42

*Cty. of Butte v. Dep't of Water Res.*,
90 Cal. App. 5th 147, 306 Cal. Rptr. 3d 860 (2023) ....................31

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)....................33, 36

*Dream Defenders v. Governor of the State of Fla.*,
119 F.4th 872 (11th Cir. 2024)....................25

*DSCC v. Trump*,
No. 26-5193, 2026 U.S. App. LEXIS 22325
(D.C. Cir. July 28, 2026) ....................22

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................38

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025)....................29, 31

*Fla. Manufactured Hous. Ass'n v. Cisneros*,
53 F.3d 1565 (11th Cir. 1995) ....................38

*Florida v. HHS*,
19 F.4th 1271 (11th Cir. 2021) ....................49

*Gonzalez v. Governor of Ga.*,
978 F.3d 1266 (11th Cir. 2020) ....................21

*Hurley v. Moore*,
233 F.3d 1295 (11th Cir. 2000) ....................41

*Kealani Distribution LLC v. FDA*,
168 F.4th 741 (5th Cir. 2026) .................... 43-45

*Kreepy Krauly U.S.A. v. Sta-Rite Indus.*,
Nos. 97-1091, 97-1368, 1998 U.S. App. LEXIS 8037
(Fed. Cir. Apr. 24, 1998) ....................32

*L.W. v. Comm'r of the Ga. Dep't of Cmty. Health*,
176 F.4th 635 (2026) ....................21

*League of Women Voters of Mich. v. Johnson*,
902 F.3d 572 (6th Cir. 2018) ....................22

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
51 F.3d 982 (11th Cir. 1995) ....................49

*Melendez v. Sec'y, Fla. Dep't of Corr.*,
No. 21-13455, 2022 U.S. App. LEXIS 10263
(11th Cir. Apr. 15, 2022) ....................32

*Michigan Millers Mut. Ins. Corp. v. Benfield*,
140 F.3d 915 (11th Cir. 1998) ....................33

*Michigan v. EPA*,
576 U.S. 743 (2015)....................24

*Morales v. Comm'r of Social Security*,
799 Fed. Appx. 672 (11th Cir. 2020)....................33

*Nat'l Tel. Coop. Ass'n v. FCC*,
563 F.3d 536 (D.C. Cir. 2009) (Kavanaugh, J.) ....................25

*Nken v. Holder*,
556 U.S. 418 (2009)....................21

*Preserve Endangered Areas of Cobb's History v. United States Army Corps. of Eng'rs*,
87 F.3d 1242 (11th Cir. 1996) .......... 19, 33

*Rural Cellular Ass'n v. FCC*,
588 F.3d 1095 (D.C. Cir. 2009) .......... 38

*Salt Lake Tribune Publishing Co. v. AT&T Corporation*,
320 F.3d 1081 (10th Cir. 2003) .......... 48, 49

*Schiavo ex rel. Schindler v. Schiavo*,
403 F.3d 1223 (11th Cir. 2005) .......... 21

*Selman v. Cobb Cty. Sch. Dist.*,
449 F.3d 1320 (11th Cir. 2006) .......... 22

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty. Colo.*,
605 U.S. 168 (2025) .......... 38

*Shahar v. Bowers*,
120 F.3d 211 (11th Cir. 1997) .......... 22

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) (en banc) .......... 21

*Small Refiner Lead Phase-Down Task Force v. EPA*,
227 U.S. App. D.C. 201, 705 F.2d 506 (D.C. Cir. 1983) .......... 24

*Swain v. Junior*,
958 F.3d 1081 (11th Cir. 2020) .......... 21

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) .......... 50

*Thompson v. Clark*,
239 U.S. App. D.C. 179, 741 F.2d 401 (D.C. Cir. 1984) .......... 25

*Upside Foods Inc. v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
171 F.4th 1239 (11th Cir. 2026) .......... 22, 47

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) .......... 46

*Wreal, LLC v. Amazon.com*,
840 F.3d 1244 (11th Cir. 2016) ....................21, 22

**Statutes**

Family Smoking Prevention and Tobacco Control Act,
Pub. L. 111-31, 123 Stat. 1776 (2009) ....................4

Regulatory Flexibility Act,
Pub. L. 96-354, 94 Stat. 1164 (Sept. 19, 1980) ....................23

5 U.S.C. § 601 ....................13

5 U.S.C. § 604 ....................23, 39

5 U.S.C. § 605 ....................1, 8, 18, 24

5 U.S.C. § 611 ....................24

5 U.S.C. § 706 ....................24

21 U.S.C. § 321 ....................5

21 U.S.C. § 387a ....................4

21 U.S.C. § 387j ....................1, 5, 6, 30

28 U.S.C. § 1292 ....................3

28 U.S.C. § 1331 ....................3

**Regulations**

13 C.F.R. § 121.201 ....................13

21 C.F.R. § 1100.1 ....................5

21 C.F.R. § 1114.7 ....................8, 11, 12, 15, 29

**Other Authorities**

*Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, Final Rule, 81 Fed. Reg. 28973 (May 10, 2016) ............................................2, 5

*Enforcement Priorities for Certain New Tobacco Products Marketed Without Premarket Authorization; Guidance for Industry*, 91 Fed. Reg. 25892 (May 12, 2026) ....................................................47

Order, *Bidi Vapor, LLC v. FDA*, No. 21-13340 (11th Cir. Feb. 1, 2022).........................................................................46

*Premarket Tobacco Product Applications and Recordkeeping Requirements*, 84 Fed. Reg. 50566 (Sept. 25, 2019) ...........................................8

*Premarket Tobacco Product Applications and Recordkeeping Requirements*, Final Rule, 86 Fed. Reg. 55300 (Oct. 5, 2021) ......................1, 10

## INTRODUCTION

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601, *et seq*., requires federal agencies that adopt rules via notice-and-comment rulemaking to engage in an analysis that considers steps to minimize the significant economic impact on small entities and potential alternatives. The only exception to this requirement is when the agency certifies that a proposed rule "will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b).

In 2021, FDA adopted a rule, *Premarket Tobacco Product Applications and Recordkeeping Requirements*, Final Rule, 86 Fed. Reg. 55300 (Oct. 5, 2021) (the "PMTA Rule") specifying for the first time the substantial investigation requirements that manufacturers of new tobacco products seeking marketing authorization would need to undertake to satisfy the Tobacco Control Act's requirements that they submit "full reports of all information . . . concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products." 21 U.S.C. § 387j(b)(1)(A). Yet when FDA adopted this rule for premarket tobacco product applications ("PMTAs"), rather than undertake a full regulatory flexibility analysis, FDA instead certified that that the PMTA Rule would not have a significant economic impact on a substantial number of small entities. FDA claimed

this was the case because it had already accounted for the costs to prepare and submit PMTAs in the regulatory flexibility analysis it had prepared for another rule five years earlier.

As the district court found, ECF No. 61 at 13-17, FDA's RFA certification was arbitrary and capricious as regards novel oral nicotine pouch products. Five years earlier, when FDA finalized a rule (the so-called "Deeming Rule")[1] to extend its jurisdiction to such products, FDA had stated that it could not estimate the costs of preparing a premarket application for any novel nicotine product besides electronic cigarettes and e-liquids for use therein and could not predict the costs or benefits of future rulemaking to specify investigational requirements before the contents of the rules themselves were established. Moreover, the limited PMTA cost estimates that FDA did supply for e-cigarette and e-liquid products were but a fraction of the actual costs to prepare an application for nicotine pouch products consistent with the PMTA Rule's requirements, even though, unlike e-cigarette products, nicotine pouches do not deliver nicotine through heating, aerosolization, or inhalation. The significant cost discrepancy is clear evidence that, contrary to its claims, FDA imposed additional investigation costs on applicants through its PMTA Rule. As a result,

---

[1] FDA, *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, Final Rule, 81 Fed. Reg. 28973 (May 10, 2016).

FDA's claim that the PMTA Rule would not have a significant economic impact on a substantial number of small entities was false.

Plaintiffs are small entities that manufacture and distribute oral nicotine pouch products. Because FDA refused to file their premarket applications on the basis that they failed to satisfy the PMTA Rule's requirements, and this refusal REDACTED [redacted], Plaintiffs sought relief from the district court. The district court entered first a temporary restraining order and then a preliminary injunction staying the refuse to file letter FDA issued to Plaintiff Zest Brands, LLC.

As explained herein, the district court's preliminary injunction order was based on ample record evidence and properly construed and applied the law. Plaintiffs have identified no basis for this Court to conclude that the district court abused its discretion in staying the refuse to file letter. Rather, for the reasons explained herein, the Court should affirm the district court's preliminary injunction order.

