No. 26-12062

# In the United States Court of Appeals for the Eleventh Circuit

THE C STORE DEPOT, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

U.S. FOOD & DRUG ADMINISTRATION, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Middle District of Florida
(Hon. Mary S. Scriven)

**PUBLIC APPENDIX OF PLAINTIFFS-APPELLEES THE C STORE DEPOT, INC. AND ZEST BRANDS LLC**

Eric N. Heyer
James C. Fraser
THOMPSON HINE LLP
1999 K Street, NW, Suite 600
Washington, DC 20006
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@thompsonhine.com
James.Fraser@thompsonhine.com

*Counsel for Plaintiffs-Appellees The C Store Depot, Inc. and Zest Brands LLC*

# INDEX OF APPENDIX OF PUBLICLY AVAILABLE MATERIALS

**Docket/Tab #**

**Volume 1**


Public Comment by RAIS Services Company on FDA Docket No. FDA-2019-N-2854-0001 (received December 16, 2019) [F-017400 – F-017431] ........ F.01

Public Comment by Vapor Technology Association on FDA Docket No. FDA-2019-N-2854-0001 (received December 17, 2019) [F-018582 – F-018648] ........ F.02

Declaration of Dr. Willie McKinney (Motion for Temporary Restraining Order, Ex. 2) [Redacted] ........ 57.02

Declaration of Inga Nasi and attached Refusal to File Letter (Motion for Temporary Restraining Order, Ex. 3) [Redacted] ........ 57.03

Motion Hearing Transcript, Feb. 27, 2026 [Redacted] ........ 58

Supplemental Declaration of Inga Nasi and attached Article, Marynak, et al., “Nicotine Pouch Unit Sales in the US, 2016-2020,” Aug. 10, 2021 (Redacted Motion for Preliminary Injunction, Ex. 1) [Redacted] ........ 59.01

Plaintiff’s TRO Hearing Exhibit 14: FDA Letter to Zest Brands LLC, dated January 30, 2026 [Redacted] ........ 60

# Tab F.01

Public Comment by RAIS Services Company

**As of:** December 12, 2022
**Received:** December 16, 2019
**Status:** Posted
**Posted:** December 16, 2019
**Category:** Private Industry - C0003
**Tracking No.** 1k3-9dwj-4w3e
**Comments Due:** December 16, 2019
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** FDA-2019-N-2854
Premarket Tobacco Product Applications and Recordkeeping Requirements

**Comment On:** FDA-2019-N-2854-0001
Premarket Tobacco Product Applications and Recordkeeping Requirements

**Document:** FDA-2019-N-2854-1082
Comment from RAIS Services Company

---

## Submitter Information

**Name:** Amanda Klingler
**Submitter's Representative:** RAIS Services Company
**Organization:** Michael W. Ogden, Ph.D., RAIS

---

## General Comment

See attached file(s)

---

## Attachments

Comment from RAIS Services Company

RAI SERVICES COMPANY

**Michael W. Ogden, Ph.D.**
Senior Vice President
Scientific & Regulatory Affairs

401 N. Main St.
Winston-Salem, NC 27101
336.741.5787
Fax: 336.728.7675
ogdenm@rjrt.com

December 16, 2019

**VIA ELECTRONIC SUBMISSION**
**AND HAND DELIVERY**

Division of Dockets Management (HFA-305)
Food and Drug Administration
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

**Re: Request for Comments: Premarket Tobacco Product Applications and Recordkeeping Requirements (Docket. No. FDA-2019-N-2854)**

Dear Sir or Madam,

On September 25, 2019, the United States Food and Drug Administration ("FDA" or "the Agency") published a notice of proposed rulemaking ("NPRM"), proposing and seeking public comment on a new rule to govern the content and format of premarket tobacco product applications.[1] In response, RAI Services Company ("RAIS") respectfully submits these comments on its own behalf and on behalf of its affiliated tobacco companies.[2]

On October 28-29, 2019, FDA held a two-day public meeting regarding the premarket review and clearance, including substantial new information on the premarket tobacco product application ("PMTA") process and FDA's expectations for such applications, of "deemed" tobacco products, including electronic nicotine delivery systems ("ENDS") products. Critical material from this meeting relating to PMTAs for deemed tobacco products has not yet not been made publicly available by CTP. As such, RAIS has not had a chance to analyze the information presented at that meeting or review the additional information not yet publicly available; therefore,

---

[1] *See* Premarket Tobacco Product Applications and Recordkeeping Requirements, 84 Fed. Reg. 50,566 (Sept. 25, 2019).

[2] RAIS coordinates regulatory compliance for Reynolds American Inc.'s ("RAI") subsidiary companies, including R.J. Reynolds Tobacco Company, American Snuff Company, LLC, Santa Fe Natural Tobacco Company, Inc., and R.J. Reynolds Vapor Company. References to RAIS in this letter include itself and its affiliated RAI subsidiaries as applicable.

we have not addressed the information presented at the public hearing in these comments and may supplement our comments at a later date.

A rule for the PMTA process is long-overdue, with nearly a decade having passed since the Family Smoking Prevention and Tobacco Control Act (the "Tobacco Control Act" or the "Act") was enacted on June 22, 2009.[3] Instead of faithfully implementing the Act by promulgating a final rule governing the PMTA application and review process, FDA has relied on guidance documents with expanding data requirements.

For the reasons set forth below, the proposed rule is legally and substantively inadequate. As discussed in more detail below, a rule governing the PMTA process is necessary and important specifically as this rule will likely govern the premarket review and clearance of the thousands of electronic nicotine delivery systems ("ENDS") products currently on the market. RAIS strongly encourages FDA to modify the proposed rule to address the concerns outlined in these comments. And when FDA does issue a final rule governing these essential elements of the regulatory framework, FDA should also rescind its prior guidance.

RAIS remains committed to working with FDA to help implement the relevant statutory requirements, consistent with Congress's stated desire to permit the continued sale of tobacco products to adults balanced against specific concerns to public health. RAIS hopes that FDA will work collaboratively with manufacturers in promulgating a final rule that will meet the statutory requirements, ensure that FDA is in a position to employ its resources efficiently and effectively, and further public health goals without unduly burdening manufacturers or consumers of tobacco products.

[3] Pub. L. No. 111–31, 123 Stat. 1776 (2009).

## EXECUTIVE SUMMARY

On September 25, 2019, FDA published its proposed rule to govern the content and format of PMTAs. While a rule is far preferable to FDA regulating through guidance documents and inconsistent individual adjudications, clarity, scientific practicability, and feasibility are critically needed in any PMTA rule. But certain aspects of FDA's proposed rule fail to provide such clarity, practicability, and feasibility. FDA should modify the proposed rule, or issue a new proposed rule, to address the concerns raised in these comments.

Congress first granted FDA authority to regulate tobacco products in the Tobacco Control Act on June 22, 2009.[4] With carefully crafted limitations, the Act directed FDA to regulate "cigarettes, cigarette tobacco, roll-your-own tobacco and smokeless tobacco"[5] and also authorized FDA to issue regulations deeming additional categories of tobacco products subject to the Act.[6] FDA's authority does not allow it, however, to ban the sale of cigarettes, smokeless tobacco products, cigars, or pipe tobacco,[7] or ban the presence of nicotine in tobacco products.[8] Congress also made clear that tobacco products that were on the market as of February 15, 2007, could remain lawfully marketed.[9] Congress specified that manufacturers should also be allowed to market new products substantially equivalent to existing products on the market as of February 15, 2007 or products previously cleared by FDA as substantially equivalent without having to undergo extensive pre-market review. The Act strikes a careful balance between, on one hand, the continued marketing and development of tobacco products to ensure that consumers are able to obtain access to the products they demand and, on the other hand, the public health gains that can be realized through appropriate regulation.

And while the Tobacco Control Act establishes the required contents of a PMTA and the criteria by which FDA must review the applications, the proposed rule appears to go beyond what was contemplated by Congress for PMTAs. And, it is imperative that FDA's final PMTA rule provide clear and substantive directions for the PMTA process in ways not directly contrary to the requirements set forth in the Tobacco Control Act as we know that PMTAs likely will be submitted for thousands of currently marketed ENDS products so that they may remain on the market in the upcoming months.

RAIS submits that the proposed rule needs to be modified to address at least six major concerns:

- The proposed rule exceeds FDA's authority by impermissibly imposing manufacturing and design parameters through the PMTA process, rather than through promulgating appropriate regulations under Section 906 of the Act;

[4] Pub. L. No. 111–31, 123 Stat. 1776 (2009).
[5] 21 U.S.C. § 387a(b).
[6] *Id.*
[7] *Id.* § 387g(d)(3)(A).
[8] *Id.* § 387g(d)(3)(B).
[9] *Id.* § 387j(a)(1)(A).

- The rule requires an impractical evaluation of certain measurements, including, for example, the length of time it takes for a user (or all users) to consume the product;
- The rule fails to provide the flexibility necessary with respect to the submission of certain information that is not dispositive regarding health risks;
- The proposed rule fails to provide least burdensome alternatives to the proposed rule requirement to include human factors investigations and fails to explain certain requirements in human factors investigations;
- The proposed rule fails to provide flexibility in meeting threshold requirements for filing a PMTA; and
- FDA failed to undertake a proper economic analysis, relying solely on an economic analysis done in conjunction with FDA's final Deeming regulation in May 2016, rather than an economic analysis conducted based on more current and informative information relating to PMTAs and ENDS products.

Indeed, FDA must make certain modifications to its proposed rule to provide a viable regulatory framework for review of PMTAs.

## Background

### I. FDA's History with Tobacco, the Tobacco Control Act, the "PMTA" Pathway, and ENDS products

FDA first attempted to bring the tobacco industry within its jurisdiction in 1996 by asserting that nicotine qualified as a "drug" under the Federal Food, Drug, and Cosmetic Act ("FD&C Act").[10] The U.S. Supreme Court rebuffed the Agency in *FDA v. Brown & Williamson Tobacco Co.*,[11] holding that the FD&C Act did not grant FDA authority to regulate tobacco products. The FD&C Act as then-constituted, the Court reasoned, did not encompass regulation of a product the government recognized as inherently unsafe.[12] In the wake of *Brown & Williamson*, Congress considered legislative proposals that would have banned cigarettes or significantly reduced adults' access to tobacco products, but Congress rejected those proposals. Instead, when Congress enacted the Tobacco Control Act of 2009, it struck a careful balance between the continued marketing and development of tobacco products for adults to consume and the public health gains that can be realized through appropriate regulation.[13]

The Tobacco Control Act gave FDA authority over four enumerated tobacco product categories—cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco.[14] The Act also provided FDA the authority to promulgate, through notice-and-comment rulemaking, new standards controlling or limiting the use of individual materials, ingredients, or constituents used in tobacco products when doing so is "appropriate for the protection of the public health."[15] At the same time, the Act prohibited FDA from banning cigarettes, smokeless tobacco products, cigars, little cigars, roll-your-own tobacco, or pipe tobacco, or requiring the reduction of nicotine yields of a tobacco product to zero.[16] Congress also carefully limited FDA's authority when regulating tobacco products that were either on the market as of February 15, 2007 (called "grandfathered" products) or certain products introduced into the market after February 15, 2007 and before March 22, 2011, and a report was submitted under Section 905(j) of the Act before March 23, 2011 (commonly referred to as "provisional" products). *See* 21 U.S.C. § 387j(a)(2)(B). In general, Congress expected that these "provisional' tobacco products would remain on the market and available to consumers unless and until FDA determined that the product has substantially different characteristics from existing products and posed different questions of public health.[17]

The Tobacco Control Act requires that all new tobacco products undergo FDA premarket review before they may be marketed and sold. Congress provided three regulatory pathways for manufacturers to obtain authorization to market and sell these products:

---

[10] Pub. L. No. 75–717, 52 State 1040 (1938).
[11] 529 U.S. 120 (2000).
[12] *Id.* at 133–34.
[13] *See* H.R. 1256 §§ 3(6)–(7) (2009).
[14] 21 U.S.C §§ 387a(b).
[15] 21 U.S.C. §§ 387g(a)(2)–(4), (c).
[16] *Id.* at §§ 387g(d)(3)(A), (B).
[17] *Id.* §§ 387e(j), 387j(a)(2)(B).

(1) filing an exemption request for a new tobacco product that involves only certain minor modifications to an existing, lawfully marketed product;

(2) filing a substantial equivalence ("SE") report under 21 U.S.C. § 387e(j)(1)(A)(i) for a new product that has either (a) the same characteristics as products that were on the market as of February 15, 2007 or products that have previously been ordered to be substantially equivalent under Section 905 (*i.e.*, predicate products), or (b) different characteristics, but the product as a whole does not raise different questions of public health; or

(3) filing a PMTA under 21 U.S.C. § 387j for a tobacco product that does not satisfy the requirements of any other pathway. The Act "grandfathered" products in the marketplace as of February 15, 2007 and exempted such products from requiring premarket review or other pre-authorization requirements.

On May 10, 2016, FDA published a final rule that deemed all products that meet the statutory definition of "tobacco product" subject to FDA's regulatory authority, including "components" (*e.g.*, batteries) and "parts," but not including "accessories" (*e.g.*, lighters, pipe pouches) of newly deemed products. *See* 81 Fed. Reg. 28978 (May 10, 2016) (the "Deeming Rule"). The final Deeming Rule extended FDA authority to currently marketed products such as dissolvables not previously regulated by FDA, gels, waterpipe tobacco, and electronic nicotine delivery systems ("ENDS") (including e-cigarettes, e-hookah, e-cigars, vape pens, advanced refillable personal vaporizers, and electronic pipes). *Id.* at 28976. The final rule also extended FDA's authority to components and parts of ENDS products, including certain e-liquids, cartridges, atomizers, and tank systems. *Id.*

By "deeming" ENDS products tobacco products, the Deeming Rule immediately subjected all ENDS products not legally marketed as of February 15, 2007 to the Tobacco Control Act's premarket review requirements. But as the Agency recognized in the Deeming Rule, there were few, if any, ENDS products on the market in 2007, and no ENDS products could have cleared premarket review with FDA prior to coming under the Agency's jurisdiction. Thus, the Deeming Rule effectively rendered most—if not all—ENDS products "adulterated" in violation of the FD&C Act.

## II. FDA's Compliance Policy Regarding Premarket Review and Clearance for Certain ENDS Products

As discussed above, FDA's final Deeming Rule requires all newly deemed products—those not marketed as of February 15, 2007 (*i.e.*, grandfathered products)—to receive premarket review and clearance before being commercially marketed in the United States. However, recognizing the market upheaval that would likely result from removing all newly deemed ENDS products from the market upon the effective date of the final rule—including the potentially damaging effects on public health by removing ENDS products that may likely pose fewer health risks than cigarettes—FDA established a compliance policy regarding its premarket review requirements for those newly deemed tobacco products that are not grandfathered products but that were on the

market as of August 8, 2016.[18] Indeed, FDA stated it would exercise its enforcement discretion, defer premarket review requirements, and allow these products to continue to be commercially marketed so long as the products adhere to the compliance policy. By contrast, any newly deemed tobacco product that was not on the market as of August 8, 2016, was immediately subject to FDA's premarket review requirements and could not be marketed until FDA grants marketing authorization. *Id.* at 28,977–78. FDA provided that it would not enforce the premarket authorization requirements for a period of time to allow manufacturers to prepare and submit their applications. Manufacturers had twelve months for substantial equivalence exemption requests, eighteen months for substantial equivalence reports, and twenty-four months for PMTAs. And once a PMTA was submitted, FDA would not enforce the premarket authorization requirement for one year (assuming FDA had not denied or refused to accept the application). *Id.* at 29,011.

In the final Deeming Rule, FDA applied the same February 15, 2007 grandfather date to the newly deemed products. Any deemed product that was not legally marketed as of February 15, 2007 is considered a new tobacco product subject to premarket review by FDA. *Id.* at 28978. Because few (if any) ENDS products were on the market as of the 2007 grandfather date, and none had previously received FDA premarket review and clearance through an FDA-authorization process (because, before the Deeming Rule, there had been neither a requirement nor an ability to do so), most (if not all) ENDS products would require PMTAs to support the continued sale of such products. *See id.* at 28,984.

In May 2017, as the close of the first compliance period approached, FDA extended the period. While the Agency did not provide an explanation, it did say that it did not intend to enforce the Deeming Rule's premarket authorization requirements for another three months. 82 Fed. Reg. 22,338.

Just months later in July 2017, FDA announced a new plan. *See* FDA News Release, *FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death* (July 28, 2017). Recognizing the importance of encouraging manufacturers to develop innovative tobacco products that provide potentially less risk, FDA announced another extension of the compliance periods. Applications for ENDS products would now be due in August 2022. *Id.* And if a manufacturer submitted an application by then, the product could remain on the market until FDA made a decision on the application or the application was withdrawn. *Id.* According to the Agency, these extensions would give it time to develop product standards to: (1) protect against known public health risks, such as ENDS battery issues; and (2) address concerns around children's exposure to liquid nicotine. It would also allow collaboration with manufacturers to develop a more efficient, predictable, and transparent premarket review process that would facilitate higher quality submissions. The Commissioner recognized the continuum of risk for nicotine delivery and further acknowledged that continued innovation could yield potentially less harmful tobacco products. In addition, the Agency announced its intent to seek public input on the complex role that flavors have come to play in the modern tobacco-product market.

---

[18] 81 Fed. Reg. at 29,003-29,006.

In September 2018, the Agency announced it was considering new enforcement policies and other regulatory measures to address the Agency's concerns over youth access to and use of ENDS products.[19]

On November 15, 2018, FDA announced a new policy framework to "protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes."[20] The Agency cited the release of the 2018 National Youth Tobacco Survey ("NYTS") data, which purportedly showed significant increases in the rates of youth e-cigarette use. FDA also proposed to revise its compliance policies regarding the continued marketing of deemed tobacco products that have not obtained premarket authorization[21], and to call on industry to do more to keep their products out of the hands of minors.

On March 13, 2019, as part of the Agency's efforts to implement this new initiative, FDA announced substantial proposed "Modifications to [its] Compliance Policy for Certain Deemed Tobacco Products" (hereinafter "ENDS Compliance Draft Guidance"). Therein, the Agency proposes several specific carve-outs to its longstanding ENDS compliance policy. According to the ENDS Compliance Draft Guidance, FDA now plans to restrict the sale of the following categories of affected products:

(1) Flavored ENDS products (other than tobacco-flavored, mint-flavored, and menthol-flavored ENDS products) that are offered for sale in ways that pose a greater risk for minors to access such products, including removal from retail stores that do not have age-restricted areas in place.

(2) Flavored ENDS products (other than tobacco-flavored, mint-flavored, and menthol-flavored ENDS products) that are offered for sale in the United States after August 8, 2021, without the manufacturer submitting (and FDA receiving) a premarket application (or after action by FDA on that application).

(3) All ENDS products, including tobacco-flavored, mint-flavored, and menthol-flavored products, that are targeted to minors or likely to promote use of ENDS by minors.

Recently the U.S. District Court for the District of Maryland in *American Academy of Pediatrics, et al. v. FDA*, set aside FDA's July 2017 guidance and ordered manufacturers of all newly deemed products, including ENDS products, to file PMTAs for marketing orders by May 12, 2020—approximately two years before the PMTA submission deadline set forth in the Agency's compliance policy.[22]

---

[19] *See* U.S. Food & Drug Admin., Statement From FDA Commissioner Scott Gottlieb, M.D., On New Steps To Address Epidemic Of Youth E-Cigarette Use (Sept. 12, 2018).
[20] *See* U.S. Food & Drug Admin., Statement From FDA Commissioner Scott Gottlieb, M.D., On Proposed New Steps To Protect Youth By Preventing Access To Flavored Tobacco Products And Banning Menthol In Cigarettes (Nov. 15, 2018), available at https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm625884.htm.
[21] To be clear, no manufacturer to date has obtained a clearance order for an e-cigarette product and few applications are known to have been filed.
[22] *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461 (D. Md. 2019).

## III. Nearly Ten Years Have Passed and FDA Has Yet to Issue Any Foundational Rules Implementing the Premarket Tobacco Product Application Framework.

While the premarket review requirements for certain newly deemed products, including ENDS products, have certainly been shortened by the court in American Pediatric, et. al. v. FDA and manufacturers are indeed expected to comply with such requirements, FDA—meanwhile—only recently published its proposed regulations regarding the PMTA review process. And this proposed rule—not final—was issued a mere 9 months prior to the submission deadline (May 2020). Instead, manufacturers in the process of preparing their PMTA submissions for ENDS products in advance of the submission deadline are relying on guidance and statements made by FDA during workshops to assess the data and documentation required to support a PMTA.

In conjunction with its premarket review process for new tobacco products, Congress imposed certain statutory safeguards intended to ensure that consumers would continue to have access to the products they prefer. Moreover, the statute reflects a clear congressional policy in favor of transparent, accountable decision-making. But instead of promulgating notice-and-comment rules, FDA has failed to faithfully implement the statute. It has also failed to undertake notice-and-comment rulemaking necessary to provide manufacturers and other interested parties with reasonable notice of the standards the Agency intends to employ when carrying out its statutory obligations. Instead, FDA has followed an arbitrary, ad hoc regulatory process that has relied heavily on contradictory, non-binding guidance documents and public statements. With no meaningful health and safety benefit, FDA's regulatory approach is stifling resources that the industry could use to engage in research and development activities aimed at producing less harmful tobacco products.

And FDA itself has recognized that ENDS products could "significantly reduce th[e] risk of tobacco-related death and disease," by providing a potentially less risky alternative source of nicotine for adult consumers of tobacco products.[23] These potential public health benefits are precisely why FDA's then-Commissioner explained, "It's incumbent upon [FDA] to explore both the potential public health benefits and the risks of this new technology with an open mind." S. Gottlieb, *Protecting American Families: Comprehensive Approach to Nicotine and Tobacco* (June 28, 2017).

Thus, it is imperative that FDA's final PMTA rule provides clear and substantive—and statutorily appropriate—regulations governing the PMTA process. In response to FDA's proposed rule, RAIS respectfully submits the following comments.

[23] *Tobacco Product Standard for Nicotine Level of Combusted Cigarettes*, 83 Fed. Reg. 11,818, 11,824 (Mar. 16, 2018). Indeed, several studies have noted that e-cigarettes could potentially pose reduced risk to individual users who exclusively use such products, as compared to combustible cigarettes. *See, e.g.*, G. O'Connell, *et al.*, *Reductions in biomarkers of exposure (BoE) to harmful or potentially harmful constituents (HPHCs) following partial or complete substitution of cigarettes with electronic cigarettes in adult smokers*, 26(6) Toxicol Mech Methods 443 (2016) (collecting studies); *see also* RAI Servs. Co., Comments on Docket No. FDA-2017-N-6565 (Regulations on Flavored Tobacco Products) (July 18, 2018) (RAI Flavors Comments) (*citing a number of studies*).

## ANALYSIS

### I. The Proposed Rule Would Require Information Well Beyond that Contemplated by Congress.

As discussed in these comments, there are several important areas that FDA must address prior to finalizing this proposed rule, including requirements that well exceed the underlying statute or that are addressed in ways directly contrary to the statute.

Section 910 of the FD&C Act establishes the required contents of a PMTA, as well as the criteria by which FDA must review the application to determine whether it would be appropriate for the Agency to authorize the marketing of a product. However, despite the exhaustive nature of the list set forth in Section 910(b)(1) of the Act, the proposed rule would go well beyond what was contemplated by Congress. This was presaged by FDA's final guidance on PMTAs for ENDS products, which itself significantly expanded the categories and details of information as provided under the Act, leading to a much more burdensome, onerous, and expensive process for each individual product.

Section 910(b)(1) of the Act requires the submission of the following:

- Full reports of all information published or known to, or which should reasonably be known to, the applicant, concerning investigations that have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products;
- A full statement of the components, ingredients, additives, and properties, and of the principle or principles of operation, of such tobacco product;
- A full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of such tobacco product;
- An identifying reference to any tobacco product standard, under section 907, which would be applicable to any aspect of such tobacco product, and either adequate information to show that such aspect of such tobacco product fully meets such tobacco product standard or adequate information to justify any deviation from such standard;
- Such samples of such tobacco product and of components thereof as the Secretary may reasonably require;
- Specimens of the labeling proposed to be used for such tobacco product; and
- Other information relevant to the subject matter of the application as the Secretary may require.

The Act further provides that, based upon the information submitted in a PMTA, as well as "any other information before the Secretary" regarding a given tobacco product, FDA shall authorize the marketing of a tobacco product if there is a finding that:

- well-controlled investigations, which may include one or more clinical investigations or other valid scientific evidence, show that marketing the tobacco product would be appropriate for the protection of the public health;
- the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of the tobacco product conform to tobacco product manufacturing standards when they are established pursuant to Section 906(e);
- the proposed labeling is not false or misleading in any particular; and
- the tobacco product conforms in all respects to any applicable standard established under Section 907.

As discussed in greater detail below, particularly with respect to the Agency's interpretation of "all information" on health risks, the proposed rule exceeds the scope of the criteria set forth in Section 910(c).

**A. The proposed rule would impose manufacturing and design parameters through the PMTA process by requiring the submission of design parameter information for ENDS products that is outside the scope of Section 910.**

Proposed section § 1114.7(i)(2) is characterized as describing "additional parts of FDA's interpretation of the requirement in section 910(b)(1)(B) of the FD&C Act to provide a full statement of the product properties…together with FDA's authority under section 910(b)(1)(G)."[24] However, under the simple headings of "Product dimensions and construction" and "Design parameters and test data," and over the course of 16 pages and 25 tables in the Federal Register, FDA proposes to expand the statutorily required "full statement of the components, ingredients, additives, and properties, and of the principle or principles of operation" of a tobacco product to include scores of detailed measurements and data requirements. While it is appropriate to evaluate product "design parameters" to determine whether a new product would be appropriate for the protection of the public health, the Act does not permit FDA to impose design and manufacturing parameters for tobacco products.[25]

Should FDA want to impose such manufacturing and design criteria, it must do so independent of the PMTA framework, under the Agency's authority pursuant to Section 906(e) of the Tobacco Control Act.[26] A tobacco product manufacturing practices ("TPMP") regulation for tobacco products is the proper mechanism to use for product design controls to ensure that a tobacco product contains what the manufacturer says it contains. Such controls are essential to ensure that a product is manufactured, packaged, stored, and labeled consistently and reliably. TPMP regulations also could require manufacturers to establish and maintain procedures to

[24] 84 Fed. Reg. at 50586.
[25] This is particularly true for currently marketed ENDS products that were designed, manufactured, and marketed before the Act required submission of PMTAs.
[26] 21 U.S.C. 387f(e)(1)(A) (The Tobacco Control Act also authorizes FDA to prescribe regulations "requiring that the methods used in, and the facilities and controls used for, the manufacture, preproduction design validation . . . , packing, and storage of a tobacco product conform to current good manufacturing practice. . . to assure that the public health is protected and that the tobacco product is in compliance with [the FD&C Act]."

document and validate design changes prior to implementation. Importantly, however, these regulations are statutorily separate and distinct from the PMTA process.

As contemplated by the plain language of the Act, it should be sufficient for a manufacturer to provide the specifications employed in designing the new product, confirm that such specifications were met in manufacturing the respective product for testing, and then provide the Agency with product samples as needed. Thus, FDA's review would entail an analysis of whether the new product—manufactured to the specifications provided to FDA in the PMTA—meets the provisions of Section 910(c).

In addition to imposing manufacturing and design parameters, the proposed rule would require the submission of "a quantitative description of the performance criteria, including test protocols, line data, and a summary of the results, for each applicable design parameter and manufacturing step."[27] Despite the fact that these parameters may not have been part of a product's specifications or design, FDA asserts that such data must be "a required part of the PMTA to demonstrate the product consistently meets the nominal values or range of values as well as design tolerances."[28] Once again, this is an attempt to impose manufacturing and design characteristics on new tobacco products in violation of the Act.

Furthermore, as discussed in more detail in Section C below, in its proposed rule, FDA introduces new requirements for human factor studies that should first fall under the purview of TPMP requirements, not PMTA requirements. For example, FDA proposes that understanding how to identify an expired product is a parameter to consider for human factor studies. However, to date, FDA has not publicly communicated any information as to what constitutes an "expired product." Product expiration and shelf-life requirements are part of manufacturing practices. Without requirements first from FDA on what defines product expiration, it is impossible for manufacturers to gauge in human factor studies how study participants understand and identify product expiration. FDA also provides a proposed risk analysis requirement as part of its human factor studies requirement. FDA recommends that "a PMTA contain a use-related risk analysis to help identify critical tasks that should be evaluated in human factors studies and inform the priority of testing the tasks in a human factors study." However, this is the first instance of FDA proposing a requirement in a proposed rule for any risk analysis. Risk analysis and risk management should be governed under TPMPs, not PMTAs. FDA has not issued any regulation on appropriate use-related risk analysis, a step the Agency identifies in the proposed rule as critical to identifying and mitigating or eliminating high-risk hazards. Additionally, the concept of "critical task" appears to have been adopted from existing regulations governing medical devices, for which a "critical task" is necessary for a user to receive an expected therapeutic benefit. FDA should more clearly examine the inclusion of this term in the final rule and, if the Agency deems it applicable to ENDS and other tobacco products, clearly define the term and its relevance to these products.

Instead of working collaboratively with manufacturers and promulgating TPMPs that incorporate real-life manufacturing controls and design features, FDA has chosen to abandon the appropriate mechanism for implementing design controls and place undue and unreasonable importance on every individual aspect of a tobacco product, irrespective of whether a product is

[27] 84 Fed. Reg. at 50586.
[28] *Id.*

designed or manufactured according to an Agency-mandated parameter. Further, the proposed rule provides insufficient explanation of how FDA will weigh these parameters when reviewing PMTAs.

The majority of the "design parameters" and data requirements set forth in the proposed rule have been arbitrarily chosen by the Agency and likely do not represent real-life manufacturing conditions or design features. Below, we focus on a select few that FDA has proposed to require for smokeless tobacco products and ENDS products.

**1. Smokeless Tobacco Products: Stability Testing**

RAIS respectfully disagrees with the proposed requirement to include analytical measurements of pH, moisture content, water activity, total aerobic microbial counts, yeast and mold counts, nitrate, nitrite, preservatives, and microbial metabolic inhibitors in stability studies for new tobacco products. As the ultimate endpoint of stability testing is to determine whether tobacco-specific nitrosamine ("TSNA") formation occurs over time, assessment of these additional parameters is burdensome, resource intensive, and unnecessary.

Including the numerous analytes proposed in stability studies of tobacco products would be unnecessarily time consuming and would require extensive resources. For example, a study assessing product stability with a 6-month shelf life requires at least 9 months to complete, and the addition of each analyte results in increasing complexity and time. Selection of appropriate methods for each analyte requires a significant investment for development and validation in a given sample matrix, and different analytical methods are known to yield variable results.[29] This is further complicated by the fact that FDA has not identified validated methods appropriate for testing of the aforementioned analytes. As each tobacco manufacturer validates, develops, or selects the analytical method used, additional variability in constituent reporting is inherent, which undermines public health evaluation and decision making. Identification of laboratories able to conduct stability testing of multiple products with measurement of numerous analytes, holding appropriate accreditation, utilizing appropriate reference standards,[30] and possessing adequate equipment and personnel able to handle high sample volumes would be difficult and overly burdensome to the entire industry.

Additionally, the assessment of numerous endpoints is unnecessary, as the quantities of the endpoints proposed by FDA will not alter the presence or quantities of total TSNAs in tobacco products as tested at each stability time point. Conducting such testing for a stability study at multiple time points for multiple batches of products would be unlikely to provide information that would consistently correlate with TSNA formation. The proposed additional testing would present

[29] Insights from analysis for harmful and potentially harmful constituents (HPHCs) in tobacco products. Oldham MJ, DeSoi DJ, Rimmer LT, Wagner KA, Morton MJ. 2014. Regulatory Toxicology and Pharmacology. 70(1): 138-148. https://www.sciencedirect.com/science/article/abs/pii/S0273230014001317.

[30] In some cases, appropriate reference standards simply do not exist yet. To the extent smokeless tobacco product reference standards do exist, they have been created and characterized by stakeholders without assistance from FDA. FDA should provide reference standards for smokeless tobacco products as they have done for cigarette filler through the National Institute of Standards and Technology. *See, e.g.*, "SRM 3222 Cigarette Tobacco Filler," https://www.nist.gov/news-events/news/2016/09/new-nist-reference-material-helps-assure-accurate-measurement-constituents.

an extra burden for the industry that may yield variable results, particularly in products with complex agricultural matrices such as smokeless tobacco. As the ultimate endpoint of stability studies is TSNA formation, the additional proposed endpoints would be redundant, as the question of TSNA formation is addressed through direct testing of multiple batches of each product at each time point.

While analysis of the parameters proposed by the FDA may yield conditions that favor increases in TSNAs,[31] assessment of the stated parameters will not yield a change in total TSNAs, which is the public health endpoint of interest. This fact, coupled with the burden of the proposed analytical testing, the analytical variability between laboratories and methods, and the fact that measurements of the proposed analytes will not alter the presence or quantity of TSNAs in tobacco products, militates against the inclusion of this requirement in the final PMTA rule.

**2. Smokeless Tobacco Products: Nicotine Dissolution**

In the proposed rule, FDA states that "tobacco cut size may alter the particle surface area and accessibility of saliva to get to the surfaces of the tobacco, thereby affecting the amount and rate of constituents released from the product."[32] Additionally, FDA asserts that the "pouch material nicotine dissolution rate is a function of tobacco cut size and pouch materials, thereby potentially affecting the amount and rate of constituents released from the product."[33] Dissolution is an analytical assessment typically used in the pharmaceutical industry, which has proven utility for assessing batch-to-batch quality of drug products, monitoring product performance following changes to drug products, and under certain conditions, estimating *in vivo* performance of drug products without the need for expensive clinical trials in solid oral dosage forms (*e.g.*, capsules, tablets).[34] Dissolution also may be considered an actionable specification in the pharmaceutical industry, required for batch release of the drug product.[35] RAIS notes that neither nicotine content, nor release rate of nicotine, are actionable specifications for RAI operating companies' smokeless tobacco products, nor are these feasible specifications for future products. This is particularly true for smokeless pouch material as the pouch material inherently does not contain nicotine; therefore, neither nicotine content nor release rate of nicotine is a feasible or actionable specification for smokeless pouch materials, as suggested by FDA (Table 2 of proposed section § 1114.7(i)(2)(ii)).

In the proposed rule, FDA appears to make a correlation between nicotine dissolution rate and absorption of/exposure to HPHCs from smokeless tobacco products. For such *in vitro* to *in vivo* correlations in the pharmaceutical industry, both *in vitro* (*e.g.*, dissolution release rate) and *in*

---

[31] Changes in TSNA contents during tobacco storage and the effect of temperature and nitrate level on TSNA formation. Shi H, Wang R, Bush LP, Zhou J, Yang H, Fannin N, Bai R.J. Agric Food Chem. 2013 Nov 27;61(47):11588-94. doi: 10.1021/jf404813m. Epub 2013 Nov 18. https://www.ncbi.nlm.nih.gov/pubmed/24188376
[32] 84 Fed. Reg. at 50587.
[33] *Id.*
[34] Shah, VP, Lesko, LJ, Fan, J, Fleisher, N, Handerson, J, Malinowski, H, Makary, M, Ouderkirk, L, Rey, S, Sathe, P, Singh, GJP, Tillman, L, Tsong, Y, and Williams RL. FDA Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms. *Dissolut. Technol*. November 1997, 15-22.
[35] Suarez-Sharp, S, Delvadia, PR, Dorantes, A, Duan, J, Externbring, A, Gao, Z, Ghosh, T, Miksinski, SP, and Seo P. Regulatory Perspectives on Strength Dependent Dissolution Profiles and Biowaiver Approaches for Immediate Release (IR) Oral Tablets in New Drug Applications. The AAPS Journal. 18(3), 2016, 578-588

*vivo* (*e.g.*, pharmacokinetic) data are required.[36] The correlation factor is determined through the use of validated models developed for the drug product. The model development may require adjustments in the dissolution testing conditions until the *in vitro* data aligns with the *in vivo* data in order for the model to be considered accurate.[37] When dissolution is used as an assessment of batch-to-batch quality control, the conditions of the dissolution experiment are not meant to represent the physiological conditions that would be required to make a correlation to *in vivo* exposures.[38]

Specific differences in drug products compared to smokeless tobacco products demonstrate why such *in vivo* correlations cannot and should not be inferred from dissolution testing results for smokeless tobacco products. The most significant difference between solid oral dosage forms of a pharmaceutical product as compared to an oral smokeless tobacco product is that solid oral pharmaceuticals are designed to dissolve/disintegrate in the gastrointestinal tract or oral cavity of the consumer.[39] Pharmaceuticals also are designed to be used in a prescribed manner, limiting variability in use behaviors from one consumer to another. Conversely, smokeless tobacco products are designed to be used in the oral cavity for a time and in a manner determined by the adult tobacco consumer, and then the products are typically discarded. Generally, smokeless tobacco products are not designed to dissolve or disintegrate, which vastly complicates the assumptions used in dissolution testing in the pharmaceutical industry when determining any potential *in vitro* to *in vivo* correlation. As such, it is clear that nicotine dissolution testing for smokeless tobacco products is not an appropriate indicator of nicotine or HPHC exposure.

Paradoxically, the proposed rule would require nicotine dissolution rates specifically for the pouch material of portioned smokeless tobacco products. In particular, FDA suggests that pouch material nicotine dissolution rate (%/min) be provided as a target specification for the pouch material, with appropriate test data provided to support that the target specifications are met. RAIS notes that pouch material for smokeless tobacco products will have no inherent nicotine dissolution rate, as the material itself does not contain nicotine. As such, a target specification for pouch material nicotine dissolution rate is not feasible, as a rate cannot be measured when the material does not contain the analyte of interest.

Additionally, as described previously, significant differences exist between solid oral dosage forms of pharmaceuticals and smokeless tobacco products. While dissolution rate may be an acceptable specification for pharmaceuticals—highly engineered products with significantly less variability than tobacco products—smokeless tobacco products rely on an agricultural component that varies from crop to crop. As such, numerous factors—including the geographic location of the crops, soil conditions, irrigation, weather, day-length, population of plants in the field, and fertilization—can influence variability in tobacco crops, including the nicotine

---

[36] Kramer, J, Steinmetz, R, and Stippler, E. "Dissolution Method Development with a View to Quality Control." Pharmaceutical Dissolution Testing. Edited by Jennifer Dressman, and Johannes Kramer. Taylor & Francis Group, LLC, 2005, 315-351.
[37] *Id.*
[38] Marques, MRC, Loebenberg, R, and Almukainzi, M. Simulated Biological Fluids with Possible Applications in Dissolution Testing. *Dissolut Technol*. August 2011, 15-28.
[39] Markl, D, and Zeitler, JA. A Review of Disintegration Mechanisms and Measurement Techniques. *Pharm Res.* 2017, 34(5), 890-917.

content.[40,41] As nicotine content may vary from crop to crop, nicotine dissolution rate target specifications are not feasible. Thus, such a design parameter should not be required for a PMTA.

The significant differences between solid oral dosage forms of pharmaceuticals and smokeless tobacco products is further highlighted in that, to date, there are no published established methods to measure the release rates of constituents in tobacco products, particularly smokeless tobacco products. Further, there is no published guidance or other communication from the Agency on the subject. Indeed, on May 7, 2018, FDA published a combined synopsis/solicitation for a contractor to develop selective dissolution procedures for smokeless tobacco products.[42] This solicitation underscores a lack of available methods from the Agency for dissolution testing of constituents in smokeless tobacco products. In the absence of established methods to measure release rates of constituents in smokeless tobacco products, stakeholders have attempted to adapt CDER's guidance for solid oral dosage forms of pharmaceuticals to smokeless tobacco product. Given the fact that pharmaceuticals are typically highly engineered and highly uniform products, formulated without the significant natural variability inherent to plant-based traditional tobacco products, adapting methods and statistical analysis guidance from CDER for pharmaceuticals to smokeless tobacco products is not practical, and in some cases, not feasible.

Lastly, as part of the attempt to adapt CDER's guidance for solid oral dosage forms to smokeless tobacco products, RAIS notes that dissolution rates in pharmaceuticals are typically used to perform a pre-change and post-change comparison of dissolution profiles for modified drug products to assess the safety and efficacy of pharmaceuticals in the absence of *in vivo* testing.[43,44,45,46] A PMTA is submitted for a tobacco product in the absence of a suitable predicate comparator product through the Substantial Equivalence pathway. As such, nicotine dissolution rates for smokeless tobacco products serve no purpose in the PMTA framework, as there is no

---

[40] Davis, DL, & Nielsen, M. (Eds.). (1999). *Tobacco Production, Chemistry, and Technology*. Oxford, UK: CORESTA Blackwell Science Ltd.

[41] Tso TC. 1990. The production of tobacco. Pages 55–64, in: Production, physiology, and biochemistry of tobacco plant. T.C. Tso, ed. IDEALS, Beltsville, MD.

[42] See Solicitation Number: FDA-RFP-1194857, "Dissolution of Smokeless Tobacco Products." https://beta.sam.gov/opp/d0dcf0ea0e1bed6dc51717d3e389a9a6/view (accessed December 12, 2019).

[43] Department of Health and Human Services, Food and Drug Administration (1995, November 30). Immediate Release Solid Oral Dosage Forms; Scale-Up and Postapproval Changes: Chemistry, Manufacturing, and Controls; In Vitro Dissolution Testing; In Vivo Bioequivalence Documentation; Guidance. Accessed from: https://www.gpo.gov/fdsys/pkg/FR-1995-11-30/pdf/95-29218.pdf

[44] U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER). Guidance for Industry: SUPAC-MR Modified Release Solid Oral Dosage Forms. Scale-Up and Postapproval Changes: Chemistry, Manufacturing, and Controls; In Vitro Dissolution Testing; In Vivo Bioequivalence Documentation. September 1997. Accessed from: https://www.fda.gov/downloads/Drugs/Guidances/ucm070640.pdf

[45] U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER). Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations. September 1997. Accessed from: https://www.fda.gov/downloads/drugs/guidances/ucm070237.pdf

[46] U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER). Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System: Guidance for Industry. December 2017. Accessed from: https://www.fda.gov/downloads/Drugs/Guidances/ucm070246.pdf

single basis for comparison (*i.e.*, a predicate product).

### 3. Smokeless Tobacco Products: Microbiological Speciation

RAIS respectfully disagrees with the proposed requirement to provide microbial content data that identifies "detected microbiological organisms by genus and species names (if applicable)."[47] The requirement of speciation would: 1) present a resource intensive, time-consuming regulatory burden, 2) yield highly variable results depending on the speciation method used, and 3) not alter the presence of TSNAs in the tobacco product as measured at each stability timepoint. For these reasons, RAIS views microbial characterization by genus and species as unnecessary.

Microbial characterization of tobacco products, especially smokeless tobacco products, in stability studies to the genus and species level would require extensive time and resources. Selection of appropriate methods would require a significant investment of time for development and validation in a given sample matrix, and different speciation methods are known to yield very different results.[48,49] This is a challenge for the entire field of microbiology—including food products, environmental samples, and microbiomes of humans and animals—not just for tobacco products.[49] Additionally, identification of laboratories able to conduct speciation testing, holding appropriate accreditation, possessing adequate equipment and personnel able to handle high sample volumes would be difficult, if not impossible, and overly burdensome relative to the utility of the information.

The results of microbial characterization studies are highly dependent on the methods employed.[48,49] Culture-based speciation methods are known to inaccurately characterize the diversity of microbiota present, as many microorganisms can enter a viable but not culturable state, and many organisms are unculturable, especially in fermented products.[50] Molecular techniques commonly used to describe the diversity of a given sample include 16s amplicon sequencing, RNA extraction and reverse transcription followed by amplicon sequencing, pyrosequencing,[51] shotgun metagenomic approaches[49] and others. Molecular-based estimations of diversity or speciation would overestimate the number of taxonomic units due to the presence of DNA from nonviable organisms[51] and thereby result in an inaccurate representation of the viable microbiota in a tobacco

---

[47] 84 Fed. Reg. at 50596.
[48] Comparing bacterial communities inferred from 16S rRNA gene sequencing and shotgun sequencing metagenomics. Shah N, Haixu T, Doak TG, Yuzhen Y. 2011. Biocomputing: 165-176. https://www.worldscientific.com/doi/abs/10.1142/9789814335058_0018
[49] Analysis of the microbiome: Advantages of whole genome shotgun versus 16S amplicon sequencing. Ravi Ranjan, Asha Rani, Ahmed Metwally, Halvor S.McGee, David L.Perkins. Biochemical and Biophysical Research Communications. Jan 2016. 469. 4: 967-977. https://www.sciencedirect.com/science/article/pii/S0006291X15310883.
[50] DNA-based, culture-independent strategies for evaluating microbial communities in food-associated ecosystems. Giraffa G, Neviani E. Int J Food Microbiol. 2001 Jul 20;67(1-2):19-34. https://www.ncbi.nlm.nih.gov/pubmed/11482566
[51] Bacterial Populations Associated with Smokeless Tobacco Products. Jing Han, Yasser M. Sanad, Joanna Deck, John B. Sutherland, Zhong Li, Matthew J. Walters, Norma Duran, Matthew R. Holman, Steven L. Foley. Applied and Environmental Microbiology. Sep 2016, 82 (20) 6273-6283; DOI: 10.1128/AEM.01612-16. https://aem.asm.org/content/aem/82/20/6273.full.pdf

sample. DNA or RNA extraction methods, sample preparation techniques, and primers used in amplification can all likewise affect estimated genus and species diversity.[52] The use of such methods results in the formation of chimeras which are hybrid products formed by two or more parent sequences. Such hybrid sequences can be interpreted as novel taxonomic units leading to additional overestimation of diversity, in some cases exceeding 70%.[52] Because the various methods for characterizing microbial communities are known to produce inconsistent results and due to the lack of guidance from regulatory agencies regarding appropriate methods for genus and species characterization of all microorganisms in a tobacco product, RAIS views this proposed requirement as both burdensome and having no practical utility.

Characterization of microbial species to the genus and species level will not alter the presence or quantities of TSNAs in tobacco products. Conducting such testing for a stability study at multiple time points for multiple batches of products would be cumbersome and unlikely to provide information that would consistently correlate with TSNA formation. The proposed additional testing would present an extra burden for the industry that will be incomplete, inaccurate, and not reproducible, particularly in products with complex agricultural matrices such as smokeless tobacco. Additionally, as the ultimate endpoint of stability studies is TSNA formation, speciation data is unnecessary, as the TSNA endpoint is addressed through direct testing of NNN, NNK, and total TSNAs.

Due to the burden inherent in microbial speciation, the inaccuracies and variability between both molecular and culture-based methodologies, and the fact that speciation will not alter the presence or quantity of TSNAs in tobacco products, RAIS respectfully disagrees with the inclusion of the proposed requirement.

#### 4. ENDS Products: Device Design Parameters

In proposed § 1114.7(i)(2)(ii)(B), FDA sets forth a list of design parameters and information on performance criteria to be provided for an ENDS device, characterizing them as "a necessary part of the application…needed to fully characterize the product and changes may affect its impact on public health" ("Table 19").[53] However, many of the proposed design parameters apply to device subcomponents that, while part of a dynamic system, do not provide a direct correlation to aerosol emissions when evaluated independently or individually. We recognize that certain parameters listed in Table 19 may have an impact on the level of HPHCs delivered by a device. Indeed, the power delivered to vaporize an e-liquid and the duration of that power are likely the two parameters with the greatest impact on the emissions yield of an ENDS product. Nevertheless, measurement of HPHCs is the best way to assess this endpoint.

Additionally, in the context of providing a "full characterization" of an ENDS product, FDA's use of "as appropriate" is key. Some of the parameters listed would not be appropriate, because they are not design parameters of each ENDS product or separate components of ENDS. In addition, there appears to be a misapprehension that each parameter has a target specification

[52] Chimeric 16S rRNA sequence formation and detection in Sanger and 454-pyrosequenced PCR amplicons. Brian J. Haas, *et al.* Genome Res. 2011. 21: 494-504. https://genome.cshlp.org/content/21/3/494.full.pdf+html
[53] 84 Fed. Reg. at 50593.

with upper and lower boundaries. That is certainly not the case, as some parameters are evaluated to characterize an ENDS product and do not bear a particular target value.

Below, we address certain parameters listed in Table 19.

#### *a. ENDS Device Design Parameters: Airflow Rate*

The airflow rate of an ENDS product varies considerably and is dependent upon the user. As such, there typically is not a target specification of airflow rate (cc/min) with upper and lower range limits for use of the ENDS product. Some ENDS products do require a minimum air flow rate to induce a pressure required to activate a pressure sensor that in turn initiates the power to heat the coil; the upper flow rate would likely be limited by physical air paths through the product, potentially acting as a critical flow orifice. However, it is viewed that an air flow rate to reach a "critical flow" would require a suction pressure well beyond that of a consumer. Thus, establishing an upper flow rate for a consumer would be difficult to establish and unnecessary. In a study that evaluated several puffing profiles with an e-cigarette at various airflow rates, it was demonstrated that airflow rate had no impact on nicotine yield.[54] Thus, airflow rate should not be considered a useful or required parameter to aid in full characterization of an ENDS product. While changes in airflow rate may be considered to affect certain characteristics of the aerosol being generated within the device (by increasing or decreasing the ratio of environmental air for a given volume of vaporized e-liquid and providing some convective cooling to the heater), an airflow rate cannot be considered a design target. Airflow rate through an ENDS device during consumer usage cannot be controlled by the manufacturer, as the user of the ENDS device provides the physical force that controls the rate. As such, airflow rate should not be a required design parameter for submission within an ENDS PMTA.

#### *b. ENDS Device Design Parameters: Coil Resistance*

Coil resistance is related to the emission of aerosol from ENDS. FDA should consider restating this parameter as "Resistance of the coil or resistive element (ohms)," because not all ENDS have a coil that is heated. More importantly, it is the overall resistance of the cartridge that is the integral factor to the power output of the product. Thus, this singular parameter of "Coil resistance (ohms)" is not the overall resistance that is considered when voltage is applied to the coil or resistive element. Rather, it is the "Overall atomizer resistance (ohms)" that is mentioned as a parameter in Table 19 that is the important criterion with respect to the power provided for e-liquid vaporization. Thus, "Coil resistance (ohms)" is an unnecessary parameter to be evaluated against acceptance criteria and should not be included as a required design parameter within an ENDS PMTA.

#### *c. ENDS Device Design Parameters: Overall Atomizer Resistance*

Proposed Table 19 includes the parameter "Overall atomizer resistance (Ohms)." FDA should consider restating this parameter as "Overall resistance of the coil or resistive element (ohms)." Additionally, most current ENDS products cannot be accurately characterized as

[54] Talih, S. *et al.* Effects of user puff topography, device voltage, and liquid nicotine concentration on electronic cigarette nicotine yield: measurements and model predictions. Nic. Tob. Res. 17, 150–157 (2015).

"atomizers." This is because these products are, in fact, vaporizers that provide heat to vaporize an e-liquid. The overall resistance (ohms) of the atomizer/cartomizer in the electrical circuit (along with power delivery unit ("PDU") output voltage)—which includes the resistance of the coil(s) or resistive element(s)—is related to the power for vaporization of the e-liquid. Thus, a relevant parameter that would include "Overall atomizer resistance (Ohms)" would be better characterized as "Overall resistance of the coil or resistive element (ohms)."

***d. ENDS Device Design Parameters: Wick Ignition Temperature***

FDA proposes to require "Wick ignition temperature (°C)" as a parameter for ENDS devices. However, the wick ignition temperature could only be assessed externally from an ENDS cartomizer and should not be assessed against acceptance criteria. The proposed rule should recognize that different types of materials (*e.g.*, ceramic, silica glass, various organic materials, stainless steel mesh, *etc*.), with different properties, are used as wicks in ENDS products. Wick ignition temperature alone is not related to the level of constituents that are emitted from an ENDS device. As such, "Wick ignition temperature (°C)" should not be a required design parameter to be tested against acceptance criteria.

***e. ENDS Device Design Parameters: Battery mAh Rating***

The battery capacity of different ENDS products varies based upon the use of the battery in a given PDU. "Battery mAh rating (mAh)" is not a required design parameter for ENDS that use a rechargeable battery. For rechargeable ENDS, "Battery mAh rating (mAh)" relates to how frequently the battery must be recharged during use of an ENDS. Information and technical specifications pertaining to the "Battery mAh rating (mAh)" is readily available from the battery cell manufacturer; this information should serve as sufficient support and evidence for "target specification with upper and lower range limits" for "Battery (mAh) rating" for submission in an ENDS PMTA.

A battery cell manufacturer's specification contains the design and performance attributes and parameters for the battery cell, including "Battery (mAh) rating", "Battery voltage operating range (V)" and "Battery current operating range (mA)." Additionally, the manufacturer's specification is required to contain all necessary technical information of the battery cell sufficient for submission to nationally and internationally recognized testing laboratories and certification in accordance with product safety test standards. Battery cell certification is a common, standard, and universally accepted practice for manufacturers of electronic consumer products that employ a battery, as it covers the electrical, mechanical, performance, and safety attributes of the battery cell. Accordingly, "test data (include test protocols, quantitative acceptance criteria, data sets, and a summary of the results)" of battery-related parameters should not be required in addition to testing and certification by nationally or internationally recognized testing laboratories. Inclusion of "Battery mAh rating (mAh)" as a testable parameter with acceptance criteria for ENDS that use a rechargeable battery would create a duplicative and unnecessary regulatory burden for applicants.

#### *f. ENDS Device Design Parameters: PDU Wattage Operating Range*

"PDU Wattage operating range" is considered an important design parameter of an ENDS device, as it specifies the range of wattages at which a given device operates (*e.g.*, 2-5 watts based on the PDU operating voltages and given circuit design) when coupled with a cartomizer designed to be used with the PDU. Accordingly, "PDU wattage operating range" should be well understood and characterized by the PMTA applicant in the functional testing documentation.

However, to require the testing of "PDU wattage operating range" on the manufacturing line would be both untenable and unnecessary. This is due to the fact that PDU wattage is a function of the "Overall atomizer resistance (ohms)" of the cartomizer assembly when coupled with the PDU output voltage (V). "PDU output voltage" is a common design parameter and a manufacturer's test requirement for the PDU. The maximum PDU output voltage is a direct relationship to the maximum PDU wattage of the ENDS device when applied to the "Overall atomizer resistance (ohms)" of the cartomizer. "PDU wattage operating range (W)" (as well as "PDU current operating (mA)," as included for comment in Table 19a) is not typically tested in the manufacturing process, as this value is directly a function of the PDU output voltage (V) tested at the time of manufacture.

Therefore, the requirement of the PDU wattage (W) as a manufacturing test requirement by the manufacturer of the PDU is not appropriate. It is, however, recommended that PDU output voltage (V) and "Overall atomizer resistance (ohms)" of the cartomizer assembly be tested at the time of manufacture as these parameters ultimately dictate the "PDU wattage" as demonstrated by the formulas for Wattage P=I*V, Resistance R=V/I and Current (Amps) I=V/R.

The distinction here—between an evaluation of a tobacco product component by its manufacturer and the applicant's characterization of "PDU Wattage Range"—is important, in that the PDU and the cartomizer are often manufactured by different entities at different locations. Thus, "PDU wattage operating range" should be characterized by the applicant using appropriate documentation rather than included as a manufacturing test requirement.

#### *g. ENDS Device Design Parameters: Coil Temperature Cut-Off and Range*

While some ENDS products have a "Coil temperature cut-off (°C)" feature, it would not be appropriate as a required design parameter for all ENDS products. Similarly, "Coil temperature range (°C)" is not a design parameter for an ENDS cartomizer and should not be a required design parameter for an ENDS PMTA. Evaluation of coil temperature range would require the opening of the cartomizer and placement of several temperature sensors to gather information about the heated zone, likely disrupting the normal operation of the cartomizer. With the potential to create artefactual data, the effort to capture "coil temperature range" is, at best, only an approximation.

These parameters are not singularly related to the ENDS products emissions; as such, evaluation of these parameters does not add materially to the knowledge of emissions of the ENDS product that could be assessed by evaluations of HPHCs. Information relative to the emissions of a given ENDS product already is required to be submitted through the results of HPHC testing.

Accordingly, "Coil temperature cut-off (°C)" and "Coil temperature range (°C)" should not be required design parameters for inclusion in an ENDS PMTA.

### 5. ENDS Products: Other Recommended Design Parameters

In the proposed rule, FDA includes as Tables 19a and 20a additional design parameters recommended to be required for ENDS products. The Agency argues that these additional parameters "may help fully characterize the product and changes may affect its impact on public health" and requests comments on whether these parameters should be required under the final rule.

In most cases, the rationale that FDA uses to support these additional recommendations is that the parameters may affect toxicant emissions. However, as noted above with respect to coil temperature, each parameter is not singularly related to the output of aerosol and HPHCs from an ENDS product. Moreover, several of the recommended parameters are simply characteristics of a given product (*e.g.*, draw resistance) or vary by user (*e.g.*, puff count) and are not directly related to aerosol delivery. As such, FDA should focus on the product in operation, allowing manufacturers to test and report on HPHCs using appropriate methods and include such data in the PMTA submission.

### B. The proposed rule would require the impractical evaluation of certain measurements that vary by user.

Proposed § 1114.7(i)(3) is FDA's interpretation of Section 910(b)(1)(B) with regard to the "principles of operation" of a tobacco product. This would require a PMTA to contain full narrative descriptions of the expected manner in which a typical consumer will use a new tobacco product, to include:

- A description of how a consumer operates the product;
- Where applicable, whether and how a consumer can change the product design and add or subtract ingredients; and
- The length of time it takes for a user to consume a single unit of the product.

With respect to the last category, FDA has requested public comment on appropriate metrics for determining what should constitute a single unit for various product types and also whether FDA should require the average time for all users to consume a single unit, the median time to consume a single until, or the range of time it takes users to consume a single unit of the product.

It is questionable as to the practical value of such a determination as the length of time for a user (or all users) to consume, for example, a specified volume of e-liquid. Individual users vary greatly in terms of how they use an ENDS product. Some users may use the product repeatedly over the course of a day or over several days, or even a week, to consume a specified volume of e-liquid. Evaluation of the time for all users to consume a single unit of e-liquid would require an enormous effort on the part of the applicant to characterize such use and to establish a data base of information. Subject to certain practical limitations, it may be possible to track usage of a product by subject in clinical studies, to some extent. However, a requirement to characterize the length

of time for a user, or all users, to consume, for example, a specific volume of e-liquid would be onerous and would pose an undue and unnecessary regulatory burden upon the applicant. Thus, this should not be a regulatory requirement.

RAIS respectfully proposes that understanding use of a single unit of a product has limited value, because the overall exposure to HPHCs from repeated use of a product is what informs health risk, not use of a single unit.

**C. The human factors investigation requirement in the proposed rule is vague and ambiguous and fails to provide an alternative to the unnecessary and excessive burdens required.**

Proposed § 1114.7(k)(1)(v) would require a PMTA to contain full reports of investigations regarding human factors that influence the health risks of the product, which "includes use conditions, use environments, use related hazards, estimated use error risk, potential unintended uses, risk controls to ensure that harms and unintended consequences are minimized, and adverse experiences related to such uses."[55] FDA provides that in the absence of published information or information otherwise known to the applicant regarding the potential impact of human factors on product risk, including information from investigations using other products that could be bridged to the product that is the subject of the application, an applicant would need to conduct its own investigation to include in the PMTA.[56] And FDA recommends that human factors investigations be conducted in the form of actual use studies as the Agency believes "it may be difficult in some cases to simulate the conditions of use, physical characteristics of the product, or environment of use."[57]

Importantly, actual use studies are costly, time consuming, burdensome, and in some cases, even unnecessary. Thus, RAIS respectfully submits that FDA should consider and provide less burdensome alternatives to "actual use" studies for human factor studies. Indeed, other FDA Centers provide alternatives to actual use studies for human factor studies. For example, FDA recommends "simulated use" studies as an alternative to actual use studies for human factor validation studies of final finished combination products[58]—products which are far more complicated and sensitive. FDA could also consider as another alternative to actual use studies the submission of data already collected by manufacturers on product use for products already on the market instead of conducting new actual use studies altogether. If FDA insists on applicants' conducting actual use studies, then the Agency should clarify that prior and current use information can be applied as a practical and sufficient approach to informing and aiding the validation of a human factor study.

Similarly, FDA should also provide alternative less burdensome human factor study requirements, depending on the type of tobacco product and its intended use. For example, FDA should consider that information relevant to human factors for tobacco products currently on the market may already exist. Therefore, it stands to reason that different and less burdensome human

[55] 84 Fed. Reg. at 50607.
[56] *Id.*
[57] *Id.*
[58] FDA, CDRH, CDER, CBER, & OCP. "Draft Guidance Human Factors Studies and Related Clinical Study Considerations in Combination Product Design and Development." (2016).

factor study requirements should be proposed for these tobacco products as opposed to tobacco products not yet introduced into interstate commerce. In the same vein, different human factor study requirements might exist for novel tobacco products. For example, if a novel tobacco product is intended to be used in a different way than existing tobacco products, it stands to reason that this type of product and its intended use would have different human factor study requirements. In sum, it is unduly burdensome and inappropriate for human factor studies for tobacco products already on the market to be conducted to the same standards as other tobacco products.

In addition to the Agency's failure to provide necessary alternatives to its human factor study requirements, FDA also proposes some requirements relating to human factor studies in the proposed rule without any explanation whatsoever or proposes overly broad requirements—each of which may adversely impact the applicant. Indeed, FDA's ambiguity in the proposed rule relating to human factor studies will likely force applicants to address unnecessary, excessive, and inappropriate parameters for human factor studies, which is unfair and unduly burdensome for tobacco product manufacturers.

In the preamble of the proposed rule, FDA references a "human factors validation study" one singular time.[59] In this singular instance, FDA states "[i]f errors or failures or new findings are identified in the human factors validation study, then these problems should be evaluated…."[60] FDA fails to define what a validation study for a human factor study is or even incorporate the concept in the context of a recommendation or requirement, opting instead to use it as an indirect inference. Furthermore, because there is no more information provided for such a validation study in the proposed rule, it is unclear as to what content and parameters FDA is seeking. For example, it is not clear if a prior human factor study can also serve as a human factor validation study or if a new separate validation study is required altogether. If FDA means the latter, then it is possible for FDA to undermine a manufacturer's human factor study altogether with an arbitrary determination that the validation study was inadequate.

FDA's use of "unintended" consequences also illustrates how ambiguous and overly broad proposed requirements for human factor studies may adversely affect manufacturers. For example, FDA states that as part of risk analysis, manufacturers should identify "unintended users who are likely to use the product and unintended environments in which the product is likely to be used." There is no logical or practical way for manufacturers to guess who all "unintended users" or what "unintended environments" might be. Moreover, FDA does not clearly provide any additional information for what the Agency considers as "unintended use" or "unintended environment." Interestingly, however, FDA does attempt to provide some clarity regarding the scope it envisions for "intended users" stating "intended users may be characterized within the application according to their respective experience levels, skills, age ranges, and use responsibilities." However, even this general attempt at clarification is grossly vague and contains subjective criteria vulnerable to wide ranges of interpretation.

FDA is effectively forcing manufacturers to illogically hypothesize and test endless "what if" scenarios for human factor studies. And to date, FDA has not provided any guidance or formal policies for human factor study requirements appropriate for tobacco products. This must be cured

[59] 84 Fed. Reg. at 50651.
[60] *Id*.

in the proposed rule.

Coupled with the ambiguity and lack of necessary alternatives, FDA provides under proposed § 1114.27(b)(1)(ii) that the Agency may refuse to file a PMTA that does not contain "a threshold amount of information regarding the potential impact of human factors on the health risks of the product."[61] And while the proposed rule does not appear to require an application to contain more than "a threshold amount of relevant information for filing," the only identifiable "threshold" FDA provides is that the Agency "must be able to determine the potential risks and benefits of the new tobacco product to the population as a whole"—a "threshold" that is at best vague.[62] FDA must define a "threshold of information for filing" more clearly, particularly as FDA stated that if it "lacks sufficient information to make this determination, it intends to issue a no marketing order for the new tobacco product."

**D. The proposed rule should allow flexibility with respect to the submission of information that is not dispositive regarding health risk.**

Proposed § 1114.7(k)(i)(C) would require that a PMTA include information on "[t]he pharmacological profile of the new tobacco product, including the pharmacokinetics, pharmacodynamics, metabolism, and elimination profile, of any of the ingredient, additive, and HPHCs for the range of potential levels of exposure resulting from the use of, or exposure to, the new tobacco product relative to other tobacco products."[63] RAIS respectfully submits that the repeated exposure to constituents of the new tobacco product is what determines health risk. In some cases, the pharmacological profile may relate to the health risk, but in other cases, it may not. In addition, exposure to many of the ingredients or constituents may be at very low levels that would not permit the assessment of pharmacokinetics, metabolism, and elimination profile. Further, the metabolism and elimination profile of nicotine are well established in the scientific peer-reviewed literature and should be able to be referred to accordingly. For this reason, RAIS suggests that the pharmacological profile of all ingredients and HPHCs be a request and not required scientific content for a PMTA.

Similarly, proposed § 1114.7(k)(1)(ii)(A)-(B) would require that a PMTA contain information about (A) "the abuse liability of the tobacco product" and (B) "how users actually use the new product including use topography, product use frequency, use trends over time, and how such use affects the health risks of the product to individual users." Abuse liability includes a "determination of both the likelihood that individuals will engage in persistent or problematic use of [a product] and the likelihood that individuals will experience undesirable consequences as a result of its use."[64] Abuse liability assessments typically include an investigation of both the pharmacodynamics of the use (*e.g.*, product liking, physiological measures) and the accompanying pharmacokinetics of a substance that influences the pharmacodynamics. These assessments are used to predict how individuals will use the product in a real use environment. By contrast, an actual use study will assess how users of a product actually use the product, either in a simulated

---

[61] 84 Fed. Reg. at 50607.
[62] *Id.*
[63] 84 Fed. Reg. 50602.
[64] Abuse Liability Assessment of Tobacco Products Including Potential Reduced Exposure Products Lawrence P. Carter, Maxine L. Stitzer, Jack E. Henningfield, Rich J. O'Connor, K. Michael Cummings, and Dorothy K. Hatsukami. 2009. Cancer Epidemiol Biomarkers Prev 18(12) 3241-62.

use setting or in a real use environment. FDA has acknowledged that an actual use study may provide outcomes relevant to the products' abuse liability. RAIS proposes that, because abuse liability assessments are predictive of repeated use of a product, either abuse liability data or actual use data would be adequate to address FDA's proposed requirements. In addition, for products not currently in market, RAIS proposes that a PMTA be required to include abuse liability data followed by postmarket reporting of actual use data because actual use studies in simulated use settings cannot fully mimic real use environments. In these cases, postmarket data are the true measure of how users will actually use the product to inform whether a product is appropriate for the protection of the public health.

## II. FDA Should Undertake A Proper Economic Analysis.

In an effort to justify its proposed rule and to comply with its legal obligations, FDA offers an analysis of the compliance costs the rule will impose on manufacturers. Notably, however, FDA has not conducted a comprehensive economic analysis relating to this proposed rule alone. Instead, FDA relies on the costs already included in the economic analysis for its May 2016 final Deeming Rule. FDA's impact analysis is flawed and statutorily deficient in several respects and undermines the reasonableness of the rule.

### A. FDA must rationally weigh the costs and benefits of the proposed rule and consider reasonable alternative proposals.

The Regulatory Flexibility Act ("RFA")[65] requires that an "initial regulatory flexibility analysis" accompany FDA's notice of proposed rulemaking.[66] The initial analysis must, among other things, "descri[be] the projected reporting, recordkeeping and other compliance requirements of the proposed rule" and assess the impact of the rule on small businesses.[67] In addition, the initial regulatory flexibility analysis must identify "any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities."[68] When FDA promulgates a final rule, it must also issue a "final regulatory flexibility analysis" responding to public comments on the initial analysis.[69] The final analysis must describe the steps FDA has taken to minimize the rule's economic impact on small businesses, including an explanation of why any "significant alternatives" to the rule were rejected.[70] FDA can avoid these requirements only by certifying that the rule "will not, if promulgated, have a significant impact on a substantial number of" small businesses,[71] and that certification must be reasonably supported.[72]

---

[65] 5 U.S.C. §§ 601–12.
[66] *Id.* § 603(a).
[67] *Id.* § 603(b)(4).
[68] *Id.* § 603(c).
[69] *Id.* § 604(a)(2).
[70] *Id.* § 604(a)(5).
[71] *Id.* § 605(b).
[72] *See* 5 U.S.C. § 611 (authorizing judicial review of agency compliance with RFA "in accordance with chapter 7"); *id.* § 706(2)(A) (arbitrary and capricious agency findings and conclusions are unlawful); *Texarkana Livestock Comm'n v. U.S. Dep't of Agriculture*, 613 F. Supp. 271, 277 (E.D. Tex. 1985).For purposes of the RFA, the term "small business" has the same meaning as the term "small business concern" in § 3 of the Small Business Act. *See* 5 U.S.C.

The Paperwork Reduction Act ("PRA")[73] requires FDA to evaluate the practical utility of the information it proposes to collect from regulated businesses, assess the burden that the proposed collection would impose, and consider ways to minimize the burden.[74] FDA must certify that the proposed information collection "is necessary," that it "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency," and that it is "written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond."[75]

Executive Order No. 12,866[76] requires FDA to "assess both the costs and the benefits" of the proposed rule and to adopt it "only upon a reasoned determination that the benefits of the intended regulation justify its costs."[77] The Order also commands FDA to "identify and assess alternative forms of regulation,"[78] to "tailor its regulations to impose the least burden on society,"[79] and to "draft its regulations to be simple and easy to understand, with the goal of minimizing the potential for uncertainty and litigation."[80] Additional procedural requirements, including review of the proposed rule by the Office of Management and Budget, apply if the proposed rule qualifies as a "significant regulatory action," defined as including "any regulatory action that is likely to . . . adversely affect in a material way the economy [or] a sector of the economy."[81]

Finally, under the Administrative Procedure Act's arbitrary and capricious standard, 5 U.S.C. § 702(2)(A), FDA's rule must be "rational," "reasonably explained," and "based on a consideration of the relevant factors."[82] The laws discussed above make certain costs of regulation "relevant factors" that FDA must consider in order to comply with the APA.[83] In assessing the costs and burdens of its proposed rule, and in weighing those costs against any anticipated benefits, FDA must act rationally. "[I]f data in the regulatory flexibility analysis — or data anywhere else in the rulemaking record — demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand."[84]

---

§ 601(3). The Small Business Act defines a small business concern as "one which is independently owned and operated and which is not dominant in its field of operation" and authorizes the Administrator of the Small Business Administration to prescribe additional standards. 15 U.S.C. § 632(a). Under SBA regulations, a business engaged primarily in cigarette manufacturing is considered small if its annual receipts do not exceed $1 billion; a business engaged primarily in manufacturing tobacco products other than cigarettes is considered small if its annual receipts do not exceed $500 million. *See* 13 C.F.R. § 121.201.

[73] 44 U.S.C. §§ 3501–20.

[74] *See id.* §§ 3506(c)(2)–(3), 3507(a)(1), (d)(2).

[75] *Id.* § 3506(c)(3)(A),(C)–(D).

[76] 58 Fed. Reg. 51,735, 51,736 (Oct. 4, 1993).

[77] *Id.* § 1(b)(6).

[78] *Id.* § 1(b)(8).

[79] *Id.* § 1(b)(11).

[80] *Id.* § 1(b)(12).

[81] *Id.* §§ 3(f)(1), 6(a)(3); *see Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1348 n.9 (D. Ariz. 1995).

[82] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 52 (1983).

[83] *See Nat'l Tel. Cooperative Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009).

[84] *Thompson v. Clark*, 741 F.2d 401, 405 (D.C. Cir. 1984); *see also* 5 U.S.C. § 611(b) (in an action for judicial review of a rule, the agency's regulatory flexibility analysis is part of the record in connection with such review); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 539 (D.C. Cir. 1983).

### B. Compliance Costs Will Far Exceed FDA's Estimates.

In the May 2016 Regulatory Impact Analysis accompanying the final Deeming Rule, FDA predicted that the average PMTA process costs for ENDS products to be anywhere from $285,656 to $2,622,224 for initial PMTAs filed, and anywhere from $8,060 to $2,595,224 for subsequent PMTAs filed for ENDS products. It is not clear whether FDA's estimates fully contemplated the costs of generating the required data, including clinical studies. FDA is incorrect with its analysis of the compliance cost associated with data generation for PMTAs. Indeed, this data generation is burdensome, time consuming, and costly—and its compliance costs much higher than estimated.

Indeed, RAIS's experience with filing a PMTA in an uncertain environment shows that the Agency's cost estimation is unrealistic. The costs for a single PMTA submission (not including supplements, amendments, and responses to deficiencies) were severely underestimated by FDA and have exceeded several million dollars. Moreover, given the Agency's recommendations (and now proposed requirements) for data submission, a PMTA for a single product would be extremely inefficient and likely to cost approximately $5 million.[85]

And—as FDA is relying on the May 2016 economic analysis, not one prepared for this proposed rule—FDA fails to take into account the increased and unexpected costs that the final rule is likely to cause on the industry that has been relying on guidance and FDA statements to prepare PMTAs. The rule—if finalized prior to May 2020 (the current PMTA submission deadline for ENDS products PMTAs)—will of course increase compliance costs due to rushed testing, undue burdens, and unexpected costs from a rule promulgated so close to a deadline to submit PMTAs.

## III. Upon Promulgation of the Final Rule, FDA Should Withdraw Certain Guidance Documents.

The proposed rule published by the Agency would address each of the topics covered in the guidance documents previously published by FDA. The final rule will establish these requirements through the procedure designated by Congress, notice-and-comment rulemaking, rather than sub-regulatory guidance. Therefore, upon promulgation of final rules regarding the PMTA application and review process, FDA should withdraw the following guidance documents as they are no longer necessary:

- Guidance: Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (ENDS) (2019), and
- Draft Guidance: Applications for Premarket Review of New Tobacco Products (2011).

FDA has the authority to promulgate a final rule on the substantial equivalence provisions as consistent and in accordance with the Tobacco Control Act.[86] In addition, FDA has the

[85] The recommended clinical studies alone would cost on the order of $2 million or more.
[86] 21 U.S.C. § 387a-1(a)(4).

authority to withdraw or rescind guidance documents.[87] In fact, the Agency withdrew 47 draft guidance documents at once in 2015, including a guidance entitled, "Preliminary Timetable for the Review of Applications for Modified Risk Tobacco Products under the Federal Food, Drug, and Cosmetic Act."[88] Similarly, in November 2012, FDA announced that it was withdrawing a guidance entitled "Enforcement Policy Concerning Rotational Warning Plans for Smokeless Tobacco Products," because it was no longer warranted as FDA had completed its review of all warning plans for smokeless tobacco products submitted to the Agency and the transition from Federal Trade Commission to FDA of the responsibility for reviewing warning plans for smokeless tobacco products was complete.[89] FDA should do the same here and withdraw the guidance when it promulgates the final rule.

## IV. Additional Comments

Below, we provide comments on other aspects of the proposed rule for which FDA specifically has requested public input, as well as requests for additional information and clarification to inform the PMTA submission process.

### A. Acceptance for Filing Criteria and Threshold Requirements

The proposed rule sets forth certain "threshold requirements" that must be met before the Agency will file a PMTA submission.[90] FDA has requested public comment as to whether the proposed information should be included in the final rule as a request or a requirement, as well as how that information relates to other provisions of the Act.

The threshold requirements set forth in proposed § 1114.27(b)(1)(ii) and § 1114.7(k) overlap with the requirements of Section 910(b)(1) of the Act, including substantive information regarding: (1) the health risks of the new product, (2) the health risks of the new product compared to the health risks of a product(s) in the same category and product(s) in at least one different category, (3) the abuse liability of the new product, (4) how consumers actually use the product, (5) the impact that the marketing of the new product would have on current tobacco product users' likelihood of use and product use trajectories, (6) the impact that the marketing of the new product would have on initiation of use by nonusers of tobacco products and their product use trajectories, (7) perception of use and use intentions, and (8) human factors.[91]

RAIS agrees that the scientific content proposed as threshold requirements for filing a PMTA are important for FDA's assessment of whether the new product is appropriate for the protection of the public health. However, RAIS respectfully submits that there is an opportunity

---

[87] *See* 5 U.S.C. § 551(5).
[88] Withdrawal of Draft Guidance Documents Published Before December 31, 2013, 80 Fed. Reg. 26,059 (May 6, 2015).
[89] Guidance for Industry: Enforcement Policy Concerning Rotational Warning Plans for Smokeless Tobacco Products, Withdrawal of Guidance, 77 Fed. Reg. 71,008 (Nov. 28, 2012).
[90] 84 Fed. Reg. 50616 (proposed § 1114.27(b)(1)(ii)).
[91] The preamble to the proposed rule notes the following: "as set forth in proposed § 1114.27(b)(1)(ii), if a PMTA does not contain a threshold amount of information regarding the potential impact of human factors on the health risks of the product, FDA intends to refuse to file the application." 84 Fed. Reg. at 50607. However, "human factors" is not listed as a threshold requirement for testing in 1114.27. It is, however, listed in § 1114.7(k)(3)(v) as required content for a PMTA.

to provide some flexibility with respect to the manner of meeting these requirements, as detailed below:

(1) Not all products should require the same level of information for each subpart of proposed § 1114.7(k) for the Agency to determine whether the new product is appropriate for the protection of the public health.

(2) As such, three types of information should be acceptable in a PMTA to fulfill the requirements proposed in § 1114.7(k):

   a. Reports of investigations conducted to directly study each requirement set forth by FDA;

   b. Bridging data from investigations conducted with different products, with appropriate rationale and justification; and

   c. Scientific rationale and justification for why a specific type of data is not needed for or relevant to the new tobacco product.

(3) For the reasons stated above, RAIS suggests that a manufacturer be required to address the scientific points indicated, provided that the Agency recognizes that such points may be addressed with one or more of the types of information listed above, including a scientific rationale for why a specific type of data is not needed for a given product. In particular, the third point above currently is not included as an option to address the proposed requirements.

An example of when scientific rationale for why specific data may not be needed for the review of a product application is as follows. A manufacturer submits an application for a product and demonstrates that no HPHCs (other than nicotine) are contained within the product or produced by the product during use. Abuse liability information regarding the product is provided to predict product use. Here, an actual use study and detailed topography may not be needed, because exposure to constituents other than nicotine would not occur, regardless of how an individual uses a product. In this case, RAIS suggests that this rationale could be provided to FDA in lieu of conducting an actual use study.

### B. Requests for Clarification

RAIS respectfully requests that the final rule address the following additional points to provide clarity to manufacturers seeking to compile and submit PMTAs:

- ***Determining the format/number of PMTAs to be submitted:*** When different groupings of tobacco products are possible, it is not clear how a manufacturer should submit this information to the Agency. For example, a closed ENDS product that consists of multiple components proposed to be sold separately (subcategories: "E-liquid, Closed" and "ENDS Components") and also the same components proposed to be sold together (subcategory: "ENDS Co-package") may only require PMTAs to be submitted on the individual components sold separately.
- ***ENDS Component subcategory definitions/clarity:*** This subcategory may be intended to describe a rechargeable power unit to be used with closed system e-

liquids cartridges/pods. However, the product properties listed imply other types of components are expected.

- ***Ability to cross-reference submissions:*** The proposed rule would allow for a PMTA to include content by cross-reference to a tobacco product master file ("TPMF") or a pending modified risk tobacco product application ("MRTPA") for the same product. In addition to TPMFs and MRTPAs, RAIS encourages FDA to consider permitting the ability to include content by cross-reference to a previously filed PMTA for a different product that may contain studies applicable to the new product.

- ***Literature review requirement:*** Proposed § 1114.7(k)(2) states that all aspects of 1114.7(k)(1) will require a literature search. It is not entirely clear what the Agency expects this review to entail. This is particularly true for a product not yet in the market; in such an instance, there arguably would be no or limited scientific literature on the product, except that summarizing research that the manufacturer itself would have conducted or been aware. FDA should clarify the intent of this section, as a literature search of an entire product category would be incredibly onerous and likely largely irrelevant for a new-to-world product.

## Conclusion

Certain modifications are required to make this proposed rule a viable regulatory framework for the compilation, submission, filing, and review of PMTAs. The market urgently needs clarity and regulatory predictability in this space, and FDA should retool the proposed rule with those ends in mind.

* * *

Thank you for your consideration of these important concerns.

Respectfully submitted,

Michael W. Ogden, Ph.D.
Senior Vice President
Scientific & Regulatory Affairs

# Tab F.02

Public Comment by Vapor Technology Association

**As of:** December 12, 2022
**Received:** December 16, 2019
**Status:** Posted
**Posted:** December 17, 2019
**Category:** Association - D0003
**Tracking No.** 1k3-9dws-fk7v
**Comments Due:** December 16, 2019
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** FDA-2019-N-2854
Premarket Tobacco Product Applications and Recordkeeping Requirements

**Comment On:** FDA-2019-N-2854-0001
Premarket Tobacco Product Applications and Recordkeeping Requirements

**Document:** FDA-2019-N-2854-1137
Comment from Vapor Technology Association

---

## Submitter Information

**Name:** Anonymous Anonymous
**Submitter's Representative:** Vapor Technology Association
**Organization:** Vapor Technology Association

---

## General Comment

See attached file(s)

---

## Attachments

Comment from Vapor Technology Association

VAPOR TECHNOLOGY ASSOCIATION

# The Vapor Technology Association's Comments in Response to FDA's Proposed Rule: Premarket Tobacco Product Application and Recordkeeping Requirements

**Docket No. FDA-2019-N-2854**

**December 16, 2019**

## I. INTRODUCTION

As the voice of the vapor products industry, the Vapor Technology Association ("VTA") respectfully submits these comments in response to FDA's notice published in the Federal Register on September 25, 2019, regarding its proposed rule entitled Premarket Tobacco Product Applications and Recordkeeping Requirements (the "Proposed Rule").

While the VTA appreciates FDA's attempt to begin to outline its expectations regarding the requirements for PMTAs for tobacco products, the Proposed Rule simply fails to adequately address a significant number of practical limitations that make it virtually impossible for vapor product manufacturers to submit PMTAs that would meet the criteria FDA has set forth by the FDA's imposed deadline of May 11, 2020; vastly underestimates the cost of preparing and submitting a PMTA for even a single product, much less the approximately three million vapor products currently on the U.S. market; and—despite promises in sworn testimony from FDA's former commissioner, Dr. Scott Gottlieb, from earlier this year, fails to make any accommodation whatsoever for the many small businesses that are the backbone of the American vapor industry. For these reasons and the others described in further detail herein, the proposed rule needs to be substantially revised to provide a plausible pathway to a marketing order for the vapor industry.

### A. The Vapor Technology Association

The Vapor Technology Association is the national non-profit industry trade association whose more than 1,000 members are dedicated to developing and selling high quality vapor products that provide adult consumers with a safer alternative to traditional combustible cigarettes. Our trade association includes the leading manufacturers of aerosolizing apparatuses – commonly known as vapor devices, e-cigarettes, or electronic nicotine delivery systems ("ENDS") – manufacturers of e-liquids, flavorings, and components, as well as wholesalers, importers, and brick-and-mortar vape shop retailers.

As is the case with the vapor industry in general, the overwhelming majority of the VTA's members are small businesses that have created significant employment opportunities in their local communities and that contribute substantially to the local, state, and federal economies. Specifically, the VTA is proud to claim as its members 28 independent state vapor trade associations and their member companies representing 33 states, the majority of which are small businesses and retailers who have implemented strict standards to prevent youth access to vapor products. The state vapor associations that are working directly with VTA on developing sound policy, implementing marketing standards, and preventing youth access to vapor products include the following:

Arizona Smoke Free Business Alliance
Arkansas Vape Advocacy Alliance
Breathe Easier Alliance of Alabama
California Smoke Free Organization
Dakota Vaping Association (SD)
Florida Smoke Free Association

Georgia Smoke Free Association
Indiana Smoke Free Alliance
Iowans For Alternatives to Smoking Tobacco
Kentucky Smoke Free Association
Louisiana Vaping Association
Maryland Vapor Alliance
Montana Smoke Free Association
Nevada Vaping Association
New England Vapor Technology Association (RI, MA, CT, NH, ME, VT)
New Jersey Vapor Rights Coalition
North Carolina Vaping Council
Ohio Vapor Trade Association
Oregon Vapor Trade Association
Pennsylvania Smoke Free Association
Pink Lung Brigade (WA)
Rocky Mountain Smoke Free Alliance (CO)
Smoke Free Alternatives Coalition of Illinois
Tennessee Smoke Free Association
Texas Vapor Coalition
Utah Smoke Free Association
Virginia Smoke Free Association
Vapors' Association for Rights & Standards (MI)

The VTA has been at the forefront of the most critical issues confronting the vapor industry and has focused intensively on the issue of ensuring that vapor products are properly marketed towards and accessible by adults only. To that end, the Board of Directors of the VTA has been speaking publicly on the issue of ending youth access to ENDS products for years, developed the industry's first comprehensive set of marketing standards, the VTA Marketing Standards for Membership in January 2018, and has developed a comprehensive plan to address illegal underage access to and use of all tobacco and vapor products—"21 and Done."

**B. The Proposed Rule Ignores Basic Facts and Leaves Serious Questions Unanswered.**

Regrettably, FDA's Proposed PMTA Rule ignores basic facts about the cost of preparing a PMTA and the accelerated deadline for doing so and fails to adequately address many of the fundamental questions surrounding the PMTA process for vapor products that the VTA and its members have been posing to FDA for years. The questions include the following:

**1.** How can FDA conclude that the Proposed Rule would "not have a significant economic impact on a substantial number of small entities"[1] when its Regulatory Impact Analysis fails to address the 13,480 vape shops and the entire distribution chain of small

[1] 84 Fed. Reg. 50566, 50629 (Sept. 25, 2019).

businesses (manufacturers, distributors, and wholesalers) that are reliant on selling a diverse array of the more than 3 million e-liquids and devices on the market, particularly when FDA states that it expects only a handful of ENDS products to even attempt to file PMTA applications?

**2.** How can FDA conclude that the Proposed Rule would "not have a significant economic impact on a substantial number of small entities" when there are over 2,400 U.S. small businesses employing over 7,500 individuals (not including those individuals employed by vape shops that manufacture their own e-liquids) that are vapor product manufacturers who would each be forced to spend millions of dollars to submit a single PMTA under the Proposed Rule?

**3.** Why has FDA failed to make any accommodation for small vapor manufacturers as promised by former Commissioner Gottlieb in testimony before Congress on February 27, 2019, and instead seems intent on imposing a process that is only accessible to a very small number of large companies?

**4.** On what rational basis can FDA assert that it will only take 1,500 hours to prepare a PMTA when JUUL Labs, Inc. and Reynolds American, Inc., two of the largest vapor product manufacturers in the world, have each indicated that their large corporations have had teams of *over 100 full-time employees* and *dozens of Ph.Ds.* working for years on their respective PMTAs?[2]

**5.** How can FDA require vapor product manufacturers to submit a PMTA by an accelerated deadline of May 11, 2020, with complete data on harmful and potentially harmful constituents when FDA has never identified an acceptable methodology for conducting aerosol testing of such products, including a standard device or device setting for the testing of e-liquids, standard e-liquids for the testing of "open system" devices, or "heavy" or "light" use pattern protocols?

**6.** How can FDA require vapor product manufactures to submit a PMTA with complete data and analyses from clinical studies of vaping topography (patterns of use), pharmacokinetics, abuse liability, and human factors analysis by an accelerated deadline of May 11, 2020, when such studies take at least 12-24 months to design, execute, and report, the Proposed Rule was just published on September 25, 2019, and it will still be months before the PMTA's Rule's requirements are finalized?

**7.** Will FDA be willing to make allowance for a rational application process whereby applicants can submit information by May 11, 2020, regarding their products' features, methods of operation, manufacturing, labeling, and marketing plans, and

[2] *See* Declaration of Joanna Engelke, Juul Labs, Inc. Chief Quality and Regulatory Officer, Doc. No. 113-4, *Am. Acad. of Pediatrics, et al. v. FDA, et al.*, No. 8:18-cv-883-PWG (D. Md. June 12, 2019); Press Release, Reynolds American Inc., Reynolds American Inc. Submits Premarket Tobacco Product Application for VUSE Products (Oct. 11, 2019), available at https://www.prnewswire.com/news-releases/reynolds-american-inc-submits-premarket-tobacco-product-application-for-vuse-products-300937224.html.

thereafter work collaboratively with FDA's Office of Science to receive feedback on HPHC testing and human study designs to generate data and information to supplement their applications over a reasonable period of time to demonstrate that their products satisfy the "appropriate for the protection of the public health" standard"?

## II. THE FINAL PMTA RULE MUST ADEQUATELY ACCOUNT FOR AND MITIGATE THE EXTREME FINANCIAL BURDEN PREPARING AND SUBMITTING A PMTA IMPOSES ON SMALL BUSINESSES.

FDA is not crafting the Proposed Rule in a vacuum. FDA has vast information at its disposal regarding the sophisticated and well-developed independent ENDS product distribution chain that is directly competing with Big Tobacco companies, such as Altria, Juul, and Reynolds, among others. In addition to making more flexible the criteria for acceptance and filing of a pre-market application for vapor products, the final PMTA Rule must also accurately account for the enormous costs of preparing and submitting a PMTA and lessen the impact of such costs on the many vapor product manufacturers that are small businesses. To that end, FDA and the Administration are at a pivotal point: either FDA regulation is going to provide rational and needed accommodations for small businesses (i.e., the bulk of the industry) or FDA's Proposed Rule will ensure that the products and competition created by the vapor industry will be eliminated virtually overnight and market control handed directly to Big Tobacco companies.

### A. The Proposed Rule Fails to Properly Account For and Grossly Underestimates the Financial Costs of Preparing a PMTA and the Resulting Adverse Impact on Manufacturers that are Small Businesses.

The specter of small vapor businesses being wiped out by FDA regulation was raised earlier this year in a Congressional hearing on February 27, 2019, by Chairman Sanford Bishop (D-GA) who queried then-Commissioner Gottlieb as follows:

> "I continue to be concerned about how smaller companies that make these products are going to be able to afford the cost of the required applications. I fear that they are going to have to go out of business unless we find a way to address this. If we do not, we will have a smaller market controlled by big companies with fewer choices for adult smokers, higher prices and probably less innovation. If adult smokers who wish to use e-cigarettes to reduce or end their use of combustibles cannot find the products that they like, they may not make that change, and the public health will suffer. ***What have you done to address the costs that may devastate the smaller companies in this industry, and what do you plan to do going forward?***"[3]

[3] *Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations for 2020; Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 116th Cong. (Feb. 27, 2019), at 35 (emphasis added).

In sworn testimony, then-Commissioner Gottlieb responded by stating that, in FDA's proposed PMTA rule, FDA would "mak[e] accommodations for small manufacturers. . . . We do not want a process that is only accessible to three large companies."[4] Despite this promise, the Proposed Rule includes no accommodations for small vapor product manufacturers.

Currently, there are over 2,400 U.S. small businesses employing over 7,500 individuals (not including those individuals employed by vape shops that mix their own e-liquids) that are also vapor product manufacturers.[5] Absent changes to the Proposed Rule that substantially lessen the financial burden of compliance, these small businesses will be unable to submit PMTAs for their millions of harm-reducing vapor products and will be forced to close their doors following the May 11, 2020 deadline for submission of PMTAs for those vapor products that are currently legally marketed.

As importantly, the Proposed Rule—which articulates a process that ensures that only a handful of companies with a handful of products will survive—virtually ensures the elimination of the diverse and independent vapor industry described in the Vapor Industry Economic Impact Analysis conducted by John Dunham & Associates, a copy of which is attached hereto as Exhibit A.[6] Thus, it is entirely insufficient for FDA's Regulatory Impact Analysis to have ignored the more than 13,000 small vape shop businesses that are reliant on a diverse industry.

VTA incorporates by reference, without repeating verbatim herein, the criticisms of the U.S. Small Business Administration set forth in its comments submitted on this docket on November 27, 2019, a copy of which is attached hereto as Exhibit B. FDA must prepare and publish for public comment an initial regulatory flexibility analysis prior to considering finalizing the Proposed Rule, as FDA's statement that "the proposed rule, if finalized, would generate net benefits or negligible costs for most affected small entities" and would thereby "not have a significant economic impact on a substantial number of small entities" is factually baseless. 84 Fed. Reg. at 50629.

In the Proposed Rule, FDA also invites comments on the accuracy of FDA's estimate of the burden of "reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing each collection of information." 84 Fed. Reg. 50625. FDA states that it estimates that "it will take each respondent approximately 1,500 hours to prepare a PMTA seeking an order from FDA allowing the marketing of a new tobacco product." *Id.* at 50627. FDA estimates an additional 213 hours to prepare an environmental assessment, for a total of 1,713 hours per PMTA application. *Id.*

---

[4] *Supra* note 3 at 351-52.

[5] John Dunham & Associates, THE VAPOR INDUSTRY ECONOMIC IMPACT STUDY (Apr. 29, 2019), available at https://vaportechnology.org/wp-content/uploads/2019/09/Vapor-Industry-Economic-Impact-Study-by-Dunham-Associates-2019-Updated.pdf.

[6] *Supra* note 5.

In reality, this estimate falls far short of the actual burden of preparing and submitting a PMTA. By way of example, in a sworn declaration filed with the United States District Court for the District of Maryland, a representative of JUUL Labs, Inc., one of the largest ENDS manufacturers in the world, testified that the company had some 87 full-time employees working on its PMTA and was dedicating $125 million to the effort.[7] Reynolds American, Inc. has publicly stated that it had over 100 employees, including dozens of Ph.Ds., working on its first PMTA—which was over 150,000 pages—over a series of years.[8] The total number of hours required to prepare and submit a PMTA that complies with FDA's requirements as set out in the Proposed Rule is certainly in the tens of thousands of hours, if not hundreds of thousands, not a mere 1,500 hours as FDA suggests.

Under the Unfunded Mandates Reform Act, FDA must also prepare a written statement assessing the anticipated costs and benefits of any rule that may result in the expenditure by the private sector of $154 million or more in any one year. 84 Fed. Red. 50629. In the Proposed Rule, FDA states that the Proposed Rule "would not result in an expenditure in any year that meets or exceeds this amount" and claims that annual costs would be only $7.05 million. Again, this figure grossly underestimates the annual costs of compliance with the PMTA Rule. VTA expects its manufacturer members alone will spend in excess of $200 million preparing PMTAs in calendar year 2020. By way of example, one VTA member expects to spend more than $15 million preparing PMTAs for just 28 SKUs representing a variety of e-liquid flavors for use in closed-system devices. FDA must comply with its statutory obligation to prepare a written statement assessing the anticipated costs and benefits of the Proposed Rule prior to finalizing the same.

**B. FDA Should Mitigate the Extreme Financial Burden of Preparing a PMTA on Small Businesses by Making Several Modifications to the Proposed Rule's Requirements.**

There are several modifications that FDA must make to the Proposed Rule's requirements to mitigate the extreme financial burden on small businesses of preparing a PMTA.

First, while our manufacturer members appreciate that FDA proposes to allow supplemental applications pursuant to proposed 21 C.F.R. § 1114.15 as a cost-reduction measure, FDA should allow expanded use of such supplemental applications for a broader range of product modifications.

Second, FDA can clarify in the Final PMTA Rule that a marketing order for an aerosolizing apparatus as a whole may also encompass parts and components that are identical replacement or spare parts sold separately without a need for additional testing, provided that the labeling and marketing plans for such parts and components is included

[7] *See* Engelke Declaration, *supra* note 2.

[8] *See* Reynolds, *supra* note 2.

in the PMTA for the aerosolizing apparatus as a whole and that such labeling and marketing makes clear that the parts and components are only intended for use in or with the aerosolizing apparatus that received the marketing order. The sale of replacement components and parts for ENDS devices constitutes a significant part of the business in which the VTA's members, and especially retail vape shops, engage. Because all components and parts of an aerosolizing apparatus that receives a marketing order will have been thoroughly vetted as part of the substantive review process for the entire device, it would be redundant and unduly costly to additionally require separate PMTAs for identical replacement components and parts. Nor would separate PMTAs provide any greater level of protection to public health. Manufacturers should be able to certify that the replacement components and parts are identical to those found in the device in much the same way that e-liquid manufacturers are able to self-certify that their e-liquids contain zero nicotine content.[9]

Third, FDA can include in the final PMTA Rule a defined list of HPHCs for which the different subcategories of vapor products (i.e., e-liquids, open-system aerosolizing apparatuses, closed-system aerosolizing apparatuses) should be tested. In its final PMTA guidance published in June 2019, FDA substantially revised the list of HPHCs for which it recommends testing vapor products, removing eight HPHCs from the original list published as part of the draft PMTA guidance in May 2016, and adding eleven new HPHCs.[10] On August 5, 2019, FDA published a notice in the Federal Register seeking comments on whether acetic acid and acetoin should also be listed as HPHCs for vapor products because of their potential adverse respiratory effects.[11] Applicants require a finalized, defined list of HPHCs for which they are required to conduct aerosol testing, as the alternative will be widely variable testing that will make comparison of products and their potential impacts on the public health that much more difficult.

Fourth, FDA should state in the Final PMTA Rule a preferred "maximum load" testing methodology (including device settings) by which HPHC aerosol testing should be conducted for e-liquids, standard e-liquid formulation(s) for the testing of "open system" devices for HPHCs (including clarifying whether unflavored, base-only e-liquids alone may be used to conduct HPHC testing on an open-system device), and "heavy" and "light" use patterns in terms of volume of aerosol inhaled per day for HPHC testing. In doing so, FDA can indicate approval of specified variations on existing standardized testing methods for aerosol generation, such as CORESTA's recommended method no. 81, *Routine Analytical Machine for E-Cigarette Aerosol Generation and Collection – Definitions and Standard*

---

[9] U.S. Food & Drug Admin., *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28,974, 28,979 (May 10, 2016).

[10] *See* U.S. Food & Drug Admin., Guidance for Industry, Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (June 2019).

[11] U.S. Food & Drug Admin., *Harmful and Potentially Harmful Constituents in Tobacco Products; Established List; Proposed Additions; Request for Comments*, 84 Fed. Reg. 38032-38035 (Aug. 5, 2019).

*Conditions*. In the absence of such defined testing protocols, the HPHC data that applicants will provide FDA will vary widely and make an apples-to-apples comparison of implications for the public health across various products that much more difficult.

Fifth, FDA should state in the final PMTA Rule that human clinical studies are only required for vapor products the HPHCs in the aerosols of which are found to exceed daily exposure action limits as published by the Occupational Safety and Health Administration (OSHA), the California Office of Environmental Health Hazard Assessment (OEHHA), CDC's National Institute for Occupational Safety and Health (NIOSH), the State of California, EPA's Integrated Risk Information System, the American Conference of Governmental Industrial Hygienists (ACGIH), or the American Industrial Hygiene Association (AIHA), as appropriate.

Human trials and *in vitro* studies are two of the most burdensome line items in any PMTA for a vapor product. The estimated costs for human studies for biomarkers of exposure, health effects, pharmacokinetics / pharmacodynamics, and vaping topography for vapor products runs into the millions of dollars. Historically, Phase I, II, and III clinical trial data has been submitted to FDA to provide evidence of the safety and efficacy of products (i.e., drugs, biologics, and medical devices) intended for the diagnosis, treatment, or cure of a disease or health-related condition. Because nothing in the FDCA, as amended by the TCA, requires FDA to determine the absolute safety or the efficacy of a tobacco product when considering a premarket application, a strong rationale exists for not requiring any human trials or *in vitro* studies at all or, alternatively, for significantly limiting the number of participants that may be required for any human trial used to support a premarket application when compared to the numbers of participants typically used in the drug, biologics, and medical device fields. VTA believes that, for products where the HPHCs are under the exposure action limit when tested under normal conditions of use, no human studies should be required at all.

As respects drugs, biologics, and medical devices, pharmacokinetic / pharmacodynamics studies and biomarkers have historically been used within a clinical trial design to determine when and how the medical innovation will have an effect on the target condition. With respect to vapor products, however, FDA's interests are focused on relative product safety compared to combustible cigarettes and emissions toxicology, rather than therapeutic purposes. The standard for approval of a PMTA does not involve efficacy in the same way as is the case for drugs, biologics, and medical devices, and the need and justification for requiring human studies is thus concomitantly reduced. For products whose HPHC levels fall below the action threshold, HPHC testing is more than sufficient to determine product toxicology; there is no need to conduct, for example, separate biomarker studies that, at best, are wholly redundant.

For products whose HPHC levels exceed the threshold, toxicology effects can be demonstrated through less burdensome alternatives to human trials, including animal modeling, product-to-product extrapolation, and reference to peer-reviewed articles. Reference to peer-reviewed articles is an approach that is currently accepted by FDA in the review of 510K applications for medical devices. Result extrapolation is a mathematical approach that is generally accepted by FDA's Center for Biologics Evaluation and Research

("CBER"). Studies developed for the approval of biologics under the Animal Rule (which is used to obtain FDA approval for products that cannot be tested in human clinical trials due to ethical concerns) have used extrapolation of biomarker data on Biological License Applications ("BLAs"). FDA should make explicit in the final PMTA Rule the acceptability of these alternative approaches to human trials—especially as respects biomarkers—to obtain a marketing order for vapor products whose HPHC levels exceed the action limit.

By specifying the HPHC testing methodology that e-liquid manufacturers are required to perform for their products and exempting their products from human clinical studies if the HPHC testing results do not exceed widely accepted daily exposure action limits, FDA can substantially lower the costs of preparing PMTAs for hundreds of manufacturers of e-liquids that are small businesses and ensure a broader variety of vapor products remain available on the market as appropriate for the protection of public health. Lowering the costs of preparing a PMTA so as to encourage more small businesses to submit PMTAs for their products will have the salutary effect of encouraging a culture of compliance for the entire vaping industry.

## III. THE FINAL PMTA RULE MUST ADDRESS THE MANY PRACTICAL OBSTACLES VAPOR PRODUCT MANUFACTURERS CONFRONT TO PREPARING AND SUBMITTING PMTAS THAT CAN BE "FILED" BY MAY 11, 2020.

### A. The PMTA Rule is Silent on When Manufacturers Must File PMTA Applications.

On July 12, 2019, the United States District Court for the District of Maryland, at FDA's urging and based on FDA's sworn court testimony, entered an order requiring FDA to set a highly accelerated ten-month deadline for the submission of PMTAs for newly deemed products—including vapor products—that were on the U.S. market as of August 8, 2016.[12] Since that time, FDA has never through any formal notification, Guidance, or even the Proposed Rule declared that manufacturers must file their applications by May 11, 2020. Moreover, FDA recently filed its Notice of Appeal of the Maryland District Court's opinion indicating that FDA is challenging the very court ruling that vacated FDA's August 2017 Guidance which had set August 2022 as the PMTA deadline. It is imperative that FDA expressly provide notice to all manufacturers of the date by which all PMTA applications must be filed with FDA for vapor products currently on the market to remain on the market.

### B. Assuming FDA Imposes A May 2020 PMTA Deadline, the Proposed Rule Fundamentally Fails to Provide A Clear or Meaningful Pathway with Which to Comply.

Absent significant modifications to the Proposed PMTA Rule—and particularly the requirements for "filing" an application found in proposed 21 C.F.R. § 1114.27(b)—the "mass market exit" of vapor products of which Director Zeller warned is likely to come to

[12] *Am. Academy of Pediatrics v. FDA*, 2019 U.S. Dist. LEXIS 116003 (D. Md. July 12, 2019) (Grimm, J.).

pass. CTP Director Zeller observed in his sworn declaration filed in the *American Academy of Pediatrics* case that:

> [M]ass market exit of [vapor] products would limit the availability of a potentially less harmful alternative for adult smokers seeking to transition or stay away from combustible tobacco products. Dramatically and precipitously reducing availability of these products could present a serious risk that adults, especially former smokers, who currently use ENDS products and are addicted to nicotine would migrate to combustible tobacco products. . . . [Such a] mass market exit . . . could adversely affect the public health."[13]

As VTA has emphasized in a lawsuit that it filed in the United States District Court for the Eastern District of Kentucky, *Vapor Technology Association, et al. v. FDA, et al.*, Case No. 5:19-cv-330-KKC (filed August 14, 2019), the grossly accelerated May 11, 2020 deadline presents many practical obstacles to vapor product manufacturers' ability to prepare "high quality" PMTAs by the new deadline of May 11, 2020, including PMTAs that would meet the minimal requirements for "filing" as proposed by FDA under the Proposed Rule. Prior to finalizing the PMTA Rule, FDA must account for these practical obstacles by providing manufacturers further flexibility for the acceptance and "filing" of PMTAs with less than complete information for newly deemed vapor products prior to the May 11, 2020 deadline and greater liberality in the supplementation of applications with additional supporting data and information after that date.

### C. Proposed 21 C.F.R. § 1114.27(b)'s "Filing" Requirements Fail to Account for Multiple Limitations on Manufacturers' Abilities to Meet Those Requirements by May 11, 2020.

Under the Proposed Rule's proposed 21 C.F.R. § 1114.27(b), FDA indicates that it will make a threshold determination of whether an application contains sufficient information to permit substantive review. Only if an application's existing contents satisfy this threshold review will an application be considered "filed." Proposed § 1114.27(b)(1) sets forth the requirements for an application to be eligible to be "filed" as a precursor to substantive review. 84 Fed. Reg. at 50655.

FDA seeks public comment on whether the information threshold requirements in proposed 21 C.F.R. § 1114.27(b)(1)(ii) would best be included in the final rule as a "request" or as a "requirement," as well as on how these requirements relate to other specific provisions of the FDCA. In the preamble to the Proposed Rule, FDA appears to propose the latter approach, stating that "[a]n applicant submitting a PMTA to FDA should include all information required to be in a PMTA as part of its initial submission." 84 Fed. Reg. 50566, 50577. VTA is particularly concerned about this requirement because of FDA's comment that "few [PMTAs submitted to date] have contained sufficient information to reach substantive review." *Id.* at 50567.

[13] Declaration of Mitchell Zeller, FDA CTP Director, Doc. No. 120-1, *Am. Acad. of Pediatrics, et al. v. FDA, et al.*, No. 8:18-cv-883-PWG (D. Md. June 12, 2019), at ¶¶ 15, 22.

In the Proposed Rule, FDA indicates that it will likely refuse to file a PMTA if, *inter alia*, the PMTA fails to include:

(1) testing data for harmful and potentially harmful constituents (HPHCs) that can be delivered by the vapor product, a description of why the HPHCs that were tested are appropriate for the type of product, and why it was appropriate for the applicant to not test for other HPHCs, *id*. at 50585;

(2) product storage and stability information to establish the microbial and chemical stability of the vapor products throughout the stated shelf life, *id*. at 50595-96; and

(3) an analysis of the health risks of the subject vapor product not just compared to combustible cigarettes, but also compared to other vapor products within the same category and subcategory (i.e., a comparison of the subject e-liquid to another e-liquid), *id*. at 50600-02, including:

(a) study data concerning the pharmacological profile of the subject product, *id*. at 50602-03;

(b) study data on the abuse liability of the subject product, *id*. at 50604, the "standard" study for which is a "double-blind, placebo-controlled, within-subject study comparing several doses of a new product to a comparator product with a known abuse liability," *id*. at 50604;

(c) study data on product use topography, frequency, and use trends over time; *id*. at 50604-05, which, based on the current state of the vapor product literature, must be gathered through a product-specific clinical study;

(d) survey and/or focus group study data on the likelihood of changes to tobacco use by current nonusers of tobacco products, *id*. at 50605-06; and

(e) actual use human factors studies, including use conditions, use-related hazards, and potential unintended uses, *id*. at 50607.

These requirements, which FDA proposes repeatedly in the Proposed Rule to be prerequisites for a PMTA to be "filed," wholly fail to account for the extremely limited time and laboratory resources available to vapor product manufacturers prior to the May 11, 2020 PMTA filing deadline.[14]

[14] For an expert discussion of the significant obstacles posed by FDA's failure to identify or establish any specific HPHC testing methodology, the lack of adequate lab resources to complete HPHC testing by May 11, 2020, the technological limitations on detecting some HPHCs, and the lack of available lab capacity and time

### 1. Proposed 21 C.F.R. § 1114.27(b) fails to account for FDA's failure to identify or establish any specific HPHC testing methodology.

First, as regards the HPHC aerosol testing that the Proposed Rule demands, FDA has never published an acceptable methodology or protocol to conduct aerosol testing on ENDS devices or e-liquids, including a standard device or device setting for the testing of e-liquids, standard e-liquids for the testing of "open system" devices, or "heavy" or "light" use pattern protocols, nor has FDA identified any particular puff profile standard developed by another body, such as CORESTA, that FDA believes would be generally appropriate for vapor products. In the Proposed Rule, FDA merely states that "[t]he constituent testing should reflect the various conditions under which consumers may use the product (*e.g.*, light use, typical use, and heavy use) and the types of products that consumers are likely to use in conjunction with the product." *Id*. at 50585. FDA recommends that e-liquids be tested in a "representative sample of e-cigarettes" in which they may be used, *id*. at 50597, and that open system e-cigarettes be tested "with a variety of e-liquids that consumers are likely to consume using the e-cigarette," *id.* at 50585.

The absolute lack of a uniform testing protocol dictates that each applicant will be required to spend hundreds of thousands, if not millions, of dollars to devise and implement its own HPHC aerosol testing methodology and hope that it will be deemed acceptable by FDA. This guessing game created by FDA is not a sufficiently specific rule to be helpful to manufacturers, and, instead, will substantially increase their costs of testing—additional costs that will be devastating to the many e-liquid manufacturers that are small businesses. VTA requests that, in the interests of public health and having consistent data presented to FDA by every manufacturer seeking to comply, FDA specify the HPHC aerosol testing methodologies that applicants should employ in conducting tests submitted pursuant to the final PMTA Rule.

### 2. Proposed 21 C.F.R. § 1114.27(b) fails to account for the lack of available lab capacity to conduct and complete HPHC aerosol testing by May 11, 2020.

Second, there are simply not enough labs or lab space to conduct and complete the volume of aerosol HPHC testing demanded by the Proposed PMTA Rule by May 2020. There are only approximately six laboratories with meaningful vapor aerosol testing experience which are compliant with FDA's good laboratory practices regulations in the United States, Canada, and the United Kingdom. These laboratories do not yet have independently validated testing methodologies or assays for detecting and quantifying all of the HPHCs found in FDA's recommended list for ENDS that was published as part of FDA's Final PMTA Guidance on June 11, 2020. There simply is not sufficient capacity for all interested vapor product manufacturers to conduct the necessary HPHC aerosol testing by

---

to complete human studies by May 11, 2020, see the Declarations of Dr. Stacey Benson filed on September 2, 2019, and November 8, 2019, in *Vapor Technology Association, et al. v. FDA, et al.*, Case No. 5:19-cv-330-KKC, copies of which are attached hereto as Exhibits C and D.

the May 2020 deadline. Despite being aware of the paucity of lab space for more than one year (as VTA wrote to FDA in December 2018 to raise these same concerns), FDA's Proposed Rule fails to acknowledge that the required tests cannot be completed by May 2020, particularly given that FDA's final list of HPHC constituents has yet to be settled.

**3. Proposed 21 C.F.R. § 1114.27(b) fails to account for technological limitations on the detection of some HPHCs.**

Third, the currently available laboratory equipment is not sufficiently sophisticated to determine whether, for particular HPHCs, the exposure level amounts detected in the aerosol exceed the threshold levels of toxicological concern specified by FDA and/or other agencies. The limits of detection with currently available equipment are substantially greater than the general population-level threshold levels of concerns for several HPHCs, meaning that laboratories cannot meaningfully determine whether HPHCs emitted in the aerosol from such products exceed the threshold levels of concern.

**4. Proposed 21 C.F.R. § 1114.27(b) fails to account for the lack of available lab capacity and time to conduct and complete human studies by May 11, 2020.**

Fourth, despite the Proposed Rule's requirement that, to be filed, PMTAs include data from human studies on the vapor product's pharmacological profile, abuse liability, use topography, frequency, and trends over time, effects on current nonusers, and human factors, there is insufficient capacity at qualified clinical laboratories to conduct and complete the requisite complex human clinical studies for the wide variety of vapor products on the market prior to May 2020. In the United States, there are only six or fewer clinical laboratories with the expertise and experience to execute the types of clinical studies required by the Proposed Rule. Further, such studies typically take at least 12 to 24 months to properly design, receive institutional review board approval, execute, perform data analysis, and report in a format appropriate for FDA review.

**D. An Alternative Flexible, "Phased" Approach to Satisfying the "Filing" Requirements and Supplementing with Additional Information as It is Developed is Required.**

To give vapor product manufacturers a realistic, good faith opportunity to demonstrate that the marketing of their products is appropriate for the protection of the public health such that their products can remain on the market without being subject to potential civil or criminal enforcement action, FDA must transparently establish a more flexible, phased "filing" policy with respect to PMTAs that are submitted by the May 11, 2020 deadline. FDA should thus, *inter alia*, identify the health risk, abuse liability, consumer use pattern, dual use, cessation, initiation, and use intention information identified in proposed 21 C.F.R. § 1114.27(b)(1)(ii) as a "request" instead of as a requirement. A flexible, phased approach would emphasize meeting the statutory requirements found in Section 910(b)(1)(B)-(F) of the FDCA as "Phase 1" of the PMTA submission, leading to acceptance and "filing" of the PMTA and an initial substantive

review, followed by the submission of further data that will take more time to develop as "Phase 2," including the health risk reporting information described in Section 910(b)(1)(A) of the FDCA.

### 1. FDA should accept and file initial PMTAs with only select information that satisfies the statutory requirements.

FDA should amend proposed 21 C.F.R. §§ 1114.7 and/or 1114.27 to provide that so long as a vapor product manufacturer submits a PMTA that provides the following information dictated by Section 910(b)(1)(B)-(F) of the FDCA by May 11, 2020, the PMTA will be accepted and "filed" by FDA:

(1) the general information described in proposed 21 C.F.R. § 1114.7(c)(1)-(8), (11) (i.e., all requirements of proposed § 1114.7(c) except the brief statement regarding how the PMTA satisfies the content requirements of Section 910(b)(1) of the FDCA, as found in proposed 21 C.F.R. § 1114.7(c)(9), and the brief description of how marketing of the vapor product would be appropriate for the protection of the public health, as found in proposed 21 C.F.R. § 1114.7(c)(10), which, as discussed below, would be provided as part of "Phase 2");

(2) the descriptive information described in proposed 21 C.F.R. § 1114.7(d);

(3) the product samples described in proposed 21 C.F.R. § 1114.7(e);

(4) the product labeling and product marketing plans developed by the time of filing described in proposed 21 C.F.R. § 1114.7(f);

(5) the environmental assessment described in proposed 21 C.F.R. § 1114.7(g) and statement of compliance with the requirements of 21 C.F.R. Part 25, including 21 C.F.R § 25.40;

(6) the product formulation information described in proposed 21 C.F.R. § 1114.7(i), **except for** (i) harmful and potentially harmful constituents (HPHCs) as described in 21 C.F.R. § 1114.7(i)(1)(v), for which applicants must be allowed a reasonable amount of time to obtain further clarity from FDA on appropriate HPHC testing regimens, to conduct HPHC testing, and to report relevant data to support the application; and (ii) storage and stability testing information, as described in 21 C.F.R. § 1114.7(i)(2)(vi), for which applicants must also be allowed a reasonable amount of time to conduct studies and generate results for submission in support of their applications;

(7) the manufacturing information described in proposed 21 C.F.R. § 1114.7(j); and

(8) the certification statement described in proposed 21 C.F.R. § 1114.7(m).

### 2. FDA should not require certain information be filed with initial PMTA submissions but should only require such after acceptance, "filing," and initial substantive review of the PMTA.

Given the practical limitations on, if not impossibility of, vapor products manufacturers' abilities to conduct the product testing and studies required by the Proposed Rule, it is neither feasible nor equitable to demand that vapor product manufacturers complete all requirements by May 11, 2020, for their PMTAs to be accepted and "filed" by FDA. To that end, FDA should institute a phased approach in which, after acceptance and filing, the Office of Science reviews the information outlined in Section B.1. above. Once that information is reviewed, and after companies have cleared Phase 1, companies should be required to submit the following additional information during the substantive review phase:

(1) the brief statement regarding how the PMTA satisfies the content requirements of Section 910(b)(1) of the FDCA described in proposed 21 C.F.R. § 1114.7(c)(9);

(2) the brief description of how marketing of the vapor product would be appropriate for the protection of the public health described in proposed 21 C.F.R. § 1114.7(c)(10);

(3) the HPHC data described in proposed 21 C.F.R. § 1114.7(i)(1)(v);

(4) the storage and stability testing information described in proposed 21 C.F.R. § 1114.7(i)(2)(vi)

(5) the health risk investigations information described in proposed 21 C.F.R. § 1114.7(k), including limited behavioral studies and label comprehension studies but excluding, as noted in Section II.B., above, human biomarker studies (unless HPHCs exceed daily exposure action limits) and human inhalation / vaping topography studies;

(6) the analysis and discussion regarding the vapor product's anticipated effect on the population as a whole as described in proposed 21 C.F.R. § 1114.7(l);

(7) the complete summary described in proposed 21 C.F.R. § 1114.7(h) (because of the inability to include the various categories of information described immediately above); and

(8) a further certification statement or statements of the type described in proposed 21 C.F.R. § 1114.7(m).

To be clear, to properly accommodate the practical restrictions and obstacles that vapor product manufacturers face when attempting to prepare and submit their PMTAs by May 11, 2020, FDA should accept and "file" applications that do not include the eight above-referenced categories of information.

As part of its review, FDA should allow applicants a reasonable period of time to *supplement* their PMTAs with the above-referenced categories of additional information. What amount of time may be considered "reasonable" to supplement an application should be determined by FDA through communication with each applicant, taking into consideration factors such as:

(i) the applicant's own efforts or engagement of contract research organizations to perform a literature review and analysis to develop the health risk investigations information described in proposed 21 C.F.R. § 1114.7(k) and the product's anticipated effect on the population as a whole as described in proposed 21 C.F.R. § 1114.7(l);

(ii) the applicant's engagement of a contract research organization (i.e., aerosol testing laboratory) to conduct HPHC testing to generate the HPHC data described in proposed 21 C.F.R. § 1114.7(i)(1)(v); and, *subsequently*,

(iii) the applicant's efforts to secure guidance from or a meeting with FDA's Office of Science to discuss any proposed human subject studies (i.e., survey and/or clinical studies) and, subsequently, the applicant's engagement of a contract research organization (i.e., survey expert or clinical laboratory) to conduct human subject studies to generate the health risk investigation data described in proposed 21 C.F.R. § 1114.7(k) and population effects information described in proposed 21 C.F.R. § 1114.7(l).

This flexible, phased approach to "filing" PMTAs under proposed 21 C.F.R. § 1114.27(b) is consistent with FDA's statement that "**[t]he main focus of the proposed rule's content requirements is the threshold amount of information necessary for application filing, rather than every piece of information necessary to receive a marketing order** both because FDA is still gaining experience in applying the authorization standard to PMTAs and because at this time, FDA believes applicants have some flexibility in the types of scientific information they can submit in order to provide sufficient health risk information to meet the standard." 84 Fed. Reg. at 50567 (emphasis added).

By proceeding in this fashion, FDA can best ensure that the prejudice to vapor product manufacturers of the accelerated filing deadline is minimized while FDA is also receiving as much data and information about the subject vapor products by May 11, 2020, as possible. Absent conversion to a more flexible "filing" threshold and phased approach, virtually all vapor product manufacturers – except several Big Tobacco companies – will be unable to meet the strict "filing" criteria set forth in proposed 21 C.F.R. § 1114.27(b)(1)(ii) and, given the accelerated filing deadline, will be forced to either remove their products from the market as adulterated in violation of Section 902(6) of the Food, Drug & Cosmetic Act, 21 U.S.C. 387b(6), *see* 21 U.S.C. § 331(a), (c), (g), or run the risk of enforcement action by the Office of Compliance and Enforcement, including potential civil monetary penalties or criminal penalties under 21 U.S.C. § 333.

## IV. VTA ENCOURAGES FDA TO MAKE ADDITIONAL MODIFICATIONS IN THE FINAL PMTA RULE THAT WILL PROVIDE GREATER CLARITY AND HELP MAKE THE PATHWAY ACCESSIBLE TO MORE THAN A HANDFUL OF THE LARGEST COMPANIES.

In addition to the above-listed recommendations necessitated by the heavily accelerated May 11, 2020 PMTA filing deadline and the excessive costs to prepare and submit a PMTA under the Proposed Rule, VTA also respectfully submits the following recommendations regarding various discrete subparts of the Proposed Rule:

### A. Container Closure System Definition.

In proposed 21 C.F.R. § 1114.3, FDA proposes to define a "container closure system" as "any packaging materials that are a component or part of the tobacco product." In its commentary, FDA explains that "[a] container closure system is a component or part of a tobacco product because of its potential to alter or affect the performance, composition, constituents, or other physical characteristics of the product." 84 Fed. Reg. at 50575. However, the definition of a "component or part" is not so limited and also includes an "assembly of materials . . . to be used with or for the human consumption of a tobacco product." *Id*. at 50636.

VTA recommends amending the definition of a container closure system to clarify that the definition includes only components or parts ***with the potential*** to alter or affect the performance, composition, or constituents of a tobacco product. Such an amendment is necessary to clarify that, by way of example, for aerosolizing apparatuses, any component or part that does not have contact with either the e-liquid or the aerosol generated after the e-liquid is heated (i.e., the plastic casing around the battery) is not considered to be part of container closure system so as to make clear that extractables and leachables testing is only required of those materials found in the components or parts that actually have contact or potential contact with the e-liquid or aerosol itself. *See*, *e.g.*, *id.* at 50601 (requiring toxicological analysis of any extractables and leachables from the container closure system).

### B. Material Description in Product Formulation

Proposed 21 U.S.C. § 1114.7(i)(1)(ii) would require an applicant to describe in its PMTA all materials in the product, including the material name, a description of its location in the product, the function of the material, the quantities (including ranges or means and acceptance limits) of the material(s), and the specifications (including quality / grades) and suppliers used for the material. 84 Fed. Reg. at 50644. VTA suggests that FDA clarify that, as regards vaping aerosolizing apparatuses (i.e., devices), the requirement to set forth material quantities (including ranges or means and acceptance limits), specifications (including quality grades), and suppliers applies only to materials found in those components or parts are reasonably expected to have contact with the e-liquid (i.e., the wick, coil, tank, etc.), and that such detailed reporting with respect to other materials that are used in the device is not required for other materials found in the device, such as

exterior plastic casing, electronic circuitry, and batteries. This clarification would align the material description with FDA's current guidance on the listing of ingredients for e-liquids under Section 904(a)(1) of the FDCA,[15] as well as common practice regarding the scope of extractables and leachables testing of aerosolizing apparatus components.

### C. Harmful or Potentially Harmful Constituent (HPHC) Definition.

In proposed 21 C.F.R. § 1114.3, FDA proposes to define "harmful or potentially harmful constituent or HPHC" not by reference to a defined list, but instead as "any chemical or chemical compound in a tobacco product or tobacco smoke or emission that: (1) is or potentially is inhaled, ingested, or absorbed into the body, including as an aerosol or any other emission; and (2) causes or has the potential to cause direct or indirect harm to users or nonusers of tobacco products." 84 Fed. Reg. at 50636. As discussed above, despite specifying in its commentary that an application "would not be required to contain testing for all HPHCs on the initial list," but should "contain a description of why the HPHCs that were tested are appropriate for the type of product," *id*. at 50585, FDA has not yet finalized a definite list of HPHCs for which it requires vapor products to be tested, nor the recommended methodologies for the same. VTA respectfully requests that FDA include a list of specified HPHCs for which vapor products must be tested in the definition of "harmful or potentially harmful constituent or HPHC" or in some other provision of the final PMTA Rule and the required methodologies for testing the same.

### D. Product Bundling.

In its commentary associated with the format of a PMTA, FDA states that "[a]n applicant may . . . submit a single premarket submission for multiple products (i.e., a bundled PMTA) and a single, combined cover letter and table of contents across all products. VTA requests that, in the final PMTA Rule, FDA formally clarify (as it has already done informally in workshops for industry stakeholders) that e-liquid manufacturers and manufacturers of closed-system devices may "bundle" applications for multiple flavors of e-liquid that share common nicotine strengths, package sizes, PG/VG ratios, or other characteristics.

### E. Marketing Plans.

VTA generally supports FDA's requirement in proposed 21 C.F.R. § 1114.7(f)(2) to require manufacturers to submit marketing plans to FDA as an integral part of the PMTA, as VTA strongly believes that appropriate marketing of vapor products that targets adult cigarette smokers can not only prevent widespread youth initiation but also provide a net benefit to public health by moving cigarette smokers to less harmful vapor products. VTA is concerned, however, that given that rapidly accelerated deadline of May 11, 2020, for vapor product manufacturers to prepare and submit PMTAs, many manufacturers will not yet have detailed marketing plans for their products in place by the filing deadline that

---

[15] *See* U.S. Food & Drug Admin., Guidance for Industry, *Listing of Ingredients in Tobacco Products*, at 6-7 (Nov. 2018), available at: https://www.fda.gov/media/101162/download.

include such information as media and distribution channels, specific tactics, total dollar amounts of media buys and marketing and promotional activities, and timing for the same, as contemplated by the Proposed Rule. *See* 84 Fed. Reg. 50581. While the Proposed Rule contemplates this possibility insomuch as it makes allowance for applicants to state that they have "not developed marketing plans by the time of submission," 84 Fed. Reg. at 50643, VTA encourages FDA to make clear in the final PMTA Rule that FDA will provide manufacturers substantial flexibility to supplement their PMTAs with detailed marketing plans for a reasonable time after the PMTAs are filed and during the substantive review process. To the extent that FDA finds material or tactics in proposed marketing plans that are cause for concern, VTA requests that FDA allow applicants a reasonable opportunity to file appropriate amendments to their marketing plans through the amendment process prior to issuing a potential no marketing order based on the initial marketing plan submitted.

### F. Additional Design Parameters.

FDA has requested comment on the potential additional design parameters recommended to be provided for ENDS (Table 19a) and e-liquids (Table 20). *See* 84 Fed. Reg. at 50594-95. It is VTA's view that the costs associated with generating the test data that would be required for these additional design parameters would far exceed the potential marginal benefit of such data to the overall determination of whether the vapor product at issue is appropriate for the protection of the public health. By way of example, as regards battery and electrical circuitry components, VTA anticipates that many manufacturers will have products that will have already received a certification of compliance with the UL 8139 standard, thus providing strong confidence in the specific operating ranges of the battery and rendering a requirement to submit such data for review by FDA superfluous.

Similarly, although particle number concentration, count median diameter, and PM2.5 may be relevant to lung and cardiovascular function, there can be no serious scientific debate that the aerosolized liquid chemicals generated by vapor products are far less harmful to overall lung and cardiovascular function than the solid state particles deposited deep into the lungs by combustible cigarettes, which is the relevant reference product when determining whether, generally speaking, the marketing of vapor products is appropriate for the protection of the public health.[16] VTA encourages FDA to not impose the additional cost of providing data on the additional design parameters set forth in Tables 19a and 20a on top of the already-multi-million dollar cost of submitting a single PMTA.

[16] *See*, *e.g.*, National Academies of Sciences, Engineering, and Medicine, PUBLIC HEALTH CONSEQUENCES OF E-CIGARETTES at Section I, 72-74 (2018) ("E-cigarette aerosol particulates consist largely of aqueous droplets and vapors of humectants, either PG or glycerol, whereas particulates in combustible tobacco smoke are complex, largely organic constituents that contain polycyclic aromatic hydrocarbons and a variety of other known or suspected carcinogens. Thus, it would be incorrect to assume that the long-term health risks of the two aerosols were similar just because particle count was similar").

### G. Storage and Stability Studies.

Given the limited laboratory capacity for conducting such studies prior to the May 11, 2020 deadline, VTA requests that FDA clarify in the final PMTA Rule that applicants may supplement or amend their applications to provide storage and stability study data during the substantive review process even if such is not available at the time the application is filed and that the failure to have a storage and stability study already underway at the time the application is submitted will not be grounds for a refusal to file determination. VTA is appreciative of FDA's apparent recognition that the accelerated May 11, 2020 deadline for filing PMTAs provides insufficient time to conduct full storage and stability studies and FDA's indication that accelerated studies, combined with basic stability information, may be used to support tentative expiration dates provided full shelf life studies are not available and are being conducted. *See* 84 Fed. Reg. 50596. However, the clarification requested above is necessary to allow manufacturers to properly plan and execute the required studies.

### H. Statement of Principles of Operation.

As regards the full statement of the principle or principles of operation in proposed 21 C.F.R. § 1114.7(i)(3), FDA requests comment on appropriate metrics for determining what should constitute a single unit for various product types and whether FDA should require the average time for all users to consume a single unit of the product, the median time to consume a single unit, or the range of time it takes users to consume a single unit. 84 Fed. Reg. at 50597. VTA respectfully submits that, for purposes of considering a closed-system vapor product, a single unit should consist of either the amount of e-liquid with which the product has been pre-filled or the amount of e-liquid in a single pod or cartridge for use with that vapor product. As regards an open system vapor product, a single unit should consist of the amount of e-liquid required to fill the reservoir, or tank, for that product. For bottled e-liquids, VTA suggests that a single unit should consist of 2 mL of e-liquid, regardless of the amount found in the container closure system. FDA should also consider the median time to consume a single unit, rather than average time or the range of time it takes users to consume a single unit.

### I. Health Risk Investigations

Proposed 21 C.F.R. § 1114.7(k)(1) requires an applicant to provide full reports of all information published or known to, or which should reasonably be known to, the applicant regarding health risks of the product. 84 Fed. Reg. at 50650. As regards such reports, FDA indicates that "[w]hile a PMTA "must contain substantive information regarding certain categories of information set forth in § 1114.27(b)(i)(ii) to be filed by FDA . . . an applicant has some flexibility in determining how to use existing information to support a PMTA for their product and what types of additional investigations it may need to conduct to provide FDA with information that demonstrates that permitting the marketing of its new tobacco product would be APPH." 84 Fed. Reg. at 50599. FDA also states that "the proposed rule is not requiring applicants to conduct these studies beyond what may be necessary to meet the filing requirements set forth in proposed § 1114.27(b)(1)(ii). *Id*. Finally, FDA states

that the proposed rule would not require an applicant to conduct any of its own studies for the purposes of the proposed application acceptance and filing requirements "except as may be necessary to meet the filing requirement of proposed (*sic*) § 1114.27(b)(2)(ii)." *Id*. Proposed 21 C.F.R. § 1114.27(b)(2), to which the preceding sentence presumably relates, provides that if FDA refuses to file an application, FDA will issue a letter to the applicant identifying the deficiencies that prevented FDA from filing the application. 84 Fed. Reg. at 50655.

FDA's discussion of proposed 21 C.F.R. § 1114.7(k)(1) and its cross-reference to proposed 21 C.F.R. § 1114.27(b)(1)(ii) is unclear as regards the health risk investigation information that a PMTA for an ENDS product must contain to be eligible to be "filed" by FDA, particularly by the May 11, 2020 deadline. By way of example, in proposed § 1114.27(b)(1)(ii)(B), FDA states that a PMTA must contain information regarding comparative health risks of the subject project and other tobacco products in the same category or subcategory, 84 Fed. Reg. at 50655, and suggests that a manufacturer of an e-liquid compare the subject product to other e-liquids used in a similar manner, 84 Fed. Reg. at 50600; *see also id*. at 50603-04 (same). However, given the relative immaturity of the scientific literature surrounding the health risks of stand-alone e-liquids in all of the areas suggested by FDA in proposed 21 C.F.R. § 1114.7(k)(1)(i)(A)-(C), and the fact that no PMTA has ever been approved for a vapor product, including an e-liquid, it is not at all clear that applicants can submit sufficient information about another vapor product in the same subcategory in a PMTA to be filed by May 11, 2020.

Nothing in Section 910(b)(1)(A) of the FDCA requires an applicant to include in its PMTA health risk information comparing the product to another product in the same category or subcategory, as opposed to whether the subject product "presents less risk than *other* tobacco products" (emphasis added). VTA proposes that FDA make clear that, to be filed by May 11, 2020, a vapor product manufacturer need not submit health risk investigation information regarding another vapor product in the same category or subcategory, but that merely submitting health risk information comparing the vapor product to a combustible cigarette will be sufficient for the PMTA to be eligible for filing, and that the need for any required health risk investigations addressing other vapor products in the same product category or subcategory can be determined in communications between the applicant and the Office of Science as part of the substantive review of the application on a case-by-case basis or as part of post-market surveillance requirements (which would be the most appropriate option given the relative immaturity of the scientific literature on vapor products in many areas). It may be that FDA has attempted to do that through its statement at 84 Fed. Reg. 50602 that "if an application does not contain . . . a comparison of the health risks [of the new tobacco product] compared to other tobacco product categories, FDA intends to refuse to file a PMTA." However, omitting any reference from studies of tobacco products in the *same* category or subcategory from the preceding sentence (i.e., exclusion by omission) is not nearly as clear as stating affirmatively that an application need not contain a comparison of the health risks of the subject product to other products in the same category or subcategory for the application to be filed. At least for purposes of filing, FDA should make clear that health

risk information comparing the subject product to a combustible cigarette alone is sufficient.

As regards abuse liability information, FDA states that "applications need to contain only a threshold amount of abuse liability information under proposed § 1114.27(b)(2)(ii) to be filed," and references a double-blind, placebo-controlled, within-subject study comparing several doses of a new product to a comparator product with a known abuse liability. Again, because abuse liability information on vapor products may need to be gathered through clinical studies, FDA should make clear that limited reliance on existing published literature regarding abuse liability will be sufficient for vapor product PMTAs to be eligible to be filed by the May 11, 2020 deadline.

Similarly, proposed 21 C.F.R. § 1114.7(k)(ii)(C) would require a PMTA to contain information regarding the likelihood that users will use the subject product in conjunction with other tobacco products. This is another area where post-market surveillance is likely to be a more reliable and accurate source of data than the limited existing scientific literature and FDA should not refuse to file an application if it does not include extensive discussion of the likelihood of long-term poly-tobacco product use with respect to the subject vapor product.

**J. Amendments.**

VTA is appreciative of the fact that FDA has made allowance for a process whereby applicants may submit additional information in support of a PMTA through the amendment process permitted by proposed 21 C.F.R. § 1114.9, and that FDA explicitly contemplates that long-term clinical study data, to the extent it is required at all, would be submitted through a supplemental amendment. *See* 84 Fed. Reg. at 50619. As the comments above illustrate, VTA expects that the amendment process will have to be heavily utilized by vapor product manufacturers to significantly supplement their applications submitted by May 11, 2020, which, by virtue of the highly abbreviated timeline to prepare them, will necessarily be incomplete as of that date.

In addition to clarifying that products for which partial or incomplete PMTAs are submitted by May 11, 2020, will not be subject to enforcement action so long as the applicants are making good faith and reasonable progress toward completing the applications, as discussed above, as regards proposed 21 C.F.R. § 1114.9, FDA should also make clear that, after the acceptance phase of a PMTA for a vapor product, FDA will be willing to communicate to an applicant any deficiencies that would prevent the application from being "filed" and allow the applicant a reasonable period of time to submit amendments to cure those deficiencies prior to refusing to file the application.

Given the general uncertainty surrounding PMTAs for vapor products, VTA anticipates that such flexibility regarding potential amendments will be required for many manufacturers to ensure that their applications have sufficient information to be eligible for filing (and, of course, to have sufficient time to develop and submit the necessary information as well). Given the highly accelerated May 11, 2020 filing deadline, it will do

vapor product manufacturers little good if FDA limits its communication of the need for supplemental information through the amendment process only to those applications that have already cleared the very high bar of being "filed" and undergoing substantive review, as opposed to also allowing such supplementation through amendment of those applications that have been accepted, but not yet filed. FDA should also make clear that an applicant may submit an amendment at any time to provide any additional information that the applicant believes would further support its PMTA or clarify the information previously submitted in support thereof.

The Proposed Rule is also unclear as to the standard for distinguishing between a "major amendment," as described in proposed 21 C.F.R. § 1114.9(b)(1), and a "minor amendment" as described in proposed 21 C.F.R. § 1114.9(b)(2). 84 Fed. Reg. at 50652. The only standard described is that major amendments will required "substantial FDA review time," with examples of major amendments including "substantial new data from a previously unreported study, detailed new analyses of previously submitted data or substantial new manufacturing information," and examples of minor amendment including "clarifications or other information that FDA needs to complete its review of a PMTA." 84 Fed. Reg. at 50610 – 50611. To provide greater clarity regarding the distinction between "major" and "minor" amendments, VTA suggests that, in the preamble to the final PMTA Rule, FDA provide specific examples from its previous experience with PMTAs and/or substantial equivalence reports of amendments that have either been requested by FDA or unilaterally submitted by applicants and which FDA would categorize as "major" or "minor" under the 21 C.F.R. § 1114.9 standard.

Finally, FDA should also clarify in the final PMTA Rule that, so long as the Office of Science understands that an applicant is in the process of gathering additional data in support of a planned amendment (whether specifically requested by FDA or indicated to be forthcoming by the applicant), CTP's Office of Compliance and Enforcement will exercise its discretion to not take enforcement action against the subject product if the product was on the market as of August 8, 2016, even if the 12-month period for substantive review of the application specified by the Maryland District Court's July 12, 2019 order[17] has expired.

## V. IN THE EVENT THAT THE MARYLAND DISTRICT COURT'S REMEDY ORDER IS VACATED, THE PMTA SUBMISSION DEADLINE SHOULD BE NO SOONER THAN 24 MONTHS AFTER PUBLICATION OF THE FINAL PMTA RULE.

Finally, in the event that the United States Court of Appeals for the Fourth Circuit vacates the Maryland District Court's July 12, 2019 remedy order from the *American Academy of Pediatrics* case, 2019 U.S. Dist. LEXIS 116003, that incorporated FDA's suggested 10-month deadline, but not that court's May 15, 2019 summary judgment order,

[17] *See Am. Academy of Pediatrics*, 2019 U.S. Dist. LEXIS 116003, at *12 (ordering, *inter alia*, that "[n]ew Products for which applications have been timely filed may remain on the market without being subject to FDA enforcement actions for a period not to exceed one year from the date of application while FDA considers the application").

and the issue of the PMTA submission deadline for newly deemed tobacco products is remanded back to FDA for its consideration, VTA urges FDA to impose a new deadline no earlier than twenty-four (24) months after the final PMTA Rule is published in the *Federal Register*. In the event FDA fails to make the substantial changes VTA proposes above regarding a phased approach that, for example, eliminates the need for human biomarker and inhalation / topography studies, twenty-four months is the minimum time needed for manufacturers to conduct the necessary product testing and complete the non-clinical and clinical studies necessary to present a complete, high-quality PMTA that would satisfy the filing review standards (which VTA maintains FDA should finalize as "requests" instead of "requirements") set forth in proposed 21 C.F.R. § 1114.27(b)(2).

## VI. CONCLUSION

The final PMTA Rule must properly account for the crushing financial burden that PMTAs place on small business manufacturers of e-liquids and vapor products and make reasonable accommodations to ensure that the small businesses that created the innovation that has historically characterized and grown the vapor industry have as fair of an opportunity to obtain a marketing order as large, publicly traded tobacco companies. To that end, the proposed PMTA Rule must include greater explicit flexibility on the requirements for a PMTA to be "filed" by May 11, 2020, and, through a phased approach, explicitly allow vapor product manufacturers to supplement their applications with additional data and information after greater clarity is provided by FDA on HPHC aerosol testing methodologies, more time is allotted for storage and stability testing data to be developed, and applicants have a reasonable opportunity to coordinate with the Office of Science on proposed health risk investigations.

Respectfully submitted,



Tony Abboud
Executive Director
Vapor Technology Association



F-018607

# Exhibit A

# The Vapor industry
# Economic Impact Study

## Methodology and Documentation
## Prepared for:

VAPOR TECHNOLOGY ASSOCIATION

## Vapor Technology Association

## By

JOHN DUNHAM & ASSOCIATES
The Winning Side of Economics

## John Dunham & Associates

## April 29, 2019

## Executive Summary:

The 2018 Vapor Industry Economic Impact Study estimates the economic contributions made by the vapor industry, which includes E-liquids, coils, box mods and other vape products to the U.S. economy in 2018. John Dunham & Associates conducted this research, which was funded by the Vapor Technology Association. This work used standard econometric models first developed by the U.S. Forest Service, and now maintained by IMPLAN Inc. Data came from industry sources, government publications and Infogroup.[1]

The study measures the number of jobs in the vapor industry; the wages paid to employees, the value added and total output. In addition, it measures the economic impact of the suppliers that support the vapor industry, as well as those industries supported by the induced spending of direct and supplier industries.

Industries are linked to each other when one industry buys from another to produce its own products. Each industry in turn makes purchases from a different mix of other industries, and so on. Employees in all industries extend the economic impact when they spend their earnings. Thus, economic activity started by the vapor industry generates output (and jobs) in hundreds of other industries, often in states far removed from the original economic activity. The impact of supplier firms, and the "Induced Impact" of the re-spending by employees of industry and supplier firms, is calculated using an input/output model of the United States. The study calculates the impact on a national basis, by state, by Congressional district, and by state legislative districts.

The study also estimates taxes paid by the industry and its employees. Federal taxes include industry-specific excise and sales taxes, business and personal income taxes, FICA, and unemployment insurance. State and local tax systems vary widely. Direct retail taxes include state and local sales taxes, license fees, and applicable gross receipt taxes. Retailers pay real estate and personal property taxes, business income taxes, and other business levies that vary in each state and municipality. All entities engaged in business activity generated by the industry pay similar taxes.

The vapor industry is a dynamic part of the U.S. economy, accounting for about $24.46 billion in output or about 0.14 percent of GDP. It employs approximately 166,007 Americans who earned wages and benefits of about $7.90 billion.

Members of the industry and their employees paid $3.31 billion in federal, state and local taxes. This does not include state and local sales taxes or excise taxes that may apply for specific retail purchases which are estimated to total $1.67 billion.

## Summary Results

The vapor industry (as defined in this study) includes manufacturers of E-liquids, coils, box mods and other vape products, wholesalers, and retailers that sell vape products such as; vape stores, tobacco shops, convenience stores, supermarkets, gasoline stations, pharmacies and drug stores, warehouse clubs and supercenters. The vapor industry reaches into all corners of the

1 Infogroup is the leading provider of business and consumer data for the top search engines and leading in-car navigation systems in North America. Infogroup gathers data from a variety of sources, by sourcing, refining, matching, appending, filtering, and delivering the best quality data. Infogroup verifies its data at the rate of almost 100,000 phone calls per day to ensure absolute accuracy.

United States, employing 87,581 and generating $3.28 billion in wages. Vape businesses directly generate $9.15 billion in economic activity nationally.

**Table 1 – Economic Contribution of the Vapor industry**

| | Direct | Indirect | Induced | Total |
|---|---|---|---|---|
| Jobs | 87,581 | 29,427 | 48,999 | 166,007 |
| Wages | $ 3,277,220,400 | $ 2,092,844,100 | $ 2,527,825,000 | $ 7,897,889,500 |
| Economic Impact | $ 9,151,211,700 | $ 7,272,386,500 | $ 8,033,914,100 | $ 24,457,512,300 |
| State and Local Taxes | | | | $ 3,125,128,300 |
| Federal Taxes | | | | $ 1,860,313,900 |

To put the direct impact of the vapor industry in context, it is slightly larger than the iron and steel forging industry in the United States and employs almost as many people as the entire commercial fishing industry.[2]

Other firms are related to the vapor industry as suppliers. These firms produce and sell a broad range of items including E-liquid, coils, batteries, and all of the merchandise needed to maintain vape businesses. In addition, supplier firms provide a broad range of services, including personnel services, financial services, advertising services, consulting services or transportation services. Finally, a number of people are employed in government enterprises responsible for the regulation of the industry. All told, we estimate that the industry is responsible for 29,427 supplier jobs. These firms generate about $7.27 billion in economic activity.[3]

An economic analysis of the vapor industry will also take additional linkages into account. While it is inappropriate to claim that suppliers to the industry's indirect firms are part of the industry being analyzed,[4] the spending by employees of the industry, and that of indirect firms whose jobs are directly dependent on the vapor industry, should be included. This spending - on everything from housing, to food, to education and medical care - makes up what is traditionally called the "induced impact," or multiplier effect, of the vapor industry. For 2018, the induced impact of the industry generates 48,999 jobs and $8.03 billion in economic impact, for a multiplier of 0.88.[5]

Table 1 presents a summary of the total economic impact of the vapor industry in the United States. Summary tables for the United States, individual states, Congressional districts, and state legislative districts are included in the output model, which is discussed in the following section.

2 Based on comparisons of economic output from the 2016 IMPLAN tables.

3 Throughout this study, the term "firms" actually refers to physical locations. One manufacturer, for example, may have facilities in 5 or 6 locations throughout the country.

4 These firms would more appropriately be considered as part of the indirect firm's industries.

5 Often economic impact studies present results with very large multipliers – as high as 4 or 5. These studies invariably include the firms supplying the induced industries as part of the induced impact. John Dunham & Associates believes that this is not an appropriate definition of the induced impact and as such limits this calculation only to the effect of spending by direct and indirect employees.

**Table 2 – Fiscal Contribution of the Vapor Industry**

| Tax Type | Federal | State/Local | Total |
|---|---|---|---|
| Individual Income | $643,566,144 | $160,089,766 | $803,655,910 |
| Social Security/Social Insurance | $826,013,743 | $13,380,142 | $839,393,885 |
| Property | | $520,306,982 | $520,306,982 |
| Business/Employee Paid Sales Taxes | | $575,613,402 | |
| Corporate Income | $244,182,266 | $38,173,598 | $282,355,864 |
| Other Personal and Business Taxes | $146,551,724 | $143,256,651 | $289,808,375 |
| Federal Excise Taxes | $0 | | $0 |
| State Excise Taxes | | $281,951,262 | $281,951,262 |
| State Sales Taxes | | $558,093,506 | $558,093,506 |
| Local Sales Taxes | | $45,237,712 | $45,237,712 |
| **Total** | **$1,860,313,877** | **$2,336,103,020** | **$4,196,416,897** |

Another important part of an impact analysis is the calculation of the contribution of the industry to the public finances of the country. In the case of the vapor industry, the taxes paid by firms and their employees provide $1.86 billion to the federal government and $3.13 billion to state and local governments including income taxes, property taxes, profits taxes, etc. These figures also include state and local sales and excise taxes that are paid by consumers when they purchase vapor products. These sales based taxes total $1.67 billion. (See Table 2)

## Economic Impact Modeling – Summary




The Economic Impact Study begins with an accounting of the direct employment in the vapor industry. The data comes from a variety of government and private sources. It is sometimes mistakenly thought that initial spending accounts for all of the impact of an economic activity or a product. For example, at first glance it may appear that consumer expenditures for a product are the sum total of the impact on the local economy. However, a single economic activity leads to a ripple effect wherein other sectors and industries benefit from this initial spending. This inter-industry effect of an economic activity can be assessed using multipliers from regional input-output modeling.

The economic activities of events are linked to other industries in the state and national economies. Activities related to vape represent the direct effects on the economy. Indirect impacts occur when these activities require purchases of goods and services such as advertising services or merchandising material from local or regional indirect firms. Additional induced

impacts occur when workers involved in direct and indirect activities spend their wages. The ratio between induced output and direct output is termed the multiplier.

This method of analysis allows the impact of local production activities to be quantified in terms of final demand, earnings, and employment in the states and the nation as a whole.
Once the direct impact of the industry has been calculated, the input-output methodology discussed below is used to calculate the contribution of the indirect sector and of the re-spending in the economy by employees in the industry and its indirect firms. This induced impact is the most controversial part of economic impact studies and is often quite inflated. In the case of the vape model, only the most conservative estimate of the induced impact has been used.

## Model Description and Data

This economic impact analysis was developed by JDA based on data provided by the Vapor Technology Association., Infogroup, the Food and Drug Administration, and Centers for Disease Control and Prevention (CDC), and Federal and state governments. The analysis utilizes the IMPLAN model in order to quantify the economic impact of the vapor industry on the economy of the United States, as well as individual states, Congressional districts, and state legislative districts.[6] The model adopts an accounting framework through which the relationships between different inputs and outputs across industries and sectors are computed. This model can show the impact of a given economic decision – such as a factory opening or operating a sports facility – on a pre-defined, geographic region. It is based on the national income accounts generated by the US Department of Commerce, Bureau of Economic Analysis (BEA).[7]

Every economic impact analysis begins with a description of the industry being examined. In the case of the vapor industry it is defined as the three components of the United States' vapor industry. These are further broken out by business type.

This will incorporate firms in the following economic sectors:

- Manufacturers: E-Liquid, coils, and component manufacturers (which includes box mods, batteries, and other vapor products).

- Wholesalers: Includes firms involved in the distribution and storage of vapor products.

- Retailers: Includes firms involved in the sale of vapor products. This sector includes retail establishments (e.g. tobacco stores, convenience stores, gas stations, vape stores, etc.)

- Data on vape shops that make their own liquid has been split to reflect a portion of the employees as manufacturers and a portion as retailers.

Based on the analysis, there are 13,928 firms directly involved in the vapor industry, not including wholesalers and retailers where vape products are but a small segment of their business. Of these, 11,469 are local retailing firms, while 2,448 manufacture vapor liquids or components. (Table 3)

6 The model uses 2016 input/output accounts.
7 The IMPLAN model is based on a series of national input-output accounts known as RIMS II. These data are developed and maintained by the U.S. Department of Commerce, Bureau of Economic Analysis as a policy and economic decision analysis tool.

**Table 3 – Firms by Type**

| | Number of Firms | % of Total Firms |
|---|---|---|
| Vape Shop | 11,469 | 82.10% |
| Blending Vape Shop | 2,012 | 14.40% |
| E-liquid Manufacturer | 380 | 2.72% |
| Wholesaler | 42 | 0.30% |
| Component manufacturer | 40 | 0.29% |
| Coil Manufacturer | 16 | 0.11% |
| Online Retail | 11 | 0.08% |
| **Total** | **13,970** | **100.00%** |

The IMPLAN model is designed to run based on the input of specific direct economic factors. It uses a detailed methodology (see IMPLAN Methodology section) to generate estimates of the other direct impacts, tax impacts and indirect and induced impacts based on these entries. In the case of the vape model, direct employment in the vapor industry is a starting point for the analysis. Direct employment is based on data provided to John Dunham & Associates by Infogroup, the Vapor Technology Association and the Centers for Disease Control and Prevention as of October of 2018. Infogroup data are recognized nationally as a premier source of micro industry data. Infogroup is the leading provider of business and consumer data for the top search engines and leading in-car navigation systems in North America. Infogroup gathers data from a variety of sources, by sourcing, refining, matching, appending, filtering, and delivering the best quality data. Infogroup verifies its data at the rate of almost 100,000 phone calls per day to ensure absolute accuracy.

**Table 4 – Direct Jobs by Industry Sector**

| Product Category | Direct Jobs | % of Total Jobs |
|---|---|---|
| Retail Vape | 70,348.87 | 80.33% |
| E-liquid Manufacturer | 4,589 | 5.24% |
| Wholesaler | 9,563.43 | 10.92% |
| Component Manufacturer | 2,472.5 | 2.82% |
| Coil Manufacturer | 600 | 0.69% |
| Total: | 87,573.80 | 100.00% |

Once the initial direct employment figures have been established, they are entered into a model linked to the IMPLAN database. The IMPLAN data are used to generate estimates of direct wages and output. Wages are derived from data from the U.S. Department of Labor's ES-202 reports that are used by IMPLAN to provide annual average wage and salary establishment counts, employment counts and payrolls at the county level. Since this data only covers payroll employees, it is modified to add information on independent workers, agricultural employees, construction workers, and certain government employees. Data are then adjusted to account for counties where non-disclosure rules apply. Wage data include not only cash wages, but health and life insurance payments, retirement payments and other non-cash compensation. It includes all income paid to workers by employers.

Total output is the value of production by industry in a given state. It is estimated by IMPLAN from sources similar to those used by the BEA in its RIMS II series. Where no Census or government surveys are available, IMPLAN uses models such as the Bureau of Labor Statistics' growth model to estimate the missing output.

The model also includes information on income received by the Federal, state and local governments, and produces estimates for the following taxes at the Federal level: Corporate income, payroll, personal income, estate and gift, excise taxes, customs duties, and fines, fees, etc. State and local tax revenues include estimates of: Corporate profits, property, sales, severance, estate and gift and personal income taxes; licenses and fees and certain payroll taxes.

While IMPLAN is used to calculate the state level impacts, Infogroup data provide the basis for legislative district level estimates. Publicly available data at the county and Legislative district level is limited by disclosure restrictions, especially for smaller sectors of the economy. Our model therefore uses actual physical location data provided by Infogroup in order to allocate jobs – and the resulting economic activity – by physical address or when that is not available, zip code. For zips entirely contained in a single congressional district, jobs are allocated based on the percentage of total sector jobs in each zip. For zips that are broken by congressional districts, allocations are based on the percentage of total jobs physically located in each segment of the zip. Physical locations are based on either actual address of the facility, or the zip code of the facility, with facilities placed randomly throughout the zip code area.

## IMPLAN Methodology[8]

Francoise Quesnay one of the fathers of modern economics, first developed the analytical concept of inter-industry relationships in 1758. The concept was actualized into input-output analysis by Wassily Leontief during the Second World War, an accomplishment for which he received the 1973 Nobel Prize in Economics.

Input-Output analysis is an econometric technique used to examine the relationships within an economy. It captures all monetary market transactions for consumption in a given period and for a specific geography. The IMPLAN model uses data from many different sources – as published government data series, unpublished data, sets of relationships, ratios, or as estimates. The Minnesota IMPLAN group gathers this data, converts it into a consistent format, and estimates the missing components.

There are three different levels of data generally available in the United States: Federal, state and county. Most of the detailed data are available at the county level, but there are many issues with disclosure – especially in the case of smaller industries. IMPLAN overcomes these disclosure problems by combining a large number of datasets and by estimating those variables that are not found from any of them. The data is then converted into national input-output matrices (Use, Make, By-products, Absorption and Market Shares) as well as national tables for deflators, regional purchase coefficients and margins.

The IMPLAN Make matrix represents the production of commodities by industry. The Bureau of Economic Analysis (BEA) Benchmark I/O Study of the US Make Table forms the bases of the

8 This section is paraphrased from IMPLAN Professional: Users Guide, Analysis Guide, Data Guide, Version 2.0, MIG, Inc., June 2000.

IMPLAN model. The Benchmark Make Table is updated to current year prices, and rearranged into the IMPLAN sector format. The IMPLAN Use matrix is based on estimates of final demand, value-added by sector and total industry and commodity output data as provided by government statistics or estimated by IMPLAN. The BEA Benchmark Use Table is then bridged to the IMPLAN sectors. Once the re-sectoring is complete, the Use Tables can be updated based on the other data and model calculations of interstate and international trade.

In the IMPLAN model, as with any input-output framework, all expenditures are in terms of producer prices. This allocates all expenditures to the industries that produce goods and services. As a result, all data not received in producer prices is converted using margins which are derived from the BEA Input-Output model. Margins represent the difference between producer and consumer prices. As such, the margins for any good add to one.

Deflators, which account for relative price changes during different time periods, are derived from the Bureau of Labor Statistics (BLS) Growth Model. The 224 sector BLS model is mapped to the 536 sectors of the IMPLAN model. Where data are missing, deflators from BEA's Survey of Current Businesses are used.

Finally, the Regional Purchase Coefficients (RPCs) – essential to the IMPLAN model – must be derived. IMPLAN is derived from a national model, which represents the "average" condition for a particular industry. Since national production functions do not necessarily represent particular regional differences, adjustments need to be made. Regional trade flows are estimated based on the Multi-Regional Input-Output Accounts, a cross-sectional database with consistent cross interstate trade flows developed in 1977. These data are updated and bridged to the 536 sector IMPLAN model.

Once the databases and matrices are created, they go through an extensive validation process. IMPLAN builds separate state and county models and evaluates them, checking to ensure that no ratios are outside of recognized bounds. The final datasets and matrices are not released until extensive testing takes place.

# THE VALUE OF VAPOR

VTA
VAPOR TECHNOLOGY ASSOCIATION

## The vapor industry's economic impact in the United States

*The U.S. vapor industry is a major part of the modern economy*

## TOTAL ECONOMIC IMPACT

THE GLOBAL E-CIGARETTE & VAPOR MARKET SIZE IS PROJECTED TO REACH $47.1 BILLION BY 2025[1]



THE VAPOR INDUSTRY GENERATES **$ 24,457,512,300** FOR THE UNITED STATES ECONOMY

THE VAPOR INDUSTRY IS PROUD TO CREATE **166,007** JOBS FOR THE AMERICAN WORKFORCE



## JOBS CREATED

A WIDE RANGE OF INDUSTRIES & SMALL BUSINESSES BENEFIT FROM JOBS DERIVED FROM THE VAPOR MARKET

## TOTAL WAGES EARNED

IN THE UNITED STATES



VAPOR BUSINESSES PAID OVER **$ 7,897,889,500** IN WAGES AND BENEFITS TO THEIR EMPLOYEES



VAPOR BUSINESSES GENERATED **$ 15,094,584,600** IN FEDERAL, STATE & LOCAL TAXES



/VaporTechAssoc /VaporTechAssoc vaportechnology.org

F-018617

[1] Grand View Research, 2018

John Dunham & Associates, 2019

VTA
VAPOR TECHNOLOGY ASSOCIATION

# The Economic Impact of the Vapor Industry 2018
# UNITED STATES

| DIRECT ECONOMIC IMPACT | Jobs | Wages | Output |
|---|---|---|---|
| Vape Store Retail Jobs | 56,458 | $ 1,292,602,700 | $ 2,334,389,000 |
| All Other Retail Jobs | 13,892 | $ 445,564,300 | $ 965,300,200 |
| Wholesale Jobs | 9,564 | $ 813,597,600 | $ 2,346,359,600 |
| E-Liquid Manufacturing Jobs | 4,590 | $ 540,099,500 | $ 2,958,339,100 |
| Component Manufacturing Jobs | 3,077 | $ 185,356,300 | $ 546,823,800 |
| **Total** | **87,581** | **$ 3,277,220,400** | **$ 9,151,211,700** |

| SUPPLIER ECONOMIC IMPACT | Jobs | Wages | Output |
|---|---|---|---|
| Agriculture | 423 | $ 18,827,900 | $ 55,119,100 |
| Mining | 692 | $ 80,012,000 | $ 204,818,400 |
| Construction | 527 | $ 31,232,100 | $ 82,450,500 |
| Manufacturing | 3,022 | $ 268,585,100 | $ 2,355,438,000 |
| Wholesale | 1,726 | $ 146,599,500 | $ 422,784,500 |
| Retail | 391 | $ 14,733,900 | $ 33,577,600 |
| Transportation & Communication | 4,443 | $ 358,365,900 | $ 1,187,518,400 |
| Finance, Insurance & Real Estate | 4,354 | $ 221,649,600 | $ 1,079,025,000 |
| Business & Personal. Services | 11,740 | $ 854,053,800 | $ 1,625,448,300 |
| Travel & Entertainment | 1,477 | $ 41,561,700 | $ 101,451,600 |
| Government | 632 | $ 57,222,600 | $ 124,755,100 |
| Other | 0 | $ 0 | $ 0 |
| **Total** | **29,427** | **$ 2,092,844,100** | **$ 7,272,386,500** |

| INDUCED ECONOMIC IMPACT | Jobs | Wages | Output |
|---|---|---|---|
| Agriculture | 939 | $ 31,444,600 | $ 108,975,400 |
| Mining | 206 | $ 23,354,800 | $ 62,593,700 |
| Construction | 552 | $ 32,765,600 | $ 88,303,200 |
| Manufacturing | 2,330 | $ 174,681,200 | $ 1,250,212,900 |
| Wholesale | 1,420 | $ 120,717,300 | $ 348,140,000 |
| Retail | 6,599 | $ 226,736,900 | $ 567,924,300 |
| Transportation & Communication | 2,644 | $ 217,901,300 | $ 904,576,400 |
| Finance, Insurance & Real Estate | 5,715 | $ 330,545,800 | $ 2,052,421,500 |
| Business & Personal Services | 19,516 | $ 1,081,186,600 | $ 1,955,726,000 |
| Travel & Entertainment | 7,217 | $ 191,326,300 | $ 521,605,300 |
| Government | 575 | $ 50,902,600 | $ 139,402,200 |
| Other | 1,286 | $ 46,262,000 | $ 34,033,200 |
| **Total** | **48,999** | **$ 2,527,825,000** | **$ 8,033,914,100** |

| | Jobs | Wages | Output |
|---|---|---|---|
| **TOTAL ECONOMIC IMPACT** | **166,007** | **$ 7,897,889,500** | **$ 24,457,512,300** |

| TAX IMPACT | TAXES GENERATED |
|---|---|
| Business Taxes Generated | $ 3,311,134,400 |
| Federal | $ 1,860,313,900 |
| State | $ 1,450,820,500 |
| Consumption Taxes Generated | $ 11,783,449,900 |
| **Total Taxes** | **$ 15,094,584,600** |

F-018618

What Do We Mean By Economic Output?
FAQ's

**Where do the Data Come From?**

The data gathered for this model came from Infogroup, VTA, and federal and state government sources. Infogroup is the leading provider of business and consumer data, which includes addresses, business titles and job totals. Since the Infogroup data are adjusted on a continual basis, staff from John Dunham & Associates scanned the data for discrepancies, verifying individual facilities using Google Maps, web searches, and any available online government documents. Each office or facility has its own employee count; therefore, a company with a separate manufacturing plant, a warehouse and an office location would have three facilities, each with separate employment counts. In addition, for cases where employment data were available, Infogroup employment figures were replaced with industry sources.

**What Model is Used?**

These employment totals are entered into the IMPLAN Model. The IMPLAN model is based on the input-output accounts published by the US Department of Commerce, Bureau of Economic Analysis and is one of the standard models used to calculate economic impact figures. Input-Output tables representing the economy in 2014 (2015 is the last year available at the time of this study) were used in this analysis. The IMPLAN model is designed to run based on the input of specific direct economic factors, like direct jobs, and generates estimates of direct wages and outputs.

**Explanation of Economic Impact Terms**

**Direct Impact Categories:**

The direct impacts of this study were divided up into the categories of the vapor industry. The vapor industry (as defined in this study) includes manufacturers of E-liquids, coils, box mods and other vape products, wholesalers, and retailers that sell vapor products such as; vape shops, convenience stores, supermarkets, gasoline stations, pharmacies and drug stores, warehouse clubs and supercenters, and discount tobacco stores.

**What is Meant By the Term Direct Impact?**

Direct Impacts are those jobs, wages or economic output solely attributable to the industry defined for the study; in this case manufacturers of E-liquids, coils, box mods and other vape products, wholesalers, and retailers that sell vapor products such as; vape shops, convenience stores, supermarkets, gasoline stations, pharmacies and drug stores, warehouse clubs and supercenters, and discount tobacco stores. These are the jobs that one can count. If one were to go to a manufacturing facility and count the number of people working there, that would be the direct employment (although there may be many more people working than there are jobs since many people work only part time). JDA uses direct employment at manufacturing facilities, offices, retail locations and other sites that are defined to be part of the industry to calculate all of the other effects presented in the study. For example, if a company facility employs 500 people, JDA then uses the IMPLAN model to calculate how much in wages and output those 500 employees create.

**What is Meant By the Term Indirect?**

Indirect is the term used in economic impact studies to define those effects that result from firms in the defined (or Direct) industry purchasing goods and services from other industries. JDA defines these as Supplier Impacts in its models. For example, when an e-liquid manufacturer pays rent on its warehouse to their landlord, or when they hire a trucking company to deliver products, or purchasing vapor products from a lab or warehouse, they are creating indirect effects in the real estate sector or trucking sector of the economy.

In the case of wholesalers, retailers and others that handle products through a supply chain, the value of the goods moving through a warehouse or a store are not counted as indirect impacts; only those goods and services used to provide the wholesale or retail service are included. When a wholesaler pays an electric bill for its facility, or a retailer buys paper for its store, indirect impact is created. Whereas, when a vapor product wholesaler buys e-liquid from a manufacturer, this transaction is not considered in the supplier impact.

**What is Meant By the Term Induced?**

Induced effects are the response by the economy that occur through re-spending of income received by payments made to employees and business owners measured in the direct and supplier parts of the economy. When people work for a retail location selling vapor products or for firms that supply goods and services to the industry, they receive wages and other payments. This money is recirculated through their household spending inducing further local economic activity. Economists call these induced impacts the multiplier effect of an activity or industry.

Examples of induced effects are the jobs created in a diner located outside of a vape component factory or retail store where people purchase sandwiches for lunch, or at the gas station where they purchase fuel for their commute, or even in neighborhoods, where workers purchase houses, go to restaurants or visit the movie theater.

**What Specifically Do You Mean When You Say a Job?**

Jobs are a measure of the annual average of monthly jobs in each industry as defined by the Quarterly Census of Employment and Wages put out by the Bureau of Labor Statistics. Jobs in our models are derived independently and do not match jobs reported by government entities in that the model defines the industry differently, and because it includes proprietors and other employees not eligible for unemployment benefits, and data from more firms and facilities than are surveyed by the government. Jobs are measured in full-time equivalent units.

**What is Meant by The Term Economic Output or Economic Impact?**

JDA uses output in its models as a general measurement of economic impact because it is the broadest and most comparative measure. Output can basically be considered similar to final sales; however, it differs due to the fact that it also includes adjustments in inventories and does not include certain taxes. In general, output represents the value of industry production for the model year calculated in terms of producer prices. Output differs depending on the industry being measured. In the case of the vapor industry, output is similar to gross sales for vapor product manufacturers. For retailers and wholesalers, output does not represent sales, but rather is similar to the accounting measure of gross margin. Simply put, output in the case of retailing can be seen as total sales revenue minus the cost of goods sold. This is similar to the wholesale or retail markup on a product.

**What is Meant By the Term Taxes Paid?**

This economic impact study measures the Vapor Industry's total tax contributions. The model includes information on income received by the Federal, state and local governments, and produces estimates for the following taxes at the Federal level: Corporate income; payroll, personal income, estate and gift, and excise taxes, customs duties; and fines, fees, etc. State and local tax revenues include estimates of: Corporate profits, property, sales, severance, estate and gift and personal income taxes; licenses and fees and certain payroll taxes.

In addition, the model includes data on federal and state excise taxes as well as state and local sales taxes paid by vapor product consumers.

The model was built prior to the enactment of the Tax Cuts and Jobs Act, and represent taxes paid during the model year.

# Exhibit B

U.S. SMALL BUSINESS ADMINISTRATION
OFFICE OF ADVOCACY
REGULATION • RESEARCH • OUTREACH

November 27, 2019

VIA ELECTRONIC SUBMISSION

Admiral Brett P. Giroir, M.D.
Acting Commissioner
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, Maryland 20993

**RE: Premarket Tobacco Product Applications and Recordkeeping Requirements Proposed Rule, Docket No. FDA-2019-N-2854**

Dear Admiral Giroir:

On September 25, 2019, the Food and Drug Administration (FDA) published a proposed rule titled *Premarket Tobacco Product Applications and Recordkeeping Requirements*.[1] This letter constitutes the Office of Advocacy's (Advocacy) public comments on the proposed rule. Advocacy is concerned that the agency's certification that the rule will not have a significant economic impact on a substantial number of small entities lacks an adequate factual basis. This certification improperly assumes that the compliance costs of the proposed rule's requirements for deemed products are due to the agency's 2016 rule, *Deeming Tobacco Products to be Subject to the Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Regulations Restricting the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Product Packages and Advertisements* (Deeming Rule).[2] The FDA did not detail all requirements for Premarket Tobacco Product Applications (PMTA), nor adequately assess PMTA costs for the Deeming Rule. Because the PMTA requirements are detailed in the proposed rule, Advocacy recommends that the agency prepare

---

[1] 84 Fed. Reg. 50,566 (Sept. 25, 2019).
[2] 81 Fed. Reg. 28,974 (May 10, 2016). The FDA promulgated the Deeming Rule with a notice of proposed rulemaking (79 Fed. Reg. 23,142 (April 25, 2014)). Advocacy submitted written comments on the notice of proposed rulemaking, raising concerns about the adequacy of the Initial Regulatory Flexibility Analysis and the failure to consider "significant regulatory alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." (5 U.S.C. § 603(c)).

and make available for public comment an initial regulatory flexibility analysis (IRFA) that adequately assesses the costs associated with the PMTA requirements in the proposed rule incurred by small entities and that would include consideration of significant alternatives to the proposed rule that will accomplish the stated objectives of applicable statutes while minimizing the proposed rule's economic impact on small entities.

## I. Background

### The Office of Advocacy

Advocacy was established pursuant to Pub. L. 94-305 to represent the views of small entities before federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA), so the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The Regulatory Flexibility Act (RFA),[3] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[4] gives small entities a voice in the rulemaking process. For all rules that are expected to have a significant economic impact on a substantial number of small entities, the RFA requires federal agencies to assess the impact of the proposed rule on small business and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to Advocacy's comments.[5] The agency must include, in any explanation or discussion accompanying the final rule's publication in the Federal Register, the agency's response to Advocacy's submitted written comments on the proposed rule, unless the agency certifies that the public interest is not served by doing so.[6] Advocacy's comments are consistent with Congressional intent underlying the RFA, that "[w]hen adopting regulations to protect the health, safety, and economic welfare of the nation, federal agencies should seek to achieve statutory goals as effectively and efficiently as possible without imposing unnecessary burdens on the public."[7]

### The Deeming Rule

The Family Smoking Prevention and Tobacco Control Act (Tobacco Control Act) provides FDA with the authority to regulate tobacco products and provides FDA the authority to identify through regulation the tobacco products that it deems to be subject to FDA regulation. Once "deemed" to be subject to FDA regulation, the Tobacco Control Act generally requires a new tobacco product to undergo premarket review by FDA before it may be introduced or delivered for introduction into interstate commerce.

On May 10, 2016, FDA published the Deeming Rule, "deeming" a series of products to be subject to FDA regulation, including electronic nicotine delivery systems (ENDS), e-liquids, and premium cigars. These deemed products became, by action of the Tobacco Control Act, subject

---

[3] 5 U.S.C. § 601 et seq.
[4] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. § 601 et seq.).
[5] Small Business Jobs Act of 2010 (PL 111-240) § 1601.
[6] *Id.*
[7] 5 U.S.C. § 601 note 7.

to PMTA requirements. All manufacturers and importers of ENDS and e-liquids, as well as all retailers that mix e-liquids, who are considered manufacturers, are subject to these requirements. Additionally, the proposed rule will affect manufacturers of premium cigars that entered the market after February 15, 2007, the statutorily determined "grandfather date." The Deeming Rule itself, however, included no specific requirements on the procedure or information to be included in a PMTA, and details of the PMTA are only briefly explained in an appendix to the rule. Where specifics are described, such mentions are prefaced by inconclusive terms such as "may," "might," or "will likely be necessary." For example, the Deeming Rule Final Regulatory Impact Analysis (FRIA) states: "[t]he types of studies that applicants *may* need to supplement existing data *might* be specific to the perception and actual use of their product. These could be in the form of survey or observational studies. A range of small surveys or set of focus group studies to more expansive behavioral use studies *might* be conducted."[8]

The analysis accompanying the Deeming Rule listed four main categories of PMTA costs: (1) composition, design, and manufacturing; (2) toxicology studies; (3) human studies; and (4) administrative staff hours.[9] Based on these categories, the FDA estimated that PMTA costs would be between $28,566 and $2,595,224 per ENDS unit, with an average cost of $466,563, and between $12,112 and $398,324 per e-liquid used in such devices, with an average cost of $131,643.[10] These estimates, however, are significantly caveated: "[w]e cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established[,]"[11] anticipating future rulemaking to flesh out the PMTA requirements.

**The PMTA Proposed Rule**

On September 25, 2019, the FDA published the PMTA proposed rule, which details the requirements of what must be included in a PMTA, the recordkeeping requirements associated with a PMTA, as well as the FDA's guidelines for review of PMTAs. The proposed rule requires each PMTA to have the following requirements: (1) general information, (2) descriptive information, (3) product samples, (4) labeling, (5) statement of compliance with 21 C.F.R. part 25, (6) a summary, (7) product formulation, (8) manufacturing, (9) health risk investigations, and (10) a certification.[12] The details of these ten requirements are discussed over the next 37 pages of the proposed rule.[13] These PMTA requirements in the proposed rule are more exacting than the four main categories of cost described in the Deeming Rule mentioned above.

---

[8] Food and Drug Administration, Deeming Tobacco Products to be Subject to the Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Regulations Restricting the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Product Packages and Advertisements, Final Regulatory Impact Analysis, Docket No. FDA-2014-N-0189, page 151 (2016) [hereinafter Final Regulatory Impact Analysis] (emphasis added).

[9] *Id.* at 87.

[10] *Id.* at 91.

[11] *Id.* at 55.

[12] 84 Fed. Reg. at 50,577.

[13] *Id.* at 50,577-50,614.

The FDA states that the sector of the tobacco industry that will be most affected by the proposed rule are manufacturers, importers, and retailers of ENDS products.[14] The FDA also states that the proposed rule generates negligible costs for most affected small entities.[15] Further, the FDA has certified that the rule will not have a significant economic impact on a substantial number of small entities because the agency assumed the costs associated with a PMTA were accounted for in the Deeming Rule FRIA, which includes the agency's Final Regulatory Flexibility Analysis (FRFA).

## II. The Proposed Rule Will Have a Significant Economic Impact on a Substantial Number of Small Entities and the FDA Must Consider Alternatives

Small businesses drive the ENDS industry. While the Census Bureau's Statistics of U.S. Businesses does not publish data specifically on the vaping industry, the data shows that well over 90 percent of Tobacco Stores (NAICS 453991) are small. According to industry sources, there are approximately 14,000 ENDS firms located across the country,[16] and there are over 20,000 establishments listed under "Vape Shops & Electronic Cigarettes" in the Yellow Pages.[17] Additionally, over 2,000 establishments with "vap," "liq," or "juice" in the establishment name have registered with the FDA.[18] The FDA cannot certify the proposed rule because it imposes significant costs on small entities that the agency did not contemplate in the Deeming Rule. Therefore, the agency must prepare and make available for public comment an IRFA and consider alternatives that would accomplish the stated objectives of applicable statutes while minimizing the rule's impact on small entities.

### A. The Agency Lacks an Adequate Factual Basis to Certify That the Proposed Rule Will Not Have a Significant Economic Impact on a Substantial Number of Small Entities, As Required by the RFA

Under § 605(b) of the RFA, an agency may avoid the requirements of an initial and final regulatory flexibility analysis, including a discussion of significant, burden-reducing alternatives, if the agency can certify that the rule will not have a significant economic impact on a substantial number of small entities.[19] Any such certification must be accompanied by a statement of the factual basis for the certification. An agency's improper certification is subject to judicial review, which could delay implementation of the rule.[20] Agency actions, including improper RFA

---

[14] In the Deeming Rule, the FDA estimated that no premium cigars would use the PMTA marketing pathway. *See* Final Regulatory Impact Analysis *supra* note 8 at 16. Advocacy does not agree that no premium cigars will use the PMTA marketing pathway.
[15] *Id.* at 50,629.
[16] The Vapor Industry Economic Impact Study, pg. 6, https://vaportechnology.org/wp-content/uploads/2019/09/Vapor-Industry-Economic-Impact-Study-by-Dunham-Associates-2019-Updated.pdf (last visited November 13, 2019).
[17] Represents a count of establishments in the "Vape Shops & Electronic Cigarettes" category in each of the 50 states and the District of Columbia as listed at https://www.yellowpages.com/.
[18] Establishment Registration & Tobacco Product Listing, https://ctpocerl.fda.gov/rlapp/home.html (last visited October 20, 2019).
[19] 5 U.S.C. § 605(b).
[20] *Id.* §§ 611(a)(1), 701 *et seq.*; *see also*, *White Eagle Coop. Ass'n v. Conner*, 553 F.3d 467, 480 (7th Cir. 2009) (small entities directly regulated by a proposed rule may challenge an agency's RFA analysis or certification).

certifications, are reviewed under the arbitrary and capricious standard of the Administrative Procedure Act.[21] Failure to provide a factual basis for a certification may result in the rule being returned to the agency.[22] Advocacy is concerned that the certification in the current rule lacks a factual basis and, thus, is improper.

In the proposed rule, the FDA states: “we anticipate that the level of effort required to gather information and prepare the PMTA aligns with the effort described in the final regulatory impact analysis for the Deeming Rule.”[23] No evidence is provided to support this statement, and it is at odds with the FDA statement in the Deeming Rule that “[w]e cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established.”[24] In the proposed rule, the FDA is relying on its inadequate assessment of the costs of the Deeming Rule to certify the PMTA proposed rule.[25] Because the costs of the PMTA process have yet to be accounted for, all the costs attributable to the PMTA requirement must be accounted for in this rule.

Advocacy has heard from several small businesses in the industry who have stated that the costs associated with the PMTA process are excessive and the PMTA requirements are overly burdensome. Indeed, Reynolds American Inc. (RAI), best known as RJ Reynolds, one of the largest tobacco manufacturers, submitted a PMTA in October 2019 that consisted of over 150,000 pages of documents.[26] RAI’s Executive Vice President James Figlar stated that RAI’s PMTA was “a culmination of years of hard work across multiple teams, involving more than 100 individuals, including dozens of Ph.D. team members collaborating every day, with a substantial financial investment.”[27] The majority of ENDS manufacturers do not have the resources or revenue to comply with the PMTA requirements. According to small businesses in the industry, most ENDS manufacturers generally have hundreds of stock keeping units (SKU) that will have to be approved through a PMTA. Submitting those SKUs individually or bundled for approval through the PMTA process will be too onerous a cost for many small businesses in the industry. One small business reported to Advocacy that it had closed three of its 14 stores, laid off 15 employees, and lost over $2 million in revenue in anticipation of complying with the PMTA proposed rule.

---

[21] 5 U.S.C. §§ 611(a), 701 *et seq.*; *see also*, *North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650, 658 (U.S. Dist. Ct. E.D. Va 1998).
[22] *North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647, 658 (U.S. Dist. Ct. E.D. Va 1997).
[23] Premarket Tobacco Product Applications and Recordkeeping Requirements, Initial Regulatory Impact Analysis, Docket No. FDA - _____, page 14.
[24] Final Regulatory Impact Analysis, *supra* note 8 at 55.
[25] Moreover, the FDA assumed in the Deeming Rule that public dockets of research would be available to assist in the development of PMTAs, “potentially reducing the time for preparation of a particular application.” Final Regulatory Impact Analysis, *supra* note 8 at 56. These resources, however, do not appear to be available. If available, the FDA should direct stakeholders to these resources. If these resources are unavailable, the agency should take this into account when developing a more detailed analysis of the proposed rule’s impacts on small entities.
[26] https://vaping360.com/vape-news/85364/the-first-vape-pmta-has-been-submitted-to-the-fda/ (last visited November 20, 2019).
[27] *Id.*

Additionally, the FDA cannot even fully account for the proposed rule's cost because all the required regulations to which any entity submitting a PMTA must adhere have not been drafted. For example, the proposed rule states that entities submitting a PMTA must account for "a full description of the methods used in, and the facilities and controls used for, the design (including design validation and design verification, to assess whether the tobacco product, as manufactured, performs in accordance with design specifications), manufacture, packing, and storage of the tobacco product in sufficient detail to demonstrate whether the product meets manufacturing specifications, can be manufactured in a manner consistent with the information submitted in the application, and conforms to the requirements of any regulations issued under section 906(e) of the Federal Food, Drug, and Cosmetic Act."[28] But to date, the FDA "has not yet issued a regulation under section 906(e) of the FD&C Act."[29]

Because of the numbers of small entities regulated by this rule, and because of the economic impact attributable to this rule, Advocacy concludes that the agency has failed to state a factual basis upon which to certify that the PMTA proposed rule will not have significant economic impact on a substantial number of small entities. The rule cannot be certified under § 605(b)(2), and the agency must publish an IRFA as required by § 603 of the RFA.

### B. The Agency Should Prepare and Make Available for Public Comment an IRFA Before Going Forward with This Rule

Advocacy urges the FDA to prepare and make available for public comment an IRFA for the proposed rule that includes a detailed quantitative analysis of the costs to small entities of the FDA's requirements and expectations for a successful PMTA. A proper IRFA must describe the impact of the proposed rule on small entities and contain the following information: (1) a description of the reasons why the agency's action is being considered; (2) a succinct statement of the objectives of, and the legal basis for, the proposed rule; (3) a description – and, where feasible, an estimate of the number – of small entities to which the rule will apply; (4) a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities that will be subject to the requirement and the types of professional skills necessary for preparation of the report or record; and (5) an identification, to the extent practicable, of all relevant federal rules that may duplicate, overlap, or conflict with the proposed rule.[30]

Although foreshadowed in the Deeming Rule, a detailed analysis of costs of individual requirements for PMTAs has never been published. There is a significant amount of specificity in this proposed rule that was not addressed in the analysis in the Deeming Rule.
Small entities have not had any opportunity to comment on specific burdens of the PMTA pathway or to suggest alternatives that may be less burdensome. The FDA should compare the estimated quantitative costs per small entity in an IRFA for the proposed rule to the costs per small entity published in the Deeming Rule to assess the incremental costs or cost savings of the PMTA proposed rule. Examples of compliance costs of requirements that FDA should specifically identify in an IRFA include preparation and submission of marketing plans, which

---

[28] 84 Fed. Reg. at 50,650.
[29] *Id.* at 50,597.
[30] 5 U.S.C. § 603(b).

were not specifically quantified in the Deeming Rule; specific costs of testing, which were mentioned in the Deeming Rule but with little detail; and the costs of specific requirements for an environmental assessment, which were mentioned in the Deeming Rule but with no detail. Estimates of individual requirements of the proposed rule are necessary for a meaningful evaluation of alternatives for small entities.

### C. The FDA Must Consider Significant Alternatives to the Proposed Rule that Accomplish the Stated Objectives of Applicable Statutes While Minimizing the Rule's Economic Impact on Small Entities

The FDA needs to present significant alternatives for regulatory relief as part of an IRFA as required by § 603(a). At a minimum, the agency should consider: (1) the establishment of different compliance or reporting requirements for small entities; (2) clarification, consolidation, or simplification of compliance and reporting requirements for small entities; (3) use of performance rather than design standards; and (4) exemption for certain or all small entities from coverage of the rule, in whole or in part.[31] Additionally, the FDA should consider significant alternatives proposed by stakeholders whose comments are published on the proposed rule's public docket.

## III. Conclusion

Advocacy is concerned that the agency's certification that the proposed rule will not have a significant economic impact on a substantial number of small entities lacks an adequate factual basis. The certification improperly assumes that the compliance costs of the proposed rule's requirements for deemed products are due to the agency's 2016 Deeming Rule. Advocacy recommends that the agency prepare and make available for public comment an IRFA that would: (1) adequately assess the costs associated with the PMTA requirements in the proposed rule incurred by small entities and (2) include consideration of significant alternatives to the proposed rule that will accomplish the stated objectives of applicable statutes while minimizing the proposed rule's economic impact on small entities.

---

[31] *Id.* § 603(c).

If you have any questions or require additional information, please do not hesitate to contact me or Assistant Chief Counsel Charles G. Jeane at (202) 205-7168 or by email at charles.jeane@sba.gov.

Sincerely,

/s/
Major L. Clark, III
Acting Chief Counsel
Office of Advocacy
U.S. Small Business Administration

/s/
Charles G. Jeane
Assistant Chief Counsel
Office of Advocacy
U.S. Small Business Administration

Copy to: Paul Ray, Acting Administrator
Office of Information and Regulatory Affairs
Office of Management and Budget

# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
Lexington Division

| | |
|---|---|
| VAPOR TECHNOLOGY ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FOOD AND DRUG ADMINISTRATION, et al.<br><br>Defendants. | Case No. 5:19-cv-00330-KKC |

**DECLARATION OF STACEY M. BENSON, Ph.D.**

I, Stacey M. Benson, Ph. D., do hereby declare as follows:

1. I am over the age of 18 years and have personal knowledge of the facts set forth below such that I would be competent to testify as to the same if called.

2. I am an epidemiologist with over 15 years of professional experience conducting, analyzing, and interpreting scientific data using well-accepted scientific methodology. Epidemiology relies on human research to assess the relationship between exposures to a substance or product and the resulting human health impacts.

3. My areas of expertise include environmental epidemiology, occupational epidemiology, respiratory protection, and clinical research. I received my undergraduate degree (B.S.) in physics from St. Lawrence University, my master's degree (M.S.) in the field of exercise physiology from the University of Pittsburgh, and my Ph.D. in Epidemiology from the University of Pittsburgh. I have held teaching positions at Carnegie Mellon University and Point Park University and served an Associate Service Fellow at the National Institute for Occupational Safety and Health, where I conducted human subject experiments at the National Personal Protective Technology Laboratory. I have published over 30 scientific articles, presented 28 papers

at both national and international conferences, and have been cited in the scientific literature over 400 times.

4. I currently serve as a Managing Health Scientist and Epidemiology Practice Area Lead at Cardno ChemRisk, a global scientific consulting firm specializing in, among other areas, product health and safety. Cardno ChemRisk is a consulting firm that provides scientific advice to the government, corporations, law firms, and various scientific and professional organizations.

5. Cardno ChemRisk has been providing consulting services to electronic nicotine delivery systems (ENDS) clients for over five years and is currently supporting clients in their efforts to comply with the Premarket Tobacco Application (PMTA) process. As such, we, and I in particular, are familiar with the PMTA procedures as they stand today, as well as the many challenges and uncertainties facing vapor product manufacturers that are attempting to satisfy the recommendations for PMTAs set forth by the Food and Drug Administration (FDA).

6. In 2016, the Food and Drug Administration (FDA) released a draft guidance document regarding PMTAs for ENDS (the "Draft ENDS PMTA Guidance"). (FDA, 2016) While the Draft ENDS PMTA Guidance discussed many aspects of the PMTA process, including several types of non-clinical and clinical studies that FDA recommended be completed by applicants, there remained many unanswered questions about, among other issues, various testing protocol requirements, including the testing methodologies that FDA would consider acceptable for carrying out aerosol testing for specified harmful and potentially harmful constituents (HPHCs) under "heavy" and "light" use patterns.

7. As a result, many vapor product manufacturers, and particularly smaller manufacturers with financial resource constraints, hesitated to plunge into the PMTA process beyond the early planning stages based only on the Draft ENDS PMTA Guidance.

8. I believe that these manufacturers' hesitancy was understandable, as the Draft ENDS PMTA Guidance indicated in bold at the top of every page as follows:

***Contains Nonbinding Recommendations***

***Draft – Not for Implementation***

(FDA, 2016). On the FDA's website, FDA's Center for Tobacco Products indicated that, once the ENDS PMTA Guidance was finalized, "it will represent FDA's current thinking on submitting PMTAs for ENDS products." (FDA, 2016; accessed June 2019.)

9. However, it was not until three years later, on June 11, 2019, that FDA released the finalized PMTA guidance document (the "Final ENDS PMTA Guidance"). (FDA PMTA Guidance, 2019.) The Final ENDS PMTA Guidance describes the types of data and information that FDA recommends applicants submit to meet the Tobacco Control Act's (TCA) requirement that a new tobacco product be protective of public health and thus entitled to a marketing authorization order.

10. As discussed in the Final ENDS PMTA Guidance, a comprehensive assessment of each vapor product requires an evaluation of the short- and long-term human health effects of the product on the population. These investigations include reviews of relevant existing scientific literature, extensive product testing (including aerosol testing), toxicological studies and analysis, stability testing, materials testing, environmental assessments, and human subject research in the form of clinical studies and behavioral testing. The findings must be generalizable to the U.S. population and include impacts on both users and non-users of the vapor product. (FDA PMTA Guidance, 2019.)

11. Although the Final ENDS PMTA Guidance provides some additional insight into how FDA is going to evaluate PMTAs, there are still many issues that have not been resolved. For

example, FDA has not issued guidance on good manufacturing practices (GMPs) for non-combustible tobacco products, including vapor products. Yet, the Final ENDS PMTA Guidance suggests that the PMTA applicant must demonstrate high standards for product quality through GMPs, supply chain assessment, and product testing. (FDA PMTA Guidance, 2019 at pp. 30-31.)

12. Similarly, the Final ENDS PMTA Guidance also suggests that applicants must demonstrate through an environmental assessment that their products do not have significant impacts on the environment. (FDA PMTA Guidance, 2019 at p. 23.) But, FDA has not issued guidance on the methods or assumptions that need to be incorporated in such an environmental assessment.

13. The Final ENDS PMTA Guidance also does not clarify when it may or may not be appropriate to conduct a bridging study to bridge data from a study on one vapor product to another vapor product.

14. Nor has the Final ENDS PMTA Guidance provided further clarity on the methodologies that should be utilized to conduct aerosol testing of devices or e-liquids. Unlike the situation with combustible cigarettes, ENDS products are fairly new and so do not have any historical data or standardized testing methodologies upon which to draw. Thus, issues regarding protocols for testing and research must still be resolved. By way of example, FDA does not provide a standard device or device settings for e-liquid manufacturers to utilize to conduct aerosol testing of their fluids. The guidance also does not recommend a standard e-liquid or set of e-liquids for open-tank device manufacturers to utilize to conduct aerosol testing of their devices. Instead, FDA only vaguely recommends that applicants conduct tests that reflect a "reasonable range" of conditions. (FDA PMTA Guidance, 2019 at p. 28.) Without further specific direction, the applicant runs the risk of falling short of what FDA expects to see in a PMTA.

15. These missing details are extremely important as the study design and number of variables to test in non-clinical and clinical studies can greatly influence the costs and time to execute and perform these studies. By way of example, there are several variables that could influence toxicological and clinical study design, execution, and findings regarding product testing: e.g., power settings, airflow settings, humectant composition, flavors, nicotine concentrations, and nicotine type (free base vs. nicotine salts). Thus, under one possible interpretation of the Final ENDS PMTA Guidance, a clinical study of a closed device with one power setting, one airflow setting, two nicotine concentrations, one propylene glycol to vegetable glycerin ratio, and three flavors would result in having to test six potential use scenarios with the study participants. This type of study design would likely take 12 to 18 months to plan, perform, analyze and summarize for the PMTA. Further, a clinical study of an open-tank device with two power settings, two airflow settings, three flavors, three PG/VG ratios, and three nicotine concentrations would be even more involved and result in 108 possible use scenarios. This type of study would likely take several years to complete.

16. As the number of use scenarios increases, the costs to conduct clinical studies also increases. Therefore, having an understanding, before developing and filing the PMTA, of what the FDA considers adequate for the range of appropriate testing conditions would be invaluable to the FDA and the applicant in at least two ways: ensuring FDA gets the information it needs to fairly evaluate the product and to set reasonable limitations on the required research so that both parties can optimize the use of limited resources.

17. For those of us who are working to complete PMTAs, this means that FDA will be required to spend a significant amount of time with each applicant (and the consultants and technicians who are helping them) leading up to the PMTA's submission to work through

numerous issues so that the application is appropriately robust and complete for a substantive review by FDA. Indeed, in the Final ENDS PMTA Guidance, FDA repeatedly urges applicants to "meet with the FDA to discuss the [planned] approach prior to preparing and submitting an application." (FDA PMTA Guidance, 2019 at p. 13). This back and forth will take months, at a minimum, to get the applicant in a place where it can actually start conducting the required studies and research with the knowledge that its efforts will provide useful information to FDA and satisfy the PMTA requirements.

18. Indeed, product-specific guidance from FDA is particularly important with respect to vapor products because FDA has not approved a single PMTA for a vapor product to date.

19. Even with an unlimited budget, for any vapor product manufacturer that waited until the Final ENDS PMTA Guidance was published on June 11, 2019, it is now not possible to submit a complete PMTA with each facet that FDA recommends by the ten-month deadline of May 11, 2020 (now nine months away).

20. A ten-month timeframe for the completion of a PMTA is not feasible or realistic for numerous reasons:

a. First, as indicated above, there a number of significant open questions regarding good manufacturing practices, environmental assessments, bridging studies, and aerosol testing methodologies—including device settings for e-liquids, e-liquids for open system devices, and regarding "heavy" and "light" use patterns for harmful and potentially harmful constituent testing—that require pre-submission meetings and extensive communication between the applicant and the Office of Science within FDA's Center for Tobacco Products to determine appropriate methodologies and parameters before the recommended testing and studies are even undertaken. These communications can last months and there is no sense in an applicant even

initiating much of its product testing and studies until it receives particularized guidance from FDA with respect to its planned approach in these areas.

b. Second, in its Final ENDS PMTA Guidance published on June 11, 2019, FDA materially changed the list of harmful and potentially harmful constituents, or HPHCs, for which it recommends the applicant test its product from the initial list in the Draft ENDS PMTA Guidance published in 2016. Of the 29 HPHCs for which FDA recommended extensive testing in the Draft ENDS PMTA Guidance, eight HPHCs (4-Aminobiphenyl, 1-Aminonaphthalne, 2-Aminonaphthalne, ammonia, anabasine, benzo[a]pyrene, 1,3-butadiene, and isoprene) were removed from the Final ENDS PMTA Guidance and eleven new HPHCs (benzyl acetate, butyraldehyde, ethyl acetate, furfural, glycidol, isoamyl acetate, isobutyl acetate, methyl acetate, N-butanol, priopionic acid, and propylene oxide) were added. (FDA, 2016 at pp. 26-27; FDA PMTA Guidance, 2019 at pp. 28-29.) Testing laboratories must now establish independently validated testing methodologies for these new HPHCs and financial resources spent previously by applicants to test for the eight HPHCs that have now been dropped from the list were spent in vain. Indeed, FDA has further complicated the HPHC picture by, on August 5, 2019—almost two months *after* the Final ENDS PMTA Guidance was published—publishing a notice in the Federal Register seeking comments on whether two further constituents never before identified in either version of the ENDS PMTA Guidance—acetic acid and acetoin—should not also be included in the list of HPHCs for ENDS products because of their potential for adverse respiratory effects. Applicants cannot reasonably be expected to complete and report on their HPHC aerosol testing when the list of HPHCs for which they are supposed to test keeps changing.

c. Third, as regards HPHC testing, FDA has indicated that it will only accept results from testing laboratories that are compliant with good laboratory practices regulations.

(FDA PMTA Guidance, 2019 at p. 34.) I believe that we at Cardno ChemRisk are as experienced as any scientific consultancy in the world with respect to vapor products and the independent laboratories with meaningful experience conducting aerosol testing of such products. However, I am aware of only five to six such qualified and accredited laboratories total in the United States, Canada, and the United Kingdom. Of these, one laboratory does not even have the capability of generating its own aerosol in-house. Further, of these five to six qualified laboratories, none currently have in place independently validated testing methodologies or assays for all of the newly added HPHCs announced by FDA on June 11, 2019, in the Final ENDS PMTA Guidance. It is my understanding that the process for obtaining approval for such new methodologies from accrediting laboratory organizations such as the American Association for Laboratory Accreditation may take weeks or even months.

e. Fourth, with respect to HPHCs, FDA indicates in its scientific policy memoranda that toxicological evaluation of inhaled tobacco products should be compared against threshold levels of concern for the general population. (FDA Reference Values, 2019.) However, the limits of detection with currently available laboratory equipment are substantially greater than the general population-level threshold levels of concern for a number of the HPHCs. This means that, even with the best equipment, accredited laboratories cannot meaningfully determine whether HPHCs emitted in the aerosol from vapor products exceed the threshold levels of concern without performing thousands of puffs on a single device. Even if this problem did not exist, given the wide range of vapor products currently on the market, for which I expect PMTAs to be submitted, laboratory capacity for aerosol testing on a 10-month time frame is likely to be exhausted in the near future and leave some potential applicants without any available lab to test their product prior to the May 11, 2020 deadline.

f. Fifth, the Final ENDS PMTA Guidance also recommends that applicants perform product stability and shelf life testing. (FDA PMTA Guidance, 2019.) To my knowledge, there is no published industry guidance on proper testing protocols for evaluating the stability of ENDS products. In lieu of guidance specific to ENDS products, some companies are using industry guidance for stability testing of new drug substances and products. The duration of the stability testing should be sufficient to cover storage, shipment, and subsequent use, which will require a test that is at least 12 months in duration. (FDA, 2003).

g. Sixth, in the Final ENDS PMTA Guidance, FDA recommends that applicants conduct human clinical studies to study patterns of use (i.e., number of puffs per use, puff duration, puff intensity, frequency of use, and duration of use) and biomarkers of nicotine exposure and health outcome such as heart rate, blood pressure, and changes in lung function. (FDA PMTA Guidance, 2019 at pp. 24, 37-41.) These are known as "vaping topography" and "pharmacokinetic" studies. FDA states that "[n]onclinical studies alone are generally not sufficient to support a determination that permitting the marketing of a tobacco product would be appropriate for the protection of the public health." The shortest possible time frame over which such studies can be conducted, however, is 12 months, and 24 months is a more reasonable time estimate. This is the case because even a clinical study with a small cohort requires: (1) development of a study protocol; (2) review and approval by an institutional review board, or IRB; (3) execution of the study (which will often require subjects to stay overnight at the clinical laboratory facility for a period of approximately a week so that they can vape *ad libitum* and have measurements taken periodically of relevant biomarkers); (4) capture and presentation of the relevant data in a format appropriate for FDA review; and (5) analysis, interpretation, and

explanation of the data in a detailed written report. Study participants typically participate in the study on a staggered basis, so data gathering typically occurs over a series of months or even years.

h. Seventh, upon information and belief, there are six or fewer clinical laboratories in the United Sates with the expertise and experience to execute the type of vaping topography and pharmacokinetics studies recommended by FDA in the Final ENDS PMTA Guidance. Further, one of these clinical laboratories will only work with large tobacco companies. I am in contact with these laboratories on a near-daily basis and, currently, the earliest any of these laboratories is even available to begin such a clinical study is not until the end of October 2019.

i. Eighth, the Final ENDS PMTA Guidance recommends conducting behavioral studies that are nationally representative. (FDA PMTA Guidance, 2019 at pp. 13, 46-47.) Such a study could not be conducted in fewer than ten months because, to be truly nationally representative, such a survey would require a detailed sampling plan and thousands of participants.

j. Ninth, any PMTA submission that complies with each of the recommendations set out by FDA in the Final ENDS PMTA Guidance is likely to be at least 50,000 pages in length and consist of a compilation of hundreds, if not thousands, of individual documents. There exist consulting firms that specialize in compiling and organizing such submissions for FDAs review and are experienced with doing so in the drug and medical device contexts. These consulting firms require that all relevant documents be provided to them at least three (3) months prior to the deadline for filing so that they have sufficient time to organize, collate, and create internal cross-references and links in the final submission package. Any applicant would thus have to have all of its studies and testing completed and write-ups prepared and transmitted to such a consulting firm by February 11, 2020, in order for the submission to be sent to FDA by May 11, 2020.

21. We expect the typical PMTA application process — from the initial planning stages to submission for FDA's substantive review — to span at least two years, if not more, for most vapor products. The estimated costs are anticipated to be in the millions of dollars for each product. All of this places a high premium on FDA providing predictability for the applicant in terms of what is required in the PMTA process so that the applicant can manage risk, as well as financial and time demands.

22. Requiring applicants who have waited for the publication of the Final ENDS PMTA Guidance to now complete PMTAs on only a ten- or eleven-month time frame is not realistic and will likely lead to the submission of numerous incomplete and/or low-quality submissions. The process applicants must go through to demonstrate that their vapor product is appropriate for the protection of public health is complex. Both FDA and applicants will need sufficient time to resolve complicated issues associated with, among other things, protocols for testing and research. A lengthier time frame than a mere ten or eleven months is required for applicants to meaningfully explain their planned testing and study protocols to FDA during the initial planning phase of the PMTA process, receive feedback, and then execute on the planned tests and studies in their efforts to submit high quality PMTAs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 28, 2019

Stacey M. Benson, Ph. D.



F-018642

References

US Food and Drug Administration (FDA, 2003). Guidance for Industry Q1AQ(R2) Stability Testing of New Drug Substances and Products. https://www.fda.gov/media/71707/download

US Food and Drug Administration (FDA, 2016). Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. Draft Guidance for Industry. May 5, 2016. https://www.fda.gov/media/97652/download

US Food and Drug Administration (FDA, PMTA Guidance 2019). Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. Guidance for Industry. June 11, 2019. https://www.fda.gov/media/127853/download.

US Food and Drug Administration (FDA, PMTA Presentation 2019). Draft Guidance: Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. Presentation by Paul Hart and Li-Lun Chen. Accessed June 2019. https://www.fda.gov/media/97881/download.

US Food and Drug Administration (FDA Reference Values, 2019). Use of Reference Values in the Toxicological Evaluation of Inhaled Tobacco Products. Accessed August 2019. https://www.fda.gov/media/124680/download.

# Exhibit D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
Lexington Division

| | | |
|---|---|---|
| VAPOR TECHNOLOGY ASSOCIATION, et al.<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FOOD AND DRUG ADMINISTRATION, et al.<br><br>Defendants. | ) | Case No. 5:19-cv-00330-KKC |

**SUPPLEMENTAL DECLARATION OF STACEY M. BENSON, Ph.D.**

I, Stacey M. Benson, Ph. D., do hereby declare as follows:

1. I am over the age of 18 years and have personal knowledge of the facts set forth below such that I would be competent to testify as to the same if called.

2. I am an epidemiologist with over 15 years of professional experience conducting, analyzing, and interpreting scientific data using well-accepted scientific methodology. Epidemiology relies on human research to assess the relationship between exposures to a substance or product and the resulting human health impacts.

3. My areas of expertise include environmental epidemiology, occupational epidemiology, respiratory protection, and clinical research. I received my undergraduate degree (B.S.) in physics from St. Lawrence University, my master's degree (M.S.) in the field of exercise physiology from the University of Pittsburgh, and my Ph.D. in Epidemiology from the University of Pittsburgh. I have held teaching positions at Carnegie Mellon University and Point Park University and served an Associate Service Fellow at the National Institute for Occupational Safety and Health, where I conducted human subject experiments at the National Personal Protective Technology Laboratory. I have published over 30 scientific articles, presented 28 papers

at both national and international conferences, and have been cited in the scientific literature over 400 times.

4. I currently serve as a Managing Health Scientist and Epidemiology Practice Area Lead at Cardno ChemRisk, a global scientific consulting firm specializing in, among other areas, product health and safety. Cardno ChemRisk is a consulting firm that provides scientific advice to the government, corporations, law firms, and various scientific and professional organizations.

5. Cardno ChemRisk has been providing consulting services to electronic nicotine delivery systems (ENDS) clients for over five years and is currently supporting clients in their efforts to comply with the Premarket Tobacco Application (PMTA) process. As such, we, and I in particular, are familiar with the PMTA procedures as they stand today, as well as the many challenges and uncertainties facing vapor product manufacturers that are attempting to satisfy the recommendations for PMTAs set forth by the Food and Drug Administration (FDA).

6. On August 28, 2019, I signed a declaration (my "Original Declaration") that I understand was filed by the Plaintiffs in the above-captioned case in support of their motion for a preliminary injunction.

7. On September 25, 2019, FDA published a proposed rule in the Federal Register entitled *Premarket Tobacco Applications and Recordkeeping Requirements* (the "PMTA Proposed Rule"). A true and correct copy of that proposed rule is attached hereto as Exhibit 1. The Proposed Rule, which is some 93 pages long, purports to "set forth the requirements for premarket tobacco product applications" for all tobacco products, including vapor products.

8. I have reviewed the Proposed Rule with a particular focus on whether it provides further clarity or guidance regarding any of the significant scientific and methodological issues and questions relating to the submission of PMTAs for vapor products that I set out in my Original

Declaration, including the concerns that I discussed in paragraphs 11 through 16 thereof and paragraph 20 thereof. These concerns include, *inter alia*, good manufacturing practices requirements, bridging studies across vapor products, methodologies for aerosol testing of devices and e-liquids, and the complete list of harmful and particularly harmful constituents (HPHCs) for which the vapor product's aerosol must be tested. With the exception of providing additional detail on the requirements for environmental assessments, the Proposed Rule fails to address the scientific and methodologic concerns I previously enumerated. The Proposed Rule also fails to address in any way the significant practical concerns arising from the technological limitations associated with available lab equipment's limits of detection for certain HPHCs, the lack of validated methodologies to support the detection of certain HPHCs at levels relevant to the general population, the significant constraints on available lab space prior to the May 11, 2020 deadline for both clinical and non-clinical testing, the timing issues surrounding shelf life and stability testing, the amount of time it takes to conduct and complete proper clinical vaping topography and pharmacokinetic studies, or the requirement for nationally representative behavioral studies.

9. In short, other than as regards environmental assessments, the Proposed Rule provides no further clarity on any of the other very significant practical concerns that constrain the ability of vapor product manufacturers to submit robust PMTAs prior to the May 11, 2020 deadline, yet the Proposed Rule also gives no indication that FDA will be willing to accept anything less than a "complete" PMTA by that date.

10. The publication of the Proposed Rule thus does nothing to affect my earlier conclusion that requiring applicants who waited for the publication of the Final ENDS PMTA Guidance in June 2019 (or even the publication of the Proposed Rule in September) to now complete PMTAs by May 11, 2020, is not realistic. Further clarity from FDA on the PMTA

requirements in the areas that I noted in my Original Declaration and then an appropriate period of time for manufacturers to execute the necessary studies and prepare their PMTAs is instead required.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 7, 2019

Stacey M. Benson, Ph. D.

References

US Food and Drug Administration. Premarket Tobacco Product Applications and Recordkeeping Requirements. 84 Federal Register 50566. September 25, 2019. https://www.govinfo.gov/content/pkg/FR-2019-09-25/pdf/2019-20315.pdf

# Tab 57.02

Declaration of Dr. Willie McKinney

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

THE C STORE DEPOT, INC., ET AL.,

Plaintiffs,

v.

U.S. FOOD AND DRUG ADMINISTRATION, ET AL.,

Defendants.

Case No. **8:26-cv-483-MSS-CPT**

**DECLARATION OF DR. WILLIE MCKINNEY**

I, Dr. Willie McKinney, declare as follows:

1. My name is Dr. Willie J. McKinney. I am over 18 years of age and would be competent to testify to the information set forth herein if called to testify as a witness in court.

2. I make this declaration based on my own personal knowledge and experience.

3. I submit this declaration in support of the motion for a temporary restraining order filed by Zest Brands LLC ("Zest") and C Store Depot, Inc.

4. I am a board-certified toxicologist, certified by the American Board of Toxicology, with more than 25 years of experience in U.S. tobacco and nicotine product regulation and regulatory science. My experience includes past senior regulatory leadership roles with Altria Client Services LLC, JUUL Labs, Inc and

extensive work advising manufacturers on premarket tobacco product applications ("PMTAs") submitted to the U.S. Food and Drug Administration ("FDA") Center for Tobacco Products ("CTP"), including product characterization, toxicological risk assessment, regulatory gap analyses, nonclinical and clinical study strategy, stability and shelf-life programs, and PMTA compilation and submission.

5. I am the founder and principal of McKinney Regulatory Science Advisors, LLC, and the Chief Executive Officer of McKinney Specialty Labs, LLC, where I lead scientific, analytical, and regulatory strategy efforts supporting tobacco and nicotine product development and FDA premarket tobacco product application compliance. From 2016 to 2019, I served on the FDA's Tobacco Products Scientific Advisory Committee ("TPSAC") as the non-voting representative of the tobacco manufacturing industry, participating in scientific deliberations concerning tobacco product standards and premarket review under the Family Smoking Prevention and Tobacco Control Act ("TCA").

6. I am currently advising Zest in connection with the PMTAs that were subject to FDA's January 30, 2026 Refuse to File ("RTF") letter, which Zest is seeking to enjoin.

7. I submit this declaration to provide my expert opinions regarding: (a) the scientific and regulatory components generally required to prepare a successful PMTA for oral pouch products containing nicotine and food-grade ingredients; (b)

reasonable cost ranges associated with major study categories and PMTA preparation activities for PMTAs for oral nicotine pouches; and (c) how those cost ranges compare with the generalized cost ranges that FDA set out for bundled PMTAs for other novel nicotine products in its "Deeming Rule" adopted in 2016.

8. Under the Family Smoking Prevention and Tobacco Control Act, a PMTA must contain sufficient scientific evidence to permit the FDA to determine that the marketing of the new tobacco product would be "appropriate for the protection of the public health" ("APPH"). 21 U.S.C. § 387j(c)(2)(A). This is a population-level standard that requires FDA to consider the risks and benefits to the population, including both users and nonusers of tobacco products. 21 U.S.C. § 387j(c)(4).

9. In 2021, FDA issued a final rule describing what must be included in a PMTA. Requirements for Tobacco Product Manufacturing Practice and PMTAs, 86 Fed. Reg. 55,300 (Oct. 5, 2021); 21 C.F.R. pt. 1114. In 2022, Congress amended the Family Smoking Prevention and Tobacco Control Act to clarify that products containing nicotine from any source—including synthetic nicotine—are regulated as tobacco products. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. P, tit. I, § 111 (2022) (codified at 21 U.S.C. § 321(rr)). Although these requirements apply to oral nicotine pouch products, FDA has not issued product-specific guidance explaining the precise studies or data expected for these products.

As a result, manufacturers must comply with the regulation at 21 C.F.R. pt. 1114, and also rely on FDA guidance and publicly available decision summaries for other noncombustible products to determine what scientific evidence is necessary to prepare a complete PMTA in the view of the FDA.

10. The exact contents of a PMTA depend on the specific product; however, FDA generally expects applications to include several core categories of scientific and regulatory information, organized into modules. These typically include:

A. **Detailed description of the product's design** and formulation, including materials, nicotine form, ingredients, and operating characteristics (if applicable);

B. **Chemistry data** identifying ingredients, impurities, and, where relevant, emissions or aerosol constituents, as well as information addressing leachables and batch consistency;

C. **Manufacturing information** describing process controls, quality assurance procedures, finished product specifications, supplier qualification, and change control systems;

D. **Nonclinical toxicology** data, often including *in vitro* testing and a toxicological risk assessment linking chemistry data to expected health risk;

E. **Clinical data**, which may include nicotine pharmacokinetics, exposure comparisons, actual use and switching behavior, and abuse liability assessments; and

F. **Consumer perception** evidence where labeling, marketing, or product characteristics could affect risk perceptions, appeal, or likelihood of initiation or switching.

The scope and depth of each category vary depending on the novelty and characteristics of the product and the availability of relevant scientific literature.[1]

11. In rulemaking and regulatory impact analyses, FDA has estimated per-application preparation costs for bundled PMTAs for certain categories of products ranging from tens of thousands of dollars to two million dollars, with some modeled averages in the hundreds of thousands of dollars.[2] These estimates are based on standardized assumptions that often do not reflect the reality faced by small

[1] See 21 U.S.C. § 387j(b)(1); 21 C.F.R. pt. 1114; Requirements for Tobacco Product Manufacturing Practice and PMTAs, 86 Fed. Reg. 55,300 (Oct. 5, 2021); FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry* (June 2019); FDA, *Tobacco Product Application Review: Evaluation of Public Health Impact* (Jan. 2018).

[2] See, e.g., Final Regulatory Impact Analysis for Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act ("Deeming Rule") (May 2016), available at https://www.regulations.gov/document/FDA-2019-N-2854-0125; Requirements for Tobacco Product Manufacturing Practice and PMTAs, 86 Fed. Reg. 55,300, 55,427–55,436 (Oct. 5, 2021) (economic analysis of PMTA preparation costs).

businesses seeking FDA marketing authorization for novel products and do not necessarily reflect the costs of developing a fully supported application for such products. Notably, FDA did not include any cost estimates to prepare a bundled PMTA for a novel oral nicotine in its regulatory impact assessment for its 2016 Deeming Rule and said it could not estimate costs associated with the Deeming Rule for any novel nicotine products other than electronic nicotine delivery systems ("ENDS"), which are commonly known as e-cigarettes.[3]

12. If anything, as a general matter, I would expect the costs of preparing a bundled PMTA for an oral nicotine pouch product to be significantly less than those associated with an ENDS product because, while ENDS products do not involve combustion, they do involve heating, aerosolization, and inhalation, whereas nicotine pouch products do not.

13. In my professional experience, the costs to prepare bundled PMTAs for oral nicotine products that include comprehensive analytical testing, nonclinical toxicology, human clinical and behavioral studies, and robust manufacturing documentation, as requested by FDA, often far exceed FDA's baseline cost estimates found in its Deeming Rule regulatory impact analysis even for bundled PMTAs for ENDS products.

[3] Final Regulatory Impact Analysis for Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act (May 2016) at 75, available at https://www.regulations.gov/document/FDA-2019-N-2854-0125.

14. Based on my professional experience planning, overseeing, and advising on PMTA development programs, the following represent reasonable planning ranges for the time and cost associated with preparing a scientifically robust, bundled PMTA for a novel oral nicotine product. Actual costs and timelines vary depending on product complexity, study design, and regulatory posture, but these ranges reflect typical industry experience:

A. **Regulatory strategy, gap assessment, and project management (approximately 3–12 months):**

Estimated cost range: $150,000 – $250,000.

B. **Chemical characterization and stability** (multi-batch testing):

Estimated cost range: $1,200,000 – $2,000,000.

C. **Chemical characterization of comparator products: (includes a cigarette and other oral nicotine products):**

Estimated cost range: $ 300,000 to $400,000.

D. **Dissolution:**

Estimated cost range: $ 100,000 to $150,000.

E. **Leachables and extractables studies**:

Estimated cost range: $150,000 – $250,000.

F. **Nonclinical toxicology:**

• In vitro test battery and reporting: $150,000 – $600,000

• Additional specialized toxicology assessments or scientific bridging justifications: $100,000 – $1,000,000 or more

• If in vivo studies are required, costs and timelines increase materially.

G. **Clinical pharmacokinetic and exposure studies** (often involving approximately 30–120 or more subjects, depending on design):
Estimated cost range: $800,000 – $2,700,000 or more.

H. **Longitudinal actual use and switching behavior studies** (multi-site, multi-month follow-up):
Estimated cost range: $1,000,000 – $3,000,000 or more, with higher costs associated with larger sample sizes, additional sites, more frequent visits, and biochemical verification.

I. **Perception, intention, and behavioral research** (including survey and experimental components, as appropriate):
Estimated cost range: $800,000 – $2,500,000 or more.

J. **Stability program to support a 12-month labeled shelf life** (multiple lots, timepoints, and packaging configurations):
Estimated cost range: $250,000 – $1,200,000 or more for one year of long-term stability testing.

K. **PMTA assembly, quality assurance, and submission build** (including electronic publishing, cross-referencing, validation checks, and internal

audit):

Estimated cost range: $500,000 – $700,000 or more.

These ranges reflect planning-level estimates for a complete bundled PMTA development program and do not include opportunity costs, internal staffing costs, or post-submission FDA deficiency letter responses, which can further increase expenditures.

15. **Total program costs.** Based on my professional experience, the total cost of preparing and supporting a complete PMTA program for approximately 18 oral nicotine product SKUs would reasonably fall within a broad range of approximately $3 million to $13.8 million or more, depending on product complexity, the scope of clinical and behavioral evidence pursued, and the extent to which data may be bridged across similar products. While certain efficiencies may be achieved where products share common formulations or design features, costs increase materially when multiple SKUs (e.g., strengths or flavors) are treated as distinct products requiring separate evidentiary support. For this reason, we strongly recommend a pre-PMTA meeting with FDA.

16. Public record examples confirm that PMTA expenditures for certain new tobacco and nicotine products can reach tens of millions of dollars and, in some cases, exceed $100 million. For example, in the February 23, 2022 Federal Trade Commission administrative decision in *In the Matter of Altria Group, Inc. and JUUL*

*Labs, Inc.*, the record reflects evidence that PMTA-related expenditures for JUUL ENDS products exceeded $100 million, and that internal estimates for certain PMTA efforts were in the tens of millions of dollars, including figures reportedly in the range of approximately $80–$90 million for particular product groups.[4]

17. These publicly reported figures are consistent with my professional experience that successful PMTA programs often require substantial investment in analytical testing, nonclinical and clinical research, behavioral studies, manufacturing systems, regulatory publishing, and specialized scientific expertise.

18. FDA's publicly available review documents show that the agency places weight on longitudinal clinical study evidence—meaning studies that follow the same individuals over time to evaluate switching from cigarettes or cessation—when deciding whether to authorize the marketing of new tobacco products. In reviewing certain PMTAs for oral nicotine products, FDA has evaluated switching and cessation outcomes at multi-month timepoints, including approximately three and six months. In some cases, FDA has also considered longer-term follow-up, such

[4] *In the Matter of Altria Group, Inc. and JUUL Labs, Inc.*, FTC Docket No. 9393, Initial Decision (Feb. 23, 2022) (discussing evidence regarding JUUL PMTA expenditures and internal cost estimates).

Docusign Envelope ID: A4182974-B830-4203-B160-510391F2DF62

as 12-month cohort data, as part of its overall assessment of population-level impact.[5]

19. These switching studies are typically performed as randomized controlled trials, although, if the subject product is sold in large-enough quantities, longitudinal cohort studies can also provide scientifically strong switching data. To my knowledge, FDA has yet to authorize a new tobacco product without some form of a longitudinal switching study.

20. Planning, executing, and reporting on a longitudinal switching study such as a randomized controlled trial requires protocol development, vendor selection, Institutional Review Board ("IRB") review and approval, participant recruitment and screening, baseline assessments, product dispensing and subject instruction, scheduled follow-up visits, study monitoring, data cleaning, statistical analysis, and preparation of the final report.

21. Importantly, FDA has never defined "pass/fail" criteria for any of the clinical studies the agency contemplates for PMTAs for nicotine pouch products, including longitudinal switching studies. Thus, even after potentially investing

[5] See, e.g., 21 U.S.C. § 387j(c)(4) (requiring consideration of cessation and initiation at the population level); FDA, *Technical Project Lead Review* and *Summary of Basis for Marketing Granted Orders* for authorized oral nicotine products (publicly available decision summaries discussing switching and cessation evidence); FDA, *Tobacco Product Application Review: Evaluation of Public Health Impact* (Jan. 2018) (describing consideration of longitudinal behavioral evidence in APPH determinations).

millions of dollars into such studies, an applicant does not know for certain whether its results will be acceptable to FDA.

22. Further, in my experience, FDA has rejected most attempts by applicants to rely on published scientific literature regarding various components of a PMTA, often because the products that are the subjects of the published literature are insufficiently similar to the subject product to "bridge" the published literature's conclusions to the subject product or because the published literature fails to includes sufficient detail as to the methodologies and parameters used in the product testing or studies that were the subject(s) of the published article(s).

23. For the reasons described above, it is my professional opinion that: (a) a scientifically robust PMTA for an oral nicotine product generally requires extensive chemistry data, toxicology assessment, manufacturing controls, and human evidence consistent with FDA's regulatory expectations; (b) the costs to prepare a scientifically robust bundled PMTA for such products typically are substantially more than the cost range FDA estimated in its 2016 Deeming Rule regulatory impact analysis for electronic nicotine delivery system products, which are more complex than oral nicotine pouches because ENDS products involve heating, aerosolization, and inhalation, whereas oral nicotine pouches do not; (c) in its publicly available reviews of new tobacco and nicotine products that FDA has authorized thus far, the agency has placed weight on the clinical study data from

randomized controlled trials related to subjects' switching from combustible cigarette use and/or smoking cessation; and (d) the total cost of preparing and supporting a complete PMTA program for approximately 18 oral nicotine product SKUs would reasonably fall within a broad range of approximately $3 million to $13.8 million or more, depending on product complexity, the scope of clinical and behavioral evidence pursued, and the extent to which data may be bridged across similar products.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 18, 2026

DocuSigned by:
Willie McKinney
50B1509072C54D2...

Dr. Willie McKinney

# Tab 57.03

Declaration of Inga Nasi and
attached Refusal to File Letter

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

THE C STORE DEPOT, INC., ET AL.,

Plaintiffs,

v.

U.S. FOOD AND DRUG ADMINISTRATION, ET AL.,

Defendants.

Case No. **8:26-cv-483-MSS-CPT**

## DECLARATION OF INGA NASI

I, Inga Nasi, declare under penalty of perjury that the following is true and correct:

1. I am over 18 years of age and would be competent to testify to the information set forth herein if called to testify as a witness in court.

2. I make this declaration based on my own personal knowledge and based on the business records of Plaintiffs Zest Brands LLC and The C Store Depot, Inc.

3. I submit this declaration in support of Plaintiffs' motion for temporary restraining order.

4. I am the founder and chief executive officer of Plaintiff Zest Brands LLC ("Zest").

5. I am also the founder and chief executive officer of The C Store Depot Inc. ("CSD").

6. I am a Tampa resident and a single mother of two high school-aged children.

7. I started my career as an entrepreneur 13 years ago when I founded CSD. CSD is a distribution business based in Tampa that services hundreds of convenience stores around the Tampa Bay area. CSD currently employs over [redacted] people.

8. In 2020, a full two years before the FDA acquired jurisdiction over products containing non-tobacco, or synthetic, nicotine, I founded Zest to develop and manufacture harm reduction products. To date, I have invested approximately [redacted] into Zest, including [redacted].

9. The reason I poured [redacted] into Zest is that I believe very strongly in what we created—novel products designed and manufactured with the highest quality ingredients to allow smokers of combustible cigarettes and users of smokeless tobacco to switch to a dramatically less harmful alternative—the ZEO Universe synthetic nicotine pouch products.

10. Collectively, Zest and CSD, which distributes the ZEO Universe pouches, have a total of approximately [redacted]

[redacted]. We used these funds to finance the preparation of our bundled premarket tobacco product applications ("PMTAs") for the ZEO Universe products that we submitted to FDA in 2022, along with the expansion of the Zest business, including hiring teams for marketing and manufacturing operations.

11. We timely submitted to FDA our bundled PMTAs for [redacted] SKUs of the Zeo Universe products on May 14, 2022, in pursuit of a marketing granted order for those products.

12. On January 30, 2026, FDA issued a Refuse to File ("RTF") letter to Zest on the bundled PMTAs. A true and correct copy of the RTF letter is attached hereto as Exhibit A.

13. In the RTF letter, FDA warned Zest that the agency could take enforcement action if we continue to sell the ZEO Universe products.

14. If the Court does not enter an injunction staying the RTF letter, the terms of Zest's and CSD's [redacted]. Both Zest and CSD will also lose the value of the substantial work put into the PMTAs to date, the value of raw materials and pre-ordered goods currently in transit or held by suppliers, and the value of the inventories that the companies currently hold because they will not be able to sell them to their customers. Approximately [redacted] is tied up in

inventory of finished ZEO Universe product held by the two companies and another [redacted] is invested in raw materials and inputs from suppliers.

15. Further, the [redacted]. There are currently [redacted] of dollars' worth of inventory at retailers and distributors of the ZEO Universe products that would [redacted].

16. I estimate the cost of [redacted]. [redacted], thus tarnishing the companies' reputations with both customers and suppliers.

17. Approximately [redacted] of Zest's revenues come from the sale of the ZEO Universe products that are the subject of the RTF letter. I anticipate that, without an injunction, due to the terms of its [redacted] and the dramatically reduced revenues it will receive without the ability to sell the ZEO Universe products, Zest will be required to [redacted].

18. Approximately [redacted] of CSD's revenues, and a much higher percentage of CSD's gross profits, come from sales of the ZEO Universe pouches. CSD is also [redacted]. Thus, as with Zest, if the Court

Docusign Envelope ID: 5F1AEE43-9D6B-469D-8D43-A2C020F66F77

does not stay the RTF letter, CSD's revenues will not be [redacted].

19. I anticipate that [redacted] of whom are Tampa Bay-area residents. We also will be [redacted] approximately [redacted] in excise tax obligations owed to the State of Florida.

20. I am also concerned that, without an injunction, the many consumers that use and rely on the ZEO Universe pouches who previously used more harmful tobacco products, such as combustible cigarettes, will end up reverting back to those products because the ZEO Universe pouches will no longer be available on the market.

Executed this 18th day of February 2026.

DocuSigned by:
Inga Nasi
478D02A7D08F430...

Inga Nasi

# Exhibit A

U.S. FOOD & DRUG ADMINISTRATION

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

January 30, 2026

**REFUSE TO FILE**

Zest Brands LLC
Attention: Inga Nasi, CEO
6303 Blue Lagoon Drive, Suite 400
Miami, FL 33126

**FDA Submission Tracking Numbers (STNs):** [redacted] see Appendix A

Dear Inga Nasi:

We completed a preliminary review of your PMTAs[1] and determined that these applications do **not** meet the filing requirements for a new tobacco product seeking a marketing order under section 910(b) of the FD&C Act.[2] As a result, we are refusing to file the applications for the new tobacco products identified in Appendix A, effective the date of this letter. Refer to Appendix B for a list of amendments and additional submissions received.

Your applications lack the following required information necessary for substantive scientific review per section 910(b) of the FD&C Act and 21 C.F.R. § 1114.7:

[redacted]

[redacted]

[redacted]

---

[1] Premarket Tobacco Product Applications (PMTAs)
[2] Federal Food, Drug, and Cosmetic Act (FD&C Act)

[redacted]

Refer to Appendix C for additional information to consider submitting in future submissions. The information provided in this letter may not represent a complete list of comments and potential deficiencies.

**You cannot introduce or deliver for introduction these new tobacco products into interstate commerce. The manufacture, sale, and/or distribution of these products, as new tobacco products that lack FDA authorization, is prohibited by law and subject to enforcement action by FDA unless and until the products receive such authorization. See generally FD&C Act section 301. These actions may include, but are not limited to, civil money penalties, including an enhanced civil money penalty under FD&C Act section 303(f)(9)(B)(i), seizure, criminal prosecution, and/or injunction. In addition, tobacco products offered for import into the United States that appear to be adulterated and/or misbranded may be detained or refused admission. It is your responsibility to ensure new tobacco products you manufacture, sell, and/or distribute comply with all applicable statutory and regulatory requirements under the FD&C Act and FDA's implementing regulations.**

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[3,4] using eSubmitter.[5] Alternatively, submissions may be mailed to:

Food and Drug Administration
Center for Tobacco Products
Document Control Center (DCC)
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

---

[3] For more information about CTP Portal, see http://www.fda.gov/TobaccoProducts/GuidanceComplianceRegulatoryInformation/Manufacturing/ucm515047.htm
[4] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[5] For more information about eSubmitter, see https://www.fda.gov/industry/fda-esubmitter

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[6]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

If you have any questions, please contact Shapol Warmzyary, Regulatory Health Project Manager, at (240) 402-5995 or Shapol.Warmzyary@fda.hhs.gov.

Sincerely,

Digitally signed by Benjamin Apelberg -S
Date: 2026.01.30 16:36:56 -05'00'

Benjamin Apelberg, Ph.D.
Deputy Director
Office of Science
Center for Tobacco Products

**Enclosures**:
Appendix A – New Tobacco Products Subject of This Letter
Appendix B – Amendments and Additional Submissions Received for This Applicant
Appendix C – Additional Comments That May Be Considered for Future Nicotine Pouch Product Submissions

[6] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Appendix B**

Amendments and Additional Submissions Received for This Applicant

Amendments Received for These Applications

| [redacted] | [redacted] | [redacted] | [redacted] | |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | | | [redacted] |

**Appendix C**

Additional Comments That May Be Considered for Future Nicotine Pouch Product Submissions

The following additional comments are intended to provide the types of information that should be included in a future submission for a nicotine pouch product. The information below is not a comprehensive list of all considerations for a future submission. You should refer to the final rule Premarket Tobacco Applications and Recordkeeping Requirements 21 C.F.R. § 1114.7 and other applicable regulations that are effective at the time you submit your PMTA.

Key product-specific information that FDA is going to focus on in the evaluation of a nicotine pouch product includes:

- **Product characterization** which includes:
  - **Complete composition:** to identify the product intended for consumer use
  - **Consistent manufacturing:** to ensure the product meets the design specifications (e.g., nicotine levels are not higher than what is on the label) and are being made in a reliable way that doesn't introduce hazards (e.g., glass, mold)
  - **Harmful and potentially harmful constituents and their amounts:** to confirm overall quantities of harmful constituents are not higher than those found in snus or similar types of smokeless products and that there are no ingredients of concern (e.g., flavorings that may pose significant health risks).
- **Abuse liability:** to ensure the product will not promote use more than other tobacco products with a known high abuse liability (e.g., smokeless tobacco products, combusted cigarettes) and that the product has the potential to be an alternative nicotine source for current users of more harmful tobacco products
- **Adverse experiences:** to ensure consumers or study participants have not reported serious and unexpected adverse experiences with use of the products
- **Accidental exposures:** to ensure sufficient mitigation measures, such as child resistant packaging, are used to reduce likelihood of accidental exposure
- **Marketing plan:** to evaluate youth exposure to marketing materials for the product and youth access to the product

*Product characterization*

- The application must provide information about ingredients in all components of your new tobacco product. The information provided for all ingredients must include sufficient detail to fully identify the composition; including but not limited to:
  - Ingredient names and absolute quantities (e.g., mg/ tobacco product) for all components
  - IUPAC chemical name and common name for all ingredients
  - Function of each ingredient
  - Single ingredient names and absolute quantities in each complex ingredient
    - It is important to distinguish between complex ingredients made to your specifications and those that are not. For all complex ingredients made to your specifications, you should provide complete information according to FDA's Guidance for Industry Listing of Ingredients in Tobacco Products. For complex ingredients that are not made to your specifications, you should provide

complete information on the single/individual ingredients that compose these complex ingredients.
        - For all complex ingredients, you should ensure that the comprising single/individual ingredient quantities add up to 100%.
    - If your application contains ingredient quantities that are reported with values such as “less than,” “<,” “NA,” “N/A,” “blank,” or “shaded quantities” (e.g., shaded cells in Excel spreadsheets), additional explanation of the meaning of these values should be provided. What is being reported may be unclear, so you should provide justification for reporting these types of values.
- The application must provide information on each material within your product. The material should be identified as well as the quantity, including ranges or means and acceptance limits.
- The application must contain information on constituents, including HPHCs and other constituents, contained within, or emitted from, the product including but not limited to:
    - Constituent name
    - Test data including test protocols, any deviation(s) from the test protocols, quantitative acceptance (pass/fail) criteria, and line data for all testing performed
    - Test methods and instrumentation including information for in-house/custom equipment and standards used to generate test data.
- The application must contain information on other properties of a tobacco product including but not limited to:
    - Product dimensions and the overall construction of the product. This may be provided through a diagram or schematic drawing that clearly depicts the finished tobacco product and its components with dimensions, operating parameters, and materials.
    - All final design parameters of the product, specifying nominal values or the explicit range of values as well as the design tolerance (where appropriate).
    - Quantitative description of the performance criteria, including test protocols, line data, and summary of the results for each intermediate and final design parameter and manufacturing step to demonstrate that the design parameters and their associate processes are adequately controlled.
    - Information on shelf life and stability. When proposing the shelf life, data should be provided to support the total length of time. Stability testing details for each endpoint should include the:
        - mean quantity and variance with unit of measure
        - number of samples and measurement replicates for each sample
        - methods used (include the associated reference and full validation report for each method where applicable)
        - length of time between the date of tobacco product manufacture and date of testing and storage conditions of the tobacco product prior to testing
        - measurements obtained, at a minimum, at the beginning (zero time), middle, and end of the expected shelf life, from the tobacco product packaged within the same container closure system in which it is intended to be marketed
- The application must contain information on the principle or principles of operation
- The application must contain a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, packing and storage including but not limited to:
    - Narrative description with a list and summary of all standard operating procedures for manufacturing, design controls, packing, and storage
    - Examples of relevant forms and records relating to the manufacturing, design controls, packing and storage

- Identification of each facility involved in the manufacturing, packaging, storage and control for the product
  - Should identify the facility name, address, and FEI number
  - Should include information on what is occurring at each facility and how it relates to the product (e.g., specific production steps for a component of the product)
- Information on testing procedures carried out before the product is released to the market

- To facilitate automated processing of product characterization data, it is helpful for the application to use structured data models designed for tobacco product submissions such as those described within CDISC's Tobacco Implementation Guide. For assistance with data preparation, contact your Regulatory Health Project Manager (RHPM) to request sample data tables that incorporate these formatting guidelines for your products.

*Abuse liability*

- The application should include a clinical study/studies (or otherwise appropriately bridged information) that assesses the new products' abuse liability (e.g., nicotine pharmacokinetics and exposure, subjective experiences, ad libitum use behaviors) in comparison to a tobacco product(s) with known abuse liability.
- When submitted evidence does not include all the new products, the application should include scientific rationale that details how and to what extent differences between the new and study products affect abuse liability. A strong rationale would include how these differences would qualitatively and quantitatively impact abuse liability outcomes (e.g., if a product variable differs by X%, explain how this difference translates to expected changes in nicotine exposure, subjective effects, or other abuse liability measures). Scientific rationale should also include a direct comparison of product specific variables that may impact use behaviors and abuse liability (e.g., nicotine content and formulation, flavor) between the new and study products. While clinical studies provide the most robust bridging information, other types of data may be appropriate (e.g., free nicotine data, dissolution study data, bioequivalence testing).

*Adverse experiences*

- Provide a list of all adverse experiences that have occurred with the new tobacco product which are known or made known to you (e.g., through a study you conducted, a call/complaint).
- For all adverse experiences that are both serious and unexpected, it is recommended to provide your analysis of the association between the adverse experience and each new tobacco product
  - Serious adverse experience means an adverse experience that results in any of the following outcomes:
    - Death;
    - A life-threatening condition or illness;
    - Inpatient hospitalization or prolongation of existing hospitalization;
    - A persistent or significant incapacity or substantial disruption in the ability to conduct normal life functions;
    - A congenital anomaly/birth defect; or
    - Any other adverse experience that, based upon appropriate medical judgment, may jeopardize the health of a person and may require medical or surgical intervention to prevent one of the other outcomes listed in this definition.

- Unexpected adverse experience means an adverse experience occurring in one or more persons in which the nature, severity, or frequency of the experience is not consistent with:
    - The known or foreseeable risks of adverse experiences associated with the use or exposure to each tobacco product as described in the PMTA and other relevant sources of information;
    - The expected natural progression of any underlying disease, disorder, or condition of the persons(s) experiencing the adverse experience and the person's predisposing risk factor profile for the adverse experience; or
    - The results of nonclinical laboratory studies.

*Accidental Exposure*

- Manufacturers may make packaging child resistant through various mechanisms. It may be helpful to review how the Consumer Product Safety Commission (CPSC) evaluates special packaging (or child-resistant packaging). This information can be found at 16 CFR part 1700[12].
    - Part 1700.20 lays out both child and adult test requirements which meet child-resistant/adult-friendly packaging.
    - Tamper-resistance is NOT the same as child-resistant. Additionally, unless the tamper-resistant feature is part of the package's child-resistant design, it is to be removed prior to testing.
- If providing child-resistant packaging, the following information has been helpful in facilitating our review of other nicotine pouch applications:
    - Detailed schematics and description of all components of the packaging including all child-resistant, or other applicable safety mechanisms.
    - For each step in the packaging process, a description of the processing step, test data for finished product in process checks, including any in-process specifications and acceptance criteria, and corrective and preventative actions (CAPA) for nonconforming packaging.
    - All documentation and testing data related to child-resistant packaging claims, such as testing procedure reports, test data, and certifications or a General Certificate of Conformity (GCC), as described at section 14(a)(1) of the Consumer Product Safety Act (15 U.S.C. 2063(a)(1).
    - Information on shelf life and stability including data to support the total length of the proposed shelf lifetime, as well as stability testing details for each endpoint including measurements taken within the same container closure system (CCS) in which the products is intended to be marketed.
    - Considering the composition, shape, and dimensions of the products, data on the rates of choking, oral and oropharyngeal injuries involving the products in adults, children and pets to date, the dimensions of the products compared to the dimensions of known choking hazards for children, along with the plans for addressing these potential hazards.

[12] eCFR :: 16 CFR Part 1700 -- Poison Prevention Packaging

- CPSC does not approve, certify, or endorse any manufacturer, consultant, or testing firm; however, you may consider reviewing CPSC's website[13] for additional Poison Prevention Packaging Act (PPPA) resources including:
  - a list of manufacturers[14] that manufacture child-resistant and senior-friendly packaging
  - a list of consultants[15] who can provide services concerning child-resistant and senior-friendly packaging
  - a list of child-resistant package testing firms[16] that conduct tests or have indicated an interest in conducting tests on child-resistant packaging, according to 16 CFR 1700.20

Additional Considerations in Future Applications for Nicotine Pouches:

*Tobacco Product Master Files:*

- When submitting a PMTA that cross-references a **Tobacco Product Master File (TPMF**), you must include written authorization from the TPMF owner that grants you authorization to reference the TPMF, specify the TPMF submission tracking number, and clearly identify the content that you are referencing in the TPMF.
- To facilitate review of your PMTA, limit TPMF references to content that contains trade secret information that you do not have access to such as that for a complex purchased ingredient. Including information in the TPMF that is not trade secret and could be submitted directly in your PMTA, or in an amendment to your PMTA, creates complexity in the review process that can result in a delay in review.
- FDA considers content required to be included in your PMTA itself not appropriate for a TPMF. This includes but is not limited to:
  - Literature reviews
  - Clinical or non-clinical studies used across multiple applications
  - Manufacturing information used across multiple applications
  - Adverse experience reports
  - Environmental Assessments (EA)

Refer to the Guidance for Industry on Tobacco Product Master Files for additional information on TPMFs and how to request authorization to reference one in your PMTA.[17]

*Identification of content to support each product within a bundled submission*

- In a PMTA submission that includes multiple new tobacco products, it is important that you clearly identify which content pertains to each distinct product and show that the PMTA content requirements of Section 910(b)(1) of the FD&C Act are satisfied for each distinct product.
- FDA considers each product with a differing flavor variant and/or nicotine strength to be a different new product.

---

[13] https://www.cpsc.gov/Business--Manufacturing/Business-Education/Business-Guidance/PPPA
[14] https://www.cpsc.gov/Regulations-Laws--Standards/Statutes/Poison-Prevention-Packaging-Act/Manufacturers-of-Child-Resistant-Senior-Friendly-Packaging
[15] https://www.cpsc.gov/Regulations-Laws--Standards/Statutes/Poison-Prevention-Packaging-Act/Consultants-for-Child-Resistant-Senior-Friendly-Packaging
[16]https://www.cpsc.gov/Regulations-Laws--Standards/Statutes/Poison-Prevention-Packaging-Act/Child-Resistant-Package-Testing
[17] Guidance for Industry: Tobacco Product Master Files. May 2016. https://www.fda.gov/media/97632/download

*Labeling*

- A PMTA must include specimens of the **labeling** proposed to be used for the new tobacco product (FD&C Act Section 910(b)(1)(F)).
- Provide the following information on labeling:
  - specimens that are legible,
  - reflect the actual size and color for use with the new tobacco product,
  - show all portions of the container closure system (e.g., top, bottom, sides of can),
  - include any warning statements appropriate for the product class where applicable, and
  - comply with all other applicable labeling requirements under the FD&C Act.

*Environmental assessment*

- An environmental assessment (EA) must be submitted as part of a PMTA.
- An EA shall focus on relevant environmental issues for your tobacco product and is to be a concise, objective, and well-balanced document that allows the public to understand the agency's decision per 21 CFR 25.40(a), and should include all of the following:
  - Discussion of the need for the proposed action (i.e., FDA issuance of marketing granted order for your tobacco product)
  - Discussion of alternatives as required by section 102(2)(E) of the National Environmental Protection Act (NEPA)
  - Environmental impacts of the proposed action and alternatives
  - Listing of the agencies and persons consulted
  - Relevant environmental issues relating to product use and disposal from use
- In your EA it is recommended to provide a discussion of relevant environmental issues relating to product manufacturing.
- Mark all confidential information as such and include it in confidential appendices in the EA, as EAs are subject to public disclosure per 21 CFR 25.51(a).
- Refer to the following resources on the CTP website for more information with respect to EAs for tobacco products:
  - *Environmental Assessment & Claims of Categorical Exclusion*,[18] presented during the 2018 Tobacco Product Application Review – A Public Meeting[19]
  - *Lessons Learned from PMTA Reviews,*[20] presented during the 2019 Deemed Tobacco Product Applications – A Public Meeting (information on EAs begins on slide 33)[21]
  - FDA's Premarket Tobacco Product Marketing Orders website[22] for examples of EAs that comply with 21 CFR Part 25
  - Guidance for Industry: National Environmental Policy Act; Environmental Assessments for Tobacco Products; Categorical Exclusions – Small Entity Compliance Guide.[23]
- While alternative formats may be used, inclusion of a certification in your EA such as the one below containing a signed and dated statement would promote efficiency in the review process.

---

[18] https://www.fda.gov/media/117503/download
[19] https://www.fda.gov/tobacco-products/ctp-newsroom/tobacco-product-application-review-public-meeting
[20] https://www.fda.gov/media/133444/download
[21] https://www.fda.gov/tobacco-products/ctp-newsroom/deemed-tobacco-product-applications-public-meeting-10282019-10292019
[22] https://www.fda.gov/tobacco-products/premarket-tobacco-product-applications/premarket-tobacco-product-marketing-orders
[23] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/national-environmental-policy-act-environmental-assessments-tobacco-products-categorical-exclusions

"The undersigned official, on behalf of [insert company name] certifies that the information presented is true, accurate, and complete."

_________________________

(Date)

____________________________

(Signature of responsible official)

________________________________________

(Name and title of responsible official, printed)

*Presubmission meeting*

- To ensure that your application contains necessary elements to support an APPH determination for a nicotine pouch product, it may be beneficial to meet with FDA prior to submission.
- If meeting with FDA before submission of a future application, appropriate time should be allotted to hold the meeting and incorporate any advice or information gained.
- When requesting a meeting, the following should be provided in your meeting information package:
  - Identification of products subject of the intended application
  - A brief statement of the purpose of the meeting, which could include discussion of the types of studies or data to be discussed at the meeting, the general nature of the primary questions to be asked and where the meeting fits in the overall product development plans
  - A preliminary list of the specific objectives/outcomes expected from the meeting
  - A preliminary list of specific critical questions, grouped by discipline
  - The approximate date on which supporting documentation (i.e., the information package described in section III.K of the *Guidance*[24]) will likely be received by FDA
  - Suggested format of the meeting (e.g., conference call, in person meeting at FDA offices, video conference, or written response) and suggested dates and times for the meeting. Meetings are usually scheduled for 1 hour.

  Additionally, your meeting information package should include the following information, as relevant to the critical questions raised in your meeting request:
  - Product composition and design data summary
  - Manufacturing and process control data summary as well as identification of all manufacturing sites, including the steps they are involved in within the process of the manufacture for the new tobacco product
  - Clinical data summary which addresses abuse liability including types of data that will be provided

Refer to the Guidance for Meetings with Industry[25] for additional information that should be included in your meeting request.

[24] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/meetings-industry-and-investigators-research-and-development-tobacco-products-revised

[25] Meetings with Industry and Investigators on the Research and Development of Tobacco Products (Revised). September 2022, available: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/meetings-industry-and-investigators-research-and-development-tobacco-products

# Tab 58

Redacted Motion Hearing Transcript,
Feb. 27, 2026

PUBLIC /
REDACTED VERSION



**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**THE C STORE DEPOT, INC., et al.,** )
)
**Plaintiffs,** )
)
) **Case No.**
**vs.** ) **8:26-CV-00483-MSS-CPT**
)
)
**UNITED STATES FOOD AND DRUG** )
**ADMINISTRATION, et al.,** )
)
**Defendants.** )

---

**MOTION HEARING**
**BEFORE THE HONORABLE MARY S. SCRIVEN**
**UNITED STATES DISTRICT JUDGE**

**FEBRUARY 27, 2026**
**9:02 A.M.**
**TAMPA, FLORIDA**

---

Proceedings recorded by mechanical stenography, transcript produced using computer-aided transcription.

---

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA 33602

**APPEARANCES:**

**FOR THE PLAINTIFFS:**

***Eric N. Heyer***
Thompson Hine, LLP
1919 M Street NW, Suite 700
Washington, D.C. 20036
(202) 263-4128

***James Michael Matulis***
Matulis IP Law
9806 Gretna Green Drive, Suite 100
Tampa, Florida 33626
(813) 451-7347

**FOR THE DEFENDANTS:**

***Mamie Wise***
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

***James Allred***
Office of the General Counsel
Department of Health and Human Services
Food & Drug Division
10903 New Hampshire Avenue
Silver Springs, Maryland 20993
(301) 837-7618

# I N D E X


| PLAINTIFF'S EXHIBITS | | PAGE |
|---|---|---|
| 1 | Deeming Rule | 43 |
| 2 | FDA Final Deeming Rule Regulatory Impact and Regulatory Flexibility Analysis | 43 |
| 3 | FDA's proposed PMTA Rule | 43 |
| 4 | FDA's proposed PMTA Rule Preliminary Regulatory Impact and Regulatory Flexibility Analysis | 43 |
| 5 | Small Business Administration's Comment on FDA's Proposed PMTA Rule Proposed Regulatory Impact and Regulatory Flexibility Analysis | 43 |
| 6 | FDA's Final PMTA Rule | 43 |
| 7 | FDA's Final PMTA Rule Final Regulatory Impact and Regulatory Flexibility Analysis/Certification | 43 |
| 8 | FDA Website Print-out: Smokeless Tobacco Products | 43 |
| 9 | Text of June 28, 2017 Speech by FDA Commissioner Scott Gottlieb | 43 |
| 10 | FDA Press Release - September 18, 2025 | 43 |
| 11 | FDA Website Print-out: Nicotine is Why Tobacco Products Are Addictive | 43 |
| 12 | FDA Website Print-out: The Relative Risks of Tobacco Products | 43 |
| 14 | Refuse to File Letter to Zest Brands, LLC | 43 |
| 16 | FDA Website Print-out: Results from the Annual National Youth Tobacco Survey (2024) | 43 |
| 18 | ZEO Universe Nicotine Pouch Sample | 45 |
| 23 | Nicotine products relative risk assessment: an updated systematic review and meta-analysis | 73 |
| 15A | demonstrative comparing Tobacco Control Act Language and PMTA Rule Language | 77 |
| 15B | demonstrative | 78 |
| 24 | Technical Project Lead Review of Nicotine Pouch PMTAs | 84 |
| 19 | photographs | 94 |

**PLAINTIFFS' WITNESSES:**

**DR. WILLIE McKINNEY**

Direct examination by Mr. Heyer 43

Cross-examination by Ms. Wise 86

**INGA NASI**

Direct examination by Mr. Heyer 91

P R O C E E D I N G S

- - - o0o - - -

THE COURT: Good morning. Call the case, please.

COURTROOM DEPUTY: The Court calls Case Number 8:26-CV-483-MSS-CPT, The C Store Depot, Inc., et al. versus Food and Drug Administration, et al.

Counsel, please state your appearances for the record, beginning with counsel for the plaintiff.

MR. MATULIS: Good morning, Your Honor. Jim Matulis on behalf of plaintiffs, The C Store Depot and Zest Brands.

THE COURT: Good morning.

MR. MATULIS: With me I have Mr. Eric Heyer and his partner, Mr. Ryan Callinan, from the Thompson Hine law firm.

THE COURT: Good morning.

MR. HEYER: Good morning, Your Honor.

THE COURT: Who is lead counsel?

MR. HEYER: I will be, Your Honor.

THE COURT: All right. What is your name?

MR. HEYER: Eric Heyer.

THE COURT: Good morning.

And for the defense?

MS. WISE: Good morning, Your Honor. Mamie Wise, lead counsel for the defense, and with me is James Allred from the FDA, who just this morning entered an appearance as a Special Assistant United States Attorney in this case.

THE COURT: Good morning. And he's leading or are you leading?

MR. ALLRED: Yes, Your Honor, I'll be leading.

THE COURT: Good morning.

MR. ALLRED: Good morning.

THE COURT: All right. We're here on a motion for a temporary restraining order. This case itself was filed under seal. I don't know why the Clerk's Office did that. I know there was a motion to seal. That's typically not done without a Court order, but the case was sealed and has remained sealed.

Is it the parties' belief that there is a basis to seal the case versus sealing specific pleadings in the case?

And since it was your request, I'll let the plaintiff answer that question first.

MR. HEYER: Yes. And I want to start by thanking Your Honor. I know this is a disruptive request for hearing and I thank Your Honor for hearing it so quickly.

Yes, we requested to seal it just until Your Honor rules on the motion for the temporary restraining order, just because of the immediate and irreparable harm that our client would suffer if word of the RTF letter got out, just the mere existence of it, so just a temporary sealing, and if Your Honor rules at the conclusion of the hearing today and then doesn't keep the whole case under seal, what we would intend to do would be to file -- would be to submit redacted versions of

what we filed so far and then that would be available on the public docket and request that Your Honor keep the unredacted versions under seal, that way that would minimize the restraint on public access to what's been filed.

THE COURT: And so who is in the courtroom in the back?

MR. HEYER: Those are our client, Ms. Inga Nasi from the plaintiffs, the founder and CEO of the plaintiffs, and our witness, Dr. Willie McKinney.

THE COURT: And spell your client's name.

MR. HEYER: It's Inga, I-N-G-A, the last name is Nasi, N-A-S-I.

THE COURT: All right.

MR. HEYER: And then Dr. Willie McKinney.

THE COURT: All right. What's the Government's response?

MR. ALLRED: Yes, Your Honor. We haven't filed an opposition. We did note our opposition before of -- our opposition to the TRO. We don't object to redacting any of the confidential commercial information; in fact, we think we're obligated to do so. We would prefer to proceed under a protective order that covers only that information. We don't think it's appropriate for the entire case to be under seal, but we haven't filed an objection to proceeding through the hearing today, but beyond that we object.

PUBLIC /
REDACTED VERSION

THE COURT: All right. Well, this is a public case, public matter -- you can have a seat -- and therefore it's not really subject to seal. We are in a Federal Court, we are -- we serve the community, and other than confidential commercial documents, there isn't typically a sealing of an entire case, which brings up the question that is sort of the overarching question in this case with respect to this temporary restraining order, which is where I would like to start this morning, and that is whether it is the contract that the plaintiff has with its constituent entities and customers and so forth that is causing the claimed irreparable injury.

It strikes the Court that the RTF is not the impetus for the damage. It may be that the RTF shouldn't have issued, and it may be that you should have a right to reconsideration of those decisions, but the injury flowing from it appears to be somewhat self-inflicted in the sense that the plaintiff negotiated what appear to be agreements that if an RTF should issue, it would have certain obligations under its [redacted], and so query whether the harm that is complained of that is alleged to be irreparable is due to those contracting obligations or whether it's due to the issuance of the RTF.

So why don't we start the matter here, I'll leave the door unlocked, should someone from the media decide to show up

PUBLIC /
REDACTED VERSION

at this hearing, for example, we would address whether the matter would remain as a case under seal, and I will not direct the Clerk's Office to do anything with the documents until the hearing is concluded, should the Court not grant the relief that is sought.

So if you would start there. I'm pretty familiar with the background and history. This is a little bit complicated, but as I understand it, plaintiff has a nicotine synthetic product that is a tobacco -- that is controlled by the Tobacco Control Act, and plaintiff applied for premarket approval, they made it through the first stage, and then they didn't make it through the second stage.

The contention the plaintiff has principally is that the requirements of the PMTA are extremely onerous and super expensive and the cost of that was not taken into account consistent with the RFA.

And the defense says, yes, it was, in any event this is a problem created by the Deeming Rule and not a problem created by the PMTA.

And plaintiff claims that's not true because the Deeming Rule specifically said we're not evaluating the costs to novel products and therefore there's no financial consideration determination that has ever been made consistent with the RFA.

Defense says, Judge, that's not your issue to deal

with because the FDA certified that it dealt with the cost issues and you're not supposed to look beyond certification; if they certified it, it is so.

Plaintiff, I assume, would say, but you can't certify a falsehood, and if it didn't happen, it didn't happen, certifying it doesn't make it true.

My question is: If I were to give the plaintiff some relief, and I'm not saying I will, but if I were to give the plaintiff some relief, what would it be? Because I don't know that I can mandatorily order an agency to withdraw a determination, and if I were to give the relief of staying the RTF, the RTF is still out there, and as I understand it, the plaintiff would still have to do what it has to do under its contractual obligations, which I'm concerned about why it hasn't done it yet since this happened in January and we are in the end of February.

So start with the question of what am I supposed to do and how is that going to solve plaintiff's claimed irreparable injury, and is the irreparable injury caused by the plaintiff's contracts or by the RTF. And if I misstated in general terms the case and the posture of the case, feel free to draw any necessary corrections.

MR. HEYER: Yeah, if I can -- we brought the witnesses, obviously, Your Honor, if Your Honor wants to hear testimony. We're happy, if you don't, to make a proffer as to

PUBLIC /
REDACTED VERSION



the questions Your Honor is asking.

First of all, if Your Honor stays the RFA letter, which Courts of Appeals routinely do for marketing denial orders where they have primary jurisdiction, the D.C. Circuit has done it, the Fifth Circuit has done it, we cited to one case in our brief, the *Wages & White Lion* case, which went all the way up to the Supreme Court, it's back down, it's my case, but the decision which we cited, which is the initial stay decision, FDA and D.O.J. made exactly the same argument made here, and the three judge panel of the Fifth Circuit unanimously said, all we're doing is staying Government action, we're not -- we're not giving a green light to do something illegally or not, we're just staying the action, that's appropriate relief, and that's the same thing that we're seeking here.

To Your Honor's question about what does this mean practically, is our client still in trouble under the contracts, practically speaking, if we put Ms. Nasi on the stand, what she's going to say is she will be able to continue selling to those customers with a stay of the RTF. It may be sort of theoretically out there and not fully withdrawn by the agency, or at least not yet, but that will allow her to continue doing under the contracts what she's been doing up to this point. So that's the practical import for her businesses.

THE COURT: [redacted]

[redacted]

MR. HEYER: [redacted], and [redacted].

THE COURT: In the Fifth Circuit that you rely on about the stay issue, was the rule a triggering event to contractual obligations that were the basis for the claimed irreparable injury?

MR. HEYER: It wasn't contractual, but it was -- and I want to be clear, our claimed irreparable harm is not limited to the contractual obligations, that's one piece of a broader puzzle, it's the loss of market share that's going to result, it's having to [redacted], it's the reputational harm. Even if somehow she were to get [redacted], what she'll testify to is that she believes her relationships with those customers would be

permanently destroyed. Even if she came back later, they would be unlikely to do business with her.

THE COURT: Why would she have to [redacted]?

MR. HEYER: Because she would no longer have [redacted] With these contractual obligations, she would end up having to [redacted] There's just not -- the companies are not [redacted].

THE COURT: But that seems all triggered by this notion that if there is an RTF letter [redacted], and so how -- so you believe that if a stay issues under those same contracts, she would stave off all those sort of parades of horrors?

MR. HEYER: Correct, Your Honor. That's exactly right. They would treat it as if the RTF -- practically speaking, as if the RTF never issued. And what you'll hear from her testimony is that the marketplace is full with competing nicotine pouch products just like hers, that just like hers for all these years have not had marketing granted orders that the FDA has allowed practically speaking to be sold, including by the biggest tobacco companies in the world, the FDA has taken no enforcement action against them, that that's why these distributors that she contracts with have

these terms that they do. As long as you're still in the process, you don't have a final RTF decision from the FDA or a marketing denial decision, [redacted] -- and she will testify that she's seen that happen with other nicotine products in the past and then there is an immediate demand that those companies take their product back and they have stopped selling those to their customers.

THE COURT: And it would be the plaintiff's contention that the FDA does not prohibit the marketing and selling of these products prior to receiving premarket approval?

MR. HEYER: As a practical matter, correct.

THE COURT: What about as a legal matter?

MR. HEYER: Well, as a legal matter, all these products are legally adulterated and it's not lawful to sell them, but as a practical matter, given the very short time period that applicants like our clients had to submit their applications, FDA has -- you'll hear testimony that FDA has never taken -- has never issued a warning letter to a company that is selling a nicotine pouch product with a pending PMTA, has never taken any other enforcement action requiring them to come off the market. So practically speaking the market reality is that the marketplace -- and we have photographs that

we would -- we would proffer of convenience stores in the area, in Tampa, showing all these competing products that are there on store shelves. That's the market reality.

THE COURT: Well, you would agree this is an equitable proceeding?

MR. HEYER: I would, Your Honor.

THE COURT: And you would agree you can't come into equity with unclean hands?

MR. HEYER: That is a maxim of equity, Your Honor, correct.

THE COURT: And if you are selling a product unlawfully but you're not getting charged and arrested for it, enforced against, or warned, is it any less unlawful?

MR. HEYER: I think what -- what our client would testify to is her belief and the way that things are operating in practice is the FDA applies enforcement discretion across all sorts of products that it regulates all the time, either informal policy, which I know they disclaim, or informally in practice. When there was -- when there was, for example, a baby formula shortage, FDA allowed all sorts of baby formula to be sold that was brought in from overseas that didn't have -- that didn't comply with the FDCA requirements.

THE COURT: But you would agree that if they did that and they did in their discretion decide one particular entity was not one they favored, for whatever reason, because it was

not lawful and because it was adulterated, it could take enforcement action against that one entity without regard to its otherwise sort of looking the other way with respect to the other products because they all sort of fall into that same category?

MR. HEYER: They could, Your Honor, and I think there would be a very interesting defense about selective enforcement in that circumstance, if all Big Tobacco's products get to stay on the market but yet the small business is the one that gets enforced against. And it's worth noting that all the -- these products have been on the market since 2019, they were subjected -- the plaintiff's products in particular, subjected to the Tobacco Control Act in April of 2022, and all this time FDA has never taken any enforcement action against them or any other nicotine pouch product.

THE COURT: What do you think has happened?

MR. HEYER: I think, practically speaking, that FDA recognizes that they have a lot of applications, they have a substantial backlog, the statute says they're supposed to be making decisions within six months of the applications going in, they understand that with respect to the synthetic nicotine products in particular, that Congress gave applicants only 30 days to put those applications in. You will hear testimony that it takes one to two years to put a robust application together, and so as a practical matter -- even if FDA, again,

PUBLIC / REDACTED VERSION

16

is saying there's no formal policy, as a practical matter they understand that that's the reality and they're allowing applicants to do that, keep their products on the market.

You would also hear testimony that every penny that our clients make from their sales they're investing into the PMTA process. As we've shown, it's an incredibly expensive process. They're not profiting off of anything.

THE COURT: But my question is: What has changed that has caused this RTF to just issue after having been pending for, what, four years?

MR. HEYER: Presumably, just because this is when FDA picked up the application, Your Honor, to do the final review.

THE COURT: All right. Let me hear from the Government, as an introductory matter, with respect to this irreparable harm piece, and then I will hear from any witnesses, if appropriate.

MR. ALLRED: Thank you, Your Honor. James Allred for the defendants. Can you hear me okay?

THE COURT: I can. Thank you.

MR. ALLRED: Okay. I'm happy to pick up just directly where we left off on irreparable harm. I'm also happy to go directly to any questions that you have.

The way we see it is that the harms here are essentially self-incurred, they don't flow from the refuse to file letter, they flow from these contractual obligations.

We wouldn't dispute that there may be harms that flow from the contractual obligations, but those seem to be choices that plaintiff made, and their decision to do so shouldn't allow for a temporary restraining order in this situation.

We also don't think that a temporary restraining order would change the status quo. You know, perhaps the provisions of the contract are written such that that would be the trigger. We haven't seen the contractual language, so we don't really know. What we do know is that the products were unlawful before the issuance of the RTF, the products are unlawful now, and so as a practical matter the status quo would be unaffected, and we think that that by itself is reason not to issue a temporary restraining order.

THE COURT: Why hasn't the FDA done anything about it if it is unlawful now and unlawful before?

MR. ALLRED: I appreciate that. There are many tobacco products out there. FDA typically adopts a risk rates enforcement prioritization scheme. I expect we'll hear today the fact that pouches, nicotine pouches, as a general matter are less risky, and we agree that on the continuum of risk they tend to be on the lowest level of risk for tobacco products. That doesn't mean that they're without risk, that doesn't mean that they're safe, and we think that there are individual products that could post significant safety concerns, and I'm happy to detail --

THE COURT: Why plaintiff's product only?

MR. ALLRED: I'm sorry?

THE COURT: I'm sure she's not the only one with these nicotine pouches.

MR. ALLRED: That's correct. And this is -- this is not the only premarket tobacco application to which FDA is responding on this particular time frame. There have been a number of marketing granted orders issued just in the past few months for these sorts of products, and I can't speak to the specifics today about exactly how many, but this is not the only other nicotine pouch product that FDA is addressing within these few months.

THE COURT: Has it issued any more RTFs?

MR. ALLRED: I'm not aware of whether other RTFs were issued, you know, in the last few weeks or months. I do know FDA has announced recently a pilot program for nicotine pouches where it's accelerating its review of these applications, I know that it reviewed a batch of nicotine pouch applications as part of that, and that it's preparing to take action or has taken action recently on a number of those products, but we don't publicly post our refuse to file letters, they're communications that we just send directly to the applicants, and so, you know, unfortunately, I don't have statistics for you on exactly how many.

THE COURT: So assuming the case is important then,

because the knowledge of its decision is not a public disclosure, it's just a private communication between the FDA and the applicant.

MR. ALLRED: We wouldn't take the position that the communication is confidential. It's -- for example, it's FOIA-able. If someone were to submit a FOIA request for these letters, then we would review and disclose them, just redacting whatever the protected information is. What I'm saying is we don't affirmatively --

THE COURT: Wouldn't the protected information include the applicant's name?

MR. ALLRED: I wouldn't think so. I can't think off the top of my head which FOIA exemption that would fall into, absent special circumstances.

THE COURT: But no one would know to seek a FOIA request if they don't know anything is afoot.

MR. ALLRED: I think that's correct. I guess I would also note that for publicly-traded companies, they often have an obligation to tell their investors when they receive these sorts of actions, and so we have seen, for example, publicly-traded companies will issue notification when they receive these.

THE COURT: So did you answer my question about whether any other RTF has been issued to a nicotine pouch applicant?

MR. ALLRED: I'm afraid I don't have a direct answer for you. I don't know precisely, but we're happy to supplement the record with that.

THE COURT: And when did the pilot program start?

MR. ALLRED: The pilot program was announced in September of 2025. There's a press release that's publicly available on the website, I'm happy to direct you to that, and that's when we announced that we would be accelerating review and taking action on a number of these applications.

THE COURT: And before you sit, and before I start to hear the plaintiff's evidence, where in the Deeming Rule process do you point the Court to any financial impact analysis applicable to novel products, which I assume you would agree this is, that the FDA is relying on in the PMTA process as having been completed as part of the Deeming Rule?

MR. ALLRED: Yes, Your Honor. I'll need to check the reference. In the Deeming Rule, I would say the only novel product that we explored at that time was e-liquid products, and, you know, the agency was not required to predict the future there, it just looked to the e-liquid products, but it did consider the costs of e-liquid product applications, and we think that's sufficiently close.

THE COURT: So the answer is nowhere?

MR. ALLRED: Nowhere did FDA consider novel products other than e-liquid products.

THE COURT: So how does the FDA certify that it has completed the financial impact analysis under the RFA by relying on the Deeming Rule process if it can't point me to anything in the Deeming Rule analysis that addresses the question?

And I understand you take the position that certification is what the Court is supposed to review for compliance with RFA, but if I know the certification is false, then why am I bound to rely on it?

MR. ALLRED: The certification, as you correctly observed, relied on the Deeming Rule. The Deeming Rule analyzed costs as it relates to e-liquid products, and e-liquid products are synthetic nicotine products, and our position --

THE COURT: But you don't contend the plaintiff's product is an e-liquid product.

MR. ALLRED: No, Your Honor.

THE COURT: Okay.

MR. ALLRED: We can see that it's not, and we can see that it's a novel tobacco product, the specific type of which was not analyzed in either rule. We absolutely concede that.

THE COURT: So how do you satisfy the certification requirement under the RFA?

MR. ALLRED: We don't think that the costs are significantly different between the different categories of novel synthetic nicotine tobacco products.

THE COURT: How do you know if you didn't do the study?

MR. ALLRED: Our position was that the requirement attaches at the time that the regulation was promulgated. FDA couldn't have anticipated all of the many different types of products that came to market afterwards. You know, it did the Deeming Rule back in 2016. These products were not present on the market in 2016. I'm not aware of whether there were any pouch -- synthetic nicotine pouch products on the market at the time. We think it's appropriate --

THE COURT: Let me stop you for a second.

MR. ALLRED: Sure.

THE COURT: You believe that the regulatory scheme that you're referring to is the Deeming Rule, and that the product -- the novel product had to be in place at the point that the Deeming Rule was promulgated?

MR. ALLRED: We think that the appropriate review, both for the PMTA certification and for the Deeming Rule Regulatory Flexibility Analysis, the appropriate review is based on the record that was at the agency at the time, on the facts that were known to the agency at the time.

THE COURT: At what time?

MR. ALLRED: At the time -- excuse me. So for the certification, it would be at the time the certification was issued, 2021.

THE COURT: This is when the new rule issued that brought novel products within the Tobacco Control Act?

MR. ALLRED: No, Your Honor. The Deeming Rule, the 2016 Deeming Rule is what brought novel products within the Tobacco Control Act. Later, in 2022, Congress also amended the Tobacco Control Act specifically to bring synthetic nicotine products under the Tobacco Control Act, but FDA did not take an additional regulatory action at that time, so there was no new requirement to conduct a new regulatory flexibility analysis at that time.

In 2021 FDA promulgated the PMTA Rule, and FDA appropriately at that time focused only on the difference in requirements that were promulgated in the PMTA Rule versus what was already required by the Deeming Rule.

THE COURT: But you would agree that the PMTA Rule promulgated in 2021 is a new rule?

MR. ALLRED: Yes, Your Honor, I agree that the 2021 PMTA Rule is a new rule.

THE COURT: And it itself does not have to comply with the requirements of the RFA?

MR. ALLRED: It does have to comply with the requirements of the RFA. We believe we met those requirements through the process in 5 U.S.C. 605 by certifying that it would not have a substantial impact on a significant number of small entities.

THE COURT: And there's the piece. You certified it. What did you do to certify it?

MR. ALLRED: So FDA conducted an analysis of what the marginal cost would be to small entities as well as the marginal benefit of promulgating the PMTA Rule versus the costs that were already imposed on those entities under the Deeming Rule. That's -- and I can give you the citation to that. That's our proposed Exhibit 5. And through that analysis it analyzed the costs to small entities of the PMTA Rule if the costs were largely administrative costs, and it also found that there would be potential benefits to these small entities.

THE COURT: And it didn't rely on the Deeming Rule in estimating those costs?

MR. ALLRED: It did not rely on the Deeming Rule in estimating those costs, but in estimating the costs it only asked the question what are the marginal costs of the promulgation of the 2021 PMTA rule versus the costs that were already imposed on small entities by the 2016 Deeming Rule, which is to say, for example, the 2016 Deeming Rule is what brought many of these products under the auspices of the Tobacco Control Act, so, for example, the 2016 Deeming Rule imposes the costs of preparing and filing a PMTA. The 2021 cost analysis just asks what additional costs are imposed on these entities based on us now specifying the content and format of parts of that PMTA.

THE COURT: But if the 2016 Deeming Rule did not conduct an analysis of the impact of the PMTA requirement on novel products, and if plaintiff's novel product wasn't brought under the Tobacco Control Act until after the 2016 Deeming Rule, then where in any process was an analysis done to get to what you would call the base against which you're applying the marginal difference?

MR. ALLRED: Thank you. And I want to make sure I didn't misspeak, and I want to make sure I understand your question.

The 2016 Deeming Rule did analyze a novel tobacco product, a new tobacco product as defined in the Act.

THE COURT: But not the plaintiff's product.

MR. ALLRED: But not the plaintiff's product. Absolutely. We concede that.

THE COURT: And not any novel product that's not an ENDS or an e-product.

MR. ALLRED: Yes, Your Honor. We agree.

THE COURT: And so that's what they did. Here are the two products we are analyzing. These products are not substantially impacted by the requirement that they participated in a PMTA, or whatever impact does not outweigh the need to do a PMTA for these products, and we have so determined.

Hello, everyone. We're not analyzing novel products,

we don't have any information, the information is not available to us to conduct an analysis of novel products. And at that point novel products were sort of a nebulous concept. And then the plaintiff's product -- was it 2021 when synthetic nicotine products were brought under the Deeming Rule?

MR. ALLRED: Your Honor, it was 2022, in Congress's amendment to the Tobacco Control Act.

THE COURT: So now we know that plaintiff's novel product is under the Deeming Rule, under the Tobacco Control Act, and there's still been no analysis of the effect of requiring a PMTA for small business novel products as required by the RFA. I don't think you're going to be able to point me to any analysis where someone looked at a novel product other than an ENDS and an e-product and conducted a financial analysis.

And then here we come in the promulgation of the PMTA, and the Small Business Administration says, you can't do this because there's been no analysis of the impact of the costs on small business entities with novel products under the RFA. And the FDA brushes that aside and says, outside the scope, if you had a problem with that, you should have raised it earlier, I'm assuming, in the promulgation of the Deeming Rule or the 2021 process, but it's too late to raise it now, and we're going to certify that this analysis has already been done.

I'm asking you, if one of the requirements, for example, were if you want to impose a condition on a small business, you have to call the Small Business Administration and have a meeting with the top tier administrators, that's what you have to do, and in the promulgation of the Deeming Rule that meeting did not occur. Roll forward to five years later, promulgation of the modification to the PMTA to add some additional requirements. The SBA says, we never had a meeting, you were supposed to have a meeting, there's been no meeting to talk to us about this; and the FDA says, you should have raised that before, we're hereby certifying a meeting has occurred; and you come to court and you say, we certify that a meeting has occurred, your obligation as a Court is to give deference to our certification, but I'm telling you we never had a meeting.

Is that different than the circumstances presented here in any way related to novel products of the type that the plaintiff sells?

MR. ALLRED: I believe it is different for a couple reasons. First of all, I take Your Honor's point, and we agree, although it's a procedural requirement, we don't think a sham procedure meets that requirement. We think you can look behind to see substantively whether it was a genuine proceeding, whether there was a genuine good faith attempt to quantify costs, as is required by the Regulatory Flexibilities

Act.

I do think that the procedure that FDA engaged in both in 2016 in the Deeming Rule and in 2021 in the PMTA Rule meets those obligations. For 2016, I think FDA reasonably attempted to calculate costs for novel products by looking at a particular novel product that was prevalent at the time and doing its best to understand what the costs would be to small entities, using that as a prototypical product.

THE COURT: I thought it specifically said we are not making any analysis of novel products because we don't have enough information, not we're going to extrapolate from e's and from -- ENDS and e-products what the costs would be to novel products. I thought they said, we don't have enough information so we're not making a call on the impact. Am I mistaken?

MR. ALLRED: I don't think you're mistaken that FDA disclaimed its ability to analyze all novel products or products that may emerge after the rule. I do think that it disclaimed that specifically in service of analyzing e-liquids as a way to understand -- sort of the best example to understand the impact on small entities.

THE COURT: Show me where it said that, we're extrapolating to all novel products our analysis of e-products and ENDS products.

MR. ALLRED: Yes, Your Honor. I'm going to consult

the record for just a moment.

THE COURT: Yes.

MR. ALLRED: I'm sorry, Your Honor, I don't have it before me and I'm willing to withdraw the statement. We're certainly happy to update the Court on this subsequently.

THE COURT: That's the whole ball of wax. What do you mean you don't have with you the provision where the FDA in the Deeming Rule said it analyzed the cost of -- cost impact to novel businesses?

MR. ALLRED: Our view is that the 2016 Deeming Rule appropriately analyzed costs to small businesses by focusing on e-liquid products, and we acknowledge that it did not analyze costs for other products. We think --

THE COURT: Did it say, we are going to therefore extrapolate from the analysis of e-products and ENDS products the costs to other novel products, and that is going to be our assessment of the cost analysis and our compliance with the RFA?

MR. ALLRED: I do not see us saying that.

THE COURT: And so how then do you certify that the Deeming Rule satisfies the RFA analysis by importation or reference?

MR. ALLRED: I'm sorry. You're talking about the certification for the -- for the PMTA Rule?

THE COURT: Yes.

MR. ALLRED: So the PMTA Rule analyzes its own costs. The certification was a certification that the costs that are added by the PMTA Rule will not have a substantial impact on a significant number of small entities.

THE COURT: But that's -- you know, the cost to build a small car is $5,000. We think that's the cost to build a small car. The cost to paint the car is marginally insignificantly higher than the cost to build the car, and that's because we know that the cost to paint the car is only $500. But if we don't know the cost to build the car in the first place, how can we say the cost to do this other thing is marginally insignificant? And how can we point to our determination about the cost to build the car if we never made a determination as to the cost to build the car?

MR. ALLRED: I do think it's appropriate that the analysis focus on the costs of each regulation, the 2021 regulation versus the 2016 regulation, attributing the costs to each one. For the 2016, I would direct you to -- I was trying to find page 86 of the Deeming Rule RFA, which is in our record at FDA 023997, which notes the product categories that --

THE COURT: Which exhibit is it?

MR. ALLRED: Excuse me. That's Exhibit 4 to the Government, Government's proposed Exhibit 4.

THE COURT: Do I have the Government's exhibits up here?

Exhibit 4, what page?

MR. ALLRED: Excuse me. Exhibit 4, so it's Bates number FDA 023997, it's numbered page 86.

THE COURT: Yes.

MR. ALLRED: And right in the middle of the page it does discuss the product categories that have been selected, and it talks about using three representative types of PMTAs that have low, medium and high average costs. So I do want to put forth that FDA viewed itself as doing type analysis, as taking representative types and assessing costs based on that. Our position is that that was an appropriate step, in light of the demands of the Regulatory Flexibilities Act. The agency was not required to be clairvoyant, it was not required to tell the future about what sorts of products would exist, it was not required to analyze every type of product as long as it was reasonable in selecting products and reasonable in assessing their costs.

THE COURT: I agree that it didn't have to do that, it didn't have to clairvoyantly, as you say, decide what new products might emerge, but then when it imposes obligations on the newly-emerged products, how does it look back to its old rule that didn't even consider those newly-emerged products in determining the cost impact and say, "We certify that we already did this," when we know we didn't do this because we didn't know anything about these new products?

MR. ALLRED: So I think two things on that. The first is that the application of the costs of the Deeming Rule -- and we acknowledge the Deeming Rule put significant costs on small entities, we certainly don't dispute that, high costs even. Those costs --

THE COURT: I thought it was just nominal costs and not significant costs, and therefore this new rule doesn't impose any more substantial costs?

MR. ALLRED: The finding for the PMTA Rule was that it would not have a significant impact -- or substantial impact on a significant number of small entities. The Deeming Rule was found to have a substantial impact on small entities, which is why it engaged --

THE COURT: On novel products?

MR. ALLRED: The rule was found to have that impact.

THE COURT: On novel products?

MR. ALLRED: Excuse me?

THE COURT: On novel products? Novel heretofore we don't know what kind of products.

MR. ALLRED: The Deeming Rule found that it would have a substantial impact on small businesses in the tobacco space, regardless of their product category.

THE COURT: Can you show me that finding?

MR. ALLRED: The finding that it would have significant impacts?

THE COURT: Yes.

MR. ALLRED: Yes, Your Honor.

So at page 131, which would be Bates --

THE COURT: One second. One second.

And what's the second page you were going to point me to?

MR. ALLRED: I'm sorry. It begins on page 131, which is Bates FDA 024 --

THE COURT: Same exhibit?

MR. ALLRED: Excuse me. Same exhibit, yes.

THE COURT: And what's the page number?

MR. ALLRED: 024042. This is where it analyzes economic effect on small entities.

THE COURT: Wait a minute. Let me get to there.

024042?

MR. ALLRED: 024042. Yes, Your Honor.

THE COURT: All right.

MR. ALLRED: This is where it analyzes economic impact on small entities, this is the Deeming Rule, this is the 2016 rule, and it continues on to the next two pages as well, and it analyzes what the economic impact will be on small entities, and, again, it focuses on both manufacturers and importers of cigars and ENDS products, ENDS products being the new tobacco product that was analyzed there, and in assessing those costs it did find significant costs from the Deeming Rule

to be imposed on those entities. Those are summarized in Table 43, is perhaps most relevant to this proceeding, which is on page 133, 024044. That analyzes the costs to small businesses estimated in Year 1, Year 2, and Year 3, a lower bound and an upper bound, and it notes significant costs in each year.

THE COURT: And where is the disclaiming language that the plaintiff is referring to that says we're not taking an analysis of novel products?

MR. ALLRED: I thought it was on page 87, although I'm not seeing it right at the moment.

THE COURT: Does plaintiff know where it is?

MR. HEYER: Your Honor, can I try to assist?

THE COURT: Beg your pardon?

MR. HEYER: Your Honor, can I try to assist? I think it's page 75.

MR. ALLRED: 75. Thank you.

MR. HEYER: Yeah. Yeah. 75.

THE COURT: Page 75?

MR. HEYER: Yeah. Right on 75, (inaudible) 69, and then 53 and 54.

COURT REPORTER: And, Counsel, when you're speaking, if you're not speaking into the microphone, I can't hear what you're saying.

MR. HEYER: Okay. I'm sorry. I'll just repeat it.

75, it's at the bottom of the page.

THE COURT: I see it.

MR. HEYER: "We are unable to quantify the costs for novel tobacco products other than ENDS due to lack of data."

And then on page 69 it talks about not being able to estimate the number of manufacturers and importers of such novel products other than ENDS products.

And on 53 and 54 it says: With respect to future rules, we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established.

THE COURT: And so, Counsel, you think that this language is somehow eliminated by reference to the cost analysis for small ENDS manufacturer or importer, which is what Table 43 is referring to?

MR. ALLRED: Your Honor, I think FDA, in conducting its regulatory flexibility analysis, was required to quantify costs for small businesses, and I think that it appropriately did so by choosing typified examples for which it was able to obtain data and then calculating low cost and high cost estimates for the examples that it chose.

THE COURT: And where in the regulatory scheme of the RFA or the FDA do you point the Court to show that this sort of internal extrapolation not referenced in the rulemaking analysis itself is sufficient to meet the requirements of the

RFA?

MR. ALLRED: We believe it complies with 5 U.S.C. 604(a) with the procedures that are specified there.

I do want to note that the regulatory flexibility analysis was referenced in the preamble to the rule itself.

THE COURT: "The rule" being the PMTA change rule?

MR. ALLRED: I'm sorry. In the Deeming Rule itself.

THE COURT: Right. Everyone acknowledges they have to do what's required under the RFA, and so did the FDA when it was promulgating the PMTA changes. There's no question that it says, I know we have to do this. And its answer was, we did it by reference to the Deeming Rule, and we know the Deeming Rule didn't do it with respect to novel products other than the e-products and ENDS, and we know the Tobacco Control Act did it with respect to standard products, we know that the novel product at issue here was brought under the TCA after the Deeming Rule, and now we have this new PMTA Rule and it doesn't do it, and it certifies that it did, but in reference to the documents, when we say "show me where," the documents make clear it didn't happen.

It just didn't happen, and it's not enough to say we are going to consider ourselves to have done it because we did it with other products, where it expressly said it's not doing it with respect to certain products. If it were an open-ended, we're going to use this as a -- as a surrogate for

novel products and we're going to extrapolate that this won't be so bad on small businesses with these novel products because we've assessed these other products, maybe I wouldn't have any authority to say the certification is inaccurate, sham, as you describe it, but here we know it didn't do the analysis, because it expressly said it didn't do the analysis, and it can't now say it did do the analysis and it's relying on an analysis that it admitted it didn't do.

And so we turn again to the question of whether it satisfied its obligations under the RFA, and if it did not, whether the issuance of the RTF is appropriate and whether plaintiff would succeed on the merits of a claim that it is not, and, importantly, of course, in a TRO context, whether the plaintiff can satisfy the heightened requirement of demonstrating irreparable harm.

Do you know this Fifth Circuit case the plaintiff is referring to, and do you have a way to distinguish it? This is, I assume, the *Wages & White Lion*.

MR. ALLRED: The *Wages & White Lion* case?

THE COURT: Yes.

MR. ALLRED: I am familiar with that case. I would just note that that case subsequently went to the Supreme Court, which held that we appropriately -- appropriately applied the PMTA requirements to those products, that Congress specifically intended for this to be a high bar for novel

tobacco products, and -- but to the specifics of can I distinguish, it's just factual distinctions, that that was a marketing denial order versus refuse to file, but I don't otherwise have a distinction there.

THE COURT: But with respect to the question of irreparable harm, plaintiff claims that case, under a unanimous decision of the Fifth Circuit -- is that the case you were referring to?

MR. HEYER: It is, Your Honor. It's a stay -- it's a published opinion on an emergency motion for stay after 2021.

THE COURT: Right. That a stay can issue to permit the plaintiff there presumably from suffering irreparable harm due to the impact, I guess you're saying, of a market analysis versus an RTF.

MR. ALLRED: The Government's position is that that was incorrectly decided. We continue to believe that contractual harms that the plaintiff seeks out themselves -- if they make representations that they will pull back their products if they receive an RTF, we think that that is a harm that they've bargained for. We think that they took --

THE COURT: But that wasn't litigated at any higher level than the Fifth Circuit?

MR. ALLRED: No, I don't believe the stay was litigated to a higher level.

THE COURT: So the standing authority under the

Fifth Circuit is that an injunction can issue in this circumstance, where an RTF triggers the resulting [redacted] the plaintiff is complaining about?

MR. ALLRED: We don't agree -- or, excuse me, we don't disagree that economic harm can be a basis for this, and I understand that that is the holding in *Wages*. Again, we think that it was incorrectly decided and our position is expressed in our briefs.

THE COURT: All right. Thank you.

MR. ALLRED: Thank you, Your Honor.

MR. HEYER: Your Honor, can I have one more point just on that last point, because it just occurred to me, and I think I'm remembering this correctly, there is an Eleventh Circuit decision in a case called *Bidi Vapor* that ultimately -- ultimately the Eleventh Circuit on the merits found these actions to be arbitrary and capricious and vacated marketing denial orders for like six different applicants for ENDS products, and I don't believe there was an opinion with it, but I believe in that case the Eleventh Circuit also entered a stay on the marketing denial order. So I just point it out because that's the governing circuit here. I don't have the case number in front of me.

THE COURT: The Eleventh Circuit granted a stay or the Eleventh Circuit approved a stay granted by the District Court?

MR. HEYER: No, granted a stay, because I believe with the marketing denial order it's direct petition for review, and my recollection is that motion for stay was granted. I'll go back and doublecheck.

THE COURT: Based on alleged economic calamities due to the trigger of market analysis?

MR. HEYER: Correct. Yeah, the requirement to pull the products back off the market, to be able to keep selling them, I'm pretty sure that was --

THE COURT: But that's a different thing in my view. I don't know what the RTF requires. Does it require the plaintiff to pull its product?

MR. HEYER: It does, and we're going to show that, there's language in bold in the RTF letter itself, Your Honor, and it's Exhibit, I think, 14 that says you cannot -- you cannot market, you cannot sell, et cetera, et cetera. It's right there in the letter, so --

THE COURT: All right. Well, let me hear -- I don't mean to pull you all off course for your planned argument, which you probably practiced in the car coming over here, but there's just like some fundamental things that drive the decision making in this case. One of them is whether the FDA ever conducted an economic analysis under the RFA of this group of novel products, and the other is whether the plaintiff will suffer irreparable harm if it's not stayed. And so while

you're putting forward your own strategies, those are the two things that are top of mind for me.

So if there's a witness you want to call, an argument you want to make, any more evidence you'd like to point the Court to, this would be your time to do that.

MR. HEYER: Thank you, Your Honor. I don't want to beat dead horses, so we have kind of a lengthy examination to go through, but if at any point Your Honor doesn't -- we don't need to cover things that are already in the record, I'm pretty sure you'll let me know and I'll move on, but there are some additional points I'd like to make.

With that, I'd like to call Dr. Willie McKinney as our first witness, Your Honor.

THE COURT: Okay. Go ahead. Call your witness.

COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you're about to give in this cause will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: My name is Willie McKinney, W-I-L-L-I-E, M-C-K-I-N-N-E-Y.

THE COURT: You may have a seat in the witness box, sir.

THE WITNESS: Thank you.

THE COURT: Sir, you're under oath. You have to give truthful answers. If you give false answers, you face penalties of perjury. Do you understand that?

THE WITNESS: I do.

THE COURT: Wait until Counsel completes his question before you start your answer, even if you can anticipate what he's going to ask you. Answer audibly, not with uh-huhs, uh-uhs and nods of the head, because they don't translate well on the transcript. And if you see opposing counsel stand to object, wait until I rule on the objection before you give your answer. Do you understand that?

THE WITNESS: I understand.

THE COURT: The Court has the declaration of -- is it Dr. McKinney?

MR. HEYER: Correct, Your Honor.

THE WITNESS: Yes.

THE COURT: Do we need to go through his credentials prior to allowing him to offer up his substantive testimony?

MS. WISE: No, Your Honor.

THE COURT: All right. So please move to the substance of what he's here to talk about.

MR. HEYER: And, Your Honor, just to speed things along, I think we're -- I talked with opposing counsel before we started, and I think we can stipulate to the admission of --

both parties can stipulate to the admission of -- on our -- on Plaintiffs' exhibit list to Exhibits 1 through 14.

THE COURT: Any objection?

MR. HEYER: I'm sorry. 1 through 12 and then 14. There is no exhibit 13.

THE COURT: You're moving away from the microphone.

MR. HEYER: I'm sorry. I think we've stipulated to the admissibility of Exhibits 1 through 12 of Plaintiff's exhibit list and Exhibit 14, as well as 16, which is an FDA website printout.

MS. WISE: That's correct, Your Honor.

THE COURT: They'll be received.

MR. HEYER: Thank you, Your Honor.

**DIRECT EXAMINATION OF DR. WILLIE MCKINNEY**

**BY MR. HEYER:**

Q Dr. McKinney, we're going to skip over your credentials and that because it's in your declaration.

Would it be fair to characterize your -- the work that your firms do as being --

THE COURT: You still can't lead.

MR. HEYER: Okay. All right.

BY MR. HEYER:

Q Are you the architect of the PMTAs that your firms work on for your clients?

A I am the architect, yes.

Q What do you -- how would you explain that?
A My clients come to me when they want help putting together a PMTA and I also say developing a strategy to put together a PMTA for various products.
Q For what sorts of products have you and your firm supported PMTA work?
A E-liquid, e-cigarettes or ENDS, Electronic Nicotine Delivery Systems, as well as pouches or oral nicotine products.
Q Can you briefly explain what a nicotine pouch is and how it works.
A A nicotine pouch is a product that does not contain any tobacco, it contains granules that have nicotine, and it's in a pouch like a -- like a teabag, and they come in various sizes, and when placed inside the cheek, it releases nicotine at a certain rate.
Q And how is that nicotine absorbed by the user?
A The nicotine is absorbed through the buccal cavity.
MR. HEYER: Your Honor, may I --
A The pouch.
MR. HEYER: Your Honor, may I approach the witness to show him the sample that's Exhibit 18?
THE COURT: You may.
MR. HEYER: And I have one to hand up to Your Honor, it's just a different flavor. We don't have two of the same flavor. Just so the official one can be the witness's one.

BY MR. HEYER:
Q Dr. McKinney, can you identify what Exhibit 18 is.
A I am looking at a can of nicotine pouches, the title is ZEO Universe, 25 pouches in the can.
Q Are those the products sold by plaintiffs in this case?
A Yes, they are.
MR. HEYER: We'd move Exhibit 18 into evidence.
THE COURT: It will be received.
Any objection?
MS. WISE: No objection, Your Honor.
THE COURT: It will be received.
BY MR. HEYER:
Q I don't know if that's open, Exhibit 18, Mr. McKinney, but if it is or if it's not, could you open it and just hold up one of the pouches so the Court can see.
A Yes, I can.
Q Thank you.
What are the ingredients in these pouches besides nicotine?
A I mentioned the covering, which is typically a cellulose, but these pouches contain flavors.
Q Are the flavors food grade ingredients?
A The flavors -- most manufacturers do use food grade --
THE COURT: May I see one of the pouches? I don't know how to open this one.

MR. HEYER: I can open it, Your Honor.

THE WITNESS: You have to run your finger along the side to break the seal.

THE COURT: Well, at least we know it's child resistant, on first opening anyway. All right.

BY MR. HEYER:

Q Dr. McKinney, are you familiar with the concept of generally recognized as safe?

A I am.

Q What is that?

A Generally recognized as safe, GRAS, refers to flavor ingredients that are typically used in food and they are recognized as safe because of their history of use or because a manufacturer has ultimately done studies to show that those ingredients are safe for use in food.

Q Are you aware of whether the ZEO Universe flavor ingredients would satisfy this standard?

A I am aware.

Q And are they -- do they satisfy the standard?

A They do satisfy the GRAS status.

Q Has FDA ever approved oral nicotine products as new drugs to serve as smoking cessation aids?

THE COURT: I'm sorry. Is GRAS an acronym?

THE WITNESS: It is.

THE COURT: What does it stand for?

THE WITNESS: Generally Recognized As Safe.

THE COURT: All right. Go ahead.

BY MR. HEYER:

Q Has FDA ever approved oral nicotine products, not as tobacco products but as new drugs to serve as smoking cessation aids?

A Yes, they have.

Q Can you give an example?

A There are lozenges that have been authorized, Nicorette gums that have been authorized as drugs.

Q How would you characterize the similarities of those products to the ingredients in the ZEO Universe pouches in terms of the nicotine and the other ingredients?

A The ZEO pouches and the -- I call them nicotine replacement therapy, so the gums use the exact same type of nicotine, the only difference is that the drugs make a claim, a claim about their ability to switch smokers or reduce smoking, smoking cessation, whereas the tobacco products do not.

Q So are there any physical differences or is it simply a labeling difference?

A There's very little, if any, physical difference between the products.

Q Okay. I want to talk a little bit about the history of FDA's efforts to regulate tobacco products. Could you explain that history.

MR. HEYER: And if Your Honor wants us to move along, we can at any point, but if you can give an overview of the history, Dr. McKinney.

THE COURT: I don't need an overview of the history.

MR. HEYER: Okay. Thank you.

BY MR. HEYER:

Q Are you aware of the Deeming Rule from 2016, Dr. McKinney?

A I am aware of the Deeming Rule of 2016.

Q Okay. Do you know whether the legal effect of the Deeming Rule was to make newly-deemed products adulterated and effectively illegal overnight?

A I don't understand the question.

Q Okay. Of the products --

THE COURT: What was the effect of the Deeming Rule?

THE WITNESS: Was to -- so the initial act only regulated cigarettes, smokeless tobacco, and roll your own.

THE COURT: The TCA.

THE WITNESS: The TCA.

THE COURT: All right.

THE WITNESS: And so the Deeming Rule brought other tobacco products, like electronic nicotine delivery system products, under the purview of FDA, or the TCA. They were regulated.

BY MR. HEYER:

Q And when that Deeming Rule took effect, do you have an

understanding as to whether that made those products now illegal and adulterated if they didn't have a marketing granted order from FDA?

A That is -- that is correct, they were in essence illegal.

Q Okay. And for those products that were on the market at the time the Deeming Rule took effect in 2016, did FDA require their removal from the market?

A No.

Q What did FDA do?

A As stated earlier, FDA had an enforcement prioritization and allowed those products to stay on the market.

Q Okay. To your knowledge, are there still tobacco products commercially marketed today, ten years later, that were affected by the Deeming Rule that are still being marketed but don't have a marketing granted order?

A Yes.

Q Now, when FDA pushed the Deeming Rule --

THE COURT: Like what kind of products?

THE WITNESS: Well, there's oral nicotine pouches, there's smokeless tobacco, there are quite a few electronic nicotine delivery system products as well.

THE COURT: But are they required to be in the PMTA process?

THE WITNESS: In order -- my understanding is in order to market a product in the United States, you need to

have authorization from the FDA, so they are required -- and to receive authorization, there's several approaches, one of them is the premarket tobacco application.

THE COURT: And so if they haven't gotten that premarket tobacco authorization, are they adulterated and illegal, even if not enforced as such?

THE WITNESS: I'm not sure I understand the "adulterated," but they are -- I'm not an attorney, but it's my understanding that they are illegal.

THE COURT: So an enforcement action could be brought against them for their marketing of the product if they're in the process or if they're not in the process, or only if they're not in the process?

THE WITNESS: That is -- that is the fear that many of my clients have, regardless of whether or not they are -- well, my clients have applications pending and they do have fear of enforcement.

THE COURT: Even if they're in the PMTA process?

THE WITNESS: That is correct.

THE COURT: And if they're outside the process, these other people, they too would be subject to enforcement?

THE WITNESS: That is correct.

THE COURT: Counsel, continue.

BY MR. HEYER:

Q Dr. McKinney, have you ever seen FDA either issue a

warning letter or take some other enforcement action, like a civil money penalty case or a seizure, against a nicotine pouch product that you know to have a pending PMTA?
A I'm not aware of any actions that have been taken if you have a pending PMTA.
Q And you understood -- I just want to make sure I understood your testimony -- that even in 2016 there were nicotine pouch or oral products on the market when the Deeming Rule took effect that are still being marketed today without a marketing granted order from FDA?
A That is correct.
Q I'm going to have you look at Exhibit 2 in the binder. This is the Regulatory Impact Analysis and Regulatory Flexibility Act analysis for the Deeming Rule.
THE COURT: This is Plaintiff's 2?
MR. HEYER: Plaintiff's 2, Your Honor.
BY MR. HEYER:
Q And I'm going to have you turn, Dr. McKinney, to page 86, if you would.
A This is tab 2, page -- and then go to page 86?
Q 86, please. Yeah.
And I want to draw your attention to the third -- or the second full paragraph from the top, the one that starts with "For each." Do you see that?
A The second paragraph?

Q Yeah, the second full paragraph.
A Yes.
Q All right. The second sentence, could you just read that aloud, the one that starts "It is important."
A I'm clearly in the wrong place, because the second sentence says "These include."
Q Are you on page 86?
A I'm on page 86, tab 2.
THE COURT: Go to the next paragraph.
MR. HEYER: Oh, yeah. The next paragraph.
THE WITNESS: Sorry. The third -- yes. Thank you. I see it.
BY MR. HEYER:
Q Okay. Could you read the sentence that says -- that starts with "It is important."
A "It is important to stress that research burdens of PMTAs are quite different from premarket applications for new drugs."
Q And the following sentence?
A For example, FDA does not expect that PMTAs will include randomized controlled trials like those conducted to support drug approvals. Instead, the emphasis is on understanding actual use.
Q That's good enough.
I want to point you to another page, if I could, to page 150 in the same exhibit.

THE COURT: What page?

MR. HEYER: 150, Your Honor.

Q And if I could draw your attention to the second paragraph from the top, and about the fourth sentence in, it starts "Formal clinical trials." Do you see that?

A I do.

Q Could you read that sentence aloud.

A "Formal clinical trials are well-known to be several million dollars in cost, but FDA does not expect that PMTAs will include randomized clinical trials (e.g. phase 3 trials) like those conducted to support drug approvals."

Q Under the final PMTA Rule that was finalized in 2021, in your experience --

THE COURT: I'm sorry. What page was he reading from?

MR. HEYER: 150, Your Honor.

THE COURT: What paragraph?

MR. HEYER: The second paragraph, it's about the middle of the paragraph, starts "Formal clinical trials."

THE COURT: All right.

BY MR. HEYER:

Q In your experience, Dr. McKinney, under the PMTA Rule that FDA finalized in 2021, have these -- are these statements true statements in terms of what FDA expects?

A No. The final rule outlines several clinical studies with

randomized controlled trials and pharmacokinetic studies being studies that are required for the PMTA.

Q Are those then studies that are required under the 2021 PMTA Rule that at least in the Regulatory Impact Analysis for the Deeming Rule in 2016 FDA was saying were not required but is now requiring?

A That is correct.

Q I'm going to have you turn in the same exhibit back to page 37, and we'll look at the very last comment in response at the bottom of the page.

A Okay.

Q And you can read the comment silently, but I'm going to have you read the first, I guess, two sentences of the response, starting with "We disagree."

A We disagree. As discussed in the PRIA, or what I just -- anyway, FDA does not expect most PMTAs to include randomized controlled trials, though other clinical or nonclinical studies may be appropriate. Application --

Q That's fine.

And, again, is this statement inconsistent with your lived experience under the 2021 PMTA Rule?

A It is inconsistent.

Q Okay. And why so?

A Well, I've advised all of my clients, if they can afford it, to conduct these studies, because all studies -- well,

products that have been authorized included these studies.
Q And to your knowledge, has FDA ever authorized through the PMTA pathway a single tobacco product of any type without some sort of a randomized -- longitudinal randomized controlled trial or some similar study following subjects over time?
A I am not aware of any authorizations that did not include a clinical study like a randomized controlled trial.
Q Then if you could flip forward again -- I'm sorry to make you go back and forth -- to page 149. We're going to look at the bottom of that page.
And just go ahead and read it to yourself silently, the last paragraph, if you could, and then I'll have a question for you.
A Okay.
Q Do you understand FDA to be suggesting that PMTA applicants will likely be able to rely heavily for their applications on publicly-available published scientific literature and/or research that FDA itself was conducting into tobacco products?
A Yes, that's the content of the paragraph.
Q And under the final PMTA Rule that was finalized in 2021, is that consistent with your experience?
A That is not consistent with my experience.
Q Could you explain why.
A Sure. The -- we have been told several times that --

THE COURT: By whom?

THE WITNESS: FDA. And this would be through deficiency letters and things like that. So my clients would receive deficiency letters for their applications, that they need to have very specific data on their product, and oftentimes the literature is not sufficient to evaluate their product.

One very specific example is analytical data. FDA has stated that it cannot evaluate -- it needs to understand the methods by which the analytical data was generated, and oftentimes the literature does not have the specificity that they need to apply that data to a specific product or application.

BY MR. HEYER:

Q And that's what FDA's scientific reviewers or Office of Science have conveyed to you and your clients?

A That's correct.

Q Is it correct that Exhibit 2, the Deeming Rule RIA, or Regulatory Impact Analysis, did not include any specific cost estimates for preparing PMTAs for what FDA calls novel nicotine products other than ENDS products?

A That is correct.

Q Can you just briefly describe what an ENDS product is.

A An ENDS product is a -- it's composed of a device that typically has a battery, a chamber for a liquid, and either a

coil or a ceramic, and it heats the liquid and the liquid is aerosolized.

Q And is it then inhaled by the user?

A And the liquid is inhaled by the user.

Q Generally speaking --

THE COURT: Is that the same as or different than a vape?

THE WITNESS: That is exactly the same as a vape.

THE COURT: All right.

BY MR. HEYER:

Q Generally speaking, how would you expect the costs, given the nature of the products, of preparing I'll call it a bundled PMTA, with similar products kind of grouped together, for ENDS products compared to the costs of preparing a bundled PMTA for nicotine pouch products?

A Yeah, there's a difference in costs because there's a difference in risks, so to speak. So heating a liquid can create adverse chemicals, those chemicals are inhaled, so the route of exposure is different than the oral products. There's electronics involved, we've heard about exploding batteries, so there are tests and certifications that you have for the battery as well. So it is a totally different category.

Q And how would you expect, generally speaking, the costs to compare for an ENDS product application versus a nicotine pouch product application?

A The cost to file a vape or ENDS product is significantly greater than an oral nicotine product.
Q Sticking with Exhibit 2, could you turn, please, to page 87, and I want to draw your attention to the top chart, the Table 11(a), and if you look at the bold figures in the bottom row, did FDA estimate the cost of bundled PMTAs for e-liquids for use in ENDS products to be between $181,686 and $2,014,120?
A That's what's listed here.
Q If you flip over to the next page, page 88, did FDA give an estimated -- I'll call it per SKU cost or per specific product in that bundle of $131,643?
A That is correct.
THE COURT: What does "per unit" mean?
THE WITNESS: Could you ask the question again?
THE COURT: What does "per unit" mean?
THE WITNESS: So I'm going to say that means per SKU. A product can have the same brand but -- and the same flavor but a different nicotine concentration, so it would be for a 3-milligram, a 6-milligram, 5-milligram.
THE COURT: And each one of those in the broad categories of grams would be designated by a different SKU?
THE WITNESS: That would -- they would be considered a different product.
THE COURT: And each one of those -- if you're a

company and you're seeking a PMTA, you need a separate analysis for each one of them, and this is the estimated cost of each one of them?

THE WITNESS: That is correct.

BY MR. HEYER:

Q If you'll turn, Dr. McKinney, to page 75. Could you read aloud the bottom paragraph on page 75.

A This final rule would also extend the Food, Drug and Cosmetic Act (FD&C Act) tobacco authorities to tobacco products that do not fit into traditional product categories, such as ENDS and nicotine gels. We are unable to quantify the costs for novel tobacco products other than ENDS due to lack of data.

Q And turn back a few more pages to page 69, please, the first paragraph. Could you read the last sentence in the first paragraph.

A Due to lack of data, we are unable to estimate the number of manufacturers and importers of small product categories, such as nicotine gels, affected by the deeming action.

Q And again to pages -- page 53 at the bottom.

A To extent -- to the extent that the commenter suggests that FDA did not accurately quantify costs or acknowledge where qualification is not possible, FDA disagrees.

Q And could you read just the following sentence as well.

A With respect to future rules, FDA is simply stating that we cannot predict the costs and benefit of future rulemaking

before the contents of the rules themselves have been established.

Q All right. And now I'd like to move to Exhibit 4, and this is the -- in the binder, if you go to tab 4, this is the Regulatory Impact and Regulatory Flexibility Analysis for the 2021 -- I'm sorry, this is the preliminary Regulatory Impact Analysis and Regulatory Flexibility Analysis for the proposed PMTA Rule from 2019.

THE COURT: Let's go ahead and take a break there for about 15 minutes.

\- - - - -

(Recess at 10:34 a.m. until 10:53 a.m.)

\- - - - -

THE COURT: Counsel, you may continue.

MR. HEYER: Thank you, Your Honor.

BY MR. HEYER:

Q Dr. McKinney, if you're looking at Exhibit 4 in the Plaintiff's exhibit binder, could you turn to page 14, and I'm going to draw your attention to the last paragraph at the bottom of the page.

Could you just read the second and third sentences in that paragraph.

A The sentence that starts with "However"?

Q Correct.

A However, we anticipate that the level of effort required

to gather information and prepare the PMTA aligns with the effort described in the final regulatory impact analysis for the Deeming Rule. Consequently, we do not expect that the proposed rule, if finalized, would change the costs of preparing and submitting a PMTA relative to the cost estimates in the final Regulatory Impact Analysis for the Deeming Rule.

Q And if you'll go backwards to page 6 of Exhibit 4, and I'll draw your attention to the second paragraph from the top, starting with the second sentence. Could you read that aloud.

THE COURT: Which page are you on?

MR. HEYER: Page 6, Your Honor, of Exhibit 4.

A Begins with the word "Because"?

Q Yes.

A "Because the proposed rule, if finalized, would generate net benefits or negligible costs for most affected small entities, we propose to certify that the proposed rule would not have a significant economic impact on a substantial number of small entities."

Q And over to the next page, on page 7, I'm just going to draw your attention to one clause there about five lines down. Do you see the sentence that says "We already included the costs to submit and review PMTAs for deemed tobacco products in the final Regulatory Impact Analysis for the Deeming Rule"?

A I see that.

Q And if you'll turn to page 22, the bottom paragraph, about

three lines up from the bottom, do you see the clause that starts with "We assume"?
A I'm sorry. Could you --
Q Yeah. At the bottom paragraph of page 22, about the third line from the end, there is a -- in the middle of the paragraph it says "We assume that the analysis." Do you see that?
A Page 22, the paragraph that starts with "To estimate"?
Q Correct. Yeah. And if you go about a little more than halfway down, there's a sentence that says "To avoid double counting costs and costs savings."
A Got it.
Q What does it say after that? "We assume" --
A "To avoid double counting costs and cost savings, we assume that the analysis for the Deeming Rule accounted for the costs to comply with most of the format and content requirements for a complete PMTA described in this proposed rule."
Q Is that different than what we looked at for FDA's statement in Exhibit 2 about -- about accounting for content costs for a PMTA?
A I'm --
Q That's okay. I'll move on.
A -- not sure I understand.
Q Quickly, I just want to draw your attention to the Small Business Administration letter that's Exhibit 5 in the

next exhibit in the binder.

A Okay.

Q The second par -- or the first full paragraph, or the second paragraph from the top on page 5, do you see where it's -- the paragraph that starts "In the proposed rule"?

A Yes.

Q Okay. And just read that -- you can read that silently to yourself and then I'll ask you the question afterwards to summarize.

A Okay.

Q All right. Is the Small Business Administration expressing its concern to FDA about whether there's any evidence to support FDA's statements in the --

THE COURT: It's much more effective when your expert testifies than when a lawyer testifies.

MR. HEYER: All right.

BY MR. HEYER:

Q If you look, Dr. McKinney, at the second sentence in that paragraph that starts "No evidence," could you read that sentence aloud.

A In the proposed rule, the FDA is relying on its inadequate assessment of the cost of the Deeming Rule to certify that the PMTA proposed -- to certify the PMTA proposed rule. Because the costs of the PMTA process have yet to be accounted for, all the costs attributable to the PMTA requirements must be

accounted for in this rule.
Q And the sentence that precedes what you just read, that starts "No evidence," can you read that sentence aloud as well.
A "No evidence is provided to support this statement, and it is at odds with the FDA statement in the Deeming Rule that we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established."
Q And flipping over to page 6, the second paragraph that starts "Because of the numbers," could you read that aloud.
A "Because of the numbers of small entities regulated by this rule, and because of the economic impact attributable to this rule, Advocacy concludes that the agency has failed to state a factual basis upon which to certify that the PMTA proposed rule will not have significant economic impact on a substantial number of small entities."
Q If I could have you, Dr. McKinney, turn over to Exhibit 6, behind tab 6, this is the final PMTA Rule from the Federal Register, and I'll ask you to turn -- there's a number in the top left corner. If you could turn, please, to page 55414, and do you see on that page a provision?
THE COURT: Hold on one second. 55 what?
MR. HEYER: 414.
THE COURT: Yes, sir.
Q Are you there, Dr. McKinney?

A Yes, I am.
Q And on the right-hand column do you see there's a section that says Section 1114.7, Required content and format?
A I do.
Q Are you familiar with this CFR provision from your work on PMTAs?
A I am.
Q Okay. And does this provision go on all the way over to page 55431?
A It does.
Q And could you just summarize at a high level what is in this particular provision of the CFR.
A This provision outlines the studies that are I'll use the word required for a PMTA, starting with characterization of the product, it touches on manufacturing, manufacturing quality, nonclinical, which includes toxicology, clinical requirements, behavioral science, environmental assessments. I'm trying to remember everything here. Yeah, I think that's -- that's about it.
Q Okay. Does --
A Post-market surveillance as well. Yeah.
Q Okay. Does it include -- I'm just going to list some topics. Does it include studies on harmful and potentially harmful constituents?
A Yes, it does.

Q Does it include toxicity studies?
A Yes, it does.
THE COURT: Does it include what?
MR. HEYER: Toxicity studies.
Q Go ahead.
A Yeah, harmful and potentially harmful constituents is a list of chemicals that the FDA established as potentially harmful, and you are to analyze your product and determine whether or not those chemicals are present and an individual that uses your product can be exposed to those chemicals.
Q Do you have to do that testing and those studies even if, other than nicotine, the products in -- the ingredients in your product are generally recognized as safe as a food ingredient?
A Yes, you do.
Q How about does this regulation require studies regarding pharmacological profile, including pharmacokinetics?
A It does, and nicotine is addictive, and the pharmacokinetics, or PK studies, in essence, you bring in subjects that use your product and you take blood and measure the rate at which the nicotine goes into the blood, because that can give you an idea of abuse potential but also nicotine getting into the blood.
Q How about actual use clinical studies, is that a requirement?
A That's a requirement. Actual use gives you -- you bring

in subjects, or recruit subjects, typically smokers, you give them access to the novel tobacco product, and you measure, number one, for example, with pouches, how many pouches they use per day, or how many cans, but you also would look at whether or not they reduce their number of cigarettes they smoke, actually -- whether or not they actually stop smoking.

THE COURT: By "you," who do you mean?

THE WITNESS: That's -- that's -- so my firm would help a client develop a strategy to meet the requirements here, and then ultimately we do some of the chemistry studies, we do those ourselves, but some of the behavioral and the clinical studies you have to have contract research organizations do the recruiting and actually do the studies, and we would monitor that.

Q How about switching studies or randomized controlled trial switching studies, is that a requirement?

A That is a requirement.

Q Consumer perception, and use, intention and human factors studies, is that a requirement under the regulation?

A That is.

Q We'll get to the costs of these things in a second.

Has FDA ever provided any sort of objective pass-fail criteria for any of these studies in this regulation?

A No.

Q Okay. Let me have you look at Exhibit 7, this is now in

the other binder, Dr. McKinney, and I'll direct your attention to page 41.
A Tab 7.
Q Correct.
A Page 41.
Q And this is now the Regulatory Impact Analysis for the final PMTA Rule in 2021, and I want to draw your attention to the paragraph that's under the Roman numeral three. Could you read the second sentence that starts "Because we expect."
THE COURT: What page are you on?
MR. HEYER: Page 41, Your Honor.
THE COURT: Go ahead.
BY MR. HEYER:
Q Go ahead, Dr. McKinney. Do you see that?
A I do.
"Because we expect that the final rule will generate net benefits or negligible net costs for most affected small entities, we certify that the final rule will not have a significant economic impact on a substantial number of small entities."
Q And if you'll go backwards to page 12, about halfway down there's a Comment 1 that references comments about failing to account for many of the costs. Do you see that?
A I do.
Q Okay. If you go down to the response then, the following

paragraph, do you see the sentence in the middle that starts "We attribute"?
A I do.
Q Could you read that and then go on to read the following short paragraph as well.
A "We attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Final Rule and not this rule. We therefore consider most aspects of these comments out-of-scope."
"For this final Regulatory Impact Analysis, we assume that applicants will prepare and submit these applications even without this final rule. In this analysis, we estimate the incremental impact of the final rule relative to the compliance costs attributable to the Deeming Rule."
Q Over to page 13, could you read Comment 4 toward the bottom of the page.
A We disagree with this --
Q I'm sorry. Up above that, where it says Comment 4, "Multiple comments."
A Oh. "Multiple comments suggested that we improperly proposed to certify that the proposed rule would not have significant impact on a substantial number of small entities because we used cost estimates from the Deeming Analysis."
Q And could you read the first two sentences of the response.

A "We disagree with this comment. We believe that this comment conflates the impacts of the Deeming Rule with the impacts of this final rule."
Q And could you read the last sentence in that paragraph, starting with "Because the analysis."
A "Because the analysis for the Deeming Rule already accounted for these impacts, we only consider the incremental change in the costs of premarket review for ENDS products created by this rule in this analysis."
Q Okay. For novel products that had -- novel nicotine products that had synthetic nicotine as opposed to tobacco-derived nicotine, when did those become subject to the Tobacco Control Act in these regulations?
A April 2022.
Q And are the Zest -- the ZEO Universe products that -- the sample that we marked, do those have synthetic nicotine in them?
A They contain synthetic nicotine.
Q And under that legislation in 2022, did manufacturers have an adequate opportunity to prepare full and robust applications before they were due in terms of allowing a product that was already on the market to continue on the market?
A If I recall, they were given 30 days.
Q Is that sufficient time, in your experience?
A No.

Q How long for a nicotine pouch application, in your experience, assuming unlimited funding, would it take to put together a robust application that satisfied all the things we just went through from the regulation?
A Well, it -- it depends. It depends on the client's risk tolerance and whether or not they want to submit an application and amend it, but typically to submit an application that could make it through the first two phases, you're looking at at least eight months to a year.
Q And so for those -- your clients that have synthetic nicotine applications in 2022, what option, if any, was available to them in terms of submitting a PMTA to keep their products on the market?
A You submit an application and you leverage the literature as much as possible, that's the only thing you can do within 30 days.
Q And after the 30 days, what would you recommend to your clients?
A That you amend your application.
Q And would those amendments add additional data and study results?
A The amendment would be -- would become a part of the application and FDA would be required to review those amendments as it is the application itself.
Q Switching gears for a second, are you familiar with the

term "continuum of risk"?
A I am.
Q Could you describe what that is.
A Continuum of risk refers to a risk profile, with cigarettes being the most harmful tobacco product and, honestly, not using any nicotine or tobacco products as least harmful.
Q Has FDA given any indication as to where it considers nicotine pouches to be as a category on the continuum of risk for all statutorily-defined tobacco products?
A FDA has stated that this category of tobacco products are very low risk.
Q And I'm not going to go through all these, but have you had a chance to review Exhibits 8 through 12 before today's hearing? These are different statements from FDA.
A I've reviewed a lot of documents. I'm going to say yes.
Q And based on your review, are those different statements consistent with what you just testified in terms of what FDA has said about pouch products?
A Yes.
Q Let me have you look at Exhibit 23.
THE COURT: Counsel, we don't have all day scheduled for this hearing. Do you intend to call a different witness?
MR. HEYER: I do, Your Honor. I wanted to get through some specific costs data with this witness, unless

Your Honor wants me to move past that, about the different components and how --

THE COURT: You just need to move along.

MR. HEYER: All right.

BY MR. HEYER:

Q Could we -- could you turn to Exhibit 23 quickly, Dr. McKinney.

A Okay.

Q And could you briefly describe what that is.

A This is a publication, it is a meta-analysis of publications that have looked at tobacco products and the risk profile of those tobacco products.

Q And have you reviewed this publication?

A I have.

MR. HEYER: Okay. Your Honor, move the admission of Exhibit 23.

MS. WISE: No objection, Your Honor.

THE COURT: It will be received.

BY MR. HEYER:

Q And if you could turn to the end of the exhibit, is there a chart there, Dr. McKinney, or a visual from the article?

A There -- yes. Yes.

Q And could you describe where nicotine pouches are compared with, say, combustible cigarettes.

A Combustible cigarettes are listed as 100 on a combined

risk score, and nontobacco pouches are listed as 0.1.

Q And are they next to not using any nicotine products at all?

A Yeah, they're below nicotine replacement therapy or drugs and right next to --

THE COURT: Counsel, I'm not going to get into the analysis of the validity of the RTF on a temporary restraining order to that --

MR. HEYER: Understood, Your Honor. I'll move on, yeah.

THE COURT: -- detail.

BY MR. HEYER:

Q Has FDA authorized the marketing of any nicotine pouch products?

A Yes, they have.

Q Which brands?

A Two brands, on! PLUS and ZYN.

Q Who are the manufacturers of those products?

A ZYN is manufactured by Philip Morris International. On! PLUS is manufactured by Altria.

Q And which company is the largest combustible cigarette manufacturer in the United States?

A Altria.

Q Have you had an opportunity to observe whether there are -- strike that.

In your experience, are there many other brands of nicotine pouch products that are on the market besides those two that do not have marketing granted orders?
A There are several.
Q We went through the PMTA Rule briefly. Are there -- are there any requirements in there that are specific only to pouch products as opposed to just all tobacco products in the CFR provision?
A No.
Q Are there specific requirements for other categories of tobacco products in there?
A ENDS products or vape products.
Q Do the same general requirements apply regardless of where products sit on the continuum of risk?
A Basically.
Q Based on your experience, have you reached an opinion as to whether FDA's requirements under the PMTA Rule include new and additional costs beyond those contemplated only by the statutory language of the Tobacco Control Act or the Deeming Rule?
A Oh, yeah. Absolutely.
Q Have you prepared a demonstrative to talk about -- or to demonstrate just in an overview the requirements of the TCA versus the regulation?
A I have. If you overlay in two columns the TCA and the

PMTA rule, you can clearly see the difference in the requirement.

Q Okay. We're going to pull up Exhibit 15A. I'll just ask if that's -- when you can see it on the screen, Dr. McKinney, if that's the demonstrative.

COURTROOM DEPUTY: You'll have to push the button on the side.

Q And is this, in fact, the demonstrative, Dr. McKinney?

A It is.

MR. HEYER: And, Your Honor, move the admission of Exhibit 15A.

THE COURT: You have to speak into the microphone all the way to the end of your sentence.

MR. HEYER: Okay. Your Honor, move the admission of Exhibit 15A.

THE COURT: Any objection?

MS. WISE: We have no objection to its use as a demonstrative but object to it as substantive evidence. I think the document is -- that it purports to quote --

THE COURT: It will be received as evidence for the Court to consider in determining whether a TRO should issue either demonstratively or to the extent it pulls over unobjected-to contents substantively.

MR. HEYER: And if we could just scroll down through that slowly.

BY MR. HEYER:
Q We talked earlier, Dr. McKinney, about some of the language that FDA had in the Deeming Rule Regulatory Impact Analysis about randomized controlled trials and references to scientific literature. Do you recall that discussion?
A I do.
Q In reality, what FDA expects under the final PMTA Rule, does that increase the costs for applicants with respect to those two areas?
A Significantly.
Q Have you prepared a demonstrative that references by category the cost estimates that you would have for a bundled nicotine pouch application?
A I did.
Q Okay. If we could pull up Exhibit 15B, please.
And could you identify Exhibit 15B, Dr. McKinney.
A Yes. We're looking at it on the screen. What would you like for me --
Q What is this? Can you just describe it.
A Oh. Oftentimes when clients come to us, we develop a strategy, and that strategy involves various testing, and they ask us, well, what is it going to cost, and so what I've listed here is some typical costs for maybe a bundled PMTA.
MR. HEYER: Move the admission of Exhibit 15B.
MS. WISE: Same objection as before.

THE COURT: Same ruling as before.

BY MR. HEYER:

Q If we scroll down to the bottom --

THE COURT: Well, I don't understand "same objection as before." I'm assuming these documents underlying these costs are somewhere in the record, or are these -- this is a substantive exhibit?

MR. HEYER: This is, I think his testimony was, based on his experiences. I can lay more foundation if Your Honor would like.

MS. WISE: We have no objection to this being used as a demonstrative, but object to it as substantive evidence.

THE COURT: All right. The Court will allow it to be used as a demonstrative.

BY MR. HEYER:

Q Dr. McKinney -- well, let's talk through it then.

If we can scroll back up to the top.

In your experience, can you just walk us through some of the different components and what the cost ranges are for a bundled PMTA of 18 SKUs of nicotine pouch products.

A Yeah. Each product is unique and has slightly different ingredients, et cetera, and so we like to do a strategy meeting, we also encourage our clients -- once we develop the approach and the strategy, we have a pre-PMTA meeting with FDA so that they can -- if they do give us some guidance on whether

or not they think our approach is appropriate.

But the first part is clients should understand their product, do a chemical characterization of their product, for example, putting your product under various conditions and letting it sit for one year and analyzing it at various times to determine whether or not, for example, microbes will grow in your product, whether or not your product is producing those harmful and potentially harmful constituents.

Dissolution is specific for pouches. We do that test to determine the rate at which the nicotine is coming out, and you can anticipate what would happen in a human pharmacokinetics study, and these studies are a little bit -- a lot cheaper than a -- than a PK study.

Leachables and extractables, is the can leaching. Certain suppliers' cans could be contaminated and leak metals or certain amounts of the plastics into the product, so we test for that.

Nonclinical studies are really focused on the toxicology, are there ingredients in there that could cause an allergic reaction, are the ingredients interacting to produce chemicals that can damage DNA, things like that.

And then the next part is the clinical, which is -- takes the longest and is the most expensive. I've talked about PK and exposure studies, or pharmacoeconomics. Actual use studies or switching studies can be anywhere from six weeks to

a year, they can be conducted over various parts of the United States and have thousands of people participate in them, which is why you see the huge difference in the costs.

Perception and intention and behavioral studies, is your product attractive to people that do not use tobacco products and will you bring people into the category that normally would not come into the category, so you do controlled studies to assess that, because FDA and I think most manufacturers do not want that.

And then, again, I have stability studies here, again.

And then my organization, you hire me and I hire experts in these -- well, I have experts, behavioral scientists, toxicologists, chemists, clinicians, and we ultimately write and pull the application together, and it's typically a very large application, millions of pages, so there's a cost associated with that.

Q Taking this all together, what is the bottom line estimate that you have for a nicotine pouch application with 18 skews?

A It's between 3 million and 13 million. And I want to -- may I say something about that difference in costs?

Big clients like Altria, if they hear a whisper of a study is required, they do it. They also, with their clinical studies, they do year-long studies rather than six weeks, which adds significant costs. In terms of repeating studies, FDA

says repeat it seven times, this is for the chemical studies, and the big clients will do that. We typically make an argument using statistics that our smaller clients can repeat the study five times. So we try to reduce the costs but maintain the same level of quality and scientific rigor.

Q Let's have you look at Exhibit 14.

Thank you, Dr. McKinney, for your testimony there.

Exhibit 14 in the binder.

A Exhibit 14.

Q And this is the refuse to file letter that was issued to plaintiff Zest Brands.

A Okay.

Q Do each of the three bases given for the refuse to file letter reference the CFR provision, the regulation that we just talked about?

A It does.

Q And do you see the language in bold on page 2?

THE COURT: Pull the lights back up, Ms. Biron.

THE WITNESS: Thank you.

Q And is that -- is that language from FDA warning Zest not to introduce or deliver for introduction these products into interstate commerce?

A That is correct.

Q Let's look at Exhibit 16.

Are you familiar with the National Youth Tobacco

Survey?
A I am.
Q What is it?
A It's a survey that is conducted every year that gives us an indication of youth use of the various categories of tobacco products.
Q Turn to page 4 of 6 in the bottom right-hand corner, if you could, please.
A Okay.
Q And does this survey cover middle school and high school students?
A It does.
Q And what percentage of those students reported use of nicotine pouches in the survey?
A 1.8 percent of students.
Q And it says "current use." Do you know how the National Youth Tobacco Survey defines current use?
A I think it's past 30 days. It defines current use as past 30 days.
Q So just potentially one time in the last 30 days?
A In the last 30 days, that's correct.
Q And if you go down under Commonly Used Brands, what brand was most commonly used by youth?
A The most commonly reported brands were ZYN and on!
Q And which brands have gotten marketing granted orders from

FDA?
A ZYN and on! have received marketing authorizations.
Q Is ZEO Universe listed among these brands?
A No.
Q And then I'll have you look at Exhibit 24, and could you identify what Exhibit 24 is.
A Sure. Exhibit 4 is a Technical Project Lead Review of Nicotine Pouches.
THE COURT: Exhibit 4 or Exhibit 24?
THE WITNESS: Thank you, Your Honor. Exhibit 24.
BY MR. HEYER:
Q And what is it again?
A It is a Technical Project Lead Review of Nicotine Pouch PMTAs.
Q And what is a Technical Project Lead Review?
A Typically when a decision is made by FDA, or authorization, I would say, it's made public, the reviewers -- the scientific reviewers' comments and their thoughts and how they came to the conclusion.
Q Is this for the on! PLUS products?
A This is for the on! PLUS products.
Q And was this for December of 2025, just two months ago?
A Yes.
MR. HEYER: I'd move the admission of Exhibit 24.
MS. WISE: We don't have any objection, but we've

brought complete copies and would prefer to admit the complete copy instead of the excerpt, just under the Rule of Completeness, Your Honor.

THE COURT: Any objection?

MR. HEYER: I have no objection to that, Your Honor. We'll just reference these and then we can swap them in. That's fine.

THE COURT: I didn't understand any of the last two sentences.

MR. HEYER: Sorry. No objection, and we can mark those. That's fine. Yeah.

THE COURT: So we'll substitute the complete copy but still call it Exhibit 24.

MR. HEYER: That's fine, Your Honor.

MS. WISE: May I approach, Your Honor?

THE COURT: You may.

Did you give a copy to the witness?

MS. WISE: Thank you, Your Honor.

BY MR. HEYER:

Q Dr. McKinney, in the Technical Project Lead Review, what did FDA state about whether it was concerned about youth usage of nicotine pouches?

And maybe you can direct us to the page that you're looking at as well, or pages.

A I'm looking at page 4 of 12 (sic), and it states that

"In terms of youth use, nicotine pouches have characteristics that may be appealing to youth, including concealability and the availability of flavors. To date, however, the available evidence does not demonstrate this category poses a significant risk to youth, as the current evidence does not show a significant uptake of the product category."

Q And is there any other place in there where they make similar statements?

A Just a second.

Basically FDA examines an application to determine whether it contains sufficient mitigation measures to prevent accidental nicotine exposures to young children.

Q That's fine. That's fine, Dr. McKinney.

A Yeah, they came to the conclusion that it's not attractive to youth.

Q And are these statements coming from FDA's scientists?

A Yes.

Q Are they coming from FDA's lawyers?

A I'm going to say no. I think a scientist wrote this.

MR. HEYER: I have no further questions for this witness, Your Honor.

THE COURT: Counsel.

MS. WISE: If I could take down the exhibit, please, Madam Clerk.

Being mindful of our time, I'll try to keep this very

brief.

**CROSS-EXAMINATION OF DR. WILLIE MCKINNEY**

**BY MS. WISE:**

Q Earlier I believe you testified that there was no difference in pouches versus nicotine gums; is that correct?

A Um, well, there -- there are differences in terms of how they're -- they're both oral, put in the oral cavity. Gums are -- the gum is chewed and then placed in the -- in the cheek, similar to pouches, but the nicotine that's used is the same nicotine, I think that's what I testified to.

Q Excuse me. Maybe I misunderstood that then.

THE COURT: I'm sorry. What did you say?

MS. WISE: Excuse me. Maybe I misunderstood that.

Q Because in evaluating these products it's important to look at things such as absorption rate; is that correct?

A Yes.

Q And that could differ between products?

A It could, which is why we do dissolution studies, which are the chemistry studies to understand how the nicotine is released from the various -- various products, which are less expensive than the pharmacokinetic studies.

Q And some of the factors that you would consider in those types of studies might include the chemical structure; is that correct?

A No.

Q Would you look at the pH?
A We would definitely look at the pH, that's part of the design and product characteristics that you would look at.
Q And things such as inactive ingredients, I believe you testified that's something that you would look at in the studies as well?
A Inactive ingredients like favors.
Q Physical properties of the products is something you'd look at?
A That is correct.
Q Just to be clear on the timeline, I believe you testified that there was some nicotine pouches that have been on the market since the Deeming Rule went into effect; is that correct?
A Yes.
Q But just to be clear, those nicotine pouches were tobacco-derived; is that right?
A I'm not sure about that.
Q Because my understanding is synthetic nicotine pouches weren't even subject to these requirements until 2022. Is that right?
A Synthetic nicotine pouches, but there were these very similar pouches that used tobacco-derived nicotine.
Q So the tobacco-derived products were subject to the Deeming Rule at the time it was adopted in 2016; is that right?

A Was adopted in 2016. They should have been, yes.
Q And the tobacco-derived pouch products were subject to the PMTA final rule as of 2021; is that right?
A That is correct.
Q But synthetic products weren't subject to the Deeming Rule in 2016 at all; is that right?
A No, they were not.
Q And they weren't subject to the PMTA Rule in 2021 either, were they?
A No.
Q They only became subject to --
A In April of 2022.
Q April of 2022. And is that because --
THE COURT: Can you all not talk over each other.
They only became subject to -- finish your question.
BY MS. WISE:
Q To both of those requirements, the Deeming Rule and the PMTA final rule, in 2022 because of the act of Congress; is that right?
A That is correct. But individuals were using and there were synthetic nicotine pouch products on the market prior to the PMTA Rule.
Q But they -- before 2022 synthetic nicotine pouches weren't subject to the PMTA Rule; would you agree?
A That is correct.

Q So at the time the analysis was done on the Deeming Rule, do you believe it was reasonable that the FDA didn't consider synthetic nicotine because it wasn't even subject to the rule?
A I'm not sure about that.
Q Just to clarify, you provided your opinion about the cost of a bundled PMTA application for nicotine pouches, but your opinion is that a bundled PMTA application for nicotine pouches is still much less than a bundled PMTA application for an ENDS product; is that correct?
A That is correct.
Q You've testified a bit about other products on the market. Is the ZYN product tobacco-derived?
A That's a good question. I'm not sure.
Q Is the on! product tobacco-derived?
A I believe that it is.
Q So to your knowledge the on! product is not synthetic nicotine; is that fair?
A I believe that to be the case.
Q And for the ZYN product, you're not sure if it's synthetic nicotine; is that --
A I don't know.
Q We've talked today some about relying on scientific literature that's already published in applications. Would you agree as a general matter that there's limited research on novel products simply because they're novel?

A Actually quite a few -- quite a few publications on pouches, on nicotine -- if you look at the product itself, you would use the literature to justify the use of ingredients, the use of nicotine, to understand how nicotine is metabolized, and you would pull all that together to support the use. So there's lots of literature that could be used. Unfortunately, it's just not accepted by the FDA.

MS. WISE: If I could just have a moment to confer, Your Honor.

THE COURT: Yes.

MS. WISE: Nothing further. Thank you, Your Honor.

THE COURT: Thank you.

MR. HEYER: I don't have any redirect.

THE COURT: All right. Sir, you may stand down.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MR. HEYER: I'll call Inga Nasi, Your Honor.

THE COURT: Please come forward to be sworn.

Please swear the witness.

COURTROOM DEPUTY: Ma'am, please raise your right hand.

Do you solemnly swear or affirm, under penalty of perjury, that the testimony you're about to give in this cause will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Inga Nasi, I-N-G-A, N-A-S-I.

THE COURT: Thank you. You may take a seat in the witness box.

Ms. Nasi, you're under oath. You have to give truthful answers. If you give false answers, you face penalties of perjury. Do you understand that?

THE WITNESS: I do.

THE COURT: Wait until counsel completes his question before you start speaking, so you all aren't speaking over each other, and wait until counsel for the FDA -- if he makes an objection or she makes an objection, wait until I rule on it before you give your answer. Do you understand that?

THE WITNESS: I do.

THE COURT: Counsel.

**DIRECT EXAMINATION OF INGA NASI**

**BY MR. HEYER:**

Q Ms. Nasi, are you an entrepreneur?

A Yes.

Q Okay. What businesses do you have that are relevant to this case?

A I own C Store Depot, which is a distribution business that I founded in 2013, and Zest Brands, which is a novel nicotine product manufacturer which I set up in 2019.

THE COURT: Sit back just a little bit. You're causing an echo.
Go ahead.
BY MR. HEYER:
Q How many employees does each company have?
A All together we have [redacted] employees and contractors.
Q Could you briefly describe what Zest Brands' business is.
A Yes. We design, through R & D and manufacturing, nicotine pouch products.
Q When did you first introduce the ZEO Universe pouch products to the market?
A 2022.
Q Was that before they became subject to FDA regulation?
A Yes.
THE COURT: Counsel, do you have questions?
MR. HEYER: Yes.
BY MR. HEYER:
Q And did there come a point where you understood them to become subject to FDA regulation?
A Yes.
Q Did you keep selling them after they became subject to FDA regulation?
A Once they became subject to FDA regulation, part of that requirement means you have to make product --

THE COURT: Did you continue to sell it after it became subject to FDA regulation?

THE WITNESS: Yes.

BY MR. HEYER:

Q Okay. Could you describe the marketplace after -- for nicotine pouch products generally after they became subject to FDA regulation.

THE COURT: What does that mean, "describe the marketplace"?

Q What were you observing in the marketplace?

THE COURT: Counsel, I don't understand that question.

Q Okay. Let me be more specific.

Were there other nicotine pouch products being sold after April 2022 that did not -- to your understanding, did not have FDA marketing authorization?

A 100 percent of all the nicotine pouch products sold in 2022, 2023 and 2024, and they include both tobacco-derived nicotine pouches and synthetic nicotine products, 100 percent of all those products through 2024 did not have a marketing granted order, and so -- let me stop.

Q And today, are there nicotine pouch products that are on the market that compete with yours that do not have FDA marketing authorization?

A Yes. I would say most of the products on the market,

including still product by the biggest tobacco companies, do not have a marketing granted order from the FDA.

Q Have you taken photographs at convenience stores in the Tampa Bay area of the nicotine pouch products that are being marketed?

A Yes, I have, and over the years I have --

THE COURT: Yes.

Just answer the questions that are asked.

THE WITNESS: Yes.

MR. HEYER: Let's show Exhibit 19. I don't know if it's possible to pull that up.

THE COURT: Any objection from defense?

MS. WISE: No, Your Honor.

THE COURT: It will be received.

BY MR. HEYER:

Q Let's scroll down, and, Ms. Nasi, could you explain what we're seeing here in Exhibit 19, and maybe when these photographs were taken.

A Yes. On the top row there is a product made by Altria, which is the maker of Marlboro, called on! PLUS. It recently was given a marketing granted order. It was a product --

THE COURT: I'm sorry. Pull the microphone toward you if you're looking at the screen.

Go ahead.

THE WITNESS: Should I repeat everything?

THE COURT: No.

THE WITNESS: Okay.

A The next row down is a product called on! that's been on the marketplace, I believe, at least since 2017. It is manufactured by Altria, which is the maker of Marlboro, and it does not have a marketing granted order.

The next product down is a product called VELO, manufactured by R.J. Reynolds, which is the manufacturer of Newport, a major -- owned by also -- R.J. Reynolds is owned by British American Tobacco, major global tobacco company, and they do not have a marketing granted order for VELO.

Underneath that row, in row number 4, is a product called VELO Plus, it's a synthetic nicotine pouch product, also owned by R.J. Reynolds, maker of Newport, and R.J. Reynolds the U.S. entity is owned by British American Tobacco. They make, as I said, VELO Plus, and it's a synthetic nicotine pouch product, and it does not have a marketing granted order.

Row number 5 is a product called Grizzly, it's a nicotine pouch product, I believe, I'm not sure, but I believe it's a synthetic nicotine pouch product, also owned by R.J. Reynolds/BAT, British American Tobacco, makers of Newport, also does not have a marketing granted order.

Underneath that there is ZYN products, owned by Philip Morris International. They were in the marketplace since at least 2017, maybe even 2014, I'm not sure, but

certainly 2017, they are were only given their marketing granted order in 2025, so between 2014 or 2017 through 2025 they were the -- about 80 percent of market share was the ZYN product, and they did not have a marketing granted order through 2025, which is when they first got it from the FDA.

Underneath that -- I think that's it. That's pretty much us, and then underneath that is us, and that's it.

Q And where and when was this picture taken?
A I think this is a REBEL store in Tampa.
Q A what store? I'm sorry?
A REBEL. It's called REBEL. It's a chain.
Q Is it a convenience store?
A Yeah, it's a national chain of convenience stores.
Q Okay. Let's just scroll down, and if you can give us a high level overview, you don't have to go into all the detail, but of the other photographs.
A Yeah. This was taken in a Pilot Flying J, it's a national chain of travel -- travel stops.

Now you moved to RaceTrac.
Q Okay. RaceTrac, the third one. Is RaceTrac a convenience store?
A The third one is RaceTrac, yeah.
Q And just stop there for a second. Does that have a lot of the same brands?
A The same brands, pretty much, because these back bars are

owned by big tobacco.

Altria, which is maker of Marlboro slash Philip Morris U.S.A., maker of on!, doesn't have the marketing granted order. Phillip Morris International, maker of ZYN, been on the market since 2014, circa, and only got the marketing granted order in 2025. Reynolds, maker of VELO, R.J. Reynolds, owned by also British American Tobacco --

Q That's fine. We've gone over that. If I can interrupt you.

Let's go down to the next photograph, and if you can describe where that one was taken.

A Where?

Q Yeah, if you know. If you recall.

A Can you just go back?

Q If you don't recall, that's fine.

A Yeah, it might be another REBEL store.

Q Okay. How about the next one, do you know?

A Yeah, this was taken in 2024, I believe, in Sheetz, it's a major chain with close to 1,000 stores in -- around Pennsylvania somewhere.

THE COURT: You're saying Sheets, S-H-E-E-T-S?

THE WITNESS: S-H-E-E-T-Z.

THE COURT: All right.

THE WITNESS: They're not here in the market, but -- they're not in the Tampa area, but they're very, very big in

the Pennsylvania through the Midwest area. It's listed, I think, top ten in the top 50 National Association of Convenience Stores list of the largest convenience stores in the U.S.

THE COURT: You personally took that photograph?

THE WITNESS: Yes. Well -- sorry. This one was taken with me present by my associate. I didn't have a good camera on my phone. So in 2024 we were traveling to the Sheetz headquarters and we were visiting their stores before the meeting and I asked my associate to take it with me while I was there, to take it while I was there, and he sent it to me.

Q Can we go on to the next photo.

A And so here are the additional brands to the brands I have cited earlier. Those brands are Sesh, a synthetic nicotine pouch manufacturer, also does not have a marketing granted order.

There's a product called LUCY, I think it's a tobacco-derived nicotine pouch, and also does not have a marketing granted order.

Q Okay.

A Oh, there's another brand here, and it was present in the prior but I didn't see it, I'm sorry, it's a little darker, called Rogue, made by a pretty large tobacco company in the U.S. called Swisher, the brand is called Rogue, and they have a combination of tobacco-derived and synthetic nicotine pouch

products, also do not have a marketing granted order.
Q Let's go down to the next photograph.
A Oh. And here, this looks like -- this store is another brand -- oh, two more brands here. I can see it closer. A brand called Cold Zone, made by a major both national and international tobacco company called Imperial Brands, that's the international name, the U.S. name is ITG, I think. I don't remember the name, but it breaks down -- but it's called ITG, major tobacco company, probably the third largest in the world, and they're the makers of Zone, which is a synthetic nicotine pouch product, also does not have a marketing granted order.
Underneath ZEO Universe pouches there is also a brand called FRE owned by a publicly listed tobacco company, pretty decent size, called Turning Point brands, the name of the brand is FRE, it's a synthetic nicotine pouch product, also does not have a marketing granted order.
And there is Rogue, as we mentioned earlier.
So I think all these pictures will now have pretty much the same names.
Q Okay. Thank you. I think we can stop there with this exhibit.
Have you historically sold your products through national convenience store distributors?
A This is where we started. We-- we were -- we were very intentional at launching the highest quality of nicotine pouch

product that we could, and oftentimes in independent stores they really don't care about quality, they just care about a cheap product.

THE COURT: You haven't been denied marketing authorization for your product, have you?

THE WITNESS: The RTF, is my understanding, the de facto denial, before we could even continue the scientific review.

THE COURT: And are you able to resubmit?

THE WITNESS: According to the letter, we need to resubmit, but start in the queue again, and in between we cannot sell the product, and without selling the product we cannot [redacted]. We literally have to start all over again, according to my understanding of the RTF.

BY MR. HEYER:

Q Have your companies profited from the sale of these products?

A Before we launched this product our distribution company was a [redacted]. Once we started making these products and we didn't -- within months of bringing the products to the market we were basically catapulted into a PMTA process that we had no reason to think that within a month we'll have to go through the process. We didn't plan on happening so quickly, right, [redacted] of dollars that now we had to do, that with my distribution company we could not do,

so very quickly we had to spend over [redacted] in the 30 days that we had to apply for, because all the -- well, we didn't meet Dr. McKinney then, but the compliance -- regulatory compliance company we've had to hire, kind of like Willie, has charged us an arm and a leg for like the 30 days that we've had to file.

So very quickly, after already having spent money to be in the market, to do the R & D, et cetera, while the product was legal, we had to now spend money -- without any warning, 30 days, we had to raise money quickly, [redacted], and within months had to basically spend [redacted] extra just to be able to remain in -- to remain in the market, because -- and I know people call this illegal, but there is another illegal altogether, which is not filing for the PMTA and truly not being able to sell, because the illegal -- there's basically seem to be two illegal structures, and the way I think of it, there is something that is truly illegal, you did not file and you cannot sell; and then there was something that is not legal but is -- the way I considered it is not really illegal, because everybody else, that was their way of being in the market. And so we wanted to do the right thing, put a product in the market and at least not be truly illegal, maybe not be legal, but not be truly illegal, and do the right thing, but that started cost -- that just to begin with cost us over [redacted].

Now we are in this market and we're pregnant, [redacted], and we have product which we have to put through scientific -- put in the scientific work, but it's a lot of product, you can't just manufacture two pouches, that in and of itself, that first batch, in order to be able to do the work, you have to make enough -- you can't do small amounts, you know, in order to do a -- you have to do a commercial batch. Just that in and of itself is over [redacted]

Q Okay. Ms. Nasi, I want to just -- from the time that you applied, of the revenues, the profits -- any profits that were spun off from your two entities, what did you have to do with those in terms of the application?

A Yeah, so just to clarify, [redacted], so, as I said, [redacted]. Starting 2023, we started [redacted] went as an investment into the nicotine pouches, so much so -- and I don't fully remember, but I think -- I should have checked before now. [redacted] I think last year [redacted] in the business, trying to make this work.

Q And was a significant reason for that because of the significant investment --

A That's only --

THE COURT: Can you all stop talking over each other.

And if you don't ask a leading question, she won't be talking over you.

BY MR. HEYER:

Q And where did that money go that was generated by the business?

A A combination of manufacturing the product -- as I said, you can't do small batches -- supporting the staff, personnel, you know, to be able to put it in the market, supporting the scientific work, which you can't -- again, you can't do the scientific work unless you manufacture the product, so everything is connected to everything else.

Q Okay. In terms of the -- and we're almost done here.

In terms of the national distributors of these products that sell to convenience stores, what in your experience do they require in terms of the regulatory status of the products to be willing to sell it?

A Yes. So the distributors self-regulate, and -- can I take a step back a little bit? You literally cannot sell --

THE COURT: Why is it relevant to my analysis of whether the PMTA complied with the RFA?

MR. HEYER: Well, I'm trying to get to the irreparable harm issue, I think, here, Your Honor.

THE COURT: All right. Can you get to that.

BY MR. HEYER:

Q So what do the national distributors that you sell to

require --
A Right.
Q -- to be able to continue purchasing your product?
A They require an -- a PMTA application by the deadline of May 2022 and an acceptance letter, which we got in December 2022, and they give you -- I know a contract has been mentioned. I just want to say, there is no negotiation of contract. They're -- [redacted].
Q Now, you got the RTF letter dated January 30th, 2026.
THE COURT: I'm sorry. And that contract requires what with respect to an RTF?
THE WITNESS: Basically there is [redacted] that basically says if you are -- for whatever [redacted].
THE COURT: And you have to re -- [redacted]?
THE WITNESS: Yes.
THE COURT: And do they [redacted]?
THE WITNESS: [redacted].
THE COURT: And if they have the product on their

shelves and you get an RTF, [redacted]?

THE WITNESS: Correct. [redacted].

THE COURT: [redacted].

THE WITNESS: [redacted]. So let's say that they ordered five pallets of different SKUs, we ship them the five pallets, one of them is [redacted]. Let's say that a month later three of these pallets are still on their shelves. They will [redacted], and I've seen this happen with other brands, so this is not just an assumption that's happened. I was a distributor of JUUL, we've seen that happen to JUUL in 2024 when they erroneously got the marketing denial order from the FDA which then got retracted, but the harm was horrendous; however, they had investors and they were able to last this in the marketplace. Years later the FDA retracted the MDO and they were given a marketing granted order and they were able to stay the course in the meantime, because by then they had raised billions of dollars. We don't have that.

Actually, part of the reason why we don't have that

is because -- so when we started doing this, we relied on the fact that hopefully we can [redacted], like a lot of companies do, but within two months of us applying to the PMTA, JUUL -- it's an ENDS company, but nonetheless, JUUL got a marketing denial order and spooked completely all the investors from the market, [redacted] we put all this money in making this product, we're now [redacted] because the entire nicotine product market is in upheaval, and it doesn't have the one thing that the investors need, which is clarity, stability, and kind of knowing what the market looks like, and that did not exist, it only started existing very recently when some marketing granted orders were given to nicotine pouches.

Q Ms. Nasi, what benefit would there be for your companies if the Court were to stay the RTF letter, if any?

A We will be able to continue selling in the marketplace, continue doing the PMTA work which we hired Dr. McKinney to do. We believe we should be done, you know, within a year. We will be able to continue doing all the things that we've invested [redacted] to do.

Q After the RTF letter issued and before suit was filed, did you attempt to engage with FDA about the RTF letter?

A Yes.

Q Okay. What did you do?

A We sent an e-mail basically asking for the same, you know, consideration, that the RTF would be rescinded or taken back.
Q And did that lead to any sort of a meeting with FDA before suit was filed?
A Yeah. A few days later, maybe a week later, I got an e-mail and they suggested -- they -- you know, they suggested a meeting, we then met, and in the meeting they basically said the RTF is what the RTF is, and if you want anything else you need to take this to court.
THE COURT: Who was in the meeting?
THE WITNESS: Eric, our counsel, and then another regulatory counsel of ours, and then from the FDA -- Eric, maybe you can say, who was the lady?
MR. HEYER: I can't testify. If you recall.
THE WITNESS: I'm sorry, Your Honor, but a lady from -- I don't remember, I apologize, but somebody there that --
THE COURT: A lawyer or regulatory person?
THE WITNESS: I don't know if she was a lawyer, but she was a regulatory person --
THE COURT: All right.
THE WITNESS: -- from the FDA.
THE COURT: Counsel, who was the person?
MR. HEYER: It was someone from -- there were two people, there's what was called a regulatory health product

manager, who sort of managed the process, who didn't really say anything substantive, and then there was someone from the Office of Science that actually does the reviews.

THE COURT: And what was that person's name?

MR. HEYER: I'd have to look it up. I don't remember her name.

THE COURT: All right.

MR. HEYER: But she was the one that communicated that.

THE COURT: Did you know the RTF letter was about to issue before you received it, or did it come out of the blue?

THE WITNESS: It came out of the blue. And I want to -- if I can address something, it didn't come -- while we say January, I got a call on Friday, January 30th at 5:00 p.m., so we can say February 1, basically saying, Ms. Nasi, can we e-mail you a courtesy letter from the FDA. So it came on the last day of January on Friday at 5:00 p.m.

BY MR. HEYER:

Q Could you address what you anticipate will happen with your businesses if the Court does not issue a stay of the RTF letter.

A As I stated in my declaration, and it's something I cannot even conceive of because it will be a complete [redacted] [redacted]. It's not even something I can comprehend even. Do you want me to go into the

detail?

Q Yes, I'd like you to.

A I'm sorry. Just --

Q Just take a [redacted] That's fine.

Could you address any harms that you anticipate apart from these contractual issues.

A Of course.

Q What other harms, if any, do you anticipate?

A Well, first of all, we have about [redacted] of half-finished goods or end-finished goods that is sitting in Europe with our co-packers that need to be shipped. Some of the product that shipped before the RTF, it was on the way and got into the port right after the RTF, it's now sitting in two ports, in Vegas and in Tampa, with basically FDA not letting it through. That's already a couple of [redacted] probably. And then I have another [redacted] sitting in Europe which with the RTF I won't even be able to bring into the border.

THE COURT: So when you say not letting it through, they are telling Customs not to let it through?

THE WITNESS: I guess that's how it works. Customs basically clears it, but then they wait for the FDA to clear it, and the FDA does not clear it now, which before, obviously, it did.

Q Yeah, that was my next question, just on that point.

Up until the RTF letter issued, did you ever have any issues with the products, the imported products, lacking marketing granted order, coming into the country?

A Never had issues. The one time the FDA stopped it to review everything and then they said, yes, it's good, kosher, and they went -- they let it through, and then since then it's always been going through.

Q Apart from these products that are being held or sitting in Europe, are there -- and apart from the [redacted], are there other harms that you anticipate?

A We have another [redacted] in the warehouse sitting. Once the news hits the wire, there will be a [redacted], contractual or not contractual, because manufact -- the retailers, these are all chain retailers that have -- that their reputation is very important for them, and just like what happened with JUUL, [redacted]. Whether contractually we've signed something or not, they're going [redacted].

THE COURT: What about your reputation?

THE WITNESS: I was going to go there. So damned if I do and damned if I don't. [redacted] because [redacted], that reputation will be destroyed. There is no coming back to the market after that, not me personally, certainly not the product, not the brand. But me

personally, how can I look at people in the eye and say, yeah, we can -- we can do this. I'll be -- I will be [redacted]. Not to mention the fact that, you know, these are regulatory products, we pay excise taxes on them, [redacted] to, you know, the State of Florida on excise taxes, we have [redacted]. It is a whole rigmarole of effect that basically will, unfortunately, [redacted]

Q Yeah. Why would the C Store Depot company also be [redacted], as you said, in addition to Zest, if it's just a distributor? [redacted]

A Zest Brands was a new company, it had no track record, [redacted]. It in and of itself [redacted], and [redacted]. [redacted]

Q What is the -- if the RTF letter is not stayed, what are the financial consequences for you personally that you

anticipate?
A [redacted]
Q Why do you say that?
A Because there will [redacted], not to mention that I take so much professional pride, always have, about my work and who I am and what I do and just doing things right, and I won't be able to face anybody, I won't be able to look anybody in the face.
Q Why have you poured [redacted]?
A Because I believe in what I do. I'm an immigrant and I came here, like everybody comes here, to do better, to be the best that I can be, to do well for me and for others, and I -- I was very excited to be able to create a product that will be much better for people, because as a distributor I saw what terrible products were created in the marketplaces. Our customers would want us to sell them. The stores, they say, hey, carry these products so we can buy it.
And I would see these products that -- they're horrible and nobody stands behind them, and there's no thoughtfulness that's put in them, and I thought, hey, we can do so much better than this, let's create something that, should my kids use them, not that I want my kids to use any of these products, but should they do so, they use it, that I will

know what's in there and I will sleep well at night.

So with that attitude I went and I hired the best, the best R & D company, it's the company that the biggest tobacco companies hire for their work, the best supplier for nicotine pouches, the same supplier that does the Nicorette nicotine, so we paid like the top dollar on every piece, and I was so proud on every piece that we did, including, you know, if you look up our brand on YouTube, on TikTok, on Instagram, you will not find it, because it was so important for me that we just do it right, we don't market it to teens. In the meanwhile, look at ZYN and at all the competitors, they're all over social media. We're not there for a reason. I just wanted to do it right.

And so in the meantime we were -- you know, we were spending the money on also the PMTA, and we were getting so close, and it's just -- to me it just -- it's insane that I'm here. It's months away from finishing the PMTA work, and here we are.

Q Other than the harm to your businesses and you personally, do you have concerns resulting from the RTF letter for the consumers of your products?

A Yes. We have so many e-mails from consumers that tell us that they've stopped vaping or stopped smoking and they're using our product and they love our product, and so I don't know what will -- you know, they might find another brand of

nicotine pouch, they might go back to cigarettes. People -- people sometimes -- users like that, they seem to be very fixated on the brand that they choose, and falling off that, I don't know what will happen as a result.

MR. HEYER: Your Honor, can I just consult with my co-counsel for just a second? I think I'm done. I just want to doublecheck.

THE COURT: Yes.

MR. HEYER: No further questions, Your Honor.

THE COURT: Counsel?

MS. WISE: We don't have any Cross of this witness, Your Honor, but if we could just very briefly address a couple of points that haven't come up already.

THE COURT: But not with this witness?

MR. ALLRED: Not with this witness. I realize that we're over our time, so I wanted to make that request of Your Honor.

THE COURT: Thank you. You may step down, ma'am.

Yes, sir.

MR. ALLRED: Thank you, Your Honor.

THE COURT: I'm sorry. Does the plaintiff have any other evidence?

MR. HEYER: No, in terms of witnesses. I do have the citation to that Eleventh Circuit case, if Your Honor would like, that I referenced earlier.

THE COURT: The Bidi?

MR. HEYER: Yeah, it's B-I-D-I Vapor, LLC v. FDA, it's an Eleventh Circuit case, the number is 21-13340, and the stay order was dated -- it's ECF number 60, and the stay order was dated February 1st, 2022.

THE COURT: And do you know how long it took the Eleventh Circuit to take up the matter for resolution?

MR. HEYER: I was -- they consolidated several cases for oral argument. I want to say -- I believe oral argument was in May and then I think the decision came out in August of 2022, if I recall correctly. Bidi was consolidated with, I believe, maybe up to six other cases for oral argument. I represented another client in that argument, and ultimately -- ultimately Chief Judge Pryor wrote the opinion ruling that the marketing denial order was arbitrary and capricious.

THE COURT: All right. Counsel, any witness you'd like to call?

MR. ALLRED: No, Your Honor.

THE COURT: Any other evidence you'd like to introduce?

MR. ALLRED: No, Your Honor.

THE COURT: Yes, sir.

MR. ALLRED: Thank you very much, and I will be brief.

I'd like to begin by making sure to call to the attention of Your Honor a newly released case that was released late yesterday afternoon. We cited the *Kealani* case in our brief. The *Kealani* case out of Eastern District of Texas, we noted it was on appeal to the Fifth Circuit. Late yesterday afternoon the Fifth Circuit did decide that case, they affirmed the grant of summary judgment to the Government. That, again, was a nicotine pouch case that was, again, challenging the Regulatory Flexibilities Act determination, the certification that was made in the PMTA Rule. We think much of the analysis is directly applicable to this case.

THE COURT: Have you given that to opposing counsel?

MR. ALLRED: We have given a copy to opposing counsel. I have courtesy copies for the Court. It is a publicly reported case, but I'd be happy to provide courtesy copies.

MR. HEYER: Your Honor, that was not a nicotine pouch case, it's an e-liquid case. I don't believe it's about nicotine pouches at all.

MR. ALLRED: I would have to doublecheck my notes. I may be mistaken.

THE COURT: Well, that's a huge mistake.

MR. HEYER: Yeah, I think the very first paragraph of the opinion talks about, Your Honor, it being seven small business manufacturers of e-liquids and a trade association

representing vapor products.

MR. ALLRED: Excuse me. He's absolutely correct. That is a mistake.

THE COURT: And was an argument made in that case that the regulation imposed in the PMTA did not adequately analyze the requirements under the RFA?

MR. ALLRED: Yes, Your Honor. The -- and I can direct --

THE COURT: Did the Court refer back to the specific provisions of the RFA that set out the cost analysis?

MR. ALLRED: Excuse me, Your Honor. I couldn't quite hear you.

THE COURT: Did they point to the specific regulations in the Deeming Rule that demonstrated that the Deeming Rule for e and ENDS did in fact conduct a cost analysis?

MR. ALLRED: So I would direct your attention to page 13 of the opinion, if you have it. And, again, I have courtesy copies if you'd like me to provide it to you.

THE COURT: I don't think I have it. Can you give it to me?

Is it in the folder?

MR. ALLRED: Yes, Your Honor.

THE COURT: Yes, sir.

MR. ALLRED: May I approach?

THE COURT: Yes, sir.

MR. ALLRED: So I would direct your attention to page 13 of the opinion, where it discusses the Appellants take issue with FDA's attribution of the PMTA-related costs to the Deeming Rule, and it says that that's a substantive factual conclusion outside the FDA certification and therefore outside the scope of judicial review.

I would also note that that opinion on pages 15 and 16 discusses the requirements to conduct studies, whether studies are required, and finds that FDA adequately analyzed the cost there, and it notes that FDA appropriately considered alternatives and rejected them and provided reasons for doing so in ways that complied with the Regulatory Flexibilities Act.

THE COURT: Well, that takes -- this case takes me right back to my original discussion with you on this record, which is whether the Court can take at face value the FDA's certification that it considered the costs based upon the determination in the Deeming Rule that costs were considered for novel products, and as you seem to indicate, if the FDA certification is sham, the Court is not obligated to accept it, and I said, point me to where in the Deeming Rule a cost analysis was done for novel products to meet the requirements of the RFA, and I think we concluded that we couldn't find any such location in the Deeming Rule, and if you have now found such a location in the Deeming Rule to overcome that

discussion, I would like to see it.

MR. ALLRED: Yes, Your Honor. Two points on that.

First, I'll start with a record citation, I would point you to -- its Exhibit 4 of our exhibits, it's labeled as page --

THE COURT: Can you put it on the overhead? Because there's a lot of paper up here.

MR. ALLRED: Yes, Your Honor.

THE COURT: Exhibit 4 of the FDA's. Yes, sir.

MR. ALLRED: Yes, Your Honor, Exhibit 4 for the FDA proposed exhibits.

THE COURT: Yes. What page?

MR. ALLRED: It is page 86, which is in -- the Bates stamp is FDA 023 --

THE COURT: I have it.

MR. ALLRED: -- 997.

THE COURT: Yes, sir.

I have it now. You don't have to put it up there.

MR. ALLRED: Okay. Great. Thank you.

I would direct you to the first full paragraph in which FDA addresses how it's going to conduct this analysis, and it says that the estimate is complicated not only by the flexibility the firms have to decide on how best to provide information, but also by the diversity of products in the ENDS category, including both --

THE COURT: You're not going to run over that word, product in the ENDS category. This is not a product in the ENDS category, is it?

MR. ALLRED: This is not in the -- in the ENDS category.

THE COURT: Okay.

MR. ALLRED: But they note it includes both e-liquids and devices, this being a nicotine delivery device.

THE COURT: Wait a minute. This being -- "this" meaning the product at issue in my case?

MR. ALLRED: I understand a pouch to be a device that delivers nicotine to the body.

THE COURT: But these -- they're talking about ENDS category and the subcategories under the ENDS. They're not talking about non-ENDS products.

MR. ALLRED: I read this as a broader statement of nicotine delivery devices.

THE COURT: It says disposable --

MR. ALLRED: But I agree it's not clear from the language.

THE COURT: It is clear from the language. These, meaning the ENDS category, include e-liquids, the device category. The e-liquid device category in turn includes closed-system products like cartridge-based cig-a-likes, and open-system vapor tanks and mods. This is not talking about

pouches that are not contemplated in this Deeming Rule.

MR. ALLRED: I agree that costs for pouches were not specifically analyzed in the Deeming Rule in 2016.

THE COURT: And the costs for novel products wasn't included in a cost analysis under the Deeming Rule. They expressly say that. I can't -- I don't know how else to say we are not doing this, but we're not doing this.

MR. ALLRED: I agree. I agree. The rule does not analyze the costs of novel products. I think that the discussion on that page that I pointed to you goes on to explain why they are choosing to use example products to estimate costs and then to use those for -- to represent the diversity of products. I agree that the discussion is specific about e-liquids and devices there, but that that is the approach that FDA chose to take.

THE COURT: It is not the approach that FDA chose to take with respect to novel products that don't fall within the category of ENDS. Page 75 says: "This final rule would also extend the FD&C Act tobacco authorities to tobacco products that do not fit into traditional product categories, such as ENDS and nicotine gels. We are unable to quantify the costs for novel tobacco products other than ENDS due to a lack of data."

They don't say we're going to extrapolate from the ENDS the cost of everything else, they're saying we're not able

to contemplate the cost of everything else because we don't have enough data.

MR. ALLRED: I agree that they acknowledge the lack of -- the lack of data for novel products.

THE COURT: And do you also acknowledge that they don't do any cost analysis for novels?

MR. ALLRED: The cost analysis in the 2016 rule is limited to e-liquids.

THE COURT: And so then how does the FDA certify it did what it didn't do?

MR. ALLRED: So I think the timeline is instructive here. In 2016 it did the cost analysis for these ENDS products and said the novel products it's not able to do it for lack of data. In 2021 it then promulgated the PMTA Rule, the PMTA Rule being specifically the rule to define the content of the PMTA, and it said we are going to do the cost analysis for the additional requirements on small businesses that's put by that rule. But it was not until 2022, a year later, that Congress then brought synthetic nicotine products under control of the Tobacco Control Act, and I would note that in that law Congress specifically stated that all regulations that had been issued about tobacco products shall also apply to the newly-deemed products, that is the synthetic nicotine products, so I think that's at least some indication of Congress' intent that these regulations that were already promulgated would apply with

equal force to the newly-deemed synthetic products.

THE COURT: What's the language of the statute exactly?

MR. ALLRED: Yes, Your Honor. It is --

THE COURT: Is it one of your exhibits?

MR. ALLRED: It's not an exhibit, no. It's in the statute. It's Public Law 117-103, and it's Section 111(e), that's the Consolidated Appropriations Act of 2022, and that is the law that brought synthetic nicotine under the provision of the Tobacco Control Act.

THE COURT: And it said what exactly in reference to this argument?

MR. ALLRED: Just to read the precise language, Section (e) is entitled "Applicability of Existing Requirements For Tobacco Products."

Effective 30 days after the date of enactment of this Act, with respect to any regulation promulgated or related guidance issued, in whole or in part, under the Food, Drug and Cosmetic Act (21 U.S.C. 301 and following) before the date that is 30 days after such date of enactment, the term "tobacco product" shall have the meaning of, and shall be deemed amended to reflect the meaning of, such term as defined in Section 201(rr) of the Federal Food, Drug and Cosmetic Act, as amended by subsection (a).

So that section makes applicable the new definition,

synthetic nicotine, to any regulation promulgated or related guidance issued.

THE COURT: But it doesn't adopt those regulations as law, it just says, if you're considering tobacco-related products and you're regulating them, we're telling you that nicotine -- synthetic nicotine products fall within whatever regulation you're imposing on those products.

What you said a second ago, I think, was it adopted all of the regulations and made them applicable to these new products. What I read it as saying is that we're making it clear to all these products and to the regulators that these other products identified are considered tobacco products for purposes of any regulation that you're doing.

MR. ALLRED: I agree. I read it as saying that these newly-deemed tobacco products, these synthetic products, are subject to the same regulation, and I read that as being Congress' intent, that these newly-deemed tobacco products would be subject to the same regulations, including both the Deeming Rule and the PMTA Rule.

THE COURT: Assuming that those regulations pass Constitutional and statutory muster.

MR. ALLRED: Yes. Yes.

THE COURT: And a regulation that violates the RFA doesn't do that.

MR. ALLRED: I agree. I do not read this to say that

there could never be any problem with the regulations, I merely read it to say it is their intent that these synthetic nicotine products fall under any regulation that has previously been -- been proposed.

THE COURT: Which is not in dispute here. Everyone agrees that this product is a tobacco product based on this Congressional enactment.

MR. ALLRED: Yes.

THE COURT: All right.

MR. ALLRED: So with that timeline in mind, my position is that it was reasonable for FDA to assess costs in the Deeming Rule based on the products that were prevalent in the market in 2016 for which it had data, and in 2021 it was reasonable for FDA to assess the costs -- the marginal costs of the PMTA Rule without reopening that assessment, bearing in mind that in 2021 the synthetic products were still not subject to the regulation, and because the analysis of whether the Regulatory Flexibility Act analysis is based on the time that the analysis was done, that that was a reasonable analysis and doesn't need to be reopened by the subsequent deeming of products like the product at issue today.

THE COURT: All right. Thank you.

MR. ALLRED: Thank you, Your Honor.

THE COURT: Anything further from the plaintiff?

MR. HEYER: Just very briefly, Your Honor, to

respond. I think it's been pretty briefed and argued before.

On the Fifth Circuit case that just came out late yesterday, again, distinguishable because there were cost estimates for ENDS products; there weren't, obviously, for nicotine pouch products.

I do want to underscore that in that case the only claim that was pled was an RFA claim, Regulatory Flexibility Act claim, there was not a separate APA claim like we assert here, and, in fact --

THE COURT: But your motion for temporary restraining order is on the RFA.

MR. HEYER: It is, but the RFA is analyzed through the lens of the APA.

THE COURT: But on a TRO I'm operating under the lens that the motion is brought under, which is RFA.

MR. HEYER: Right, Your Honor. And I wanted to point Your Honor to when then-Circuit Judge Kavanaugh in the D.C. Circuit case, National Telephone Cooperative Association v. FCC, this is in -- I think in the Government's papers, 563 F.3d 536, from D.C. Circuit, a pin cite of page 540, there's a discussion about how the APA standard is imported into the Regulatory Flexibility Act analysis there, and just very briefly, it says: "The Regulatory Flexibility Act makes the interests of small businesses a 'relevant factor' for certain rules. Therefore, the APA together with the Regulatory

Flexibility Act require that a rule's impact on small businesses be reasonable and reasonably explained."

So I don't -- I want to avoid the Court having an overly-blinkered approach to this, because there's case law on someone deciding and just saying, oh, if you check the box on the procedure, that's enough. It's not only that, especially when there's an APA component to it as well.

An issue that was not raised in the Fifth Circuit case that we've tried to demonstrate here is the -- under what was discussed by FDA in the Deeming Rule, in the Deeming Rule Regulatory Impact Analysis, particularly about two distinct elements that we selected as examples, randomized controlled trials and the ability to rely on published scientific literature. There's a lot of language in there about how randomized controlled trials are not going to be necessary and suggesting applicants can rely heavily on published literature to keep the costs down. You heard Dr. McKinney's testimony that in realty under the PMTA Rule it's exactly the opposite and that that increases the costs significantly for applicants. In reality, the reality is nothing like what was painted in the Deeming Rule under the 2021 PMTA Rule.

On the issue of the timeline, you heard testimony that nicotine pouch products were on the market as of 2016, as of the time of the Deeming Rule, and that, you know, at the time that the Deeming Rule -- the PMTA Rule was finalized in

2021, they had been on the market for quite a while, the ZYN products and some of the other ones, and you heard some testimony from, I think, both of our witnesses about that. So FDA -- even if, theoretically, FDA couldn't have enough data or didn't know enough about them or the manufacturers in 2016 for the Deeming Rule analysis, certainly by 2021 they were a known quantity, a known presence in the market, and yet again FDA gave it the back of the hand and refused to consider addressing those to as opposed to ENDS, again, relying exclusively on the earlier discussion that was limited to ENDS products.

And Your Honor heard Dr. McKinney's testimony how, given the nature of the products and the delivery mechanism, he would expect generally the costs for an ENDS product PMTA to be significantly more than a pouch product. In reality, when you look at the 2016 estimates of 130-odd-thousand dollars to 2 million dollars for an ENDS product and then the real cost for an application for a pouch product of 3 million to over 13 million, we see how these are so divorced and so distinct that I think the reasonableness and the reasoned decision making of FDA is also on the line, you know, there as well.

And then on the final point about the fact that Congress came and added -- I think Your Honor -- I'm not going to beat a dead horse, I think Your Honor stated it well, but, yes, Congress added synthetic nicotine pouch products to the

Tobacco Control Act in 2022 after the Deeming Rule was finalized, but the point is nicotine pouch products that were tobacco-derived were already subject to the requirements since 2016 and were already on the market, so -- and, again, Congress didn't adopt wholesale and make statutory law 21 CFR 1114.17, all Congress said is the definition is now expanded for purposes of all the regulations that are out there, so that -- unfortunately, I don't think that gets -- unfortunately for FDA, I don't think that gets it where FDA wants to go and say this was somehow by decree of Congress and what FDA did isn't legally relevant, it's -- regardless, FDA was aware of the pouch products as a category by 2021, aware of their presence, and didn't go back and do any sort of analysis around them when it finalized the PMTA Rule.

Thank you, Your Honor.

THE COURT: Thank you.

And if the FDA's rules certification -- I'm sorry, if the FDA's certification in the PMTA that it meets the RFA requirement by relying on the Deeming Rule turns out to be facially untrue, does that render the promulgation of the PMTA arbitrary and capricious for lack of reasoned decision making or does it render the PMTA Rule, I don't know, void or voidable for failure to comply with the RFA?

MR. HEYER: I think from our perspective they're both flipsides of the same coin, Your Honor. I think by virtue of

the fact that it was adopted without complying with the -- the sort of sham, it renders the adoption of the PMTA Rule arbitrary and capricious. I think they're -- and the case law is a little bit hard to parse on this, but I think they're -- that's why I pointed Your Honor to Judge Kavanaugh's decision, because there's discussion about that and it says "A regulatory flexibility analysis is, for APA purposes, part of an agency's explanation for its rule," and it cites to a couple of older D.C. Circuit cases that say, you know, that if the data in the regulatory flexibility analysis demonstrates that the rule would constitute such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand. That's one of the cases that's cited there, so -- I have a copy if Your Honor would like to see it.

THE COURT: I would like a copy.

If the Court makes this ruling that the PMTA, as it relates to novel products, improperly certified compliance with the RFA, what's the downstream effect of everything regulated under the PMTA? Everything regulated that's novel, not the e's and the ENDS and so forth.

MR. HEYER: I think what that would -- well, I've been focused on this particular -- these particular plaintiffs and this particular product. I think that it would at minimum require, before FDA would apply the rule to, say, other pouch applications or our client's pouch applications, that they

would have to go back and actually go through a compliant RFA process to be able to have an enforce -- to apply the rule's requirements at that point.

THE COURT: Well, that's not really accurate, is it? Wouldn't the FDA have to reengage the PMTA rulemaking, deal with a cost analysis for small businesses, novel products, and allow comment and so forth with respect to its determinations in that regard, and so wouldn't it have the effect of upending the entire PMTA scheme as it relates to novel products? It couldn't just use a rule that was improperly and arbitrarily and capriciously promulgated but then fix the problem on an individualized basis, or on a more globalized basis with respect to, say, pouch -- nicotine pouch products, and then if there's another product, do another cost sort of outside the rule.

MR. HEYER: Yeah, I haven't thought about other categories of novel products. Certainly -- I'm just speculating here. I suppose FDA could go back and -- what's been suggested here that didn't exist is they could give other examples for pouch products and say, well, we would -- this would be representative of what we would expect for other -- it's -- again, it's an economic sort of analysis, so I'm not an expert in this stuff, but put in the type of language that Your Honor was asking counsel to look for in the Deeming Rule RIA that was not there.

THE COURT: But that's not a matter of an individualized assessment of a product. That's a matter of rulemaking, promulgating the PMTA.

MR. HEYER: Right.

THE COURT: And the PMTA could have sort of global problems as it relates to novel products certainly at least.

MR. HEYER: Yeah, I don't disagree with Your Honor. I think that's the implication of what FDA has done here, sort of the bed they made.

THE COURT: Counsel, how do I cure the problem that the FDA has created here by not conducting a cost analysis and inaccurately certifying that it had conducted a cost analysis in the Deeming Rule process without upending the PMTA as it relates to novel products entirely?

MR. ALLRED: Yes. Thank you, Your Honor.

I would start that just for today's purposes, just for the TRO, I think that any remedy would be limited to this individual RTF, so I think this is looking down the road, and I think we'll certainly develop that more on the record, but to preview it, we think there are options available that don't involve vacatur. There could be an analysis for whether it was harmless error. If you find it was deficient for not having included novel products, at least we have harmless error analysis, and then there are options to stay its applicability to small businesses while FDA conducts the additional analysis.

THE COURT: All right. That provides some comfort. It's not my goal to upend the whole PMTA. It's problematic though, and I think that a TRO should issue, precluding the -- or staying the RTF issued to the plaintiff in this case.

The Regulatory Flexibility Act requires that the FDA do a cost analysis or certify that the rule would not have a significant economic impact on a substantial number of small businesses or small business entities. In promulgating the regulation in 2021, the FDA chose to include a certification that certified that its rulemaking would not have a significant impact. It did not conduct a separate cost analysis with respect to small businesses, relying instead, it said, on the analysis purportedly performed on these products for small businesses, not e's and ENDS, but novel products when it promulgated the Deeming Rule in 2016; and after several passes, the defendant is unable to point the Court to anyplace in the 2016 Deeming Rule where the FDA performed any cost analysis on novel tobacco products, only on ENDS and e-liquid products, and it expressly disclaimed that it did in the language of the Deeming Rule, stating, "We are unable to quantify the costs for novel tobacco products other than ENDS due to a lack of data," and there are a number of other places where they reiterate their declining to offer up any cost analysis on Deeming -- on novel products through the Deeming Rule, and of course it also said, we don't know what new requirements would apply in any

subsequent rulemaking that we are not addressing here, so we're not able to do that.

It also seemed to suggest that it didn't believe that what it was doing in the way of a cost analysis would anticipate that these products would have to undergo any sort of major scientific proof-based analysis in meeting the requirements of marketability, and, lo and behold, the PMTA promulgation in 2021 did not just have some sort of marginal modification, administrative sort of requirements, but imposed substantial substantive requirements, with no cost analysis from anyplace, certainly not in the 2016 Deeming Rule, which expressly disclaimed that any cost analysis had been performed, and one wouldn't expect that it would have been since it didn't anticipate these sort of high-level scientific requirements would be imposed.

By including the certification and stating that costs associated with the PMTAs resulted from the Deeming Rule and not through rulemaking under the PMTA, the FDA did not provide an explanation of the economic effects and costs of the final PMTA Rule and its particular testing and study requirements for novel tobacco products, and its certification that it had done so was not reasonable, it was not reasoned decision-making, and it was therefore -- and it was false, and it was therefore arbitrary and capricious and inconsistent with the sort of analysis that Justice Kavanaugh, then Circuit Judge Kavanaugh,

contemplated in the administrative procedures process.

And it was brought to the FDA's attention in its rulemaking authority under the PMTA, and rather than conduct the analysis that was required, it just brushed it aside and said this is out of the scope and declined to conduct the RFA cost analysis that was required, and it did so on the record. So it had a chance to fix the problem when it was brought to its attention by commenters and by the Small Business Administration in connection with its rulemaking under the PMTA.

The small business letter that you submitted, Counsel, that was in connection with the Deeming Rule or the PMTA?

MR. HEYER: The PMTA Rule, Your Honor.

THE COURT: Yes.

The record evidence from the plaintiff establishes through expert testimony that the requirements are substantial and costly and expensive and onerous and none of them were set forth as part of the Deeming Rule, and none of them were -- none of the costs were considered as part of the PMTA analysis and rulemaking obligations consistent with the RFA. The defense offers no controverting evidence to that effect on this record.

If the plaintiff is subject to this RTF, the plaintiff will be threatened -- the plaintiffs will be

threatened with irreparable harm as a result. The RTF letter expressly prohibits the plaintiffs from continuing to sell their products, and according to the plaintiff, [redacted], [redacted], [redacted], [redacted], [redacted]. They would not be able to correct those problems if it's later determined that the PMTA was properly promulgated -- I'm sorry, was improperly promulgated through a full litigation, they can't go back and retrieve all of that, and, of course, they're not entitled to financial compensation from the FDA due to the application of doctrines of sovereign immunity.

In addition, they would suffer reputational harm that would not be reparable. [redacted], and that harm is not compensable. Even if the FDA could pay them money, money doesn't always correct loss of reputation and honor, and so it would be irreparable even without sovereign immunity.

And obviously the public interest does not support the perpetuation of unlawful agency actions. It does support ensuring that Governmental agencies abide by statutes that

govern their operations, and to the extent that agency deference used to be a thing, it is no more. Agencies, like every other entity, must comply with the letter of the law and applicable undisputed rules, and the RFA requires that the agency conduct a cost analysis or certify that any of its rules would not have a significant economic impact on a substantial number of small entities. The plaintiff is and appears to be a textbook example of what the RFA was intended to protect.

Permitting the plaintiff, on the other hand, to continue in the status quo for 14 days for the Court to look at preliminary injunctive relief will not pose significant harm to the public interest.

It appears from this record also that there are a number of other similar products in the market, there's been no operation against those products, and so to that extent it doesn't seem like the agency is concerned about any harm to the public. It hasn't engaged in enforcement action, which it claims it's entitled to do, over the course of the entire PMTA process by the plaintiff and other similarly-situated businesses offering novel synthetic nicotine products.

Accordingly, the Court would grant the temporary restraining order for a period of 14 days to permit the Court to take up consideration of a motion for preliminary injunction or such other final relief as the parties might determine to craft of their own accord.

The Court finds that there is no bond necessary in the circumstances of this case insofar as the Court is merely setting the parties at status quo, I guess it's kind of ante, previous to the imposition of the sending of the RTF to the plaintiff, and letting things stand as they sit.

Is there anything further from the plaintiff in this respect?

MR. HEYER: No, Your Honor.

THE COURT: One second.

The Court makes the additional finding that the potential harm that the plaintiffs would face absent the relief provided would outweigh any harm a temporary restraining order would inflict on the defendants.

We've spoken about the FDA throughout these proceedings. What is the interrelationship between the FDA and the HHS, which I think is the other defendant in this case?

MR. ALLRED: Yes, Your Honor. The FDA is a component agency of HHS, the Department of HHS. I would also, if it sets your mind at ease, represent that attorneys for FDA are also attorneys for HHS, they are part of the Food and Drug Division of Office of General Counsel of HHS, so I represent all parties.

THE COURT: All right. Anything else from the defendant?

MR. ALLRED: No, Your Honor.

THE COURT: I intend for my ore tenus order to be the order entered in this case. If anybody needs a copy of it, they can request it from the court reporter. If you need clarification, file a motion requesting same.

What is your schedule for consideration of a motion for preliminary injunction at the conclusion of this 14 day period?

MR. HEYER: I think, Your Honor, we can confer on that.

THE COURT: 14 days from today -- it's the 27th. 14 days is March 13th. So if you all could confer, and can you file something by close of business on Tuesday?

MR. HEYER: I think so.

MR. ALLRED: Yeah, we can do that.

MR. HEYER: Some sort of a joint status report just proposing a joint scheduling order or the like, Your Honor?

THE COURT: Right. And if the parties stipulate to the continuance of the TRO to give you more time to brief, so that we are not operating under this enormously tight schedule for an issue of this significance, then you should let the Court know and we will try to locate a time out beyond March 13th.

MR. HEYER: Thank you, Your Honor.

MR. ALLRED: Thank you, Your Honor.

THE COURT: Thank you. We're dismissed.

- - - - -

(Proceedings concluded at 1:03 p.m.)

- - - - -

C E R T I F I C A T E

This is to certify that the foregoing transcript of proceedings taken in a motion hearing in the United States District Court is a true and accurate transcript of the proceedings taken by me in machine shorthand and transcribed by computer under my supervision, this the 5th day of March, 2026.

/S/ DAVID J. COLLIER

DAVID J. COLLIER
OFFICIAL COURT REPORTER

# Tab 59.01

Supplemental Declaration of Inga Nasi
and attached Article

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| THE C STORE DEPOT, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 8:26-cv-00483-MSS-CPT |
| v. | ) | |
| | ) | |
| U.S. FOOD AND DRUG ADMINISTRATION, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**SUPPLEMENTAL DECLARATION OF INGA NASI**

I, Inga Nasi, declare under penalty of perjury that the following is true and correct:

1. I am over 18 years of age and would be competent to testify to the information set forth herein if called to testify as a witness in court.

2. I make this supplemental declaration based on my own personal knowledge and based on the business records of Plaintiffs Zest Brands LLC and The C Store Depot, Inc., as well as other records that I specifically identify herein

3. I submit this supplemental declaration in support of Plaintiffs' motion for a preliminary injunction.

4. During my testimony at the hearing on Plaintiffs' motion for a temporary restraining order on January 30, 2026, I testified that I was aware that ZYN nicotine pouches, which are a competing brands of nicotine pouches to our

ZEO Universe pouches, had been on the market since at least 2017, and maybe even since 2014.

5. I have since had a chance to conduct further research to confirm exactly when ZYN nicotine pouch products were first marketed in the United States and I have found that they were first test-marketed in 2014 and that by 2016, they were widely available in stores in the Western United States and through an online retailer. I confirmed this information about ZYN's availability in 2016 from the 2016 Annual Report of Swedish Match, the company that manufactures ZYN that was subsequently acquired by Philip Morris International. The 2016 Annual Report is attached as Exhibit A. It references this information on page 21. An article that I found on the history of marketing of ZYN products from the website Vaping360.com is also attached as Exhibit B.

6. I also found a press release from Swedish Match dated November 7, 2016, that announces the expanded marketing of its ZYN products. A copy of that press release is attached as Exhibit C.

7. According to a scientific article, Altria's On! nicotine pouches were also introduced to the U.S. market in 2016 and R.J. Reynolds' VELO products in 2019. That article is attached as Exhibit D.

8. In addition to nicotine pouch products, there were other types of novel oral nicotine products on the U.S. market for years before FDA finalized its PMTA

Rule in 2021. Other examples of these products include nicotine lozenges and discs sold by companies like R.J. Reynolds and Altria under brand names like REVEL and VERVE. In fact, FDA issued a marketing granted order for several of Altria's VERVE nicotine discs through the PMTA pathway in 2021. An example of one of those marketing granted orders is attached hereto as Exhibit E.

9. At the evidentiary hearing, I explained using photographs taken in convenience stores how there are many brands of nicotine pouch products that lack FDA marketing orders that are being sold. Based on my experience with what those retail chains and their distributors require, I believe that each of those brands that contains tobacco-derived nicotine had to be commercially marketed in the United States and have a PMTA submitted by the September 9, 2020 PMTA submission deadline in order for those stores and their distributors to be willing to agree to carry those products. According to a research letter in a scientific journal that studied retailer scanner data, in fewer than the first six months of 2020—that is, the year before the PMTA Rule was finalized—45,965,455 units of nicotine pouches were sold. I attach a copy of that article as Exhibit F.

10. In my initial declaration filed in support of Plaintiffs' motion for a temporary restraining order, I explained that, without an injunction, [redacted]

[redacted]. [redacted]

11. In signing on with our distributors of the ZEO Universe products, [redacted]. [redacted]. Once [redacted]. We are also producing to FDA under the terms of an agreed-upon protective order copies of [redacted]

**PUBLIC / REDACTED VERSION**

[redacted] I am not attaching it to this declaration because of the [redacted].

12. As I explained in my testimony at the evidentiary hearing, as a distributor of JUUL vaping products, I saw this play out firsthand in 2022, when FDA mistakenly issued a marketing denial order in response to JUUL's PMTAs for its vaping products. At the time, the distributors immediately stopped selling the products and demanded that JUUL accept returns of the product and issue refunds because retailers and distributors did not want to be stuck selling a product that might be subject to FDA enforcement action.

Executed this 11th day of March.

DocuSigned by:
Inga Nasi
478D02A7D08F450...
Inga Nasi

* * *

* * *

# Exhibit F

Home | JAMA | Vol. 326, No. 6

Research Letter

FREE

# Nicotine Pouch Unit Sales in the US, 2016-2020

Kristy L. Marynak, MPP[1]; Xu Wang, PhD[1]; Mateusz Borowiecki, BS[2]; et al

Author Affiliations | Article Information

Cite Permissions Metrics

JAMA
**Published Online: August 10, 2021**
2021;326;(6):566-568.
doi:10.1001/jama.2021.10366

RELATED ARTICLES FIGURES

In 2016, a tobacco product commonly referred to as nicotine pouches entered the US market. These pre-filled, microfiber pouches contain nicotine powder that dissolves in the mouth without requiring spitting. Nicotine pouches contain nicotine salts that deliver high levels of nicotine with less irritation than the free-base nicotine in most smokeless tobacco products.[1,2] Nicotine is highly addictive, harms fetal development, and can harm brain development through age 25 years.[3] Leading smokeless tobacco manufacturers sell nicotine pouches in varying strengths and flavors as the brands on! (Altria), Velo (British American Tobacco [BAT]), and ZYN (Swedish Match). Marketing materials describe the products as "tobacco-free," "all white," and more discreet and convenient than electronic and conventional cigarettes.[2,4]

Sections PDF Share

## Methods

Data for all US sales of nicotine pouches from March 27, 2016, through June 13, 2020, were licensed from the Nielsen Company for convenience, club, discount, and dollar stores; mass merchandisers; supermarkets; pharmacies; and military commissaries in the contiguous 48 states and Washington, DC. National-level unit and dollar sales for each universal product code (UPC) were provided in 4-week aggregates.

Nicotine pouch products were identified through external market research and review of UPC variables. One unit was defined as a container of (typically 15-20) nicotine pouches. Unit sales were aggregated by year, manufacturer, flavor, and venue. Shares of unit sales by manufacturer were calculated as a proportion of total unit sales. Dollar sales were inflation adjusted to 2020 dollars. Average monthly percentage change (AMPC) in unit sales and 95% CIs, by manufacturer and flavor, were calculated using Joinpoint version 4.8.0.1 (National Cancer Institute), a segmented regression analysis application. Statistically significant AMPCs did not cross 0.

## Results

Nicotine pouch sales were observed among 5 manufacturers, with Swedish Match and Altria data first appearing in July and August 2016, respectively; Kretek International in February 2018; and BAT and Rogue in July and November 2019, respectively.

Nicotine pouch sales increased from 163 178 units ($709 635) in 2016 to 45 965 455 units ($216 886 819) during the January to June 13, 2020, period (July 2016–June 2020 unit AMPC, 10.9 [95% CI, 10.4-11.4]; Figure 1). Mint flavors (including spearmint and wintergreen) were most commonly sold across the study period. However, during the January 2019–June 2020 period, unit sales of fruit-flavored nicotine pouches (AMPC, 19.2 [95% CI, 14.2-24.5]) increased more rapidly than mint (AMPC, 10.1 [95% CI, 8.5-11.8]) and other nonfruit or nonmint flavors (AMPC, 9.3 [95% CI, 8.1-10.4]; Figure 2).

View Large Download

**Figure 1. Nicotine Pouch Unit Sales in the US by Manufacturer, July 1, 2016–June 13, 2020**

Sections PDF Share




One unit was defined as a container of (typically 15-20) nicotine pouches. As of November 2020, Dryft is sold under the Velo brand by British American Tobacco.

View Large Download

**Figure 2. Mean Quarterly Unit Sales of Nicotine Pouches in the US by Flavor, 2016-2020**




Sections PDF Share

One unit was defined as a container of (typically 15-20) nicotine pouches. Estimated from annual sales divided by quarters of data available. The fruit category includes Altria's berry and citrus; British American Tobacco's citrus; Kretek International's black cherry, citrus, and dragon fruit; Rogue Holdings' honey lemon and mango; and Swedish Match's citrus. The mint category includes Altria's and British American Tobacco's mint, Kretek International's peppermint, Rogue Holdings' peppermint, and Swedish Match's cool mint and peppermint. The spearmint category includes Kretek International and Swedish Match. The wintergreen category includes Altria, Kretek International, Rogue Holdings, and Swedish Match. The cinnamon category includes Altria, Kretek International, and Swedish Match. The coffee category includes Altria, Kretek International, and Swedish Match. Altria's original flavor (0.015% of unit sales) was excluded because it did not fit within the aforementioned categories.

Swedish Match led unit share, peaking at 92.6% in July 2019. By June 2020, Swedish Match comprised 78.7% of unit share, followed by Altria (10.0%), BAT (7.6%), Rogue (2.4%), and Kretek International (1.3%). Convenience stores accounted for 97.7% of total sales.

## Discussion

Sales of nicotine pouches have increased considerably since 2016. Convenience stores were the primary nicotine pouch sales venue, and Swedish Match led unit sales. However, during the COVID-19 pandemic, BAT reports "pivoting consumer activations into digital"[5]; additionally, a nicotine pouch e-commerce site reported 250% US sales growth during the January-June 2020 period.[4]

All tobacco products, including nicotine pouches, are regulated by the US Food and Drug Administration (FDA). Manufacturers of nicotine pouches are required to submit certain product information to the FDA, convey nicotine warnings, and comply with marketing restrictions.

Limitations of the study include that it could not assess purchaser age. Data may reflect sales to adults or direct or indirect sales to youth. Additionally, sales may be underestimated because data do not include e-commerce or tobacco specialty store transactions.

Noncombustible nicotine products might benefit nonpregnant adults if used as complete smoking substitutes.[3] However, nicotine pouches have similar nicotine content to conventional tobacco products[6]; nicotine is addictive and poses significant health risks for young people.[3] Moreover, nicotine pouches' flavors and marketing for discreet use mirror e-cigarette marketing tactics known to attract nicotine-naive young people.[1,3] Given the expanding range of tobacco products, clinicians should ask patients about any tobacco product use, including nicotine pouches.[3]

Sections PDF Share

## Article Information

**Corresponding Author:** Kristy L. Marynak, MPP, Office on Smoking and Health, Centers for Disease Control and Prevention, 4770 Buford Hwy, MS S107-7, Atlanta, GA 30341 (kmarynak@cdc.gov).

**Accepted for Publication:** June 8, 2021.

**Author Contributions:** Mr Borowiecki and Dr Kim had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.

*Concept and design:* Marynak, Wang, Borowiecki, Tynan, King.

*Acquisition, analysis, or interpretation of data:* All authors.

*Drafting of the manuscript:* Marynak, Borowiecki, King.

*Critical revision of the manuscript for important intellectual content:* Marynak, Wang, Kim, Tynan, Emery, King.

*Statistical analysis:* Marynak, Borowiecki, Kim.

*Obtained funding:* King.

*Administrative, technical, or material support:* Wang, Tynan, King.

*Supervision:* Kim, Tynan, Emery, King.

**Conflict of Interest Disclosures:** None reported.

**Funding/Support:** This work was funded by the US Centers for Disease Control and Prevention (CDC).

**Role of the Funder/Sponsor:** The CDC participated in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, and approval of the manuscript; and decision to submit the manuscript for publication.

**Disclaimer:** The findings and conclusions in this report are those of the authors and do not necessarily represent the official position of the CDC. Use of trade names is for identification only and does not imply endorsement by the CDC, the Public Health Service, or the US Department of Health and Human Services.

## References

Sections PDF Share

doi:10.1080/17425247.2020.1814736
PubMed | Google Scholar | Crossref

2. Robichaud MO, Seidenberg AB, Byron MJ. Tobacco companies introduce "tobacco-free" nicotine pouches. *Tob Control*. 2020;29(e1):e145-e146.
PubMed | Google Scholar

3. US Department of Health and Human Services. e-Cigarette use among youth and young adults: a report of the Surgeon General. Published 2016. Accessed May 14, 2021. https://e-cigarettes.surgeongeneral.gov/documents/2016_SGR_Full_Report_non-508.pdf

4. Nicokick website. Accessed January 13, 2021. https://nicokick.com/us/about-us/

5. British American Tobacco. British American Tobacco 2020 interim results transcript from presentation webcast and Q & A conference call on July 31, 2020. Accessed April 1, 2021. https://www.bat.com/group/sites/UK__9D9KCY.nsf/vwPagesWebLive/DOBUYN5F/$file/HY_2020_Presentation_Transcript.pdf

6. Stanfill S, Tran H, Tyx R, et al. Characterization of total and unprotonated (free) nicotine content of nicotine pouch products. *Nicotine Tob Res*. Published online May 26, 2021. doi:10.1093/ntr/ntab030
PubMed | Google Scholar

View Full Text | Download PDF

Sections PDF Share

# Tab 60

Redacted Plaintiff's TRO Hearing Exhibit 14

U.S. District Court
Middle District of Florida
PLAINTIFF'S EXHIBIT

Exhibit Number: 14

Case Number:
8:26-cv-483-MSS-CPT

The C Store Depot, Inc., et al.
v.
US Food & Drug Administration, et al.

Date Identified:
February 27, 2026

Date Admitted:
February 27, 2026

# PUBLIC / REDACTED VERSION

U.S. FOOD & DRUG ADMINISTRATION

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

January 30, 2026

**REFUSE TO FILE**

Zest Brands LLC
Attention: Inga Nasi, CEO
6303 Blue Lagoon Drive, Suite 400
Miami, FL 33126

**FDA Submission Tracking Numbers (STNs):** [redacted], see Appendix A

Dear Inga Nasi:

We completed a preliminary review of your PMTAs[1] and determined that these applications do **not** meet the filing requirements for a new tobacco product seeking a marketing order under section 910(b) of the FD&C Act.[2] As a result, we are refusing to file the applications for the new tobacco products identified in Appendix A, effective the date of this letter. Refer to Appendix B for a list of amendments and additional submissions received.

Your applications lack the following required information necessary for substantive scientific review per section 910(b) of the FD&C Act and 21 C.F.R. § 1114.7:

[redacted]

[redacted]

[redacted]

[1] Premarket Tobacco Product Applications (PMTAs)
[2] Federal Food, Drug, and Cosmetic Act (FD&C Act)

[redacted]

Refer to Appendix C for additional information to consider submitting in future submissions. The information provided in this letter may not represent a complete list of comments and potential deficiencies.

**You cannot introduce or deliver for introduction these new tobacco products into interstate commerce. The manufacture, sale, and/or distribution of these products, as new tobacco products that lack FDA authorization, is prohibited by law and subject to enforcement action by FDA unless and until the products receive such authorization. See generally FD&C Act section 301. These actions may include, but are not limited to, civil money penalties, including an enhanced civil money penalty under FD&C Act section 303(f)(9)(B)(i), seizure, criminal prosecution, and/or injunction. In addition, tobacco products offered for import into the United States that appear to be adulterated and/or misbranded may be detained or refused admission. It is your responsibility to ensure new tobacco products you manufacture, sell, and/or distribute comply with all applicable statutory and regulatory requirements under the FD&C Act and FDA's implementing regulations.**

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[3,4] using eSubmitter.[5] Alternatively, submissions may be mailed to:

Food and Drug Administration
Center for Tobacco Products
Document Control Center (DCC)
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

---

[3] For more information about CTP Portal, see http://www.fda.gov/TobaccoProducts/GuidanceComplianceRegulatoryInformation/Manufacturing/ucm515047.htm
[4] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[5] For more information about eSubmitter, see https://www.fda.gov/industry/fda-esubmitter

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[6]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

If you have any questions, please contact Shapol Warmzyary, Regulatory Health Project Manager, at (240) 402-5995 or Shapol.Warmzyary@fda.hhs.gov.

Sincerely,

Digitally signed by Benjamin Apelberg -S
Date: 2026.01.30 16:36:56 -05'00'

Benjamin Apelberg, Ph.D.
Deputy Director
Office of Science
Center for Tobacco Products

**Enclosures**:
Appendix A – New Tobacco Products Subject of This Letter
Appendix B – Amendments and Additional Submissions Received for This Applicant
Appendix C – Additional Comments That May Be Considered for Future Nicotine Pouch Product Submissions

[6] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Appendix B**

Amendments and Additional Submissions Received for This Applicant

Amendments Received for These Applications

| [redacted] | [redacted] | [redacted] | [redacted] | |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | | | [redacted] |

## Appendix C

Additional Comments That May Be Considered for Future Nicotine Pouch Product Submissions

The following additional comments are intended to provide the types of information that should be included in a future submission for a nicotine pouch product. The information below is not a comprehensive list of all considerations for a future submission. You should refer to the final rule Premarket Tobacco Applications and Recordkeeping Requirements 21 C.F.R. § 1114.7 and other applicable regulations that are effective at the time you submit your PMTA.

Key product-specific information that FDA is going to focus on in the evaluation of a nicotine pouch product includes:

- **Product characterization** which includes:
  - **Complete composition:** to identify the product intended for consumer use
  - **Consistent manufacturing:** to ensure the product meets the design specifications (e.g., nicotine levels are not higher than what is on the label) and are being made in a reliable way that doesn't introduce hazards (e.g., glass, mold)
  - **Harmful and potentially harmful constituents and their amounts:** to confirm overall quantities of harmful constituents are not higher than those found in snus or similar types of smokeless products and that there are no ingredients of concern (e.g., flavorings that may pose significant health risks).
- **Abuse liability:** to ensure the product will not promote use more than other tobacco products with a known high abuse liability (e.g., smokeless tobacco products, combusted cigarettes) and that the product has the potential to be an alternative nicotine source for current users of more harmful tobacco products
- **Adverse experiences:** to ensure consumers or study participants have not reported serious and unexpected adverse experiences with use of the products
- **Accidental exposures:** to ensure sufficient mitigation measures, such as child resistant packaging, are used to reduce likelihood of accidental exposure
- **Marketing plan:** to evaluate youth exposure to marketing materials for the product and youth access to the product

*Product characterization*

- The application must provide information about ingredients in all components of your new tobacco product. The information provided for all ingredients must include sufficient detail to fully identify the composition; including but not limited to:
  - Ingredient names and absolute quantities (e.g., mg/ tobacco product) for all components
  - IUPAC chemical name and common name for all ingredients
  - Function of each ingredient
  - Single ingredient names and absolute quantities in each complex ingredient
    - It is important to distinguish between complex ingredients made to your specifications and those that are not. For all complex ingredients made to your specifications, you should provide complete information according to FDA's Guidance for Industry Listing of Ingredients in Tobacco Products. For complex ingredients that are not made to your specifications, you should provide

complete information on the single/individual ingredients that compose these complex ingredients.
    - For all complex ingredients, you should ensure that the comprising single/individual ingredient quantities add up to 100%.
  - If your application contains ingredient quantities that are reported with values such as "less than," "<," "NA," "N/A," "blank," or "shaded quantities" (e.g., shaded cells in Excel spreadsheets), additional explanation of the meaning of these values should be provided. What is being reported may be unclear, so you should provide justification for reporting these types of values.
- The application must provide information on each material within your product. The material should be identified as well as the quantity, including ranges or means and acceptance limits.
- The application must contain information on constituents, including HPHCs and other constituents, contained within, or emitted from, the product including but not limited to:
  - Constituent name
  - Test data including test protocols, any deviation(s) from the test protocols, quantitative acceptance (pass/fail) criteria, and line data for all testing performed
  - Test methods and instrumentation including information for in-house/custom equipment and standards used to generate test data.
- The application must contain information on other properties of a tobacco product including but not limited to:
  - Product dimensions and the overall construction of the product. This may be provided through a diagram or schematic drawing that clearly depicts the finished tobacco product and its components with dimensions, operating parameters, and materials.
  - All final design parameters of the product, specifying nominal values or the explicit range of values as well as the design tolerance (where appropriate).
  - Quantitative description of the performance criteria, including test protocols, line data, and summary of the results for each intermediate and final design parameter and manufacturing step to demonstrate that the design parameters and their associate processes are adequately controlled.
  - Information on shelf life and stability. When proposing the shelf life, data should be provided to support the total length of time. Stability testing details for each endpoint should include the:
    - mean quantity and variance with unit of measure
    - number of samples and measurement replicates for each sample
    - methods used (include the associated reference and full validation report for each method where applicable)
    - length of time between the date of tobacco product manufacture and date of testing and storage conditions of the tobacco product prior to testing
    - measurements obtained, at a minimum, at the beginning (zero time), middle, and end of the expected shelf life, from the tobacco product packaged within the same container closure system in which it is intended to be marketed
- The application must contain information on the principle or principles of operation
- The application must contain a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, packing and storage including but not limited to:
  - Narrative description with a list and summary of all standard operating procedures for manufacturing, design controls, packing, and storage
  - Examples of relevant forms and records relating to the manufacturing, design controls, packing and storage

- Identification of each facility involved in the manufacturing, packaging, storage and control for the product
  - Should identify the facility name, address, and FEI number
  - Should include information on what is occurring at each facility and how it relates to the product (e.g., specific production steps for a component of the product)
- Information on testing procedures carried out before the product is released to the market

- To facilitate automated processing of product characterization data, it is helpful for the application to use structured data models designed for tobacco product submissions such as those described within CDISC's Tobacco Implementation Guide. For assistance with data preparation, contact your Regulatory Health Project Manager (RHPM) to request sample data tables that incorporate these formatting guidelines for your products.

*Abuse liability*

- The application should include a clinical study/studies (or otherwise appropriately bridged information) that assesses the new products' abuse liability (e.g., nicotine pharmacokinetics and exposure, subjective experiences, ad libitum use behaviors) in comparison to a tobacco product(s) with known abuse liability.
- When submitted evidence does not include all the new products, the application should include scientific rationale that details how and to what extent differences between the new and study products affect abuse liability. A strong rationale would include how these differences would qualitatively and quantitatively impact abuse liability outcomes (e.g., if a product variable differs by X%, explain how this difference translates to expected changes in nicotine exposure, subjective effects, or other abuse liability measures). Scientific rationale should also include a direct comparison of product specific variables that may impact use behaviors and abuse liability (e.g., nicotine content and formulation, flavor) between the new and study products. While clinical studies provide the most robust bridging information, other types of data may be appropriate (e.g., free nicotine data, dissolution study data, bioequivalence testing).

*Adverse experiences*

- Provide a list of all adverse experiences that have occurred with the new tobacco product which are known or made known to you (e.g., through a study you conducted, a call/complaint).
- For all adverse experiences that are both serious and unexpected, it is recommended to provide your analysis of the association between the adverse experience and each new tobacco product
  - Serious adverse experience means an adverse experience that results in any of the following outcomes:
    - Death;
    - A life-threatening condition or illness;
    - Inpatient hospitalization or prolongation of existing hospitalization;
    - A persistent or significant incapacity or substantial disruption in the ability to conduct normal life functions;
    - A congenital anomaly/birth defect; or
    - Any other adverse experience that, based upon appropriate medical judgment, may jeopardize the health of a person and may require medical or surgical intervention to prevent one of the other outcomes listed in this definition.

- Unexpected adverse experience means an adverse experience occurring in one or more persons in which the nature, severity, or frequency of the experience is not consistent with:
  - The known or foreseeable risks of adverse experiences associated with the use or exposure to each tobacco product as described in the PMTA and other relevant sources of information;
  - The expected natural progression of any underlying disease, disorder, or condition of the persons(s) experiencing the adverse experience and the person's predisposing risk factor profile for the adverse experience; or
  - The results of nonclinical laboratory studies.

*Accidental Exposure*

- Manufacturers may make packaging child resistant through various mechanisms. It may be helpful to review how the Consumer Product Safety Commission (CPSC) evaluates special packaging (or child-resistant packaging). This information can be found at 16 CFR part 1700[12].
  - Part 1700.20 lays out both child and adult test requirements which meet child-resistant/adult-friendly packaging.
  - Tamper-resistance is NOT the same as child-resistant. Additionally, unless the tamper-resistant feature is part of the package's child-resistant design, it is to be removed prior to testing.
- If providing child-resistant packaging, the following information has been helpful in facilitating our review of other nicotine pouch applications:
  - Detailed schematics and description of all components of the packaging including all child-resistant, or other applicable safety mechanisms.
  - For each step in the packaging process, a description of the processing step, test data for finished product in process checks, including any in-process specifications and acceptance criteria, and corrective and preventative actions (CAPA) for nonconforming packaging.
  - All documentation and testing data related to child-resistant packaging claims, such as testing procedure reports, test data, and certifications or a General Certificate of Conformity (GCC), as described at section 14(a)(1) of the Consumer Product Safety Act (15 U.S.C. 2063(a)(1).
  - Information on shelf life and stability including data to support the total length of the proposed shelf lifetime, as well as stability testing details for each endpoint including measurements taken within the same container closure system (CCS) in which the products is intended to be marketed.
  - Considering the composition, shape, and dimensions of the products, data on the rates of choking, oral and oropharyngeal injuries involving the products in adults, children and pets to date, the dimensions of the products compared to the dimensions of known choking hazards for children, along with the plans for addressing these potential hazards.

---

[12] eCFR :: 16 CFR Part 1700 -- Poison Prevention Packaging

- CPSC does not approve, certify, or endorse any manufacturer, consultant, or testing firm; however, you may consider reviewing CPSC's website[13] for additional Poison Prevention Packaging Act (PPPA) resources including:
  - a list of manufacturers[14] that manufacture child-resistant and senior-friendly packaging
  - a list of consultants[15] who can provide services concerning child-resistant and senior-friendly packaging
  - a list of child-resistant package testing firms[16] that conduct tests or have indicated an interest in conducting tests on child-resistant packaging, according to 16 CFR 1700.20

Additional Considerations in Future Applications for Nicotine Pouches:

*Tobacco Product Master Files:*

- When submitting a PMTA that cross-references a **Tobacco Product Master File (TPMF**), you must include written authorization from the TPMF owner that grants you authorization to reference the TPMF, specify the TPMF submission tracking number, and clearly identify the content that you are referencing in the TPMF.
- To facilitate review of your PMTA, limit TPMF references to content that contains trade secret information that you do not have access to such as that for a complex purchased ingredient. Including information in the TPMF that is not trade secret and could be submitted directly in your PMTA, or in an amendment to your PMTA, creates complexity in the review process that can result in a delay in review.
- FDA considers content required to be included in your PMTA itself not appropriate for a TPMF. This includes but is not limited to:
  - Literature reviews
  - Clinical or non-clinical studies used across multiple applications
  - Manufacturing information used across multiple applications
  - Adverse experience reports
  - Environmental Assessments (EA)

Refer to the Guidance for Industry on Tobacco Product Master Files for additional information on TPMFs and how to request authorization to reference one in your PMTA.[17]

*Identification of content to support each product within a bundled submission*

- In a PMTA submission that includes multiple new tobacco products, it is important that you clearly identify which content pertains to each distinct product and show that the PMTA content requirements of Section 910(b)(1) of the FD&C Act are satisfied for each distinct product.
- FDA considers each product with a differing flavor variant and/or nicotine strength to be a different new product.

---

[13] https://www.cpsc.gov/Business--Manufacturing/Business-Education/Business-Guidance/PPPA
[14] https://www.cpsc.gov/Regulations-Laws--Standards/Statutes/Poison-Prevention-Packaging-Act/Manufacturers-of-Child-Resistant-Senior-Friendly-Packaging
[15] https://www.cpsc.gov/Regulations-Laws--Standards/Statutes/Poison-Prevention-Packaging-Act/Consultants-for-Child-Resistant-Senior-Friendly-Packaging
[16] https://www.cpsc.gov/Regulations-Laws--Standards/Statutes/Poison-Prevention-Packaging-Act/Child-Resistant-Package-Testing
[17] Guidance for Industry: Tobacco Product Master Files. May 2016. https://www.fda.gov/media/97632/download

*Labeling*

- A PMTA must include specimens of the **labeling** proposed to be used for the new tobacco product (FD&C Act Section 910(b)(1)(F)).
- Provide the following information on labeling:
    - specimens that are legible,
    - reflect the actual size and color for use with the new tobacco product,
    - show all portions of the container closure system (e.g., top, bottom, sides of can),
    - include any warning statements appropriate for the product class where applicable, and
    - comply with all other applicable labeling requirements under the FD&C Act.

*Environmental assessment*

- An environmental assessment (EA) must be submitted as part of a PMTA.
- An EA shall focus on relevant environmental issues for your tobacco product and is to be a concise, objective, and well-balanced document that allows the public to understand the agency's decision per 21 CFR 25.40(a), and should include all of the following:
    - Discussion of the need for the proposed action (i.e., FDA issuance of marketing granted order for your tobacco product)
    - Discussion of alternatives as required by section 102(2)(E) of the National Environmental Protection Act (NEPA)
    - Environmental impacts of the proposed action and alternatives
    - Listing of the agencies and persons consulted
    - Relevant environmental issues relating to product use and disposal from use
- In your EA it is recommended to provide a discussion of relevant environmental issues relating to product manufacturing.
- Mark all confidential information as such and include it in confidential appendices in the EA, as EAs are subject to public disclosure per 21 CFR 25.51(a).
- Refer to the following resources on the CTP website for more information with respect to EAs for tobacco products:
    - *Environmental Assessment & Claims of Categorical Exclusion*,[18] presented during the 2018 Tobacco Product Application Review – A Public Meeting[19]
    - *Lessons Learned from PMTA Reviews,*[20] presented during the 2019 Deemed Tobacco Product Applications – A Public Meeting (information on EAs begins on slide 33)[21]
    - FDA's Premarket Tobacco Product Marketing Orders website[22] for examples of EAs that comply with 21 CFR Part 25
    - Guidance for Industry: National Environmental Policy Act; Environmental Assessments for Tobacco Products; Categorical Exclusions – Small Entity Compliance Guide.[23]
- While alternative formats may be used, inclusion of a certification in your EA such as the one below containing a signed and dated statement would promote efficiency in the review process.

---

[18] https://www.fda.gov/media/117503/download
[19] https://www.fda.gov/tobacco-products/ctp-newsroom/tobacco-product-application-review-public-meeting
[20] https://www.fda.gov/media/133444/download
[21] https://www.fda.gov/tobacco-products/ctp-newsroom/deemed-tobacco-product-applications-public-meeting-10282019-10292019
[22] https://www.fda.gov/tobacco-products/premarket-tobacco-product-applications/premarket-tobacco-product-marketing-orders
[23] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/national-environmental-policy-act-environmental-assessments-tobacco-products-categorical-exclusions

"The undersigned official, on behalf of [insert company name] certifies that the information presented is true, accurate, and complete."

_________________________
(Date)

____________________________
(Signature of responsible official)

________________________________________
(Name and title of responsible official, printed)

*Presubmission meeting*

- To ensure that your application contains necessary elements to support an APPH determination for a nicotine pouch product, it may be beneficial to meet with FDA prior to submission.
- If meeting with FDA before submission of a future application, appropriate time should be allotted to hold the meeting and incorporate any advice or information gained.
- When requesting a meeting, the following should be provided in your meeting information package:
    - Identification of products subject of the intended application
    - A brief statement of the purpose of the meeting, which could include discussion of the types of studies or data to be discussed at the meeting, the general nature of the primary questions to be asked and where the meeting fits in the overall product development plans
    - A preliminary list of the specific objectives/outcomes expected from the meeting
    - A preliminary list of specific critical questions, grouped by discipline
    - The approximate date on which supporting documentation (i.e., the information package described in section III.K of the *Guidance*[24]) will likely be received by FDA
    - Suggested format of the meeting (e.g., conference call, in person meeting at FDA offices, video conference, or written response) and suggested dates and times for the meeting. Meetings are usually scheduled for 1 hour.

  Additionally, your meeting information package should include the following information, as relevant to the critical questions raised in your meeting request:
    - Product composition and design data summary
    - Manufacturing and process control data summary as well as identification of all manufacturing sites, including the steps they are involved in within the process of the manufacture for the new tobacco product
    - Clinical data summary which addresses abuse liability including types of data that will be provided

Refer to the Guidance for Meetings with Industry[25] for additional information that should be included in your meeting request.

[24] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/meetings-industry-and-investigators-research-and-development-tobacco-products-revised

[25] Meetings with Industry and Investigators on the Research and Development of Tobacco Products (Revised). September 2022, available: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/meetings-industry-and-investigators-research-and-development-tobacco-products

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2026, I electronically filed the foregoing Appendix with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system, causing copies to be served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ *Eric N. Heyer*
Eric N. Heyer

*Attorney for Plaintiffs-Appellees*
*The C Store Depot, Inc.*
*and Zest Brands LLC*