## <u>STATEMENT OF JURISDICTION</u>

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. Defendants timely appealed the district court's April 10, 2026 preliminary injunction order and this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1. Whether the district court abused its discretion when it found that Plaintiffs were substantially likely to prevail on their claim that FDA issued a sham certification under 5 U.S.C. § 605(b) for its 2021 PMTA Rule because FDA claimed it had already included the costs to prepare applications for all newly deemed products in the final regulatory impact analysis for its 2016 Deeming Rule when, in fact, it had engaged in no cost analysis for oral nicotine pouches and had expanded the investigation requirements for all deemed tobacco products in the PMTA Rule.

2. Whether the district court abused its discretion when it found that Plaintiffs were threatened with irreparable harm and that the merged balance of harms and public interest factors weighed in favor of preliminary injunctive relief.

## STATEMENT OF THE CASE

### A. The Tobacco Control Act's Premarket Authorization Requirement for New Tobacco Products

The Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776 (2009) ("TCA" or "Act"), grants FDA jurisdiction over tobacco products. The TCA's requirements originally extended only to cigarettes, smokeless tobacco, and certain other traditional tobacco products. 21 U.S.C. § 387a(b). However, the TCA allowed FDA to extend by regulation the Act's requirements to "any other tobacco products that the Secretary by regulation deems" to fall under the Act. *Id*. Through its 2016 "Deeming Rule," FDA deemed products containing

nicotine derived from tobacco to be "tobacco products" under the Act. 81 Fed. Reg. 28974 (adopting, *inter alia*, 21 C.F.R. § 1100.1); ECF No. 43-1. In 2022, Congress expanded the TCA's definition of "tobacco product' to include products "containing nicotine from any source." Pub. L. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

The TCA defines a "new tobacco product" as a tobacco product that was not commercially marketed in the United States as of February 15, 2007. 21 U.S.C. § 387j(a)(1)(A). Section 910 of the Act requires anyone wishing to market a new tobacco product in interstate commerce to submit a premarket tobacco product application ("PMTA") to FDA. 21 U.S.C. § 387j. To receive a marketing granted order, an applicant must demonstrate that its product is "appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2)(A).

While the TCA sets out certain categories of information that a PMTA must contain, 21 U.S.C. § 387j(b), it does not elaborate as to the specific requirements. Instead, the Act provides that whether a product is appropriate for the protection of the public health "shall, *when appropriate*, be determined on the basis of well-controlled investigations, which *may* include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product." 21 U.S.C. § 387j(c)(5)(A) (emphases added). But the Act also provides that if FDA "determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A)) which is sufficient to evaluate

the tobacco product," FDA may grant marketing authorization based on that other evidence." 21 U.S.C. § 387j(c)(5)(B). The TCA itself thus grants FDA discretion to determine *whether* and, if so, *what* "investigations" are required for a tobacco product to be "appropriate for the protection of the public health."

## B. FDA's 2016 Deeming Rule Regulatory Flexibility Analysis

When FDA issued the Deeming Rule in 2016, the agency had not yet developed any regulations specifying the types of "investigations," or studies, required of applicants for premarket authorization. ECF No. 55 at ¶ 37. Nevertheless, FDA issued a Final Regulatory Impact and Regulatory Flexibility Act analysis (the "Deeming Rule RIA") in conjunction with the Deeming Rule. ECF No. 43-2.

In its Deeming Rule RIA, FDA stressed that "research burdens of PMTAs are quite different from premarket applications for new drugs. For example, FDA does not expect that PMTAs will include randomized clinical trials like those conducted to support drug approvals." ECF No. 43-2; ECF No. 58 at 52:16-54:7. In response to public comments that argued that "based on the types of studies that FDA would require . . . the cost of a PMTA could be millions of dollars per product," FDA stated, "We disagree." ECF No. 43-2 at 37; ECF No. 58 at 54:20-55:7. In its discussion of potential "Human Studies," FDA stated that applicants would be able to rely on publicly available information or studies that FDA itself was conducting at the time—not that multi-million-dollar studies of the applicants' individual products

would be required. ECF No. 43-2 at 149-50.

Even though novel oral nicotine products, including some nicotine pouch products, were already on the market when the Deeming Rule RIA was published, *see* ECF No. 59-1 at ¶¶ 4-6, the Deeming Rule RIA did not include any specific estimates for the costs of preparing PMTAs for novel nicotine products other than electronic nicotine delivery systems ("ENDS"), or e-cigarettes, and e-liquids for use in them. ECF No. 43-2 at 114. For e-liquids, FDA estimated the cost of a bundled PMTA to be between $181,686 and $2,014,120, with an average cost per individual product, or SKU, of $131,643. ECF No. 43-2 at 87-88. FDA stated that its cost estimates were "based on information provided by FDA scientists who have experience with review of premarket applications as well as their knowledge of research and testing costs from coordinating or conducting research in areas such as toxicology and human health studies." ECF No. 43-2 at 86. Nowhere, however, did the Deeming Rule RIA delineate the specific tests or studies that comprised the "investigations" that FDA considered when developing its PMTA cost estimates for e-liquids and ENDS.

Although FDA recognized that the PMTA requirements would now apply to "tobacco products that do not fit into traditional product categories, such as ENDS and nicotine gels," FDA stated that it was unable to quantify the "costs for novel tobacco products other than ENDS due to lack of data." ECF No. 43-2 at 75; *see*

*also id.* at 114 ("We are unable to quantify the costs for other novel tobacco products . . . due to data limitations and the relatively small size of their markets."). FDA also stated that it could not even estimate the number of manufacturers of such novel products that would be affected by the Deeming Rule. *Id.* at 69.

In response to public comments arguing that FDA had failed to accurately quantify the costs of the Deeming Rule, including the costs of preparing PMTAs, FDA stated: "With respect to future rules, . . . we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." ECF No. 43-2 at 53-54.

### C. FDA's Section 605(b) Certification in Support of the Agency's 2021 PMTA Rule

In 2019, FDA first published its proposed PMTA rule, which specified requirements for the contents and format of PMTAs for all new tobacco products. 84 Fed. Reg. 50566; ECF No. 43-3 (proposing adoption, *inter alia*, of 21 C.F.R. § 1114.7).

FDA simultaneously published a preliminary regulatory impact analysis and initial regulatory flexibility analysis ("PMTA Rule Preliminary RIA"). ECF No. 43-4. Therein, FDA proposed to certify pursuant to 5 U.S.C. § 605(b) that the PMTA Rule "would not have a significant economic impact on a substantial number of small entities." ECF No. 43-4 at 6. FDA reasoned that it had "already included the costs to submit and review PMTAs for deemed tobacco products in the final

regulatory impact analysis for the Deeming Rule" in 2016, *id*. at 7, and that the earlier analysis "accounted for the costs to comply with the format and content requirements of a PMTA as described in the TCA," *id*. at 22.

In comments in response to the PMTA Rule Preliminary RIA, the Small Business Administration's Office of Advocacy objected to FDA's proposed certification because the certification "improperly assumes that the compliance costs of the proposed rule's requirements for deemed products are due to the agency's 2016 rule," rather than to the PMTA Rule, which explained FDA's interpretation and implementation of the statutory requirements. ECF No. 43-5 at 1. Likewise, ENDS industry participants challenged FDA's PMTA cost estimates for ENDS and e-liquids from its earlier Deeming Rule RIA. By way of example, RAI Services Company, an affiliate of various R.J. Reynolds entities, commented that "[t]he costs for a single PMTA submission (not including supplements, amendments, and responses to deficiencies) were severely underestimated by FDA and have exceeded several million dollars. . . . [A] PMTA for a single product would be extremely inefficient and likely to cost approximately $5 million." F-017428. RAI Services Company commented that the recommended clinical studies alone would cost "on the order of $2 million or more." F-017428 at n.85. Similarly, an ENDS trade group, the Vapor Technology Association, incorporated by reference the SBA's criticisms and noted that one member company expected to spend "more than $15 million preparing

PMTAs for just 28 SKUs representing a variety of e-liquid flavors for use in closed-system devices." F-018589. The VTA also noted that a representative of JUUL Labs, Inc. had testified that company was dedicating $125 million to its PMTA efforts. F-018589.

Nevertheless, in October 2021, FDA published the final PMTA Rule ("PMTA Rule"), 86 Fed. Reg. 55300 (Oct. 5, 2021), ECF No. 43-6, and final Regulatory Impact Analysis and Regulatory Flexibility Act Analysis ("PMTA Rule RIA"), ECF No. 43-7. In the PMTA Rule RIA, FDA did not undertake a full Regulatory Flexibility Act analysis that considered the costs of preparing a PMTA to satisfy the final PMTA Rule's requirements (beyond minor administrative costs due to, for example, new formatting requirements) or consider less costly alternatives for small entities. *Id*. at 41-44. Instead, FDA certified that the Final PMTA Rule would "generate net benefits or negligible net costs for most affected small entities." *Id*. at 7, 41. FDA thus certified that the Final PMTA Rule would not have a significant economic impact on a substantial number of small entities. *Id*.

Even though, in less than the first six months of 2020 alone, almost 46 million units of nicotine pouch products were sold to U.S. consumers, like the Deeming Rule RIA before it, the PMTA Rule RIA did not engage in any regulatory flexibility analysis specific to PMTAs for nicotine pouch products. ECF No. 59-1 at ¶ 9 and Ex. F thereto; ECF No. 58 at 21:14-20.

In response to comments contending that FDA had failed to account for many of the costs to prepare and submit PMTAs for deemed tobacco products, FDA stated: "We attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Final Rule and not this rule. We therefore consider most aspects of these comments out-of-scope." ECF No. 43-7 at 12. Likewise, in response to comments, like those of the SBA, that suggested that FDA's Regulatory Flexibility Act certification was improper, FDA stated: "We disagree with this comment. We believe that this comment conflates the impacts of the Deeming Rule with the impacts of this final rule." *Id*. at 13.

FDA thus rejected the suggestion that it needed to prepare a full regulatory flexibility analysis. ECF No. 43-7 at 42. As a result, FDA did not fully consider potential alternatives or modifications to the proposed PMTA Rule to lessen the burden of its requirements on small entities as would otherwise be required by 5 U.S.C. § 604(a)(6).

### D. The PMTA Rule's Additional and Costly "Investigation" Requirements.

The final PMTA Rule imposed significant investigation requirements on the PMTA process, regardless of product type. *See* 21 C.F.R § 1114.7(k); ECF No. 55 at ¶¶ 57-59; ECF No. 58 at 64:17-67:24, 75:16-77:10; ECF No. 43-14 (Pltfs. Ex. 15A).[2]

[2] "Pltfs. Ex." Refers to the exhibits introduced by Plaintiffs at the February 27, 2026 hearing on Plaintiffs' motion for a temporary restraining order.

Applicants for all types of new tobacco products must provide extensive non-clinical and/or clinical studies with human subjects and the applicant's own, unique products on, *inter alia*, delivery of harmful and potentially harmful constituents, 21 C.F.R. § 1114.7(k)(1)(i)(A), toxicity studies, 21 C.F.R. § 1114.7(k)(1)(i)(B), studies regarding the pharmacological profile of the products, including pharmacokinetics, 21 C.F.R. §§ 1114.7(k)(1)(i)(C), actual use studies, 21 C.F.R. § 1114.7(k)(1)(i)(C), switching studies following subjects over time, 21 C.F.R. § 1114.7(k)(1)(ii)(A)-(B) and (k)(1)(iii)(C), and consumer perception and use intention and human factors studies, 21 C.F.R. § 1114.7(k)(1)(iv)(A)-(C). ECF No. 43-6 at 132-33; ECF No. 43-14 (Pltfs. Ex. 15A); ECF No. 58 at 64:17-67:24, 75:16-77:10.

For the study requirements, FDA does not provide pass/fail criteria. ECF No. 58 at 67:22-24; ECF No. 55 at ¶ 60; ECF No. 57-2 at ¶ 21. And, contrary to its earlier statements that randomized controlled trials would likely be unnecessary, FDA places weight on longitudinal clinical study evidence, typically in the form of randomized controlled trials, that follow the same individuals over time to evaluate switching from cigarettes or cessation when deciding to authorize new tobacco products. ECF No. 57-2 at ¶¶ 18, 19; ECF No. 58 at 53:3-55:7. In fact, FDA has never authorized a product "that did not include a clinical study like a randomized controlled trial." ECF No. 58 at 55:2-7; ECF No. 57-2 at ¶ 19. And in contrast to its earlier suggestions that applicants could rely heavily on publicly available

information, FDA has frequently communicated to applicants that publicly available scientific literature "is not sufficient to evaluate their product." ECF No. 58 at 55:8-56:17; ECF No. 57-2 at ¶ 22.

The costs to prepare bundled PMTAs for oral nicotine products that provide all the information FDA requests in the PMTA Rule far exceed FDA's baseline cost estimates found in its Deeming Rule RIA for ENDS products. ECF No. 58 at 77:2-81:5; ECF No. 43-15; ECF No. 57-2 at ¶ 13. The cost of preparing such a PMTA for 18 oral nicotine product SKUs ranges between $3 million and $13.8 million or more. ECF No. 58 at 80:18-81:5; ECF No. 43-15 (Pltfs. Ex. 15B); ECF No. 57-2 at ¶¶ 14-15.

**E. Plaintiffs' Oral Nicotine Pouch Products**

Plaintiff Zest Brands, LLC manufactures and Plaintiff C Store Depot Inc. distributes oral nicotine pouch products under the brand ZEO Universe. ECF No. 55 at ¶¶ 5-6; ECF No. 58 at 91:23-92:13. Each of Zest and CSD qualify as a "small business" for purposes of the Regulatory Flexibility Act because each employs fewer than 1,500 employees. ECF No. 58 at 92:5-7; 5 U.S.C. § 601(3); 13 C.F.R. § 121.201.

Unlike traditional tobacco products, Plaintiffs' nicotine pouches do not contain any tobacco plant material; instead, in addition to pharmaceutical-grade nicotine, they contain inactive and non-addictive ingredients that FDA generally recognizes as safe ("GRAS") when used as food additives. ECF No. 55 at ¶ 16; ECF

No. 58 at 45:13-47:1. Using the products does not involve combustion or inhalation; rather, users place the pouches between their lip and gum, and the nicotine is absorbed into the bloodstream through the buccal membranes. ECF No. 55 at ¶ 15, 17; ECF No. 58 at 44:9-17. As a result, nicotine pouch products, including Plaintiffs' products, are far less harmful than traditional tobacco products, including smokeless tobacco products, which FDA says may contain 4,000 chemicals, including as many as 30 linked to cancers. ECF No. 55 at ¶ 18; ECF No. 43-8. Oral nicotine pouch products are significantly less complex that ENDS products or e-liquids because unlike those products, pouches do not rely on heating, aerosolization, or inhalation. ECF No. 55 at ¶ 62; ECF No. 58 at 57:11-58:2.

FDA has recognized that products like Plaintiffs' present significantly less health risks than products containing tobacco, and particularly combusted tobacco products, such as cigarettes. ECF No. 55 at ¶¶ 19, 22; ECF No. 43-10; ECF No. 43-12. This is, in part, because, as FDA has also long stated, nicotine itself does not cause cancer; rather, it is the other chemical compounds in tobacco and tobacco smoke that cause fatal lung diseases and cancer. ECF No. 55 at ¶¶ 20-21; ECF No. 43-9; ECF No. 43-11.

### F. Zest's Timely Submitted PMTAs for its Pouches and FDA's Refuse to File Letter

Zest first marketed its ZEO Universe nicotine pouches, which contain synthetic nicotine, in 2022 before they became subject to FDA regulation or the

TCA's premarket authorization requirement. ECF No. 58 at 70:15-18, 91:19-25; 92:8-15. Zest timely submitted its bundled PMTAs for nineteen of its pouch products on May 14, 2022, ECF No. 43-13 (Pltfs. Ex. 14) at 4, meaning that the products were not immediately subject to FDA enforcement for selling products without authorization and that the pouches benefitted from FDA's general practice of allowing the continued importation and marketing of such products with timely-filed PMTAs so long as the applications are undergoing any stage of review. ECF No. 55 at ¶¶ 69, 71, 74-80; ECF No. 58 at 17:14-25, 92:19 – 99:19, 109:25-110:7;ECF No. 43-18 (Pltfs. Ex. 19).

On January 30, 2026, FDA issued a refuse to file letter to Zest. ECF No. 58 at 108:10-17; ECF No. 43-14 (Pltfs. Ex. 14). REDACTED [redacted] ECF No. 43-14 (Pltfs. Ex. 14); ECF No. 58 at 81:13-16. REDACTED [redacted] ECF No. 43-14 (Pltfs. Ex. 14); ECF No. 58 at 81:17-23; 100:9-14. Zest attempted to engage with FDA and had a meeting with the agency about the RTF letter before seeking judicial relief from the district court. ECF No. 58 at 106:22-107:22.

## G. The Refuse to File Letter Posed an Immediate, REDACTED [redacted] Risk to Plaintiffs

REDACTED [redacted]

REDACTED [redacted]

REDACTED [redacted]

[redacted]

## H. Proceedings Before the District Court.

On February 20, 2026, Plaintiffs filed a verified complaint and motion for a temporary restraining order with the district court. In support of their motion for a temporary restraining order, Plaintiffs filed sworn declarations from Plaintiffs' principal, Inga Nasi, and expert witness, Dr. Willie McKinney.

On February 27, 2026, the court held an evidentiary hearing on Plaintiffs' motion for a temporary restraining order. ECF No. 58. At the hearing, Plaintiffs called both witnesses to testify. Dr. McKinney is a board-certified toxicologist and scientific consultant on premarket applications for nicotine and tobacco products who previously served as a non-voting industry representative on FDA's Tobacco Products Scientific Advisory Committee. He provided testimony regarding the scope of investigation requirements under the PMTA Rule and contrasted the costs to prepare a PMTA that satisfied the requirements of the PMTA Rule with FDA's dramatically lower cost estimates in its Deeming Rule RIA to prepare bundled PMTAs for e-liquids and ENDS products. *See, e.g.*, ECF No. 58 at 77:2-80:20. At no time did counsel for Defendants object to the district court's consideration of Dr. McKinney's testimony.

At the conclusion of the hearing, the district court made ore tenus findings

that:

> By including the [section 605(b)] certification and stating that costs associated with the PMTAs resulted from the Deeming Rule and not through rulemaking under the PMTA [Rule], the FDA did not provide an explanation of the economic effect and costs of the final PMTA Rule and its particular testing and study requirements for novel tobacco products, and its certification that it had done so was not reasonable . . . it was false, and it was therefore arbitrary and capricious."

ECF No. 58 at 134:3-135:10. The district court thus entered a temporary restraining order staying the refuse to file letter that the parties subsequently agreed to extend until April 10, 2026.

On March 11, 2026, Plaintiffs filed their motion for a preliminary injunction. Following briefing by the parties, the district court granted the motion on April 10, 2026 and entered an order staying the refuse to file letter. Defendants timely noticed this appeal.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it entered a preliminary injunction staying the refuse to file letter issued to Plaintiffs. The district court properly found that Plaintiffs were likely to succeed on the merits of their claim that FDA acted arbitrarily and capriciously when it certified under the Regulatory Flexibility Act, 5 U.S.C. § 605(b), that its PMTA Rule would not have a significant economic impact on a substantial number of small entities.

Far from being clearly erroneous, the district court's finding that the PMTA Rule imposed additional investigation burdens and costs beyond those contemplated by the Deeming Rule was supported by extensive evidence, including FDA's admissions in the Deeming Rule RIA that it could not develop PMTA cost estimates for novel nicotine products other than e-liquids and ENDS, ECF No. 43-2 at 75, 114, and could not "predict the costs or benefits of future rulemaking before the contents of the rule themselves have been established," *id*. at 54. The significant discrepancy between FDA's estimated costs to prepare PMTAs for e-liquids and ENDS in the Deeming Rule RIA and the actual costs of preparing PMTAs for less complex nicotine pouch products that satisfy the PMTA Rule's requirements also supported the district court's findings.

The district court properly credited Dr. McKinney's uncontroverted testimony regarding the contents of a nicotine pouch application that satisfies the PMTA Rule's requirements and the corresponding costs. The district court did not abuse its discretion in considering this evidence because it satisfied several exceptions to the general rule that a reviewing court is limited to the administrative record, including that FDA's failure to explain the bases for its PMTA cost estimates in the Deeming Rule RIA would otherwise frustrate judicial review, because the subject of Dr. McKinney's testimony was technical and complex, and because the administrative record itself exhibited agency bad faith and improper decision-making. *Preserve*

*Endangered Areas of Cobb's History v. United States Army Corps. of Eng'rs*, 87 F.3d 1242, 1246 n.1 (11th Cir. 1996).

The district court also did not fail to grant FDA appropriate deference. Unlike in the cases cited by Defendants, the focus of the district court's arbitrary and capricious finding was not a predictive estimate or judgment about which certainty at the time of the rulemaking was elusive. Rather, FDA had actual knowledge that, despite what it claimed in its section 605(b) certification, the PMTA Rule imposed costly new "investigation" requirements on applicants. Yet the agency dismissed comments highlighting this discrepancy and proceeded to finalize its misleading certification regardless.

The district court also properly considered Defendants' failure to estimate the costs of the PMTA Rule's requirements for novel nicotine products other than ENDS and e-liquids. It was not an abuse of discretion for the district court to expect FDA to at least acknowledge and assess the additional costs the PMTA Rule would impose on manufacturers of nicotine pouch products that, by 2021, were generating sales of almost 100 million cans per year.

Finally, the district court properly found that Plaintiffs were threatened with irreparable harm absent a stay and that, rather than harming the public interest, injunctive relief would best advance it by ensuring that FDA acts lawfully. This Court should affirm the district court's grant of preliminary injunctive relief.

## **STANDARD OF REVIEW**

To obtain a preliminary injunction, a plaintiff must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 12247 (11th Cir. 2016) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). "Where the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

This Court reviews the grant of a preliminary injunction "for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *L.W. v. Comm'r of the Ga. Dep't of Cmty. Health*, 176 F.4th 635, 641 (2026) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020)). "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005); *accord L.W. v. Comm'r*, 176 F.4th at 641 (abuse of discretion exists "only

when a decision is in clear error, or when neither the district court's decision nor the record provide sufficient explanation to enable meaningful appellate review" (internal quotation and citation omitted)). This Court's review of a district court's preliminary injunction is thus "exceedingly narrow" and "deferential." *Wreal*, 840 F.3d at 1248.

"In deciding issues on appeal [the Court] consider[s] only evidence that was part of the record before the district court." *Selman v. Cobb Cty. Sch. Dist.*, 449 F.3d 1320, 1332 (11th Cir. 2006); *accord Upside Foods Inc. v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 171 F.4th 1239, 1248 (11th Cir. 2026) (observing that an appellate court "simply look[s] to the record at the time of the district court's ruling . . . when reviewing an interlocutory order"); *Shahar v. Bowers*, 120 F.3d 211, 213 n.1 (11th Cir. 1997) ("At no time when a case is on appeal is adding information to the record—information that was never before the district court—usual and favored by the law."); *League of Women Voters of Mich. v. Johnson*, 902 F.3d 572, 578-79 (6th Cir. 2018) (on interlocutory appeal, an appellate court is "not called to decide whether" the district court erred "as the case currently stands" but whether the district court erred "as the case stood"); *DSCC v. Trump*, No. 26-5193, 2026 U.S. App. LEXIS 22325, at ¶12 (D.C. Cir. July 28, 2026) (refusing to consider subsequent factual developments "because they are not part of the record before the district court or before us on appeal").

## ARGUMENT

### I. The District Court Properly Found that Plaintiffs Are Likely to Succeed on the Merits.

Congress enacted the Regulatory Flexibility Act "to improve Federal rulemaking by creating procedures to analyze the availability of more flexible regulatory approaches for small entities." Pub. L. 96-354, 94 Stat. 1164, 1164 (Sept. 19, 1980). To that end, the RFA requires an agency to conduct a "final regulatory flexibility analysis" when the agency adopts a rule via notice-and-comment rulemaking. 5 U.S.C. § 604.

A regulatory flexibility analysis includes, among other things, "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statute," including a discussion of why the agency rejected other significant alternatives to the rule. 5 U.S.C. § 604(a)(6). Congress required agency regulatory flexibility analyses because "uniform Federal regulatory and reporting requirements [had] in numerous instances imposed unnecessary and disproportionately burdensome demands" on "small businesses," that had "adversely affected competition in the marketplace" and "discouraged innovation." 94 Stat. 1164.

Congress recognized that there are some situations in which an agency rule does not impact small businesses. Therefore, the RFA exempts agencies from conducting a regulatory flexibility analysis when the agency head provides a

certification that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). But such a certification must include "a statement providing the factual basis for [the] certification." 5 U.S.C. § 605(b).

Congress expressly made a federal agency's section 605(b) certification under the Regulatory Flexibility Act subject to judicial review under the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 611(a), including the APA's provisions that allow courts to "set aside" agency actions that are "arbitrary" or "capricious" under 5 U.S.C. § 706(2)(A).[3] An agency action "qualifies as 'arbitrary' or 'capricious' if the agency did not engage in 'reasoned decision-making.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). In other words, "the process by which" an agency "reaches [a] result must be logical and rational." *Id*. (quoting *Allentown*, 522 U.S. at 374).

As the D.C. Circuit has observed:

> the APA together with the Regulatory Flexibility Act require that a rule's impact on small businesses be reasonable and reasonably explained. A regulatory flexibility analysis is, for APA purposes, part of agency's explanation for its rule. *See Small Refiner Lead Phase-Down Task Force v. EPA*, 227 U.S. App. D.C. 201, 705 F.2d 506, 539 (D.C. Cir. 1983) ("a reviewing court should consider the regulatory flexibility analysis as part of its overall judgment whether a rule is

[3] The RFA also allows district courts to remand the rule to the agency and defer enforcement of the rule against small entities. 5 U.S.C. § 611(a)(4).

> reasonable"); *see also Thompson v. Clark*, 239 U.S. App. D.C. 179, 741 F.2d 401, 405 (D.C. Cir. 1984) ("Thus, if data in the regulatory flexibility analysis -- or data anywhere else in the rulemaking record -- demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand.") (citation omitted).

*Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540-41 (D.C. Cir. 2009) (Kavanaugh, J.).

It is axiomatic that to win reversal of a preliminary injunction, a defendant must prove either that the district court committed a clear error of fact or that it misapprehended or misapplied the applicable law. *Dream Defenders v. Governor of the State of Fla.*, 119 F.4th 872, 876 (11th Cir. 2024). Despite their litany of arguments on both points, Defendants fail to show either here.

## II. The District Court Properly Found that the PMTA Rule Materially Expanded the Burdens and Costs of Preparing a PMTA Beyond Those Imposed by the Deeming Rule.

In granting Plaintiffs' motion for a preliminary injunction, the district court found that "the PMTA requirements stemming from the PMTA Rule are substantial, costly, expensive, and onerous, and none of them were set forth as part of the Deeming Rule as the FDA contends." ECF No. 61 at 15. The district court emphasized the yawning chasm between the scope of PMTA testing and study requirements that the PMTA Rule contemplated for far more complex inhalation products, like e-liquids for ENDS, and the substantially greater costs to prepare a

PMTA that satisfies the Final PMTA Rule's expanded "investigation" requirements for simpler nicotine pouch products:

> By way of example, the Plaintiffs' expert testified that a PMTA would cost between $3,000,000 and $13,000,000. (Tr. 80:18-21) Plaintiffs' expert also testified that he is not aware of the FDA ever accepting a PMTA "that did not include a clinical study like a randomized controlled trial," (Tr. 55:2-7), which is directly contrary to the Deeming Rule's statement that the "FDA does not expect that PMTAs will include randomized controlled trials" that were "well known to be several million dollars in cost." (Dkt. 43-2 at 150). Further, none of these costs were considered as part of the PMTA analysis and rulemaking obligations consistent with the RFA. Defendants offer no controverting evidence at this stage of the case. ***Therefore, Plaintiffs have made a substantial showing that the FDA improperly attributed costs derived from the PMTA Rule to the Deeming Rule even though the PMTA Rule created new cost burdens***.

ECF No. 61, at 15-16 (emphasis added).

The district court also found that FDA "inaccurately" stated in its PMTA Rule Preliminary RIA that that it had "already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory analysis for the Deeming Rule" and that FDA "was again inaccurate" when it "assume[d] that the analysis for the Deeming Rule accounted for the costs to comply with most of the format and content requirements for a complete PMTA described in this proposed rule." *Id.* at 14-15. Based on these factual findings, the district court concluded that FDA acted on "false premises" when it published the Final PMTA Rule and the PMTA Rule RIA with its section 605(b) certification. *Id*. at 15.

Defendants provide no basis for this Court to hold the district court's factual findings in this respect clearly erroneous. Defendants repeatedly contend that the "costs and burdens associated with premarket authorization . . . were properly considered by FDA in the deeming rule," Defs.' Br. at 28-29, that "FDA accounted for the significant costs of extending the Act's premarket authorization . . . when it promulgated [the Deeming Rule]," *id*. at 34, and that "the PMTA rule plainly does not impose any new study requirements" and "does not impose any new significant costs or requirements," *id*. at 36. But these statements are decidedly counterfactual and amount to nothing more than the agency's *ipse dixit*. As the district court's foregoing analysis shows, it did not merely "presume" that the Final PMTA Rule necessarily imposed additional investigation costs, Defs.' Br. at 36, but based its factual findings on extensive evidence that such had in fact occurred.

Beyond the limited examples specifically mentioned by the district court, Plaintiffs cited extensive other evidence that the Final Deeming Rule imposed significant additional "investigation" requirements for all new tobacco products. For its Deeming Rule cost estimates of between $181,686 and $2,014,120 for a bundled PMTA including 15 unique e-liquid products and an average cost per SKU of $131,643, ECF No. 43-2 at 87-89, FDA noted that it "expects that the content of PMTAs will vary significantly, depending on factors such as product type, complexity, and novelty." *Id.* at 148. For ENDS e-liquids, FDA anticipated that

microbiological testing may be needed and that for certain e-liquids, stability testing would be needed. *Id*. FDA's analysis also suggested that toxicological studies may be limited to only the ingredients in the e-liquid and that it is "possible that much or all of the relevant information may exist within the publically [*sic*] available literature." *Id*. at 149. Further, if nonclinical studies were needed, "they could be on the individual ingredient instead of the product, potentially allowing that study to cover multiple products using that ingredient or constituent." *Id*. The categories of "human studies," or clinical studies, that FDA said it expected applicants to undertake included perception evaluations, product use/misuse, labeling comprehension, abuse liability, and health impact. *Id*. at 149-51. FDA suggested that only perception and actual use studies in the form of either a survey or observational studies may be required of the specific product under consideration and emphasized that it did not expect to require randomized controlled trials with costs of several million dollars. *Id*. at 150.

Whereas the Deeming Rule cost analysis had suggested that toxicological analysis could be limited to only the ingredients in e-liquids, the Final PMTA Rule required non-clinical harmful and potentially harmful constituent testing of e-liquid aerosol "at the quantitative levels delivered to both users and nonusers under the range of conditions under which the product might be used," as well as information gathered from, *inter alia*, *in vitro* testing on "genotoxicity, carcinogenicity,

reproductive toxicity, immunotoxicity, acute toxicity, and repeat dose (chronic) toxicity of the new tobacco product relative to other tobacco products" as well as information gathered from leachable and extractable studies on the container closure system and ingredient mixture. 21 C.F.R. § 1114.7(k)(1)(i)(A)-(B).

FDA also expanded the "human studies" it required to now include expensive clinical studies of nicotine pharmacokinetics and abuse liability, 21 C.F.R. § 1114.7(k)(1)(i)(C), (k)(1)(ii)(A)-(B), as well as product switching over time through studies like randomized controlled trials, 21 C.F.R. § 1114.7(k)(1)(ii)(B)-(E); *see also FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 562 (2025) (describing marketing denial orders for flavored e-liquid products because applicants had not provided evidence from a randomized controlled trial, longitudinal cohort study, or another "reliable and robust" method).

FDA's resulting section 605(b) certification was thus neither "reasonable" nor "reasonably explained." It was not until 2021 that FDA exercised the discretion Congress had afforded it in the TCA to specify particular "investigation" requirements for *all* new tobacco products, including the additional requirements not included in FDA's Deeming Rule e-liquid cost analysis highlighted above. Yet FDA failed to consider or account for less costly alternatives—including for lower-risk products like pouches—that would be less burdensome on small entities. Instead, FDA claimed that these content requirements were required by the TCA itself when

the plain text of the TCA suggested in 21 U.S.C. § 387j(c)(5)(B) that it may be the case that *no* product-specific clinical "investigations" may be required.[4]

Defendants attempt to distract the Court by repeating in various formulations their mantra that the PMTA rule did "not substantially increase the costs or burdens beyond what was already imposed by the statute." Defs.' Br. at 34. But this proves both too much and not enough. As the district court noted, the Deeming Rule RIA contains no specificity regarding the studies or tests that FDA considered when it developed its cost estimates to generate PMTAs for e-liquids and ENDS products. ECF No. 61 at 16. Instead, the Deeming Rule RIA merely states that its cost estimates were "based on information provided by FDA scientists" who had experience with reviewing premarket applications and of testing costs in the general areas of toxicology and "human health studies." ECF No. 43-2 at 86. If the contours of the PMTA testing and study requirements used to develop the cost estimates found in the Deeming Rule RIA had, in fact, matched those later set forth by the PMTA Rule in 21 C.F.R. § 1114.7, the gross disparity between the anticipated costs for applications for e-liquids set forth in the Deeming Rule RIA and the actual costs for a nicotine pouch application compliant with the PMTA Rule's requirements would not exist. This disparity is further underscored by the contrast between FDA's

---

REDACTED

[redacted]

messaging related to the Deeming Rule, including the agency's emphasis on the lack of need for randomized controlled trials costing millions of dollars and applicants' ability to rely on published literature, and the reality of the PMTA Rule's requirements that applicants conduct randomized controlled trials and have only the most minimal latitude to rely on published scientific literature as opposed to product-specific studies. ECF No. 58 at 53:3-56:22.

It is not uncommon for scientific agencies' demands for evidence required to satisfy a statutory standard to evolve over time and impose new burdens and costs along the way. *Cf. FDA v. Wages & White Lion Invs., LLC*, 604 U.S. at 566 ("Analysis of the FDA's position prior to the denials at issue requires a close reading of nuanced statements in a body of guidance documents that evidence the agency's evolving assessment of the relevant issues."); *Cty. of Butte v. Dep't of Water Res.*, 90 Cal. App. 5th 147, 161, 306 Cal. Rptr. 3d 860, 876 (2023) ("[P]ublic agencies [must] ensure their analyses stay in step with evolving scientific knowledge and state regulatory schemes. And so[,] an agency's approach that is legally adequate at one point in time may not "necessarily be sufficient going forward" (internal quotations and citations omitted)). That is exactly what happened here. In Defendants' parlance, the PMTA Rule "mandated that applicants provide evidence of a type or in a volume materially greater than had previously been required" and thereby imposed "substantial new cost[s]." Defs.' Br. at 34. The mere fact that the statutory standard

for marketing authorization remained the same throughout provides no basis for this Court to hold the district court's factual findings clearly erroneous.

## III. The District Court Properly Credited Plaintiffs' Expert's Uncontroverted Testimony Regarding Application Costs.

**1.** Defendants also contend that the district court "improperly relied on expert testimony to assess the merits of plaintiffs' assertion that the PMTA rule imposes substantial new costs on applicants." Defs.' Br. at 37. But Defendants forfeited this objection when they failed to assert it during Plaintiffs' expert's testimony and the district court did not misapprehend the law when it credited Dr. McKinney's testimony in any event.

As an initial matter, Defendants forfeited any objection by failing to object to Dr. McKinney's testimony during the hearing on Plaintiffs' motion for a temporary restraining order. It is well established that "a failure to object to evidence [in the district court] results in waiver of appellate review of the issue." *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 U.S. App. LEXIS 10263, at *47 (11th Cir. Apr. 15, 2022) (finding that the district court did not abuse its discretion by granting a preliminary injunction); *see also Kreepy Krauly U.S.A. v. Sta-Rite Indus.*, Nos. 97-1091, 97-1368, 1998 U.S. App. LEXIS 8037, at *13 (Fed. Cir. Apr. 24, 1998) (finding that defendant waived any objection to the court's decision to qualify an expert by failing to object during the preliminary injunction hearing and noting that nothing in the expert's substantive testimony "undermine[d] the district court's

ruling"). By failing to contemporaneously object to Dr. McKinney's testimony, Defendants forfeited any right to object to the district court's reliance thereon and cannot raise the issue for the first time here.

Defendants also contend that the district court erred in considering Dr. McKinney's testimony because its review should have been limited only to the administrative record. Defs.' Br. at 37. While it is the case that, "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record," *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019), this Court has recognized exceptions where "1) an agency's failure to explain its action effectively frustrates judicial review; 2) it appears that the agency relied on materials not included in the record; 3) technical terms or complex subjects need to be explained; or 4) there is a strong showing of agency bad faith or improper behavior." *Preserve Endangered Areas of Cobb's History*, 87 F.3d at 1246 n.1 (quoted in *Morales v. Comm'r of Social Security*, 799 Fed. Appx. 672, 676 (11th Cir. 2020)). Moreover, "it is very much a matter of discretion with the trial court whether to permit the introduction of [expert] evidence, and we will not reverse . . . unless the trial court's decision is manifestly erroneous." *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (internal quotation and citation omitted). Each of the first, third, and fourth

exceptions to the general rule apply here and the district court did not abuse its discretion in considering Dr. McKinney's extra-record testimony.

First, as noted above, in its Deeming Rule RIA, FDA failed to explain anywhere which specific tests and studies it was including for purposes of calculating its estimates for the costs of PMTAs for ENDS products. Instead, FDA merely stated in conclusory fashion that its estimates were based on information provided by agency scientists. ECF No. 43-2 at 86. But for the extra-record testimony provided by Dr. McKinney regarding the necessary components of an application that satisfies the PMTA Rule's requirements and the associated costs, FDA's failure to explain the bases for its PMTA cost estimates in the Deeming Rule RIA would have frustrated judicial review. Without Dr. McKinney's testimony, the district court would not have been able to determine by reference to the costs for a complete application under the PMTA Rule that the scope of tests and studies required by the PMTA Rule is significantly broader than that contemplated by the Deeming Rule.

Second, the district court properly considered Dr. McKinney's testimony because of the highly complex and technical subject that is premarket applications for non-combusted nicotine products like pouches, e-liquids, and ENDS. Dr. McKinney's testimony was necessary to educate the district court on the significant distinctions between, on the one hand, ENDS and e-liquids as nicotine products that

are heated, aerosolized, and inhaled, and, on the other hand, oral nicotine pouch products that deliver nicotine through buccal absorption, and why these distinctions drive disparate costs to prepare PMTAs for the different product categories under the PMTA Rule's requirements.

Third, strong evidence of agency bad faith or improper behavior also justified the district court's consideration of Dr. McKinney's testimony. On the face of the administrative record, FDA's actions were self-contradictory and thus indicative of bad faith or improper decision-making. In its Deeming Rule RIA, FDA pointed to the future and claimed that it could not "predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established," ECF No. 43-2 at 54, while in its section 605(b) certification to support the PMTA Rule, FDA stated "[w]e already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule," ECF No. 43-4 at 7, even though the agency had not attempted any such estimates for any novel nicotine products other than ENDS and e-liquids. As the district court properly found, FDA "did not do what it later purports to certify that it did." ECF No. 61 at 18. This evidence of bad faith from the administrative record also more than justified the district court's consideration of Dr. McKinney's

testimony.[5] *See Dept. of Commerce v. New York*, 588 U.S. at 785 ("Our review is deferential, but we are not required to exhibit a naiveté from which ordinary citizens are free. . . . Accepting contrived reasons would defeat the purpose of [judicial review]" (internal quotation and citation omitted)). The district court did not abuse its discretion in considering Dr. McKinney's extra-record testimony.

**2.** Defendants also contend that the district court erred in crediting Dr. McKinney's testimony because it "related to the costs of submitting applications generally, rather than providing any analysis of the increased costs associated with the PMTA Rule as opposed to the previously operative regulatory scheme." Defs.' Br. at 37-38. But, in his declaration submitted in support of Plaintiffs' motion for a temporary restraining order, Dr. McKinney stated that "the costs to prepare bundled PMTAs for oral nicotine products that include comprehensive analytical testing, nonclinical toxicology, human clinical and behavioral studies, and robust manufacturing studies, as requested by FDA, often far exceed FDA's baseline cost estimates found in its Deeming Rule regulatory impact analysis even for bundled PMTAs for ENDS products." ECF No. 57-2 at ¶¶ 13, 23.

[5] Further, even if the district court had discounted Dr. McKinney's testimony, other evidence supplied by ENDS industry participants criticizing FDA's estimation of PMTA costs in light of the subsequent PMTA Rule's requirements existed in the administrative record and belied FDA's claim that it had accounted for all PMTA preparation costs in its Deeming Rule RIA.

And, in his hearing testimony, Dr. McKinney highlighted clinical studies that FDA had suggested in its Deeming Rule RIA were unnecessary, but later required under the PMTA Rule, including randomized controlled trials and clinical pharmacokinetic studies. ECF No. 58 at 53-55. Dr. McKinney also testified that even though FDA had indicated in the Deeming Rule RIA that applicants could rely heavily on published scientific literature and/or research that FDA itself was conducting on tobacco products, under the PMTA Rule, FDA typically rejects an applicant's reliance on the literature because it "does not have the specificity that [FDA] need[s] to apply that data to a specific product or application." *Id.* at 55:2-56:22.

The district court thus did not err in crediting Dr. McKinney's uncontroverted expert testimony. *See* ECF No. 61 at 15-16.

## IV. The District Court Did Not Fail to Grant FDA Appropriate Deference.

Defendants invoke cases stressing the significant deference that courts afford agencies when they attempt to make "predictive judgments" regarding the costs of rules they enact to suggest that FDA's section 605(b) certification was reasonable. Defs.' Br. at 39. But these cases are inapposite here.

In each of the cases cited by Defendants, the agency decision at issue involved a predictive, forward-looking estimate or judgment about which certainty at the time of the rulemaking at issue was elusive. *See Associated Fisheries of Me., Inc. v.*

*Daley*, 127 F.3d 104, 111 (1st Cir. 1997) (addressing anticipated Coast Guard enforcement costs and industry compliance costs for amendment to fisheries management plan); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("Where, as here, the FCC must make predictive judgments about the effects of increasing subsidies, certainty is impossible."); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty. Colo.*, 605 U.S. 168, 182 (2025) (discussing considerations for forward-looking environmental impact statements under NEPA); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 422-28 (2021) (discussing anticipated impact of revoking three FCC rules, noting that the FCC repeatedly asked commenters for data on the relationship between ownership rules and minority and female ownership, and when it received none, the agency "made a reasonable predictive judgment based on the evidence it had"); *Fla. Manufactured Hous. Ass'n v. Cisneros*, 53 F.3d 1565, 1578-81 (11th Cir. 1995) (addressing estimated cost-benefit calculations of new wind construction safety standards that considered anticipated reductions in property damage, reductions in federal disaster relief expenditures, reductions in death and injuries, and increased costs of production and higher prices).

Here, in contrast, the issue is not a difficult-to-predict, forward-looking estimate. Rather, FDA knew at the time it finalized the PMTA Rule that it had failed to even attempt to quantify the costs to prepare a PMTA for oral nicotine pouches or

any other novel nicotine products beyond ENDS and e-liquids. FDA also knew, based on its cost estimates for ENDS and e-liquids provided in the Deeming Rule RIA, its commentary in the Deeming Rule RIA regarding the types of studies that would and would not be required, and the stakeholder feedback submitted by the SBA and ENDS industry representatives during the public comment phase that its PMTA Rule substantively expanded the testing and study requirements and that the Deeming Rule RIA grossly underestimated the costs to satisfy the expanded testing requirements. Yet FDA dismissed comments raising these concerns as "out-of-scope." ECF No. 43-7 at 12.

Unlike circumstances where substantial deference to agency decision-making is appropriate because of the unpredictability of the future, here FDA had actual knowledge that, despite what it claimed in its section 605(b) certification, the PMTA Rule imposed costly new "investigation" requirements on applicants. Yet FDA plowed ahead to finalize its misleading certification regardless. Had FDA actually undertaken a complete regulatory flexibility assessment and considered, *inter alia*, steps to "minimize the significant economic impact on small entities consistent with the stated objectives" of the TCA, 5 U.S.C. § 604(a)(6), such deference to predictions FDA may have made therein might very well have been warranted. But to apply such substantial deference to a situation where the agency's actual knowledge belied its certification to the contrary, as here, would be to misapply the

principle in contravention of its motivating purpose and create an exception to arbitrary-and-capricious review that would swallow the rule. The district court did not fail to grant FDA appropriate deference.

## V. The District Court Properly Considered Defendants' Failure to Estimate the Costs of the PMTA's Rule's Requirements for Novel Nicotine Products Other than ENDS and E-liquids.

**1.** Defendants also claim that because Plaintiffs' synthetic nicotine pouches "were not subject to the Tobacco Control Act when FDA promulgated the deeming rule in 2016 or the PMTA rule in 2021, . . . FDA was not required to consider plaintiffs in the process of rulemaking." Defs.' Br. at 30. This argument is also a red herring.

Plaintiffs' contention, and the district court's concern, was not that FDA was required to specifically consider *Plaintiffs* or their particular *synthetic* nicotine pouches in finalizing the PMTA Rule, but that FDA was required to consider the fact that it had never previously attempted to estimate the costs of a PMTA for *any* novel nicotine product other than ENDS or e-liquid, including oral nicotine pouches as a category, before representing in its section 605(b) certification that "we already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule." ECF No. 61 at 13-14. It was for this reason that the district court concluded that "Plaintiffs have made a substantial showing that the FDA improperly asserted that the cost assessment

required by the RFA was performed in the promulgation of the Deeming Rule." *Id.* at 15.

Contrary to Defendants' contention, nowhere did the district court suggest that Congress's later decision to expand the TCA to also cover synthetic nicotine products somehow retroactively rendered FDA's PMTA Rule unreasonable. Defs.' Br. at 30. Rather, the PMTA Rule was *already* unreasonable as to *all* oral nicotine pouch products because it was premised on a sham certification. It is thus irrelevant that Plaintiffs' particular synthetic nicotine pouches only became subject to the TCA in 2022.

**2.** Defendants also assert that the district court erred because the RFA "does not demand that an agency separately analyze each product type or sector of the small business community that may be affected by a rule." Defs.' Br. at 32. Defendants' contention fails for two reasons. First, Defendants failed to advance this argument below, and so cannot assert it for the first time on appeal. *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court" (internal citations and quotations omitted)); *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000) ("Arguments raised for the first time on appeal are not properly before this Court.").

Second, in support of this proposition, Defendants rely on a passage in *Cigar Association of America v. FDA*, 5 F.4th 68 (D.C. Cir. 2021), in which the D.C. Circuit rejected the appellants' contention that FDA violated the RFA because it failed to consider the benefits of premarket review specifically for cigars and pipe tobacco, *id*. at 76. *Cigar Association of America*, however, dealt with the Deeming Rule and specifically noted that FDA had separately quantified the costs of subjecting cigars and pipe tobacco to substantial equivalence review, which is another premarket pathway available to many such products under the TCA. *Id*. In contrast, Plaintiffs' challenge here is to the PMTA Rule and the fact that, despite its statement in its section 605(b) certification to the contrary, FDA had *never* attempted to account for the costs of a PMTA for *any* novel nicotine product other than ENDS or e-liquid, including oral nicotine pouches. Plaintiffs' contention is that, because FDA had previously ignored a significant product category that, by 2020, had sales of almost 100 million cans of nicotine pouches a year, ECF No. 59-1 at ¶ 9 and Ex. F thereto, the RFA required the agency to at least acknowledge and assess the additional costs the PMTA Rule imposed on manufacturers of those products.

**3.** Defendants also contend that the district court erred when, as part of its factual recitation, on page 14 of its order, the district court observed that "[t]he Deeming Rule also did not specify the investigations or specific studies a PMTA would require for approval." Defs.' Br. at 32. FDA argues that the "relevant question

is whether FDA erred in its determination that the PMTA rule would meaningfully increase costs for small businesses" and contends that it did not. *Id*.

But, as has already been discussed at length, the district court did not clearly err when it found that FDA had, in fact, expanded its "investigation" requirements from the Deeming Rule RIA to the PMTA Rule. Because the agency actively expanded the scope of tests and studies it required, it is irrelevant that, even before the PMTA Rule was finalized, applicants had to satisfy the requirements of 21 U.S.C. § 387j when preparing their applications. Because the PMTA Rule increased the costs of compliance for small businesses, FDA's section 605(b) certification that it did not was incorrect and thus arbitrary and capricious.

## VI. *Kealani* is Distinguishable.

As they did before the district court, Defendants rely heavily in their brief on the Fifth Circuit's opinion in *Kealani Distribution LLC v. FDA*, 168 F.4th 741 (5th Cir. 2026). In *Kealani*, a coalition of e-liquid manufacturers challenged the PMTA Rule on the basis that FDA's section 605(b) certification was arbitrary and capricious because its conclusion that the Rule would not have a significant impact on a substantial number of small entities was unsupported by the record. *Id*. at 746. *Kealani* is readily distinguishable from the case *sub judice* for several reasons.

First, because *Kealani* dealt exclusively with e-liquids, FDA provided at least some estimate of the anticipated costs of preparing the corresponding PMTAs in the

Deeming Rule RIA, *id*. at 745 (noting estimated costs for e-liquid applications of between $181,686 and $2,014,120). Here, in contrast, FDA readily admitted that it did not prepare any estimated costs for PMTAs for oral nicotine pouches or other novel nicotine products either as part of the Deeming Rule RIA or in conjunction with the PMTA Rule. ECF Nos. 43-2 at 75; 43-7 at 8, 12. Thus, unlike with ENDS, it most certainly was not the case that FDA "already included the costs to submit and review PMTAs for [oral nicotine pouch products] in the final regulatory impact analysis for the Deeming Rule." ECF No. 43-7 at 8.

Second, as the Fifth Circuit found, the plaintiffs in *Kealani* "d[id] not explain how the Final PMTA Rule significantly expands the 'categories of topics covered and detail' required in a PMTA from that which was required in the Deeming Rule." 168 F.4th at 749. Indeed, the Fifth Circuit found that the plaintiffs "forfeited due to inadequate briefing" their argument. *Id*. at 749 nn. 40 & 41 (noting that "[i]t is not the duty of the Court to compare the 156-page Deeming Rule against the 139-page Final PMTA Rule in an effort to find evidence to support Appellants' argument").

Here, in contrast, as explained at length both in the district court's preliminary injunction order, ECF No. 61 at 13-18, and above, Plaintiffs adduced unrebutted evidence both through expert testimony and in the administrative record itself that the PMTA Rule materially expanded the "investigation" requirements contemplated even by FDA's Deeming Rule RIA cost estimates for ENDS and e-liquids, including

by requiring randomized controlled trials and other clinical studies and by minimizing applicants' ability to rely on published scientific literature and some 70 studies that FDA had funded by requiring product-specific evidence.[6]

Finally, although *Kealani* states that "FDA's attribution of PMTA-related costs to the Deeming Rule . . . is a substantive factual conclusion underlying the FDA's certification" that is "outside of the scope of judicial review of alleged RFA violations," 168 F.4th at 749, the district court here stated that although it was not going to "delve into the substantive underpinnings of the certification," a certification "that is facially false does not have the force of a certification." ECF No. 61 at 17-18.

* * *

For all these reasons, the district court did not abuse its discretion in concluding that Plaintiffs were substantially likely to succeed on the merits of their RFA and APA claims.

## VII. The District Court Properly Found that Plaintiffs Were Likely to Suffer Irreparable Harm and that the Equities Favor Injunctive Relief.

Defendants argue that the district court abused its discretion in concluding that Plaintiffs were threatened with irreparable harm and that the equities favor injunctive

[6] In contrast, the *Kealani* court noted that there, the plaintiffs did "not dispute FDA's factual determinations" and made "no argument here that FDA arrived at a mistaken estimate of the cost of a particular type of testing." 168 F.4th at 749, n.40.

relief for several reasons. None of these reasons amounts to an abuse of discretion that could support vacating the injunction.

**1.** Defendants claim that the [redacted] harms with which Plaintiffs are threatened stem from the TCA's general prohibition on importing or marketing tobacco products that lack an FDA marketing granted order and that the district court's order staying the refuse to file letter is thus ineffective to provide any relief. Defs.' Br. at 41-42. But the record is clear that FDA has never taken any enforcement action against any oral nicotine pouch product with a timely-filed and pending premarket application, a decision that counsel for Defendants stated to the district court was driven by the relative risk profile of the products. ECF No. 58 at 50:25-51:11, 71:25-74:5. This Court and others have previously stayed FDA marketing denial orders for other tobacco products that lacked marketing granted orders and were sold under similar exercises of FDA enforcement discretion. *See, e.g.*, Feb. 1, 2022 Order in *Bidi Vapor, LLC v. FDA*, No. 21-13340 (11th Cir.); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143-44 (5th Cir. 2021) (noting that under 5 U.S.C. § 705, a reviewing court may, "to the extent necessary to prevent irreparable injury, . . . issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings"). Further, as the district court noted, FDA itself stipulated in a parallel case where an applicant was challenging a refuse to file letter that it would not take

enforcement action against the plaintiff pending final judgment. ECF No. 61 at 24. The threatened REDACTED [redacted] harm that resulted from the refuse to file letter REDACTED [redacted] thus more than justified the district court's entry of its preliminary injunction.

Nor can FDA point to a guidance document that it issued more than a month *after* the district court entered its preliminary injunction to suggest that the district court abused its discretion in finding irreparable harm. The district court issued its preliminary injunction order on April 10, 2026. ECF No. 61. FDA announced the availability of its Guidance for Industry in the *Federal Register* on May 12, 2026. 91 Fed. Reg. 25892 (May 12, 2026). The district court therefore could not have considered the FDA Guidance and it has no bearing on whether the district court abused its discretion. In reviewing an interlocutory order, this Court "simply look[s] to the record at the time of the district court's ruling, which is what an appellate court always does." *Upside Foods Inc.*, 171 F.4th at 1248. At the time the district court issued its order, the record reflected that FDA had never taken enforcement action against nicotine pouches that were subject of a timely-filed and pending PMTA, regardless of whether FDA had issued a "filing" letter to the applicant under the Final PMTA Rule. ECF No. 58 at 50:25-51:11, 71:25-74:45. To the extent the subsequent Guidance may have later changed the contours of that deferred

enforcement approach, Defendants cannot fault the district court for failing to weigh a document that did not yet exist.

**2.** Defendants also contend that the threatened reputational harm is “self-inflicted” REDACTED [redacted] Defendants’ reliance on *Salt Lake Tribune Publishing Co. v. AT&T Corporation*, 320 F.3d 1081 (10th Cir. 2003), does not support their contention that Plaintiffs’ reputational harm is “self-inflicted.” In *Salt Lake Tribune*, the movant’s injury flowed from the ordinary expiration of a five-year contract it had negotiated when the defendant exercised its bargained-for right not to renew and the movant did not challenge that decision. *Id.* at 1099. The Tenth Circuit declined to let the plaintiff use the courts to change an express, bargained-for term of the contract. *Id.* at 1104-05. Here, by contrast, REDACTED [redacted]

Additionally, the plaintiff in *Salt Lake Tribune* sought to alter the status quo by forcing the owner to allow the plaintiff to manage the newspaper after the contract expired. 320 F.3d at 1106. Here, however, the preliminary injunction “merely preserv[es] the status quo” pending the final resolution of Plaintiffs’ claims. ECF

No. 61 at 23. REDACTED [redacted] is precisely the kind of injury that, under *Salt Lake* Tribune's own formulation, "cannot be undone, such as by an award of compensatory damages." 320 F.3d at 1105. Defendants' reading of *Salt Lake Tribune* would effectively immunize unlawful agency action from preliminary relief REDACTED [redacted] This Court should reject this overbroad reading.[7]

**3.** Defendants also suggest that the injunction harms the public interest and frustrates Congress's objectives because Congress required premarket authorization before tobacco products may be commercially marketed and expanded the universe of products subject to the TCA in 2022 to those containing nicotine from any source. But nothing in the preliminary injunction prohibits FDA from taking enforcement action against Plaintiffs' nicotine pouches should FDA so

[7] REDACTED [redacted] And, in any event, the district court could properly rely on hearsay evidence at the preliminary injunction stage. *See Florida v. HHS*, 19 F.4th 1271, 1313 (11th Cir. 2021) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding'" (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)).

choose; rather, all the preliminary injunction does is stay the refuse to file letter itself. Contrary to *Amici*'s claim, the district court did not issue an order "allowing [Plaintiffs] to market their products." *Amici* Br. at 3. To the extent FDA exercises its discretion not to take enforcement action against Plaintiffs' nicotine pouches as a result of the stay of the refuse to file letter (as FDA has for *all* nicotine pouches with timely-filed and pending premarket applications), that decision is FDA's and FDA's alone; nothing in the preliminary injunction order requires as much. Thus, the preliminary injunction is in no way crosswise with Congressional intent.

**4.** Finally, Defendants argue that the injunction harms the public interest because it disrupts FDA's efforts to streamline the process for reviewing premarket applications to make the process more efficient. Defs.' Br. at 44-45. However laudable FDA's goals, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *accord Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) ("There is generally no public interest in the perpetuation of unlawful agency action.").

Thus, far from abusing its discretion, the district court properly found that Plaintiffs were likely to suffer irreparable harm as a result of the refuse to file letter and that the equities and the public interest favored entry of the preliminary injunction.

# CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order.

Respectfully submitted,

THOMPSON HINE LLP

By: /s/ Eric N. Heyer

Eric N. Heyer
James C. Fraser
1999 K Street, NW, Suite 600
Washington, DC 20036
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com

*Counsel for Plaintiffs-Appellees*
*The C Store Depot, Inc.*
*and Zest Brands LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2026, I caused the foregoing Plaintiffs-Appellees' Brief to be lodged under seal with the Clerk's Office for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system and to be served via electronic mail on the following counsel of record for Defendants-Appellants:

Daniel Tenny
Daniel.Tenny@usdoj.gov

Sophia Shams
Sophia.Shams@usdoj.gov

/s/ Eric N. Heyer
Eric N. Heyer

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Plaintiffs-Appellees' Brief complies with the type-volume requirement set forth in Federal Rule of Appellate Procedure 32. The word count feature found in Microsoft Word reports that the Brief contains 12,273 words, excluding the items exempted under Fed. R. App. P. 32(f).

The Plaintiffs-Appellees' Brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.

/s/ Eric N. Heyer
Eric N. Heyer